**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **KWAME AJAMU and WILEY BRIDGEMAN,** | **Case No.** |
| **Plaintiffs,** | |
| **v.** | **Judge** |
| **CITY OF CLEVELAND, Estates of former Cleveland Police Detectives EUGENE TERPAY, JAMES T. FARMER, and JOHN STAIMPEL, Estate of former Cleveland Police Sergeant PETER COMODECA, former Cleveland Police Detective FRANK STOIKER, former Cleveland Police Sergeant JAMES WHITE, former Cleveland Police Detective ENGELHART, Badge No. 242, former Cleveland Police Detective MICHAEL CUMMINGS, and as-yet unidentified current or former employees of the City of Cleveland,** | **Magistrate Judge** |
| **Defendants.** | |
| | **JURY TRIAL DEMANDED** |

**COMPLAINT AND JURY DEMAND**

Plaintiffs, Kwame Ajamu (formerly known as Ronnie Bridgeman) and Wiley Bridgeman, state as follows for their Complaint:

**INTRODUCTION**

1.      Kwame Ajamu and Wiley Bridgeman are brothers who, along with their friend

Ricky Jackson, were wrongfully incarcerated in 1975 for a murder that they did not commit.

Ajamu (then known as Ronnie Bridgeman) was arrested when he was 17 years old.  His older

brother, Wiley Bridgeman, was 20 years old.  They, along with 18-year-old Ricky Jackson, were

convicted and sentenced to death for the murder of Harold Franks.

2.      All three men (Ajamu, Bridgeman, and Jackson) had their death sentences later

changed to a term of life imprisonment.

3.      These men were finally exonerated in November 2014.  Not counting time on

parole, Ajamu's wrongful imprisonment totaled approximately 25 years; Bridgeman's totaled

more than 37 years.

4.      The men were exonerated after the one and only supposed "eyewitness" who

testified against them at their criminal trials—Edward ("Eddie") Vernon—finally came forward

to tell the truth: that as a 12-year-old boy, Eddie was threatened and coerced by Cleveland police

detectives into falsely testifying against Jackson and the Bridgeman brothers, and that his

statements implicating them in the crime were a complete fabrication created by the detectives.

5.      Misconduct by Cleveland police detectives and those working in concert with

them caused Ajamu and Bridgeman's wrongful convictions.  This misconduct included, but was

not limited to, the following: witness manipulation; fabrication, destruction, and suppression of

evidence; and perjury.  Ajamu and Bridgeman therefore bring this action under 42 U.S.C. § 1983

and Ohio law seeking redress for the wrongs done to them, as well as to deter future misconduct.

Jackson has also recently filed suit, Case No. 1:15-cv-989, in this district.[1]

### JURISDICTION AND VENUE

6.     This action arises under the laws of the United States, and jurisdiction is conferred

on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

Supplemental jurisdiction of the Court over the claims arising under state law is invoked under

28 U.S.C. § 1367 (supplemental jurisdiction).

7.     Venue in the Northern District of Ohio is proper under 28 U.S.C. § 1391(b),

because it is the district in which many if not all of the defendants reside, and because a

substantial part of the events or omissions giving rise to the claims occurred within the Northern

District of Ohio.

### PARTIES

8.     Plaintiff **Kwame Ajamu** (formerly Ronnie Bridgeman) is a 57-year-old resident

of Cleveland, Ohio.  Plaintiff **Wiley Bridgeman** is a 60-year-old resident of Cleveland, Ohio.

At the time of their arrest in May 1975, Ajamu was 17 years old and Bridgeman was 20 years

old, and they were living with their family in Cleveland.

9.     Defendant **City of Cleveland** is an Ohio municipal corporation that operates the

Cleveland Police Department.  Under the doctrine of *respondeat superior*, the City is liable for

---

[1] For simplicity, we have attempted to keep the structure and numbering of this
Complaint similar to Jackson's.

all torts committed by the Defendant Officers while employed by the City.  The City is additionally responsible for the policies and practices of the City and the Police Department.

10.     Defendant **Estate of Eugene Terpay** ("Defendant Terpay") is joined as a successor-in-interest to Eugene Terpay, who at all times relevant to this Complaint was a Cleveland Police Detective.

11.     Defendant **Estate of James T. Farmer** ("Defendant Farmer") is joined as a successor-in-interest to James T. Farmer, who at all times relevant to this Complaint was a Cleveland Police Detective.

12.     Defendant **Estate of John Staimpel** ("Defendant Staimpel") is joined as a successor-in-interest to John Staimpel, who at all times relevant to this Complaint was a Cleveland Police Detective.

13.     Defendant **Estate of Peter Comodeca** ("Defendant Comodeca") is joined as a successor-in-interest to Peter Comodeca, who at all times relevant to this Complaint was a Cleveland Police Sergeant.

14.     Defendant **Frank Stoiker** was at all times relevant to this Complaint a Cleveland Police Detective.

15.     Defendant **James White** was at all times relevant to this Complaint a Cleveland Police Sergeant.

16.     Defendant **Engelhart**, Badge No. 242, was at all times relevant to this Complaint a Cleveland Police Detective.

17.     Defendant **Michael Cummings** was at all times relevant to this Complaint a Cleveland Police Detective.

4

18.     **As-yet unidentified current or former employees of the Cleveland Police Department** were at all times relevant to this complaint law-enforcement officers within the Department.

19.     Defendants Terpay, Farmer, Staimpel, Comodeca, Stoiker, White, Engelhart, Cummings, and as-yet unidentified current or former employees of the Cleveland Police Department are referred to as the "**Defendant Officers**."  At least one of the Defendant Officers was, at all times relevant, a final policymaker, or had been delegated such authority, for the Defendant City.

20.     At all times relevant, the Defendant Officers acted under color of law and within the scope of their employment for the Defendant City and the Department.  The Defendant Officers are sued in their individual capacities.  Additionally, they are sued in their official capacities.

# FACTS

## Three Friends Grow Up on Arthur Avenue

21.     Ricky Jackson and his family moved to Ohio in 1972, into a house on Arthur Avenue in Cleveland.

22.     Jackson became friends with Ajamu (then Ronnie Bridgeman, also known as "Bitsey") and Bridgeman (also known as "Buddy"), two brothers who lived a few houses down. In 1975, Jackson and Ajamu were teenagers, and Wiley Bridgeman was 20 years old.  They are all African-American.

5

23.     These friends were about to unnecessarily lose their upcoming adult lives to wrongful incarceration.

### The Murder of Harold Franks

24.     On the afternoon of May 19, 1975, Harold Franks was shot and killed outside of Fairmont Cut-Rate, a drugstore on Fairhill Avenue near the street where Jackson and the Bridgeman brothers lived.

25.     Franks was a money-order salesman.  He was killed as he left the Fairmount Cut-Rate after conducting business there.  The two assailants had thrown acid in his face, beat him over the head, stole his briefcase containing cash and money orders, and shot him twice in the chest.  The shooter also fired a third shot into the store, wounding the storeowner's wife, Anna Robinson.

### The Evidence

26.     Neither the Bridgeman brothers nor Jackson had anything to do with the robbery and murder of Harold Franks.  All three are completely innocent.

27.     Within a week of the crime, all three were arrested for the robbery and murder of Franks.

28.     There was never any physical evidence tying the Bridgeman brothers or Jackson to the crime.  Although police recovered some physical evidence from the scene, not a single piece of it was linked to the Bridgeman brothers or to Jackson.

29.     None of the Bridgeman brothers' or Jackson's fingerprints or DNA were ever found at the crime scene, nor was any incriminating evidence of any kind ever discovered in their possession.

6

30.     In fact, much of the evidence pointed to other persons.  Almost immediately after the shooting, an informant told police that he had seen the assailants escape in a two-toned green car.  The informant gave a license plate number of CC4902.  The Defendant Officers learned that this plate matched a dark green car belonging to Ishmael Hixon, whose arrest record included a robbery and shooting the year before.  The year after the Bridgeman brothers and Jackson were convicted, Hixon pleaded guilty to over a dozen counts of aggravated robbery in an unrelated case.

31.     The Defendant Officers also received information that another man, Paul Gardenshire, might have been involved in the murder.  Shortly after the shooting, Gardenshire's mother contacted the store owner and police to report that her son had a gun and that she believed he was involved in the shooting in some way.

32.     Defendant Officers also received information from a second informant, Ed Garrett, that implicated Gardenshire in the shooting.  Garrett told the Defendants that Gardenshire had stolen his grandfather's .38 caliber handgun, which was the same caliber gun used in the crime.  He also reported that Gardenshire was driving around in a green convertible, which matched the initial description of the two-toned green car the assailants used to flee the scene.  Neither of these details was public knowledge at the time Garrett provided this information to Defendants.  Defendant Terpay found Gardenshire's green convertible where Garrett said it would be.

        a.  Garrett also told authorities that additional named suspects, including known police informants, may also have participated in the crime.

33.     Despite these leads, the Defendant Officers did not conduct any serious investigation into Hixon, Gardenshire, or any other suspects.  The Defendant Officers'

investigation into these suspects ended around the time that the Bridgeman brothers and Jackson were supposedly identified by a single 12-year-old "eyewitness" named Eddie Vernon.

## Fabrication of Eddie Vernon's Testimony

34.     The only evidence ever linking Ajamu and Bridgeman to the crime was the testimony of Eddie Vernon, who claimed that he saw the brothers and Jackson commit the crime.

35.     In actuality, Eddie did not see who committed the crime and had no information or knowledge suggesting that the Bridgeman brothers or Jackson were involved.  At the time of the shooting, Eddie was a seventh grader on a school bus coming home from junior high school with other children.  He heard shots while he was on the bus but did not see anything.  He was familiar with the Bridgeman brothers and Ricky from the neighborhood, but he did not see them commit any crime.

36.     Eddie was one of a number of children who walked to the scene of the shooting from the bus stop after the shooting had occurred.  After the police began pushing back the crowd of people observing the scene, Eddie and a friend, Tommie Hall, left the scene.

37.     As Eddie and Tommie walked home, Tommie allegedly told Eddie that he knew who committed the crime, and that it was "Ricky," "Buddy," and "Bitsey."  Tommie, who was only a year or two older than Eddie, had also not seen who had committed the crime—he and Eddie were on the school bus at the same time when the shooting occurred.

38.     After stopping by his home, Eddie went back to the scene of the crime.  There, he purportedly told the police that he knew who may have committed the crime.  Although he had not witnessed the crime, Eddie thought at the time that he was being helpful.  But things quickly spiraled out of control.

8

39.     Sometime over the course of the next several days, one or more of the Defendant Officers, including Defendants Terpay, Farmer, and Comodeca, questioned Eddie without his mother or other guardian present.  Eddie told the Defendants that he did not see any of the assailant's faces.  Defendants Terpay and Farmer also showed Eddie photographs of potential suspects, but he did not identify anyone out of those photographs.

40.     One or more of the Defendant Officers, including Defendants Terpay, Farmer, and Comodeca, engaged in unduly leading and coercive questioning and fed Eddie details about the crime, including where Franks was shot, that acid was thrown in his face, and that he was hit over the head.  Eddie knew none of this information because he did not witness the crime.  The Defendant Officers interrogated Eddie without a guardian present.

41.     Defendants Terpay and Farmer took Eddie for a ride around the neighborhood and told him to point out the houses of "Buddy" and "Ricky."

42.     On May 25, 1975, Wiley Bridgeman and Ricky Jackson were arrested.  Ronnie Bridgeman (Kwame Ajamu) was arrested initially only for interfering with police procedure during the course of his brother's arrest.

43.     One or more of the Defendant Officers, including Defendants Terpay and Famer, interrogated Jackson and Wiley Bridgeman separately regarding the murder of Franks.  During Jackson's interrogation, Defendants Terpay and Farmer repeatedly put a phone book on Jackson's face and other areas of his body and hit him through it so that it would not leave any marks.  Defendant Terpay also called Jackson "nigger" and tried to coerce him into falsely confessing to the crime.

44.     Despite this abuse, Jackson did not falsely confess to the crime.

9

    a.   Wiley Bridgeman was also interrogated by one or more of the Defendant Officers, including Defendant Staimpel.   Defendant Staimpel told Bridgeman that he should confess and that "a wise man would take 10 years" as a sentence.  Nonetheless, Bridgeman did not falsely confess to the crime.

    b.   Ronnie Bridgeman (Ajamu) was never interrogated and never falsely confessed to the crime.

45.     At Defendants Terpay and Farmer's direction, Defendants Stoiker and Staimpel picked up Eddie from his home and brought him alone to the police station to view a lineup with Wiley Bridgeman and Jackson in it.  Defendants White and Cummings were also involved in conducting the lineup.

46.     Eddie tried to come clean about not knowing who committed the crime.  During the lineup, Eddie did not identify anyone he recognized as being involved in the crime, because he did not witness the crime.  He told Defendants Stoiker, Staimpel, White, and Cummings that he did not recognize anyone.

47.     After Eddie failed to identify Jackson and Wiley Bridgeman in the lineup, the Defendant Officers were furious at Eddie.

48.     One or more of the Defendant Officers, including Defendants Stoiker, Staimpel, White and Cummings, took Eddie alone into a separate room.  Defendants Stoiker, Staimpel, White, and/or Cummings began yelling at Eddie, calling him names, throwing things around the room, and slamming and beating on the table.  The Defendants told Eddie that he was lying, and they threatened to put his mother and father in jail if he backed out.  Eddie was scared, did not

understand what was happening, and began to cry. Eddie's mother was sick at that time, and the prospect of her going to jail was very scary to him as a 12-year-old boy.

49.     With Eddie terrified and in tears, one or more of the Defendant Officers, including Defendants Staimpel and Stoiker, told Eddie not to worry and that they would "fix it." Defendants Staimpel and Stoiker told Eddie to say that he was scared during the lineup and that that was the reason why he did not pick anyone out. Eddie was not, in fact, scared to pick anyone out of the lineup; the reason he did not pick anyone out of the lineup was because he had no actual knowledge that Jackson or the Bridgeman brothers had committed the crime.

50.     Eddie told the Defendant Officers that he did not see what happened, but they threatened him and told him that if he did not testify against Jackson and the Bridgeman brothers, Eddie's mother and father would be arrested. Eddie did not believe that he had any choice but to go along with the statement the Defendant Officers fabricated for him.

51.     After the lineup, one or more of the Defendant Officers, including Defendants Staimpel, Stoiker, and Cummings, engaged in suggestive identification procedures by showing Eddie single photos of Jackson, Wiley Bridgeman, and Ronnie Bridgeman (Ajamu).

52.     Defendants Staimpel, Stoiker, and Engelhart prepared a written statement for Eddie falsely implicating Jackson and the Bridgeman brothers in the crime.

53.     All of the Defendant Officers knew that what they put in Eddie's statement was not true and that it contained information they fed to him.

54.     After the lineup, Defendants Terpay and Farmer got Eddie out of school. Defendant Terpay knew what had happened during the lineup and knew about Eddie's fabricated

11

statement, and he told Eddie that he was mad at him for not picking anyone out of the lineup at first.

55.     In addition, the Defendant Officers ignored other evidence that exculpated Jackson and the Bridgeman brothers.  For instance, a girl named Karen Smith viewed the same lineup because she walked past the assailants on her way into the store as Harold Franks was heading out of the store.  Smith told the Defendant Officers that she was positive Jackson and Wiley Bridgeman were not the ones she had seen outside the store, because she knew Jackson and Bridgeman from the neighborhood.

56.     Moreover, both the Jackson house and Bridgeman house were thoroughly searched by the police, and nothing connecting Jackson or the Bridgeman brothers to the crime was found.  Defendants Terpay, Farmer, Staimpel, and Stoiker searched the Jackson and Bridgeman homes even though these Defendants had applied for and been denied search warrants by the prosecutor's office.

57.     Eddie testified against Jackson and the Bridgeman brothers in 1975.  Eddie testified against Wiley Bridgeman again in 1977 at a retrial.  During this time, one or more of the Defendant Officers, including Defendant Terpay, continued to meet with Eddie to rehearse the false testimony they had made up for him.  The more they discussed the crime, the more information the Defendant Officers fed Eddie.

58.     One or more of the Defendant Officers, including Defendant Terpay, also created notes or memoranda of their interviews with Eddie containing exculpatory information, which they destroyed.

59.     One or more of the Defendant Officers, including Defendants Staimpel, Stoiker, Terpay, and Farmer, fabricated police reports indicating that Eddie possessed independent knowledge of facts from the crime that only someone who witnessed the crime would know.

60.     The Defendant Officers never disclosed to the prosecutors, nor to the Bridgeman brothers or their counsel, the following: (1) that they fabricated Eddie's inculpatory statement; (2) that Eddie could not identify anyone in the lineup because he had not witnessed the crime; nor (3) that they had created false police reports.  The Defendant Officers never disclosed to the prosecutors, nor to the Bridgeman brother or their counsel, any of their misconduct described in this Complaint.

61.     At the time of their trials, the Bridgeman brothers did not know that the police had threatened Eddie into testifying falsely against them.  The first time they heard about the police threatening Eddie into providing false testimony was in 2014.

62.     If the prosecutors had known that the Defendant Officers fabricated evidence and committed the other misconduct described, they would not have pursued the prosecution of the Bridgeman brothers, and their unlawful detention would not have been continued.

63.     Given that the entirety of the State's case against the Bridgeman brothers rested on Eddie's testimony, the exculpatory evidence described in the preceding paragraphs would have been material, if not critical, to the Bridgeman brothers' defense of their criminal charges.

**Kwame Ajamu's and Wiley Bridgeman's Wrongful Convictions**

64.     In 1975, in separate trials, the Bridgeman brothers were tried for Harold Franks' robbery and murder, and for the attempted murder of Anna Robinson.  On the basis of Eddie's testimony, the Bridgeman brothers were convicted of aggravated murder, aggravated robbery,

and attempted aggravated murder. They were later both sentenced to death by electric chair. Throughout the proceedings, and throughout their lives, they maintained their innocence.

65.     The Bridgeman brothers never indicated that they would plead guilty nor implicate each other or Ricky Jackson in the crime, because they were all innocent and had committed no crime.

66.     Had the Defendant Officers disclosed their fabrication of Eddie Vernon's testimony at the time of the original trial to prosecutors, or to the Bridgeman brothers or their counsel, the prosecution would not have been pursued and the Bridgeman brothers would not have been convicted.

67.     At all relevant times, the stated policy of the attorneys in the Cuyahoga County Prosecutor's Office was to disclose all exculpatory evidence of which they were aware.

68.     The exculpatory evidence described in the preceding paragraphs was not provided by any member of the Cleveland Police Department to any member of the Prosecutor's office.

69.     The Defendant Officers' misconduct continued even after the Bridgeman brothers were convicted and during the time they were pursuing appellate and post-conviction relief. A few years after Jackson's conviction, a defense attorney contacted Eddie to ask him questions about what he saw. Defendant Terpay told Eddie that he was not allowed to talk about the incident, and that if anyone came asking questions, he should tell him and Defendant Terpay would "take care of it." Because Eddie was scared of Defendant Terpay, he did not talk to the defense attorney.

14

70.     Similarly, when Eddie was around 19 or 21 years old, another defense attorney came to talk to him.  Because the Defendant Officers had told him not to talk to anyone, he refused to talk and contacted Defendant Terpay instead.

71.     During this time, Eddie continued to be fearful of what Defendant Terpay and other officers would do if he came forward to tell the truth.

### Exoneration of the Bridgeman Brothers

72.     In 2013, Eddie told his pastor that he had given false testimony in the trials of Jackson and the Bridgeman brothers decades earlier.  Now in his 50's, Eddie could no longer bear the weight of having contributed to the wrongful incarceration of three innocent men.  He signed an affidavit to that effect.

73.     After Jackson, the Bridgeman brothers, and their attorneys became aware of Eddie's new testimony, they presented that testimony to the criminal court via motions for new trials and petitions for post-conviction relief.

74.     An evidentiary hearing was held in Jackson's case in November 2014.  Eddie testified at the hearing that Jackson and the Bridgeman brothers were innocent, that Eddie never witnessed the Franks murder, and that he was coerced and threatened by Cleveland police into making false statements against Jackson and the Bridgeman brothers.

75.     At the conclusion of the hearing, the State of Ohio withdrew its opposition to Jackson's motion for a new trial and moved to dismiss the criminal charges against Jackson.

76.     On November 21, 2014, the court granted the State's motion to dismiss, and all charges against Jackson were dismissed.  Jackson was ordered released from prison after serving more than 39 years of a life sentence.

15

a. The State then moved to dismiss the criminal charges against Wiley
Bridgeman. On November 24, 2014, the court granted the motion, and all
charges against Bridgeman were dismissed. He was ordered released from
prison after serving more than 37 years in prison. (He had been paroled
for approximately 1.5 years in the interim.)

b. The State also moved to dismiss the criminal charges against Kwame
Ajamu (Ronnie Bridgeman), who had been released on parole since 2003.
Ajamu had served more than 25 years in prison.

c. The county prosecutor's office filed separate notices regarding all three
men stating that it "considers the defendants innocent" and that they "have
been victims of a terrible injustice."

77.     All three men then filed suit in state court for a declaration that they are
"wrongfully imprisoned individuals" under state law and that they did not commit the offenses
charged, including all lesser-included offenses. The State stipulated that each of the men
qualified as "wrongfully imprisoned," and the court entered judgment declaring them so.

**The Bridgeman Brothers' Injuries**

78.     The Bridgeman brothers' years of wrongful imprisonment are both among the
longest served prior to exoneration in U.S. history.

79.     The Bridgeman brothers were wrongfully deprived of nearly their entire adult
lives. Kwame Ajamu was imprisoned at 17 years old, paroled at 45 years old, and was
exonerated at 57 years old. Wiley Bridgeman was imprisoned at 20 years old, briefly paroled for
1.5 years, and exonerated and released from prison at 60 years old. They must now attempt to

16

make lives for themselves without the benefit of decades of life experiences that ordinarily equip adults for all aspects of life.

80.     Additionally, the emotional pain and suffering caused to them by losing decades in prison during the prime of their lives is enormous.  During their wrongful incarceration, the Bridgeman brothers were stripped of the various pleasure of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  They missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love, to marry, and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.  They lost many relatives and other loved ones during their incarcerations.

81.     Not only did the Bridgeman brothers spend decades in prison as innocent men, they were also tried for capital murder, sentenced to death, and spent years on death row.

82.     They suffered various physical, mental, and emotional injuries in prison.  Ajamu was also physically assaulted by officers when he was first arrested and brought to the police station.

83.     As a result of the foregoing, Plaintiffs have suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

    a.   Among other damages, Wiley Bridgeman has also been diagnosed with mental-health issues, including schizoid-related disorder.

b.  Among other damages, Kwame Ajamu has also suffered symptoms

consistent with PTSD (post-traumatic stress disorder), including

nightmares and uncontrollable crying.

## COUNT ONE

### 42 U.S.C. § 1983 — Fourteenth Amendment:
### *Brady* Violations

84.  All of the foregoing paragraphs are incorporated as though fully set forth here.

85.  In the manner described more fully above, the Defendant Officers, acting

individually, jointly, and in conspiracy with each other, destroyed, failed to disclose, and

otherwise withheld and/or suppressed exculpatory information and material from the

prosecution, Plaintiffs, and Plaintiffs' defense counsel.

86.  The Defendant Officers were acting under color of law and within the scope of

their employment when they took these actions.

87.  The Defendant Officers' misconduct directly resulted in the unjust criminal

convictions of Plaintiffs, thereby denying them their constitutional right to a fair trial guaranteed

by the U.S. Constitution.  By their actions, the Defendant Officers thereby misled and

misdirected the criminal prosecution of Plaintiffs.  Absent this misconduct, the prosecution of

Plaintiffs could not and would not have been pursued, and there is a reasonable probability that

they would not have been convicted.

88.  Furthermore, in the manner described more fully above, one or more of the

Defendant Officers, including Defendant Terpay, continued to withhold and/or suppress

exculpatory evidence even after their criminal trials and during the time that Plaintiffs' appellate

and post-conviction efforts were pending.

89.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and/or suppressing exculpatory evidence.  For instance, it was a widespread practice and custom of the officers in the Department not to turn over investigative notes, including statements of witnesses, taken during the course of an investigation.  As a matter of practice, such memos and notes were destroyed after the creation of typewritten official reports that were placed into an investigation file.

90.    This widespread practice was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, thereby effectively ratifying it.

91.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the Department declined to implement sufficient policies or training on officers' obligation to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and related case law, even though the need for such policies and training was obvious.  The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who violated their *Brady* obligations, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

      a.  Systemic problems and lack of training within the Department in 1975 have been well documented.  Indeed, in September 1975—the very same year as the crime, arrests, and interrogations regarding the Franks

murder—the Cleveland Foundation issued a written report regarding the

Cleveland Police Department after extensive study and interviews with the

Chief of Police and many officers in the Department.  The report was

titled **"Private Sector Assistance to the Cleveland Police Department,"**

authored by John D. Maddox and Mark H. Furstenberg.  Maddox was a

local attorney and Furstenberg was the Director of Personnel for the

Boston Police Department.   The purpose of the report was to effectuate

the Cleveland Foundation's "continuing effort to assist the Department."

(4).  One main goal was to "ascertain in cooperation with the Police

Department problem areas in its operation . . . ."  Moreover, "[t]he

majority of individuals interviewed were officers of the Department who

must deal with these problems in the daily discharge of their duties."

i.   At the outset, the report recognized the lack of supervision in that

era over the massive power delegated to subordinate officers,

quoting one commentator as follows: "No other agency, so far as I

know, does so little supervising of vital policy determinations

which directly involve justice or injustice to individuals."  (1).

ii.   One of the main problems the report noted was a lack of training

within the Department.  The report emphasized that there was "an

absence of ongoing inservice training for all officers," and defined

"inservice training" as "the periodic training received by a police

officer throughout his career to maintain, update, and improve his

police knowledge and skills."  (11).   The report later noted as

20

follows: "Presently there is little formal training going on in the Department and there is little reason to believe that the Department can make a major investment in training, however much importance it may attach to training."  (27).

iii. The lack of training in the Department at that time was so severe that Cleveland police officers interviewed emphasized that it was a major concern.  As the report stated, "The need for inservice training was one of the two problems most frequently mentioned by the officers interviewed."  (27).

iv. Police corruption within the Department was another major concern noted in the report.  The year before, in 1974, the Mayor appointed the Cleveland Crime Commission to investigate police corruption, and the 1974 Cuyahoga County Grand Jury also investigated police corruption.  (13.)

v. The report also noted racial concerns with police interactions at that time, explaining that "[m]inorities dissatisfied simultaneously with the abuse they have suffered at the hands of police demanded more influence over the policies of the police department and greater access to it."  Yet, this "has produced little change in police departments."  (14.)

vi. The report further explained that the Cleveland Police Manual, titled "Rules of Conduct and Discipline," in place at that time was the same one promulgated in 1950 and was "out of date" in light of

21

national standards for appropriate policing.  (25).  The 1950

manual does not provide guidance regarding interrogations,

juvenile interrogations, or lineups.  The report recommended that

the Department draft updated policies.  This would provide much-

needed guidance to police officers on such basic issues as arrests,

lineups, and interrogations.  The report noted the benefits of having

proper policies in place: "Such policies create departmental

uniformity, provide guidance to officers in complex situations,

instill public confidence, and protect conforming officers from

civil liability."  (25).

vii.  Many of these problems in the Police Department related to

Cleveland's failing economy.  The Department saw its number

decrease by more than 700 during the 1970s.  This, along with

rising crime rates, left the Department with a reputation as a

disorganized and demoralized force.

b.  The City and the Department also had problems with racial discrimination

during this time.  In 1977, a federal court found the City guilty of

discriminating against minorities within its own ranks, with respect to

hiring and promoting police officers.

c.  Further systemic problems within the Cleveland Police Department at this

time were documented in a **1974 report by the Mayor's Crime

Commission** on police corruption and criminal conduct.

i.  This report explained that "corrupt practices have taken place within the Divisions of Police, here and throughout the Nation." (1).

ii.  The report recommended solving structural problems at the highest levels, noting that establishing a position of Director of Police would "solidify the presently diffused executive responsibility for the Police Department's Operations."  This "would establish lines of responsibility and accountability and would foster the changes necessary to correct the structural, organizational and procedural sources that can lead to police corruption and misconduct."  "More importantly, it would create the institutional conditions necessary to provide the citizens of Cleveland with the highest possible quality of police service."  (3).

iii.  This report also included in its Appendix a **1966 study by Public Administration Service on the Cleveland Police Department**, noting massive structural and organizational problems that continued into the 1970s.  This 1966 study noted that Police Division's "formal organization violates sound organizational concepts in many respects.  It is further confused by informal arrangements, power centers, and unusual lines of communications which make the apparent structure of organization virtually meaningless."  Moreover, "there is a lack of uniform policies and procedures, common objectives, and control."  (20).

23

1. This 1966 study also explained that the Department can perhaps "best be described as a loose federation."  "Such an organization precludes effective leadership, and encourages tendencies to build small empires, and to create sinecure positions."  (20).  Such "small empires" show that there are various policymakers within the Department.  Additionally, "[t]he management process of planning is conspicuously absent."  (22).  "[T]here is no sense of urgency about planning for the solution of even obviously critical problems."

2. Supervision problems were severe:  "The management process of directing is but little exercised by many commanders and effective field supervision is virtually non-existent."  "Some of the commanding officers interviewed could not fully define their own responsibilities, let alone those of subordinate elements or personnel." (22).  "The management process of controlling is little exercised in any meaningful sense, because the concept is not recognized, its significance is not appreciated and the administrative processes that make control possible are not present."  "No great improvement can be made in Cleveland's police service unless

24

organization and management are brought to higher standards."

3.  The report noted how indifferent the Department was to its own obvious shortcomings: "The problems of police and community relations are so critical in Cleveland that they warrant immediate and serious attention leading to the adoption of new concepts, policies, programs, and procedures.  Yet the division stands aloof from very serious community problems, and it has no real program directed toward the analysis of these problems, nor for their solution.  Training in police and community relations is not offered in sufficient depth or extent."   And "[n]o tactical or strategical plans have been devised."  (23).

iv.  The 1974 report on police corruption also included in its Appendix a 1972 memorandum from Mayor Ralph Perk to the Director of Safety and to the Chief of Police.  This memorandum remarked that Cleveland Police officers had recently been indicted "for offenses such as armed robbery, rape, and manslaughter . . . ." (Item F.)  The Mayor further noted that the current police manual was out of date: "Immediate steps should also be undertaken for a complete revision of the 'Rules of Conduct and Discipline' written in 1950, for members of the Cleveland Police Department so that it

25

is consistent with the requirements and conditions that exist today in 1972." (6)

d. Another study, entitled **"The Cleveland Police Department, 1970–1980"** conducted by the Cleveland Department of Police itself further noted similar problems.

    i. This report began by stating that "[c]ertain factors that have caused the level of police service to deteriorate have not been effectively addressed for many years." (1)

    ii. This report also noted the glaring lack of policies and guidance: "Patrol officers need clear guidance from their department in the form of written rules which lay out the department's expectations for their behavior.  Sometimes those rules are called policy; sometimes they are called general orders.  In Cleveland, the orders have been added on top of one another over a thirty year period, and no one in the department has an up-to-date rule book."  (4).

e. Former Cleveland Mayor Carl Stokes described that the failures of the Cleveland Police Department and its officers in the era relevant to the incidents in this Complaint went to the highest levels, including the Office of Mayor.  His autobiography, **"Promises of Power,"** published in 1973, provides some of these facts.

    i. Stokes explains that when he became Mayor in 1967, he viewed the election "as a mandate to reform the Police Department."

(171).  In his words, "This great hope became my greatest frustration, my greatest failure."

ii.  Stokes noted that Cleveland police officers were "all almost totally lacking in the training in human relations that some departments have at least made a beginning to provide." (173.)  "The most obvious, and to me the most important, failure of the police was in their dealings with the black community."

iii.  Stokes also remarked on the policy or practice under which improper or criminal conduct toward blacks was left without consequence:  "And all the police knew that few policemen faced charges or an appearance before the grand jury for shooting a black man while on duty."  (173).

iv.  Stokes noted that the officers' determination "to live by the old ways won out," and that "we were never able to penetrate their inward ways, their cohesive hostility to any change."  (174)

v.  Stokes noted that "white police had long ago decided to vigorously enforce the law only when the victims of crime were white . . . ."  (175).

vi.  Stokes also provided insight into the true leadership within the Department itself: "A clique of senior police officers actually ran the Cleveland Police Department—no matter who was chief."  (177.)

    vii.  Stokes provided insight into the mindset of certain officers at that time as well, noting that one officer attributed society's ills to "Jews, niggers and Commies." (178).

    viii.  In the end, Stokes conceded that the improvements he sought for the Police Department never occurred: "But it is true that I accomplished none of the substantive, structural reforms of the department that I had hoped for." (205).

    f.  News articles also suggest further specific misconduct by some of the particular Officer Defendants named in this Complaint. Defendant Terpay allegedly "made false statements" at a criminal trial related to a 1966 burglary. And in 1975, civil-rights attorney Stanley Tolliver filed a complaint against Terpay, alleging that he and other officers beat a confession out of his client. An investigation claimed there was no basis for the complaint.

92.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiffs' rights described in this Count was caused by the actions of policymakers for these Defendants.

93.    The Defendant City is liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

28

94.     As a direct and proximate result of the Defendants' actions, Plaintiffs'
constitutional rights were violated and they suffered injuries and damages, including but not
limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other
grievous and continuing injuries and damages as set forth above.

**COUNT TWO**

**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:**
**Fabrication of False Evidence**

95.     All of the foregoing paragraphs are incorporated as though fully set forth here.

96.     In the manner described more fully above, the Defendant Officers, acting
individually, jointly and in conspiracy with each other, fabricated evidence, including without
limitation, false police reports, fabricated statements attributed to witnesses, and fabricated
testimony offered at Plaintiffs' trials.  Defendants knowingly fabricated evidence, and a
reasonable likelihood exists that the false evidence affected the decision of the jury.

97.     The Defendant Officers were acting under color of law and within the scope of
their employment when they took these actions.

98.     The Defendant Officers' misconduct directly resulted in the unjust criminal
convictions of Plaintiffs, thereby denying them their constitutional rights to a fair trial guaranteed
by the U.S. Constitution.  Absent this misconduct, there would have been no probable cause for
Plaintiffs' continued detention, and the prosecutions of Plaintiffs could not and would not have
been pursued.  This misconduct caused Plaintiffs to be wrongfully convicted of crimes of which
they are innocent.

99.     The misconduct described in this Count was undertaken pursuant to the policy
and practice of the City and the Department in that Cleveland police officers regularly used

29

unconstitutional measures to falsely implicate criminal suspects, including by fabricating evidence, feeding information to witnesses, and engaging in leading, coercive, and unduly suggestive questioning of witnesses.

100. This widespread practice was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the conduct exhibited deliberate indifference to the problem, thereby effectively ratifying it.

101. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the Department declined to implement sufficient policies or training on the fabrication of evidence or police reports, or on the obligation not to provide details about crimes to witnesses, even though the need for such policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who fabricated evidence or fed information to witnesses, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

102. In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiffs' rights described in this Count was caused by the actions of policymakers for these Defendants.

103. The Defendant City is liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

104.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT THREE

### 42 U.S.C. § 1983 — Fourth and Fourteenth Amendments: Malicious Prosecution

105.    All of the foregoing paragraphs are incorporated as though fully set forth here.

106.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, instigated, influenced, or participated in the decision to prosecute Plaintiffs, and there was no probable cause for the criminal prosecutions. As a consequence of the criminal prosecutions, Plaintiffs suffered a deprivation of liberty apart from their initial seizure.  Plaintiffs' criminal prosecutions were terminated in their favor in a manner indicative of innocence.

107.    The Defendant Officers accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and the Defendant Officers made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

108.    Statements of the Defendant Officers regarding Plaintiffs' alleged culpability were made with knowledge that these statements were false and perjured.  In so doing, the Defendants fabricated evidence and withheld exculpatory information.

109.    In the manner described more fully above, the Defendant Officers' misconduct denied Plaintiffs their constitutional rights to procedural due process under the Fourteenth

Amendment and rights under the Fourth Amendment to be free from continued detention without probable cause.  Absent this misconduct, there would have been no probable cause for Plaintiffs' continued detention, and the prosecution of Plaintiffs could not and would not have been pursued. This misconduct caused Plaintiffs to be wrongfully convicted of crimes of which they are innocent.

110.    Furthermore, in the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiffs' substantive due process rights under the Fourteenth Amendment.

111.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

112.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and suppressing exculpatory evidence, coercing and threatening witnesses into providing false inculpatory testimony, providing their own false testimony, and fabricating false evidence.

113.    This widespread practice was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the conduct exhibited deliberate indifference to the problem, thereby effectively ratifying it.

114.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the Department declined to implement

sufficient policies or training on the disclosure of exculpatory evidence, fabrication of evidence, feeding information to witnesses, engaging in coercive, leading, or unduly suggestive questioning of witnesses, or use of coercion or threats against witnesses, even though the need for such policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who committed such misconduct, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

115.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiffs' rights described in this Count was caused by the actions of policymakers for these Defendants.

116.    The Defendant City is liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

117.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT FOUR

### 42 U.S.C. § 1983 — Failure to Intervene

118.    All of the foregoing paragraphs are incorporated as though fully set forth here.

119.     In the manner described more fully above, during the constitutional violations described here, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so.

120.     The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

121.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that Cleveland police officers regularly failed to intervene to prevent the violation of suspects' constitutional rights.

122.     This widespread practice of failing to intervene was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, thereby effectively ratifying it.

123.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the Department declined to implement sufficient policies or training even though the need for policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

124.     The Defendant City is liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

125.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT FIVE

### 42 U.S.C. § 1983 — Conspiracy to Deprive Constitutional Rights

126.    All of the foregoing paragraphs are incorporated as though fully set forth here.

127.    Prior to Plaintiffs' convictions, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves—explicitly or implicitly—to frame Plaintiffs for a crime they did not commit and thereby to deprive them of their constitutional rights, all as described in this Complaint.

128.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means.  In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiffs of these rights.

129.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

130.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

131.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not

limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT SIX

### 42 U.S.C. § 1983 — Supervisory Liability

132. All of the foregoing paragraphs are incorporated as though fully set forth here.

133. The constitutional injuries complained of here were proximately caused by (i) the intentional misconduct of the supervisory defendants, including Defendants Comodeca and White, or (ii) by these supervisory defendants being deliberately and recklessly indifferent to their subordinates' misconduct, knowing that ignoring that misconduct would necessarily violate Plaintiffs' constitutional rights.

134. Specifically, these supervisory defendants, including Defendants Comodeca and White, were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants to obtain Edward Vernon's false testimony, or these supervisory defendants were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

135. Moreover, these supervisory defendants, including Defendants Comodeca and White, were aware of and facilitated, conducted, and oversaw the withholding of exculpatory evidence, including but not limited to Edward Vernon's statement that he could not identify the perpetrators, but they failed to disclose that information, or were deliberately, willfully or recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

136.    The supervisory defendants, including Defendants Comodeca and White, were acting under color of law and within the scope of their employment when they took these actions.

137.    As a direct and proximate result of the actions of the supervisory defendants, including Defendants Comodeca and White, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT SEVEN

### Ohio State Law — Malicious Prosecution

138.    All of the foregoing paragraphs are incorporated as though fully set forth here.

139.    In the manner described more fully above, the Defendant Officers, acting maliciously, individually, jointly, and in conspiracy with each other, instituted or continued the prosecution of Plaintiffs without probable cause. As a consequence of the criminal prosecution, Plaintiffs were unlawfully seized, deprived of liberty, and wrongfully convicted of a crime for which they are innocent.  Plaintiffs' criminal prosecution was terminated in their favor in a manner indicative of innocence.

140.    The Defendant Officers accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

141.     Statements of the Defendant Officers regarding Plaintiffs' alleged culpability were made with knowledge that these statements were false and perjured.  In so doing, the Defendants fabricated evidence and withheld exculpatory information.

142.     The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

143.     Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

144.     As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT EIGHT

### Ohio State Law — Intentional Infliction of Emotional Distress

145.     All of the foregoing paragraphs are incorporated as though fully set forth here.

146.     In the manner described more fully above, Defendant Officers, acting individually, jointly, and in conspiracy with each other, intentionally or recklessly engaged in extreme and outrageous conduct that caused Plaintiffs serious, severe emotional distress as well as bodily harm.  The Defendant Officers' misconduct was the actual and proximate cause of Plaintiffs' emotional distress and bodily harm.

147.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

148.    Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

149.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT NINE

### Ohio State Law — Civil Conspiracy

150.    All of the foregoing paragraphs are incorporated as though fully set forth here.

151.    In the manner described more fully above, the Defendant Officers, acting in concert with other known and unknown co-conspirators in a malicious combination, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

152.    In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiffs and the intentional infliction of emotional distress upon them.

153.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

154.     Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

155.     As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT TEN

### Ohio State Law — *Respondeat Superior*

156.     All of the foregoing paragraphs are incorporated as though fully set forth here.

157.     While committing the acts alleged in the preceding paragraphs, the Defendant Officers were employees and agents of the Defendant City, acting at all relevant times within the scope of their employment.

158.     While committing the acts alleged in the preceding paragraphs, the behavior of the Defendant Officers was calculated to facilitate and/or promote the business for which they were employed by their employer, Defendant City.

159.     Defendant City is liable as principal for all torts committed its agents.

### COUNT ELEVEN

### Ohio State Law — Indemnification

160.     All of the foregoing paragraphs are incorporated as though fully set forth here.

161.     Ohio law provides that the Defendant City is directed to pay any tort judgment for compensatory damages for which its employees are liable within the scope of their employment activities.

162.     The Defendant Officers were employees of the Defendant City and acted within the scope of their employment at all times relevant in committing the actions and omissions described here.

## COUNT TWELVE

### 42 U.S.C. § 1983 — Fourteenth Amendment: Unconstitutional Lineup Procedure

163.     All of the foregoing paragraphs are incorporated as though fully set forth here.

164.     In the lineup procedures noted above, the Defendant Officers fabricated evidence by threatening Eddie Vernon and intimidating him into falsely identifying the Bridgeman brothers and Ricky Jackson as involved in the Franks murder.

165.     The lineup process and showing of photographs to Vernon were also impermissibly suggestive.

166.     The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

167.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and suppressing exculpatory evidence, coercing and threatening witnesses into providing false

inculpatory testimony, coercing and unduly suggesting that witnesses identify suspects in lineups or photos, providing their own false testimony, and fabricating false evidence.

168.    This widespread practice was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the conduct exhibited deliberate indifference to the problem, thereby effectively ratifying it.

169.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the Department declined to implement sufficient policies or training on the disclosure of exculpatory evidence, fabrication of evidence, feeding information to witnesses, engaging in coercive, leading, or unduly suggestive questioning of witnesses and unduly suggestive lineups and photo identifications, or use of coercion or threats against witnesses, even though the need for such policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who committed such misconduct, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

170.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiffs' rights described in this Count was caused by the actions of policymakers for these Defendants.

171.    The Defendant City is liable because the violation of Plaintiffs' rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

172.    As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT THIRTEEN

### Ohio State Law — Negligence: Willful, Wanton, and/or Reckless Conduct

173.    All of the foregoing paragraphs are incorporated as though fully set forth here.

174.    Defendant Officers failed to exercise due care and acted with malicious purpose, in bad faith, and/or in a wanton or reckless manner, and engaged in willful, wanton, and/or reckless conduct, while engaged in police functions and activities, including, but not limited to, *Brady* violations, the fabrication of false evidence, unconstitutional lineup procedures, the failure to intervene during civil-rights violations, conspiracy to deprive constitutional rights, civil conspiracy, malicious prosecution, and the intentional infliction of emotional distress.

175.    As a direct and proximate result of Defendants' willful, wanton, and/or reckless conduct, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### PRAYER FOR RELIEF

Plaintiffs Kwame Ajamu and Wiley Bridgeman respectfully request that this Court enter judgment in their favor and against Defendants City of Cleveland, Estate of Eugene Terpay, Estate of James T. Farmer, Estate of John Staimpel, Estate of Peter Comodeca, James White,

Frank Stoiker, Detective Engelhart, Michael Cummings, and other as-yet unidentified current or former employees of the City of Cleveland, awarding compensatory and consequential damages, costs, and attorneys' fees (including those pursuant to 42 U.S.C. § 1988), along with punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated:  July 2, 2015          Respectfully submitted,

KWAME AJAMU (fka Ronnie Bridgeman)
WILEY BRIDGEMAN

 /s/ Terry H. Gilbert

Terry H. Gilbert (OH 0021948)
Jacqueline Greene (OH 0092733)
FRIEDMAN & GILBERT
55 Public Sq., Suite 1055
Cleveland, OH  44113
Phone:   (216) 241-1430
Fax:      (216) 621-0427
E-mail:  tgilbert@f-glaw.com
          jgreene@f-glaw.com


David E. Mills (OH 0075400)
THE MILLS LAW OFFICE LLC
1300 West Ninth Street, Suite 636
Cleveland, OH  44113
Phone:   (216) 929-4747
Fax:      (202) 379-1767
E-mail:  dm@MillsFederalAppeals.com

*Counsel for Plaintiffs*
*Kwame Ajamu and Wiley Bridgeman*