# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KWAME AJAMU, *et al.*, | ) | CASE NO. 1:15-CV-01320 |
| | ) | |
| Plaintiffs, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT KAREN LAMENDOLA'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Karen Lamendola, in her capacity as Guardian Ad Litem for Frank Stoiker, respectfully moves for summary judgment in his favor on all claims alleged by Plaintiffs Kwame Ajamu and Wiley Bridgeman.  As set forth in the attached Memorandum in Support, qualified immunity should be granted on all federal law claims.  Moreover, summary judgment should be granted on all state law claims because Plaintiffs cannot establish the required elements of each claim and cannot prove that Stoiker is not entitled to statutory immunity under Ohio law.

Respectfully submitted,

/s/ Stephen W. Funk

| | |
|---|---|
| Amanda M. Knapp (0081948) | Stephen W. Funk (0058506) |
| aknapp@ralaw.com | sfunk@ralaw.com |
| ROETZEL & ANDRESS, LPA | ROETZEL & ANDRESS, LPA |
| 1375 East Ninth Street | 222 S. Main St., Suite 400 |
| One Cleveland Center, Ninth Floor | Akron, Ohio 44308 |
| Cleveland, OH  44114 | Telephone:  330.376.2700 |
| Telephone: 216.623.0150 | Facsimile:  330.376.4577 |
| Facsimile: 216.623.0134 | |

*Attorneys for Defendant Karen Lamendola, in her capacity as Guardian Ad Litem for Frank Stoiker*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    A.    Testimony of Edward Vernon...............................................................................2

        1.    The Shooting and Armed Robbery on May 19, 1975 ...................................2

        2.    The Line-Up on May 25, 1975. .....................................................................5

        3.    Vernon's Alleged Conversation with Terpay After The Lineup.................9

        4.    Vernon's Testimony at the 1970s Criminal Trials .......................................9

    B.    The Lack Of Evidence Against Detective Frank Stoiker. ......................................10

ARGUMENT ....................................................................................................................11

I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ALL
    SECTION 1983 CLAIMS BECAUSE PLAINTIFFS CANNOT ESTABLISH
    THAT FRANK STOIKER IS NOT ENTITLED TO QUALIFIED
    IMMUNITY IN HIS FAVOR .....................................................................................11

    A.    Stoiker Is Entitled To Qualified Immunity On Count One...................................13

        1.    Plaintiffs Cannot Demonstrate That Stoiker Withheld Exculpatory
            Evidence From The Prosecutor. ...................................................................13

        2.    Plaintiffs Cannot Show That It Was Clearly Established in 1975
            That A Police Officer In Stoiker's Position Could Be Held
            Personally Liable For The Alleged Brady Violation .................................15

    B.    Stoiker Is Entitled To Qualified Immunity On Count Two ...................................17

    C.    Stoiker Is Entitled To Qualified Immunity On Count Three .................................18

        1.    Plaintiffs Cannot Demonstrate That Stoiker Was An Active
            Participant In Their Criminal Prosecutions. ................................................18

        2.    Plaintiffs Cannot Show A Lack Of Probable Cause .................................19

        3.    Plaintiffs Cannot Show That It Was Clearly Established in 1975
            That A Police Officer In Stoiker's Position Could Be Held
            Personally Liable For Malicious Prosecution.............................................20

    D.    Stoiker Is Entitled To Qualified Immunity On Count Four.............................20

i

E.      Stoiker Is Entitled To Qualified Immunity On Count Five. ..................................22

     1.      Intracorporate Conspiracy Doctrine Bars Conspiracy Claim....................22

     2.      Plaintiffs Cannot Demonstrate That Stoiker Joined And/Or Participated In Any Alleged Conspiracy. ...................................................23

     3.      Plaintiffs Cannot Show That It Was Clearly Established in 1975 That The Intracorporate Conspiracy Doctrine Did Not Apply to § 1983..........................................................................................................24

F.      Stoiker Is Entitled To Qualified Immunity On Count Six ......................................24

G.      Stoiker Is Entitled To Qualified Immunity On Count Nine...................................26

II.      THE COURT SHOULD GRANT SUMMARY JUDGMENT AND IMMUNITY ON PLAINTIFFS' STATE LAW CLAIMS ..................................................27

A.      Stoiker Is Entitled To Immunity For All State Law Claims ..................................27

B.      Stoiker Is Entitled To Summary Judgment On Count Ten ....................................28

C.      Plaintiffs Cannot Establish The Elements Of A Malicious Prosecution Claim. .......................................................................................................................28

D.      Plaintiffs Cannot Prevail On Their State Law Conspiracy Claim. .........................29

CONCLUSION.................................................................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Ayers v. City of Cleveland,* No. 1:12-CV-753, 2013 WL 775359 (N.D. Ohio Feb. 25, 2013) ................................................................................................................ 19, 22

*Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842 (4th Cir. 1964) ................................................ 17

*Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006) ................................................................ 20

*Binay v. Bettendorf*, 601 F.3d 640 (6th Cir. 2010) ................................................................ 12

*Blakely v. Williams*, No. 3:07 CV 2689, 2008 WL 5263699 (N.D. Ohio Dec. 17, 2008) ............. 27

*Brady v. Maryland*, 373 U.S. 83 (1963) .............................................................. 14, *passim*

*Briner v. City of Ontario*, No. 1:07CV129, 2010 WL 3982755 (N.D. Ohio Oct. 7, 2010) ................................................................................................................ 23, 24

*Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009) ............................................ 28

*City & Cnty. of San Francisco, Calif. v. Sheehan*, __ U.S. __, 135 S. Ct. 1765 (2015) ... 12, 13, 17

*D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014) ........................................................ 14

*D'Ambrosio v. Marino*, Case No. 11-CV-933, 2013 WL 256312 (N.D. Ohio Jan. 23, 2013) ....................................................................................................................... 28

*Davis v. Scherer*, 468 U.S. 183 (1984) ............................................................................. 12

*DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604 (6th Cir. 2015) ................................. 23, 24, 25

*Elkins v. Summit Cty., Ohio,* No. 5:06-CV-3004, 2009 WL 1150114 (N.D. Ohio Apr. 28, 2009), *aff'd,* 615 F.3d 671 (6th Cir. 2010) ........................................................ 17, 22

*France v. Lucas*, 836 F.3d 612 (6th Cir. 2016) ................................................................ 12, *passim*

*Froehlich v. Ohio Dept. of Mental Health*, 114 Ohio St.3d 286, 2007-Ohio-4161 ...................... 29

*Geter v. Fortenberry*, 882 F.2d 167 (5th Cir. 1989) ........................................................ 17

*Gillespie v. City of Battle Creek*, 100 F. Supp. 3d 623 (W.D. Mich. 2015) ........................... 23, 24

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) .......................................... 26

*Grider v. City of Auburn, Ala.*, 618 F.3d 1240 (11th Cir. 2010) .................................. 23

*Hays v. Jefferson County, Ky.*, 668 F.2d 869 (6th Cir. 1982) ......................................... 26

*Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505 (6th Cir. 1991) ..................................................................................................23

*Hutsell v. Sayre*, 5 F.3d 996 (6th Cir. 1993) ......................................................27

*Jones v. Cannon*, 174 F.3d 1271 (11th Cir. 1999)....................................... 19, 22

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)...................................17

*Kerr v. Hurd*, 694 F. Supp. 2d 817 (S.D. Ohio 2010) ......................................30

*Kyles v. Whitley*, 514 U.S. 419 (1995) .............................................................16

*LeFever v. Ferguson*, 645 Fed. Appx. 438 (6th Cir. 2016), *cert. denied*, 137 S.Ct. 496 (Nov. 28, 2016) ..............................................................................14

*Martin v. Insight Communications Co., LP*, Case No. 2:10-cv-00537, 2011 WL 1233401 (S.D. Ohio 2011)..........................................................................29

*McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2005) .........................20

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).................14, 16, 17, 25

*Mowett v. City of Detroit*, No. 16-12971, 2017 WL 85835 (E.D. Mich. Jan. 10, 2017)...............23

*Neil v. Biggers*, 409 U.S. 188 (1972) ...............................................................27

*Ohio Vestibular & Balance Ctrs., Inc. v. Wheeler*, 6th Dist. Lucas No. L-11-1320, 2013-Ohio-4417, 999 N.E.2d 241 (Ohio App. 6th Dist. 2013)...........................30

*O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574 ............................28

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................ 12, 13

*Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016) .............................26

*Reichle v. Howards*, ___ U.S. ___, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) ......................... 13, 21

*Rizzo v. Goode*, 423 U.S. 362 (1976) ...............................................................26

*Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014) ..................................... 24, 25

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015), *reh'g denied* (Feb. 26, 2015) .............. 15, 17

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) ..................................... 19, 20

*Taylor v. Streicher*, 465 Fed. Appx. 414 (6th Cir. 2012)........................... 20, 29

*Turner v. Scott*, 119 F.3d 425 (6th Cir. 1997)..................................................22

iv

*United States v. McCallie,* 554 F.2d 770 (6th Cir. 1977)..................................................................16

*Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013) ........................................................................25

*White v. Pauly*, 580 U.S. ___, 2017 WL 69170 (Jan. 9, 2017)......................................................13

*Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859 (1998) .......................................30

**Statutes**

42 U.S.C. § 1983................................................................................................................. 13, *passim*

42 U.S.C. § 1985(3)........................................................................................................................23

Ohio Revised Code Section 2744.03(A)(6) ....................................................................................28

**Rules**

Federal Rules of Civil Procedure, Rule 12(b)(6).............................................................................12

Federal Rules of Civil Procedure, Rule 12(c) .................................................................................12

Federal Rules of Civil Procedure, Rule 56......................................................................................12

**PRELIMINARY STATEMENT**

This case arises from the criminal investigation and prosecution of Ricky Jackson ("Jackson"), Ronnie Bridgeman, now known as Kwame Ajamu ("Ajamu"), and Wiley Bridgeman ("Bridgeman") for the murder of Harold Franks and the attempted murder of Anna Robinson in connection with an armed robbery that occurred at the Fairmount Cut-Rate store on May 19, 1975.  It is undisputed that Jackson, Ajamu, and Bridgeman were prosecuted and convicted of aggravated murder, attempted murder, and aggravated robbery in 1975 based, in part, upon the eyewitness testimony of Edward Vernon ("Vernon"), who was then a 12-year-old junior high school student who lived in the neighborhood and who testified that he personally observed the shooting and robbery at the 1975 criminal trial.  (ECF #53, 1st Amd. Compl. ¶ 4, 73); (ECF #63-1, Deposition of Edward Vernon, pp. 18-19).  Approximately 40 years later in 2013, after the lead detectives in the Franks homicide investigation were deceased, Vernon came forward to recant his prior sworn testimony and ultimately signed two Affidavits and provided sworn testimony at a November 2014 hearing that he did not actually observe the 1975 shooting. (*Id*. at 18-19, 144-149, 205-209).  The State of Ohio then dismissed the criminal charges against Ajamu and Bridgeman in November 2014, and they proceeded to file this civil action for wrongful imprisonment against the City of Cleveland and a number of former Cleveland police officers.  (ECF #53, 1st Amd. Compl. ¶ 4-5, 95-97).

In this regard, it is undisputed that the lead detectives in the Franks homicide investigation – Eugene Terpay and James Farmer – are now deceased.  Although Plaintiffs originally sought to allege claims against the Estates of Eugene Terpay, James Farmer, John Staimpel, and Peter Comodeca, this Court dismissed the claims against the Estates and then denied leave to permit the filing of new claims against the Administrator of the Estates.  (ECF #49, Order, filed 7/5/16); (ECF #50, Opinion and Order, dated 7/15/16).  Moreover, Plaintiffs

voluntarily dismissed their claims against Defendants Michael Cummings and James White. (ECF #43 and 42, Stipulations of Dismissal, filed 2/10/16).  Thus, the only remaining defendants are the City of Cleveland, Jerold Englehart, and Karen Lamendola, in her capacity as Guardian Ad Litem for Frank Stoiker.  (ECF #53, 1st Amd. Compl. ¶ 10-12, filed 8/10/16).

This Motion for Summary Judgment has been filed on behalf of Defendant Karen Lamendola ("Lamendola) who was appointed to act as the Guardian Ad Litem for Frank Stoiker ("Stoiker").  Stoiker is a 90-year-old former employee of the City of Cleveland Division of Police who has been diagnosed with severe Alzheimer's type Dementia and has no memory of the people or events alleged in this case, which occurred over 40 years ago in 1975.  (ECF #11-2, Declaration of Dr. Timothy Bohn, M.D., ¶ 4-10, filed 9/16/15); (ECF #11-1, Declaration of Karen Lamendola, ¶ 3-6, ¶ 12, filed 9/16/15).  Although Stoiker was a homicide detective in 1975, he was not the lead detective for the Franks homicide investigation and was not a witness at the 1970s criminal trials.  Indeed, at Vernon's deposition in October 2015, Vernon did not identify Stoiker as having engaged in any wrongful acts.  While Plaintiffs have *alleged* that Stoiker "conspired" to prepare a "false" statement for Vernon in 1975, there is insufficient evidence to establish this allegation.  `Under the circumstances, therefore, Stoiker is entitled to qualified immunity and summary judgment in his favor on all claims.

## STATEMENT OF FACTS

**A.      Testimony of Edward Vernon**

**1.      The Shooting and Armed Robbery on May 19, 1975.**

As set forth in the First Amended Complaint, Plaintiffs' case is based primarily upon the allegations of Edward Vernon ("Vernon"), a key eyewitness for the prosecution at the 1970s trials of Jackson, Ajamu, and Bridgeman who later recanted his testimony in 2014.  (ECF #63-1, Deposition of Edward Vernon, pp. 17-19).  In May 1975, Vernon was a 12-year-old who lived

2

near the intersection of East 108th Street and Frank Avenue in the City of Cleveland.  (Vernon Dep. 10-11).  He lived in close vicinity of Jackson, Ajamu, and Bridgeman, and already knew all three individuals and their families prior to the shooting incident on May 19, 1975.  (*Id.* at 39-40, 165-170, 193-194).  At that time, Wiley Bridgeman was known by the nickname, "Buddy," and Ronnie Bridgeman was known by the nickname, "Bitsey."  (*Id.* at 39-40, 165).  Vernon also lived in close vicinity to the Fairmount Cut-Rate store at the corner of Fairhill and Petrarca, where he would catch the bus in the morning to his school, Audubon Junior High School.  (*Id.* at 13-15, 19, 22-25).

It is undisputed that the murder of Harold Franks, a money order salesman, and the attempted murder of Anna Robinson, the store owner's wife, occurred on the afternoon of Monday, May 19, 1975, at the Fairmount Cut-Rate store.  (Vernon Dep. 15-17).  In 1975, Vernon testified at the criminal trials of Jackson, Ajamu, and Bridgeman that he personally observed the shooting.  (*Id.* at 18-19).  In particular, Vernon testified that Jackson was the person who shot Harold Franks and Anna Robinson, that Ajamu participated by hitting Franks over the head and throwing something in his face, and that Wiley Bridgeman participated by driving the getaway car.  (*Id.*)

In 2014, Vernon signed two Affidavits, and then testified at an evidentiary hearing at the Cuyahoga County Court of Common Pleas in which he recanted his 1975 testimony.  (ECF #63-1, Vernon Dep. 125-126, 142-149); (ECF #63-2, Vernon Dep. Ex. A, 2013 Affidavit); (ECF #63-3, Vernon Dep. Ex. B, 2014 Affidavit).  As set forth in his 2015 deposition transcript and in his 2014 affidavit, Vernon now contends that he did not personally observe the 1975 shooting.  (Vernon Dep. 17).  Rather, he now states that he was still on the school bus on May 19th when he allegedly heard shots, but did not see the actual shooting itself.  (*Id.* at 30-36).  Vernon

3

admits, however, that he was the person who initiated contact with the Cleveland police in 1975 and who voluntarily came forward on his own initiative to identify Jackson, Ajamu, and Bridgman as the individuals who were involved in the shooting.  (Vernon Dep. 43-44, 176-177, 215, Vernon Dep. Ex. B, 2014 Aff. ¶ 4).

In particular, Vernon now contends that he was walking home from the Fairmount Cut-Rate store with a friend, Tommy Hall, who allegedly told him "that he knew who did it, and he said that Ricky and Bitsey and Buddy had did it."  (Vernon Dep. 39-40).  At that time, Vernon already knew who Ricky, Buddy, and Bitsey were because they all lived in his neighborhood, and he delivered papers to their houses.  (*Id*. at 40).  After his alleged conversation with Tommy Hall, Vernon returned to the Fairmount Cut-Rate store, and told a uniformed Cleveland police officer that he "knew who did it."  (*Id*. at 43-44).  When asked why he came forward to the police, Vernon explained that he "believed" Tommy Hall that "Ricky, Buddy, and Bitsey" had committed the crimes, and that he "thought that he was doing the right thing by coming forward and telling what [he] knew."  (*Id*. at 44, 215).

Sometime later on the next day, Vernon testified that Detectives Eugene Terpay ("Terpay") and James Farmer ("Farmer") allegedly came to his house and, after introducing themselves to Vernon and his parents, asked whether Vernon would be willing to come to the police station to provide a statement.  (Vernon Dep. 45-46).  Vernon testified that Terpay and Farmer allegedly "asked me the names of the people who did it, and I gave them the names of the people who did it."  (*Id*. at 47-49).  Although Vernon testified that Terpay and Farmer allegedly provided him with factual details about the crime, he admitted that Terpay and Farmer did not suggest that Jackson, Ajamu or Bridgeman committed the crimes.  (*Id*. at 176).  Rather, it was Vernon who allegedly told the detectives that Ricky was the shooter, that Bitsey was the

person who hit Mr. Franks in the head, and that Buddy was the person who was driving the car. (*Id*. at 176-177). Vernon also provided the detectives with the approximate height and weight of the three suspects, and told them that Buddy owned a light green and dark green car that was involved in the crime. (*Id*. at 51-53, 61-62).

According to Vernon, he next spoke with Terpay and Farmer on the following day when they allegedly came to his house and drove him to the police station to look at binders of photographs. (Vernon Dep. 56-59). In so doing, Terpay and Farmer did not point to any particular photographs in the binders and did not suggest anything with respect to the photographs. (*Id*. at 178). Ultimately, Vernon's review of the photographs was immaterial because it is undisputed that Vernon did not actually see Ricky, Buddy or Bitsey in the photographs and did not identify them to the police based upon his review of the photographs. (*Id*. at 58-59, 178-179). Sometime after viewing the photographs, Vernon again met with Terpay and Farmer in order to show them where Jackson and the Bridgemans lived. (*Id*. at 56-57, 64-65). While Terpay was driving, Vernon allegedly "duck down" in the back seat and pointed out where Jackson and the Bridgemans lived. (*Id*. at 66-67, 179-180). Shortly thereafter, the Cleveland police arrested Jackson, Ajamu, and Bridgeman at the Bridgeman home in the early morning hours of Sunday, May 25, 2016. (ECF #63-4, Jackson Dep. 48-49, 179-180); (ECF #63-5, Bridgeman Dep. 63-67); (ECF #63-6, Ajamu Dep. 57-60).

### 2. The Line-Up on May 25, 1975.

On Sunday, May 25, 1975, Vernon was picked up by two different police detectives in order to participate in a lineup. (Vernon Dep. 69, 181-182). The two detectives were not Terpay and Farmer, and Vernon does not know their names. (*Id*. at 74). The police detectives also picked up a second witness, Karen Rene Smith, who did not witness the shooting, but who allegedly saw two men standing outside the store before the shooting. (ECF #63-7, Deposition

5

of Karen Rene Smith, pp. 15-17, 25, 36-37, 74-76).  At her deposition, Smith also testified that she was picked up by two detectives in order to participate in a lineup on May 25th.  (*Id*. at 36-37).  When the detectives opened the car door, Smith saw Vernon in the back seat.  (*Id*. at 37).  When she asked what he was doing there, Vernon alleged told her, "I saw the whole thing."  (*Id*.)

In this regard, both Vernon and Smith testified that they personally knew Jackson, Ajamu, and Bridgeman before the lineup, and that they recognized both Jackson and Bridgeman in the lineup.  (Smith Dep. 9-10, 43); (Vernon Dep. 39-40, 184, 193-194).  The lineup itself was conducted by a different police officer who asked each witness whether he or she "recognized" anyone in the lineup.  (Smith Dep. 41-43); (Vernon Dep. 73-74, 184).  In response, Smith said that she recognized "two people from the neighborhood," but did not recognize the "people who were at the store at the time."  (Smith Dep. 43).  She further admitted that the police "never asked [her] to lie" and "never told [her] to identify any particular person."  (*Id*. at 87).  Moreover, she admitted that her lack of an identification was a subject of her testimony at the trials.  (*Id*.)

When Vernon was asked whether he recognized anybody in the lineup, he "said no." (Vernon Dep. 74).  As Vernon admitted at his deposition, however, he in fact recognized Jackson and Bridgeman in the lineup.  (*Id*. at 184).  Thus, his statement that he did not recognize anybody in the lineup was false because Vernon in fact knew Jackson and Bridgeman, and had previously identified them to the police as being the persons involved in the crimes.  (*Id*. at 181, 193-194).

After Vernon stated that he did not recognize anyone in the lineup, he was allegedly taken to a private interview room by two detectives.  (*Id*. at 80-81).  In a sworn affidavit, executed in March 2014, Vernon originally testified that "<u>a</u> detective there took me into this other room," and "it was just the <u>two of us</u> in the room."  (Vernon Dep. 186-187, Vernon Dep. Ex. B, 2014 Aff. ¶ 12) (emphasis added).  At his deposition, however, Vernon testified that there

6

were three people in the room (him and two detectives), but that only one of the two detectives did all of the talking. (Vernon Dep. 81, 187-188). In particular, Vernon testified that one of the detectives allegedly beat on the table and was "angry" because Vernon had previously "made a statement and you said that you knew who did it," and that he now "lied" that he did not recognize anyone. (*Id.* at 80-81). The same detective then allegedly told Vernon that "you can't go to jail," but "your mother and father can go to jail for perjury." (*Id.*).

In this regard, Vernon later identified the detective who allegedly was "yelling at me and calling me a liar" as Detective John Staimpel. (Vernon Dep. 107-108, 229-232). Vernon was unable to identify the other detective in the room, however, and was unable to recognize any of the other defendants upon viewing their photographs, except for Terpay, Farmer, and Staimpel. (*Id.* at 107-113).[1] Moreover, Vernon did not identify any wrongful acts that were allegedly committed by the other unidentified detective in the interview room. (*Id.* at 81, 188). Rather, he testified that the other detective did not say anything and "didn't do anything." (*Id.*)

After Staimpel allegedly banged on the table and threatened Vernon's parents with perjury, Vernon testified that he became "scared" and began to cry. (Vernon Dep. 80-81). Vernon *never* told the detectives in the interview room, however, that he did not actually see "what happened." (*Id.* at 86). Staimpel then allegedly said, "we'll fix it," and left the room. (*Id.* at 80-81, 231). He returned with a short, written statement for Vernon to sign, which allegedly said that Vernon was "scared . . . to pick them out of the lineup." (*Id.* at 80-81, 84, 107-108).

---

[1] Prior to Vernon's deposition, the parties entered into a stipulation in which the parties agreed to show photographs of the defendants by reference to pre-assigned numbers without revealing their names. (ECF #26, Stipulation re Deposition of Edward Vernon, filed 10/19/15). A stipulation listing the photograph numbers assigned to each defendant is attached as Exhibit #8). (ECF #63-8, Stipulation re: Photographs Used at Depositions).

In this regard, Vernon was unable to identify the specific written statement that he allegedly signed in the interview room.  (Vernon Dep. 85-86).  At his deposition, Vernon was shown a copy of the written statement that had been introduced and used by defense counsel to cross-examine him at the 1970s trials, which was marked as Vernon Dep. Ex. 5.  (ECF #63-1, Vernon Dep. 85, 101, 103, 192-193); (ECF #63-9, Vernon Dep. Ex. 5).  Vernon testified, however, that Exhibit 5 was "something different" than the written statement that was allegedly brought to him by Staimpel in the lineup room.  (Vernon Dep. 85-86, 101, 103-104).  Although Vernon later recalled "giving a statement and them – yes, and them typing it up, yes," he repeatedly testified that Exhibit 5 was _not_ the written statement that was allegedly brought to him by Staimpel in the interview room.  (*Id.* at 85-86, 101, 103-104, 229).

Indeed, with respect to the statement marked at Vernon Deposition Exhibit 5, Vernon was unable to identify the circumstances about how this statement was prepared.  (Vernon Dep. 104-105).  While he testified that "yeah, there was a time where things were being typed up," he did not provide any details about the preparation of Exhibit 5.  (*Id.*)  In particular, Vernon stated:

Q. Do you recall ever sitting in a room with officers and, you know, an officer typing up a statement?

A. There were so many different times where – yeah, there was a time where things were being typed up, yes.

* * *

Q. Okay.  Do you remember ever signing this statement here [Ex. 5] or a copy of it that look like this?

A. I remember something being – it could have been – could have been my signature, could have – you know, but I remember statements, I remember statements, I remember paperwork, I just remember paperwork, you know.

(*Id.*)

### 3.    Vernon's Alleged Conversation with Terpay After The Lineup.

On the day after the lineup, Vernon allegedly had a conversation with Detectives Terpay and Farmer about his failure to recognize any suspects at the lineup.  (Vernon Dep. 89-98). According to Vernon, Terpay allegedly said, "why would you go down there and tell a lie, and say that this is not them?"  (Vernon Dep. 90).  In response, Vernon allegedly said that "I did what my mother told me to do," but he did not tell Terpay that he "didn't see anything."  (*Id*. at 91).  Although Vernon later testified that he "kind of told" Terpay and Farmer at the police station "that, you know, I didn't see any of this," Terpay allegedly answered him by stating, "well, you made a statement that you saw these things."  (*Id*. at 92).

According to Vernon, Terpay then allegedly told Vernon that "[y]ou know that your mother and father are going to go to jail?"  (Vernon Dep. 95).  Vernon then agreed to testify "because of the threatening remarks that Detective Terpay made, and also because I didn't want my mother and father, you know, to go to jail."  (*Id*. at 96-97).  Terpay, however, did not tell Vernon "what he wanted [him] to say."  (*Id.*)  Rather, according to Vernon, Terpay said that "you'll have to tell the truth" and then allegedly told him "to stick with what I had told him in the beginning . . . that I saw who did it and I gave a statement of – who they were."  (*Id*. at 98).

### 4.    Vernon's Testimony at the 1970s Criminal Trials.

Prior to the commencement of the criminal trials, Vernon met approximately four times with one of the prosecuting attorneys, Dominic Del Balso ("Del Balso") to review his testimony. (ECF #63-10, Deposition of Dominic Del Balso, pp. 42-52, 54-55, 109-110); (ECF #63-1, Vernon Dep. 121-122).  Del Balso testified that Terpay was the lead detective and likely would have been present during the witness interviews.  (Del Balso Dep. 43-44, 111-112).  In this regard, Del Balso testified that Vernon did not seem "scared," (*id*. at 45), and that Vernon and Terpay "seemed to get along fine" and had a "friendly relationship," and that Vernon did not "in

9

any way seem uncomfortable." (*Id.* at 112-113).  Moreover, Del Balso testified that he "found [Vernon] to be credible" and had a sufficient foundation for his testimony that he personally witnessed the shooting.  (*Id.* at 110).

During the criminal trials, Vernon stayed at a hotel, for at least part of the time, with his mother and father.  (Vernon Dep. 118-119, 195).  While he regularly met with Detective Terpay to talk about his testimony, he does not remember any specific conversations.  (Vernon Dep. 114-115).  He testified at all of the criminal trials and was subject to extensive cross-examination by defense counsel.  (Vernon Dep. 18); (Del Balso Dep. 115-116).  Vernon never told anybody (except his mother), however, that he allegedly "had been threatened by the detectives." (Vernon Dep. 116).  In fact, over the next 40 years, Vernon never told anyone that he did not tell the truth at the 1970s criminal trials until he first told his pastor in 2013.  (*Id.* at 206-209).

**B.      The Lack Of Evidence Against Detective Frank Stoiker.**

Despite a lengthy discovery period, there is not a single witness who has identified Stoiker as a detective who was personally involved in any unconstitutional conduct during the Franks homicide investigation and prosecution.  Indeed, at their depositions, both Vernon and Smith did not recognize Stoiker's photograph at all.  (Vernon Dep. 109); (Smith Dep. 60). Moreover, Jackson did not recognize Stoiker's photograph, and Jackson, Ajamu, and Bridgeman all testified that they did not have personal knowledge of Vernon's interactions and communications with the police.  (Jackson Dep. 151-152, 164-165); (Bridgeman Dep. 198-200); (Ajamu Dep. 69).  Thus, there is no witness who has identified Stoiker as a person who engaged in any misconduct in connection with any interactions or communications with Vernon.[2]

---

[2]   In this regard, we note that Plaintiffs have retained an expert witness, Donald Anders, who wrote a lengthy expert report in this case.  In his expert report, Mr. Anders did not identify any misconduct by Detective Stoiker at all.  (ECF #63-12, Anders Dep. pp. 154-155).

Indeed, it is undisputed that Stoiker was not a witness at any of the 1970s trials. (Del Balso Dep. 120-121, Del Balso Dep. Ex. A-D, ECF #63-11).  While Plaintiffs have alleged that Stoiker "conspired" with Detective Staimpel to prepare a false witness statement for Vernon's signature, there is insufficient evidence to substantiate this allegation.  In his 2014 affidavit, Vernon originally testified that there was only "two of us" in the room.  (ECF #63-3, Vernon Dep. Ex. B, Aff. ¶ 12).  Although Vernon later testified at his deposition that there was a second detective with Staimpel, he was unable to identify or describe the other detective.  (Vernon Dep. 81, 187-188).  Moreover, Vernon did not identify any wrongful acts that were committed by the other detective.  (*Id.*).  Thus, there is insufficient evidence to establish that Stoiker can be held personally liable for any constitutional violations.

**ARGUMENT**

**I.  THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ALL SECTION 1983 CLAIMS BECAUSE PLAINTIFFS CANNOT ESTABLISH THAT FRANK STOIKER IS NOT ENTITLED TO QUALIFIED IMMUNITY IN HIS FAVOR.**

It is well-established that police officers are entitled to qualified immunity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted).  As the Supreme Court has held, qualified immunity gives "government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *City & Cnty. of San Francisco, Calif. v. Sheehan*, __ U.S. __, 135 S. Ct. 1765, 1774 (2015) (citations omitted).  "The qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." *Davis v. Scherer*, 468 U.S. 183, 195 (1984).  "Once defendants raise the defense of qualified immunity,

11

'the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity.'" *France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010)).

The Supreme Court has established a two-step procedure for determining qualified immunity. "First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (citations omitted). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* In so doing, the court has discretion in deciding which of the two prongs should be addressed first in determining whether a governmental official is entitled to qualified immunity. *Id.* at 236.

To be clearly established, a right must be sufficiently clear that every "'reasonable official would [understand] that was he is doing violates that right,'" and could therefore "'reasonably … anticipate when [his or her] conduct must give rise to liability for damages.'" *Reichle v. Howards*, ___ U.S. ___, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (citations omitted). As the Supreme Court has repeatedly explained over the past five years, "'clearly established law' should not be defined 'at a high level of generality,'" but "must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. ___, 2017 WL 69170, *4 (Jan. 9, 2017) (citations omitted). In other words, the Supreme Court has held that a police officer is entitled to qualified immunity in his or her favor as a matter of law unless the plaintiff can show that "the 'contours' of the right are clear to a reasonable official," *Reichle*, 132 S.Ct. at 2094, and "were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent ... placed the statutory or constitutional

12

question beyond debate.'" *Sheehan*, 135 S.Ct. at 1774 (citations omitted).  Thus, as the Supreme Court recently reiterated in *White*, qualified immunity must be granted as a matter of law unless the plaintiff can "identify a case where an officer acting under similar circumstances" was found liable for the alleged violation.  *Id.* at *6 (reversing denial of qualified immunity because the appellate court "failed to identify a case where an officer acting under similar circumstances" was held liable for the alleged constitutional violation).

Here, Plaintiffs have alleged seven (7) claims under 42 U.S.C. § 1983:  (1) failure to disclose exculpatory evidence (Count 1); fabrication of false evidence (Count 2); malicious prosecution (Count 3); failure to intervene (Count 4); conspiracy (Count 5);  supervisory liability (Count 6), and unconstitutional lineup procedure (Count 7).  As discussed below, however, Plaintiffs cannot establish that Stoiker is not entitled to qualified immunity on each claim.

A.    **Stoiker Is Entitled To Qualified Immunity On Count One.**

1.    **Plaintiffs Cannot Demonstrate That Stoiker Withheld Exculpatory Evidence From The Prosecutor.**

Count One alleges a due process claim for the alleged withholding of evidence from the prosecuting attorney under *Brady v. Maryland*.   To establish a violation of their constitutional rights under *Brady*, Plaintiffs "must prove that a defendant withheld favorable exculpatory or impeachment evidence; the state suppressed that evidence; and the suppression resulted in prejudice, meaning that the suppressed evidence was material." *LeFever v. Ferguson*, 645 Fed. Appx. 438, 442 (6th Cir. 2016), *cert. denied*, 137 S.Ct. 496 (Nov. 28, 2016).  Although *Brady* initially imposed disclosure obligations on prosecutors alone, the Sixth Circuit later held in *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009), that "the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police." *Id.* at 381. In so doing, the Sixth Circuit held that police officers only owe a duty to disclose exculpatory

13

evidence to the prosecutor (not the defense), and then only "when its exculpatory value is 'apparent' to the officer." *D'Ambrosio v. Marino*, 747 F.3d 378, 389-390 (6th Cir. 2014).

Here, there is insufficient evidence that Stoiker can be held personally liable for the alleged withholding of exculpatory evidence from the prosecutor. It is undisputed that Stoiker was not the lead detective for the Franks homicide investigation, and thus there is no evidence to show that Stoiker would have been responsible for providing the Franks homicide investigation file to the prosecuting attorney's office. Moreover, there is no evidence to show that Stoiker would have been personally aware of the "exculpatory value" of any evidence that was allegedly withheld or would have known back in 1975 that Vernon did not actually observe the shooting, as Vernon now alleges some forty years later. Under the circumstances, therefore, there is insufficient evidence to prove that Stoiker was personally involved in withholding exculpatory evidence from the prosecutor, let alone to establish that he knew the "exculpatory value" of any evidence that was allegedly withheld.

In this regard, the First Amended Complaint does not identify any alleged "evidence" that was actually withheld by Stoiker. Although the First Amended Complaint states that the Investigating Officers "never disclosed" their alleged misconduct to the prosecutors (1st Amd. Compl. ¶ 68-69), this allegation, even if it could be proven, is not the type of allegation that can state a valid *Brady* claim as a matter of law. As the Seventh Circuit recently held, a *Brady* violation cannot be based upon the allegation that police officers were "keeping quiet about their wrongdoing." *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), *reh'g denied* (Feb. 26, 2015) ("our case law makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution"). Thus, even though Plaintiffs have failed to establish that

14

Stoiker was personally aware of any alleged wrongdoing, the fact remains that this allegation is not sufficient to state a valid *Brady* claim. *Id.*

Finally, the Court should reject any argument that Stoiker can be held liable for the alleged destruction of handwritten notes, as alleged in Paragraph 65 of the First Amended Complaint.  (1st Amd. Compl. ¶ 65).  Here, there is no evidence that Stoiker ever prepared or kept any handwritten notes, let alone to establish that he destroyed any handwritten notes.  Moreover, under the applicable case law, the destruction of interview notes is not a constitutional violation.  *See United States v. McCallie,* 554 F.2d 770, 773 (6th Cir. 1977) (citing cases).  Accordingly, the Court should conclude Stoiker is entitled to qualified immunity on Count One under the first prong of the applicable two-part test.

> **2.**      **Plaintiffs Cannot Show That It Was Clearly Established in 1975 That A Police Officer In Stoiker's Position Could Be Held Personally Liable For The Alleged *Brady* Violation.**

Even if Plaintiffs can establish a valid *Brady* claim against Stoiker under the present case law, Stoiker still would be entitled to qualified immunity because it was not "clearly established" in May 1975 that a police officer in Stoiker's position could be held personally liable for the alleged *Brady* violation.  In determining whether a right is clearly established, the Sixth Circuit has specified that courts "'may rely on decisions of the Supreme Court, decisions of this court and courts within this circuit, and in limited instances, on decisions of other circuits.'"  *Moldowan,* 578 F.3d at 381-82.  Looking at applicable Supreme Court decisions, it was not until 1995 that the Supreme Court first held that a prosecutor's duty under *Brady* applied to exculpatory evidence known only to police officers.  *See Kyles v. Whitley,* 514 U.S. 419, 437 (1995).  Even then, the Supreme Court held that the responsibility to disclose exculpatory evidence remained with the prosecutor, not the police.  *Id.*

In 2009, the Sixth Circuit held for the first time that "the police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan*, 578 F.3d at 379. In so doing, the *Moldowan* court held that it was "clearly established" as of August 1990 that a police officer's suppression of exculpatory evidence would violate the constitutional rights of the accused. *Id.* at 382. The court did not base its decision on Sixth Circuit precedent, however, noting that the Sixth Circuit cases recognizing a *Brady*-derivative claim were "more recent" than 1990 and "less specific" than the decisions of other circuits. *Id.* Instead, the court based its "clearly established" analysis on the decisions of three other circuits: *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842 (4th Cir. 1964), *Geter v. Fortenberry*, 882 F.2d 167 (5th Cir. 1989), and *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

Upon review of this case law, however, it is apparent that Plaintiffs cannot prevail on the second prong of the applicable qualified immunity standard. Of the three cases relied upon by the *Moldowan* court, only the Fourth Circuit's decision in *Barbee v. Warden, Md. Penitentiary* was issued prior to 1975, and that case is distinguishable from the facts of this case. In *Barbee*, the Fourth Circuit ordered the issuance of a writ of habeas corpus due to the "state's failure" to disclose ballistics reports that would have undermined inferences about the defendant. *Id.*, 331 F.2d at 846. In so doing, the court found that the "state" had committed a *Brady* violation, without addressing the more difficult question of whether a police officer could be held personally liable for the alleged *Brady* violation.

In light of applicable case law, therefore, Plaintiffs cannot meet his burden to identify a Supreme Court or Sixth Circuit case that was decided before May 1975 that "clearly established" that a police officer in Stoiker's position could be held personally liable under *Brady* based upon

16

the particularized facts of this case. *Sheehan*, 135 S.Ct. at 1774. Moreover, there are no pre-1975 cases that would clearly establish that a police officer in Stoiker's position could be held liable under *Brady* for allegedly "keeping quiet about their wrongdoing." *Saunders-El*, 778 F.3d at 562; *see also Elkins v. Summit Cty., Ohio,* No. 5:06-CV-3004, 2009 WL 1150114, at *9 (N.D. Ohio Apr. 28, 2009) (finding no case law to support failure to intervene claim to prevent alleged *Brady* violations by other police officers), *aff'd,* 615 F.3d 671 (6th Cir. 2010). Accordingly, Stoiker also is entitled to qualified immunity on Count One under the second prong of the test.

**B.     Stoiker Is Entitled To Qualified Immunity On Count Two.**

Count Two alleges a claim for the fabrication of evidence. The Sixth Circuit has held that "[a]n officer violates a person's constitutional rights when he knowingly fabricates evidence against them and a reasonable likelihood exists that the false evidence would have affected the jury's decision." *France*, 836 F.3d at 629. Here, although the First Amended Complaint alleges that Stoiker "conspired" with Detective Staimpel to prepare a false witness statement for Vernon, there is insufficient probative evidence to establish that Stoiker was personally involved in the preparation of the witness statement described at Vernon's deposition. In this regard, there is no evidence that Stoiker ever threatened or coerced Vernon to testify falsely, let alone to establish that he actually knew back in 1975 that Vernon did not witness the crime. Moreover, there is no evidence that Stoiker ever testified at the criminal trials or was involved in fabricating any of the evidence that was introduced and admitted at the criminal trials. Thus, Stoiker is entitled to qualified immunity under the first prong of the two-part test.

Further, Stoiker is entitled to qualified immunity in his favor because Plaintiffs cannot identify a pre-1975 case that would "clearly establish" that a police officer in Stoiker's position he could be held liable for a "fabrication" of evidence claim based upon the particularized facts of this case. Moreover, there is no pre-1975 case law to establish that Stoiker could be held

17

personally liable for the alleged fabrication of evidence by other police officers. *See Ayers v. City of Cleveland,* No. 1:12-CV-753, 2013 WL 775359, at *11 (N.D. Ohio Feb. 25, 2013) (no case law to support failure to intervene claim to prevent the fabrication of evidence or coercing of false testimony); *see also Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir. 1999) ("There is no controlling authority clearly establishing that once a police officer knows another officer has fabricated a confession …, that police officer has a constitutional duty to intervene to stop the other officer's conduct"). Thus, Stoiker also is entitled to qualified immunity on Count Two under the second prong of the applicable standard.

> ### C. Stoiker Is Entitled To Qualified Immunity On Count Three.

Count Three alleges a claim for "malicious prosecution" under federal law. In order to prevail on this claim, Plaintiffs must prove: "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *France*, 836 F.3d at 625 (*citing Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010)). Here, Plaintiffs cannot satisfy the first or second elements of this claim.

> #### 1. Plaintiffs Cannot Demonstrate That Stoiker Was An Active Participant In Their Criminal Prosecutions.

As the Sixth Circuit has held, "[w]hether an officer influenced or participated in the decision to prosecute hinges on the degree of the officer's involvement and the nature of the officer's actions." *Sykes*, 625 F.3d at 312, n. 9. Here, it is undisputed that Stoiker was not the lead detective in the Franks homicide investigation, and that he did not testify at the criminal trial. Moreover, there is no evidence that Stoiker had any communications with the prosecuting attorneys who handled the Ajamu and Bridgeman trials or actively participated in the

18

prosecutions.  To the contrary, it is undisputed that the murder charges were the result of grand jury indictments, and there is no evidence that Stoiker ever testified before the grand jury.  Thus, Stoiker is entitled to qualified immunity on the malicious prosecution claim.  *See France*, 836 F.3d at 627-629 (summary judgment affirmed for officers who did not "actively participate" in prosecution).

Indeed, even if Plaintiffs could prove that Stoiker was somehow involved in the preparation of a false witness statement, as alleged in Count 2, the fact remains that this allegation is legally insufficient to establish that Stoiker can be held liable for malicious prosecution.  In *Sykes*, the Sixth Circuit made clear that the preparation of false investigatory materials is not sufficient to establish a malicious prosecution claim unless the investigatory officer made "knowing misstatements . . . to the prosecutor." *Id.*, 625 F.3d at 315-316.  Here, there is no evidence that Stoiker made "knowing misstatements" to the prosecutors who handled the grand jury proceedings and the trials.  Thus, there is insufficient evidence to establish liability for a malicious prosecution claim.  *See McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005) (no liability for malicious prosecution when defendant did not participate in prosecution); *Taylor v. Streicher*, 465 Fed. Appx. 414, 420 (6th Cir. 2012) (officers not liable for malicious prosecution because they did not actively participate in the prosecution, noting that lead investigator – even if he could be considered a "participant" – was not a named defendant).

### 2.   Plaintiffs Cannot Show A Lack Of Probable Cause.

Ajamu and Bridgeman also cannot establish the second element of a malicious prosecution claim:  the lack of probable cause.  As the Sixth Circuit recently reiterated, "[i]t has been long settled that the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *France*, 836 F.3d at 626 (*citing Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006)).  Although "[a]n exception to this

19

rule applies when the indictment was obtained wrongfully by police officers who knowingly presented false testimony to the grand jury or who testify with a reckless disregard for the truth," the exception is not applicable to Stoiker because there is no evidence that Stoiker knowingly presented false testimony to the grand jury. *See France*, 836 F.3d at 626 (citations omitted). Accordingly, for this additional reason, Stoiker is entitled to qualified immunity on Count Three.

> **3.      Plaintiffs Cannot Show That It Was Clearly Established in 1975 That A Police Officer In Stoiker's Position Could Be Held Personally Liable For Malicious Prosecution.**

Stoiker also is entitled to qualified immunity on Count Three because it was not "clearly established" in 1975 that a police officer in Stoiker's position could be held personally liable for malicious prosecution based upon particularized facts of this case.  The Supreme Court has repeatedly emphasized that "the right allegedly violated must be established, 'not as a broad general proposition,' but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle*, 132 S.Ct. at 2094 (citations omitted).  Here, Plaintiffs cannot point to a pre-1975 case that would clearly establish that a police officer could be held liable for malicious prosecution where he did not actively participate in the prosecutions, did not testify before the grand jury or at trial, and did not have sufficient knowledge of the evidence to determine whether there was a lack of probable cause.  Accordingly, Stoiker is entitled to qualified immunity on Count Three.

> **D.      Stoiker Is Entitled To Qualified Immunity On Count Four.**

Count Four alleges that Stoiker is liable under 42 U.S.C. § 1983 based upon an alleged failure to intervene to prevent a constitutional violation by other Investigatory Officers.  (1st Amd. Compl. ¶ 137).  This claim must fail, however, because there is no evidence to show that Stoiker was in a position to prevent unconstitutional conduct by other officers and because the case law does not establish a legal basis for such liability.

20

Under applicable Sixth Circuit precedent, a police officer can be held liable for the failure to intervene only in excessive force cases when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). As previously discussed, however, a police officer cannot be held liable for the failure to intervene to prevent another officer from fabricating evidence or withholding exculpatory evidence. *Ayers*, 2013 WL 775359, at *11 (finding no case law to support failure to intervene claim based on allegations of falsified evidence, coercing false witness testimony, and *Brady* violations); *Elkins,* 2009 WL 1150114, at *9 (finding no case law to support failure to intervene claim based upon alleged *Brady* violations); *Jones*, 174 F.3d at 1286 ("There is no controlling authority clearly establishing that once a police officer knows another officer has fabricated a confession …, that police officer has a constitutional duty to intervene to stop the other officer's conduct"). Thus, there is no legal basis for a failure to intervene claim.

Even if a legal basis for failure to intervene claim could be found, there is insufficient evidence to prove a failure to intervene claim against Stoiker. Here, Plaintiffs cannot prove that Stoiker observed or had reason to know of any unconstitutional conduct, or had the opportunity or means to prevent the alleged harm. Moreover, given the lack of pre-1975 case law to establish that a police officer could be held liable under a "failure to intervene" theory, there is clearly no legal basis to conclude that the alleged duty to intervene was "clearly established" in 1975. *See Ayers*, 2013 WL 775359, at *11; *Elkins*, 2009 WL 1150114, at *9 (same).

**E.**     **Stoiker Is Entitled To Qualified Immunity On Count Five.**

**1.**     **Intracorporate Conspiracy Doctrine Bars Conspiracy Claim**

Count Five alleges that the Investigating Officers entered into a "conspiracy" to violate Plaintiffs' constitutional rights.  This claim must fail as a matter of law because it is barred by the intracorporate conspiracy doctrine. As the Sixth Circuit has explained, the intracorporate conspiracy doctrine bars a conspiracy claim if all of the alleged conspirators are "members of the same collective entity." *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 510 (6th Cir. 1991). Here, because all of the alleged conspirators were employees of the City of Cleveland, any conspiracy claim is barred as a matter of law.

In this regard, it is well established in the Sixth Circuit that the intracorporate conspiracy doctrine applies to conspiracy claims alleged against the employees of a political subdivision under 42 U.S.C. § 1985(3).  *Hull*, 926 F.2d at 510.  Moreover, although the Sixth Circuit has not yet decided this issue, "multiple courts within this circuit have applied the intra-corporate conspiracy doctrine to not just section 1985 conspiracy claims, but also to cases involving allegations of conspiracy brought under the wider rubric of section 1983." *Mowett v. City of Detroit*, No. 16-12971, 2017 WL 85835 (E.D. Mich. Jan. 10, 2017) (citing cases); *see, e.g., Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) (applying intracorporate conspiracy doctrine to § 1983 claim brought against law enforcement officers employed by same agency); *Gillespie v. City of Battle Creek*, 100 F. Supp. 3d 623, 632 (W.D. Mich. 2015) (applying intracorporate conspiracy doctrine to § 1983 conspiracy claim against City employees) (citing cases); *see also DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 615 (6th Cir. 2015) (noting that district courts in the Sixth Circuit are split as to whether the intracorporate conspiracy doctrine applies to municipal officials in a § 1983 action, and that Sixth Circuit has not yet ruled on this issue); *Briner v. City of Ontario*, No. 1:07CV129, 2010 WL 3982755, at *14

22

(N.D. Ohio Oct. 7, 2010) (noting Ohio district courts are split on whether intracorporate conspiracy doctrine applies to claims under § 1983) (citing cases).

Although some courts have declined to apply the intracorporate conspiracy doctrine to § 1983 claims because the conspirators were acting outside the scope of their employment, this exception is inapplicable here. *See DiLuzio*, 796 F.3d at 616; *Briner*, 2010 WL 3982755, at *15. Here, Plaintiffs expressly allege that all of the officers' actions were undertaken "within the scope of their employment." (1st Amd. Compl. ¶ 148). Moreover, there is no evidence to establish that any of the Investigatory Officer's actions were undertaken for personal reasons. Accordingly, under the applicable case law, this Court should find that the intracorporate conspiracy doctrine applies to Plaintiffs' § 1983 conspiracy claim. *Gillespie*, 100 F. Supp. 3d at 631-632 (applying intracorporate conspiracy doctrine to § 1983 conspiracy claim).

### 2. Plaintiffs Cannot Demonstrate That Stoiker Joined And/Or Participated In Any Alleged Conspiracy.

Even if Count Five is not barred by the intracorporate conspiracy doctrine, the evidence still does not support a civil conspiracy claim against Stoiker as a matter of law. As the Sixth Circuit has held, a conspiracy claim under § 1983 requires proof of "an agreement between two or more persons to injure another by unlawful action." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). To prevail on such a claim, Plaintiffs must demonstrate "'that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that caused the injury." *Robertson*, 753 F.3d at 622. Although circumstantial evidence can be used to establish an agreement among conspirators, there must nevertheless be "specific evidence that the defendants shared a single plan and a common objective." *Id.*

23

Here, there is no evidence to prove a "single plan" and/or a "common objective" to deprive Ajamu and Bridgeman of their constitutional rights. Moreover, there is no evidence that Stoiker knowingly agreed to join this alleged conspiracy and committed an overt act in furtherance of the alleged conspiracy. Thus, even if the intracorporate conspiracy doctrine did not apply, Stoiker still would be entitled to qualified immunity on Count Five. *Robertson*, 753 F.3d at 622 (affirming summary judgment on § 1983 conspiracy claim due to lack of specific evidence of a common plan or objective); *Moldowan*, 578 F.3d at 395 (affirming summary judgment on § 1983 conspiracy claim due to "lack of the requisite material facts and specificity necessary to sustain a conspiracy claim").

> ### 3. Plaintiffs Cannot Show That It Was Clearly Established in 1975 That The Intracorporate Conspiracy Doctrine Did Not Apply to § 1983.

Stoiker also is entitled to qualified immunity on Count Five because Plaintiffs cannot demonstrate that it was "clearly established" in 1975 that the intracorporate conspiracy doctrine would not apply to bar conspiracy claims against police officers of the same municipality under Section 1983. While the existing case law weighs in favor of applying the intracorporate conspiracy doctrine to § 1983 claims, the fact remains that Sixth Circuit has never affirmatively held that the intracorporate conspiracy doctrine does <u>not</u> apply to conspiracy claims under Section 1983. *DiLuzio*, 796 F.3d at 615. Thus, for this additional reason, Stoiker is entitled to qualified immunity on Count Five because it was not "clearly established" in 1975 that a police officer could be held liable for an intracorporate conspiracy.

> ### F. Stoiker Is Entitled To Qualified Immunity On Count Six.

Count Six alleges a claim for "supervisory" liability. (1st Amd. Compl. ¶¶ 152-153.) Here, the supervisory liability claim against Stoiker must fail as a matter of law because there is no evidence to establish that he was a "supervisor" who had the right to control the conduct of

24

any of the other homicide detectives.  As the U.S. Supreme Court has held, a "supervisor" is a person who is "empowered by the employer to take tangible employment actions" against a subordinate employee.  *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  Indeed, under Sixth Circuit precedent, it is not sufficient merely to allege that a supervisor had the "right to control employees."  *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (citations omitted).  Rather, to succeed on a failure to supervise claim, a plaintiff must show that the supervisor "authorized, approved, or knowingly acquiesced in" the employee's unconstitutional conduct.  *Peatross v. City of Memphis*, 818 F.3d 233, 243 (6th Cir. 2016).

Here, there is no evidence that Stoiker was a "supervisor" who had the authority and right to control the conduct of the other detectives.  Moreover, there is no evidence that Stoiker authorized, approved, or knowingly acquiesced in the unconstitutional conduct of a subordinate employee.  Thus, the Court should conclude that Stoiker is entitled to qualified immunity on the alleged supervisory liability claim under the first prong of the applicable two-part test.

Further, Stoiker is entitled to qualified immunity on Count Six because Plaintiffs cannot establish that it was clearly established that an employee in Stoiker's position could be held liable under 42 U.S.C. § 1983 for a supervisory liability claim.  The Sixth Circuit first applied the doctrine of supervisor liability in *Hays v. Jefferson County, Ky.*, 668 F.2d 869 (6th Cir. 1982), based upon the Supreme Court's decision in *Rizzo v. Goode*, 423 U.S. 362 (1976).  Both decisions were decided after 1975.  Indeed, Plaintiffs cannot identify any case law, let alone pre-1975 case law that would clearly establish that a mere detective – who did not have any supervisory responsibility – would have clearly known in May 1975 that he could be held liable under § 1983 for a supervisory liability claim.  Accordingly, Stoiker is entitled to qualified immunity on this claim as a matter of law.

**G.    Stoiker Is Entitled To Qualified Immunity On Count Nine.**

Count Nine alleges a claim for "unconstitutional lineup procedure" based upon the allegation that "the lineup process and showing of photographs to Vernon" were "impermissibly suggestive." (ECF #53, 1st Amd. Compl. ¶ 169). The Supreme Court has held that a witness identification violates a defendant's due process rights only if the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 197 (1972). In determining whether liability can arise under § 1983, however, the Sixth Circuit has held that "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993). Instead, a suggestive identification can give rise to liability under § 1983 only in "extraordinary circumstances." *Id.*

In this regard, the question of "[s]uggestiveness generally depends 'upon whether the witness's attention was directed to a suspect because of police conduct.'" *Blakely v. Williams*, No. 3:07 CV 2689, 2008 WL 5263699, at *4 (N.D. Ohio Dec. 17, 2008). Here, this claim must fail as a matter of law because the undisputed evidence establishes that Vernon did not identify Jackson, Ajamu, or Bridgeman based upon the viewing of photographs or the May 25th lineup. Rather, he identified Jackson, Ajamu, and Bridgeman long before the lineup ever began, and in fact showed the police where the suspects lived. Further, this meritless claim must fail because it is undisputed that Ajamu did not appear in the lineup, and thus cannot complain about any of the lineup procedures. Moreover, there is no evidence to prove that Stoiker was the person who actually conducted the lineup, let alone to establish that he personally engaged in any impermissibly suggestive conduct during the lineup process. Thus, Plaintiffs cannot show a constitutional violation by Stoiker.

For these reasons, therefore, Stoiker is entitled to qualified immunity on Count Nine under both the first and second prong of the applicable test.  First, Ajamu and Bridgeman cannot establish that Stoiker actually violated their constitutional rights through an "impermissibly suggestive" lineup procedure.  Second, given that the Sixth Circuit has held that a § 1983 claim for an unconstitutional lineup procedure can arise only in "extraordinary circumstances," *Hutsell*, 5 F.3d at 1005, Plaintiffs cannot demonstrate that a reasonable official in Stoiker's position would have clearly known in 1975 that he could be held liable for a constitutional violation in connection with a lineup that he did not conduct and was not the proximate cause of the identifications.  Thus, Stoiker is entitled to qualified immunity on Count Nine.

## II.  THE COURT SHOULD GRANT SUMMARY JUDGMENT AND IMMUNITY ON PLAINTIFFS' STATE LAW CLAIMS.

### A.  Stoiker Is Entitled To Immunity For All State Law Claims.

For all of the reasons previously discussed, this Court also should grant immunity in Stoiker's favor on all state law claims under R.C. 2744.03(A)(6).  This statute provides that an employee of a political subdivision is immune from tort liability unless he acted "with malicious purpose, in bad faith, or in a wanton or reckless manner."  *Id.; see O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶ 74-75.  Here, Plaintiffs lack the evidence to prove that Stoiker acted "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Thus, if the Court grants qualified immunity under federal law, it also should grant immunity under R.C. 2744.03(A)(6).  *See Chappell v. City of Cleveland*, 585 F.3d 901, 916, fn.3 (6th Cir. 2009).

### B.  Stoiker Is Entitled To Summary Judgment On Count Ten.

Count Ten alleges a claim for "negligence:  willful, wanton, and/or reckless conduct" under Ohio law.  (1st Amd. Compl. pg. 47).  This claim does not state a valid cause of action under Ohio law.  First, it is clear that any claim for "negligence" must be dismissed because, as

27

previously discussed, an employee of a political subdivision is entitled to immunity from negligence claim under R.C. 2744.03(A)(6)(b). In so doing, the applicable immunity standard in R.C. 2744.03(A)(6)(b) – willful, wanton and/or reckless conduct – does not establish an independent cause of action. Rather, it sets forth a *defense* to tort liability under Ohio law. Accordingly, the Court should grant summary judgment on Count Ten because it does not state a valid cause of action under Ohio law. *D'Ambrosio v. Marino*, Case No. 11-CV-933, 2013 WL 256312, *1, fn. 1 (N.D. Ohio Jan. 23, 2013) (dismissing similar claim alleged under state law because it was a defense, not an independent cause of action).

In this regard, it appears that Count Ten is simply an impermissible attempt to convert constitutional claims into "negligence" claims under Ohio law. Paragraph 178 of the First Amended Complaint alleges that Defendants "failed to exercise due care and acted with malicious purpose, in bad faith, and/or in a wanton and reckless manner" based upon the constitutional and tort claims in Counts 1 through 9. This is improper and does not state an independent claim. Indeed, even if it did, it still must fail because Plaintiffs cannot prevail on Counts 1-9 and cannot establish that Stoiker engaged in willful, wanton, and reckless conduct.

**C.      Plaintiffs Cannot Establish The Elements Of A Malicious Prosecution Claim.**

Count Seven alleges a claim for malicious prosecution under Ohio law. Under Ohio law, a claim for malicious prosecution has the same three elements as a malicious prosecution claim alleged under federal law: "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Froehlich v. Ohio Dept. of Mental Health*, 114 Ohio St.3d 286, 2007-Ohio-4161, ¶ 10. Here, for the reasons set forth in Argument I.C., above, Plaintiffs cannot demonstrate that Stoiker maliciously "instituted" or "continued" the prosecutions. *Taylor*, 465 Fed.Appx. at 420. Moreover, he cannot show a lack of probable cause because Ohio law also provides that a grand jury

28

indictment creates a presumption of probable cause. *Martin v. Insight Communications Co., LP*, Case No. 2:10-cv-00537, 2011 WL 1233401, at *8, fn. 14 (S.D. Ohio 2011). Thus, Plaintiff cannot prevail on the malicious prosecution claim in Count VII. *Id.* at *8.

D. **Plaintiffs Cannot Prevail On Their State Law Conspiracy Claim.**

Count Eight alleges a claim for civil conspiracy under Ohio law. This claim must fail as a matter of law, however, because it is well established that the intracorporate conspiracy doctrine applies to state law conspiracy claims "[w]here all defendants, allegedly co-conspirators, are members of the same collective entity." *See Kerr v. Hurd*, 694 F. Supp. 2d 817, 834 (S.D. Ohio 2010) (citations omitted). Although an exception to this doctrine applies where the conspirators were acting outside the scope of their employment, such exception is inapplicable here because, as previously discussed, the First Amended Complaint alleges that the Investigating Officers were acting within the scope of their employment. *See Ohio Vestibular & Balance Ctrs., Inc. v. Wheeler*, 6th Dist. Lucas No. L-11-1320, 2013-Ohio-4417, 999 N.E.2d 241, ¶ 30 (Ohio App. 6th Dist. 2013). Even if the intracorporate conspiracy doctrine did not apply, however, the fact remains that Plaintiffs cannot establish a conspiracy claim for the same reasons applicable to Count Five. Moreover, the claim must fail because Ohio law provides that "an underlying unlawful act is required before a civil conspiracy claim can succeed." *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859, 868 (1998). Thus, for all of these reasons, the Court should grant summary judgment on the common law conspiracy claim in Count Eight.

29

## CONCLUSION

For these reasons, Defendant Karen Lamendola, in her capacity as guardian ad litem for Frank Stoiker, respectfully requests that the Court grant qualified immunity and summary judgment on all claims alleged in the First Amended Complaint.

Respectfully submitted,

*/s/ Stephen W. Funk*

| | |
|---|---|
| Amanda M. Knapp (0081948) | Stephen W. Funk (0058506) |
| ROETZEL & ANDRESS, LPA | ROETZEL & ANDRESS, LPA |
| One Cleveland Center, 10th Floor | 222 South Main Street, Suite 400 |
| 1375 East Ninth Street | Akron, OH 44308 |
| Cleveland, OH 44114 | Telephone:  (330) 849.6602 |
| Telephone: (216) 623-0150 | Facsimile:  (330) 376.4577 |
| Facsimile:  (216) 623-0134 | Email: sfunk@ralaw.com |
| Email: aknapp@ralaw.com | |

30

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the case is currently assigned to the complex track, and that this foregoing Defendant Karen Lamendola's Motion for Summary Judgment complies with the 30-page limitation for complex cases set forth in Loc. R. 7.1(f).

/s/ Stephen W. Funk
Stephen W. Funk

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January, 2017, the foregoing *Defendant Karen Lamendola's Motion for Summary Judgment* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Stephen W. Funk
Stephen W. Funk

31