Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

RICKY JACKSON,

Plaintiff,

JUDGE BOYKO

-vs-            CASE NO. 1:15-CV-00989

CITY OF CLEVELAND, et al.,

Defendants.

_____/

KWAME AJAMU, et al.,

Plaintiffs,

-vs-       JUDGE BOYKO

CASE NO 1:15-CV-01320

CITY OF CLEVELAND, et al.,

Defendants.

_____/

Videotaped deposition of EDWARD VERNON, taken as if upon examination before Brian A. Kuebler, a Notary Public within and for the State of Ohio, at the offices of Friedman & Gilbert, 55 Public Square, Suite 1055, Cleveland, Ohio, at 9:31 a.m. on Thursday, October 29, 2015, pursuant to notice and/or stipulations of counsel, on behalf of the Plaintiffs in this cause.

- - - -

Page 3

ALSO PRESENT:

Brad J. Simpson - Videographer (216)382-1043

Page 2

APPEARANCES:

Elizabeth Wang, Esq.
Loevy & Loevy
2060 Broadway, Suite 460
Boulder, Ohio  80302
(720) 328-5642,
   On behalf of the Plaintiff;
   Ricky Jackson;

Terry H. Gilbert, Esq.
Jacqueline C. Greene, Esq.
Friedman & Gilbert
55 Public Square, Suite 1022
Cleveland, Ohio  44113
(216) 241-1430,
   and
David E. Mills, Esq.
The Mills Law Office, LLC
1300 West Ninth Street, Suite 636
Cleveland, Ohio  44113
(216) 929-4747,
   On behalf of the Plaintiffs,
   Kwame Ajamu and Wiley Bridgeman;

Stephen W. Funk, Esq.
Amanda M. Knapp, Esq.
Roetzel & Andress
222 South Main Street
Suite 400
Akron, Ohio  44308
(330) 376-2700,

   On behalf of the Individual
   And Estate Defendants;
Shawn Mallamad, Esq.
City of Cleveland Law Department
601 Lakeside Avenue
Room 106 City Hall
Cleveland, Ohio  44114
(216) 664-2569,

   On behalf of the Defendant,
   City of Cleveland.

Page 4

I N D E X

EXAMINATION
EDWARD C. VERNON
BY MS. WANG                8
EXAMINATION
EDWARD C. VERNON
BY MR. GILBERT           139
EXAMINATION
EDWARD VERNON
BY MR. FUNK              141
rE-EXAMINATION
EDWARD VERNON
BY MS. WANG              225
RE-EXAMINATION
EDWARD VERNON
BY MR. FUNK              236
Plaintiff's Exhibit 1       10
Plaintiff's Exhibit 2       14
Plaintiff's Exhibit 3       20
Plaintiff's Exhibit 4       41
Plaintiff's Exhibit 5       85
Plaintiff's Exhibit 6      113
Plaintiff's Exhibit 7      234
Defendant's Exhibit A      144
Defendant's Exhibit B      146
Defendant's Exhibit C      160
Defendant's Exhibit D      161
Defendant's Exhibit E      206
Defendant's Exhibits F, G    222

OBJECTION INDEX

MR. FUNK          16
MR. FUNK          52
MR. FUNK          54
MR. FUNK          60
MR. FUNK          65
MR. FUNK          65
MR. FUNK          67
MR. FUNK          70
MR. FUNK          73
MR. FUNK          73
MR. FUNK          75
MR. FUNK          75
MR. FUNK          79
MR. FUNK          81

Page 5

| | |
|---|---|
| MR. FUNK | 82 |
| MR. FUNK | 83 |
| MR. FUNK | 83 |
| MR. FUNK | 83 |
| MR. FUNK | 85 |
| MR. FUNK | 86 |
| MR. FUNK | 86 |
| MR. FUNK | 87 |
| MR. FUNK | 87 |
| MR. FUNK | 88 |
| MR. FUNK | 91 |
| MR. FUNK | 91 |
| MR. FUNK | 92 |
| MR. FUNK | 94 |
| MR. FUNK | 95 |
| MR. FUNK | 95 |
| MR. FUNK | 96 |
| MR. FUNK | 97 |
| MR. FUNK | 97 |
| MR. FUNK | 103 |
| MR. FUNK | 108 |
| MR. FUNK | 109 |
| MR. FUNK | 112 |
| MR. FUNK | 117 |
| MR. FUNK | 117 |
| MR. FUNK | 121 |
| MR. FUNK | 125 |
| MR. FUNK | 126 |
| MR. FUNK | 131 |
| MR. FUNK | 139 |
| MR. FUNK | 139 |
| MS. WANG | 142 |
| MS. WANG | 148 |
| MS. WANG | 154 |
| MS. WANG | 155 |
| MS. WANG | 159 |
| MS. WANG | 173 |
| MS. WANG | 176 |
| MS. WANG | 179 |
| MS. WANG | 193 |
| MS. WANG | 203 |
| MS. WANG | 203 |
| MS. WANG | 213 |
| MS. WANG | 214 |
| MS. WANG | 214 |
| MS. WANG | 214 |
| MS. WANG | 217 |
| MS. WANG | 217 |
| MS. WANG | 219 |

Page 6

| | |
|---|---|
| MS. WANG | 220 |
| MR. FUNK | 227 |
| MR. FUNK | 227 |
| MR. FUNK | 227 |
| MR. FUNK | 227 |
| MR. FUNK | 228 |
| MR. FUNK | 229 |
| MR. FUNK | 229 |
| MR. FUNK | 230 |
| MR. FUNK | 231 |
| MR. FUNK | 231 |
| MR. FUNK | 232 |
| MR. FUNK | 233 |
| MR. FUNK | 233 |
| MR. FUNK | 233 |
| MR. FUNK | 234 |
| MR. FUNK | 235 |

Page 7

THE VIDEOGRAPHER:  We're now on the record.  This is the videotaped deposition of Edward Vernon.

Today's date is October 29th, 2015.  The time is approximately 9:31.

This is the case of Ricky Jackson versus City of Cleveland, et al., and Kwame Ajamu, et al.  Case Numbers 1:15-CV-00989 and 1:15-CV-01320.  In the US District Court, Northern District of Ohio, Eastern Division.

Will counsel please identify themselves and who they represent for the record, please.

MS. WANG:  Elizabeth Wang, W-a-n-g.  Counsel for Plaintiff, Ricky Jackson.

MR. GILBERT:  Terry Gilbert, co-counsel on behalf of Kwame Ajamu and Wiley Bridgeman.

MR. MILLS:  David Mills, co-counsel on behalf of Kwame Ajamu and Wiley Bridgeman.

MS. GREENE:  Jacqueline Greene, co-counsel on behalf of Kwame Ajamu and

Page 8

Wiley Bridgeman.

MR. MALLAMAD:  Shawn Mallamad, counsel of Defendant City of Cleveland.

MR. FUNK:  Stephen Funk, counsel for all the other defendants except for the City of Cleveland.

MS. KNAPP:  My name is Amanda Knapp, also counsel for the individual defendants.

THE VIDEOGRAPHER:  Swear the witness.

EDWARD C. VERNON, of lawful age, called by the Plaintiffs for the purpose of examination, as provided by the Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF EDWARD C. VERNON BY MS. WANG:

Q.  Good morning.

A.  Good morning.

Q.  Could you please state your name and spell it for the record.

A.  Edward Vernon.  E-d-w-a-r-d, V-e-r-n-o-n.

Q.  And how old are you?

A.  53.

Page 9

Q.  What's your birth date?
A.  6/10/62.
Q.  Where do you live?
A.  5504 Superior Avenue.
Q.  How long have you lived there?
A.  Well, I just moved there about a month, month and a half ago.
Q.  Is that in the City of Cleveland?
A.  Yes.
Q.  How long have you lived in Cleveland?
A.  Primarily all of my life except for my stay in New Jersey.
Q.  And do you work?
A.  Yes, I do.
Q.  Where do you work?
A.  7-Eleven.
Q.  And what do you do there?
A.  I'm a sales associate.
Q.  And what's the highest level of education you have?
A.  Twelfth grade.
Q.  Approximately when did you finish the 12th grade?
A.  I didn't.
Q.  Oh, you didn't.
A.  Nuh-uh.

Page 10

Q.  Okay.  When did you attend 12th grade?
A.  1980.
Q.  Okay.  I'm going to call your attention to the date of May 19th, 1975.
A.  Uh-huh.
Q.  How old were on you May 19th, 1975?
A.  Twelve.
Q.  And what school did you go to then?
A.  Audubon Junior High School.
Q.  And where did you live at that time?
A.  I stayed on Frank Avenue between Frank and East 108th.  I stayed on 108th, which corresponds with Frank, yeah.
Q.  Do you remember the address?
A.  Not vaguely, no.  Not right offhand.

                - - - -
    (Thereupon, Plaintiff's Exhibit 1 was  marked
     for purposes of identification.)
                - - - -

Q.  I'm going to hand you what's been marked as Plaintiff's Deposition Exhibit 1.
A.  Uh-huh.
Q.  It's a -- for the record, it's a four-page exhibit of some printouts from Google Maps --
A.  Uh-huh.

Page 11

Q.  -- of the area around 108th and Frank Avenue in Cleveland.
A.  Uh-huh.
Q.  All right.  Could you just take a look at that map for a minute.  And do you see -- is that around the location where your house was in 1975?
A.  That's correct.
Q.  Okay.  And do you recall if your address was 2220 East 108th Street?
A.  Like I said, I can't remember the correct address, but I'm pretty sure that's what it was, yeah.
Q.  It was a little bit south of Frank on 108th?
A.  Yeah, yeah.  Because it had the -- it's kind of like an empty field and then the opposite corner was a store, and the opposite corner of that was a little park and, yeah, and Jehovah Witness hall on the other side over there, yeah.
Q.  And who did you live with in that house at the time?
A.  I lived with my mother and my father, my three sisters.
Q.  What are your sisters' names?
A.  My sister Darlene, my sister Susan, and my sister Carly.  And I also have a stepsister named Lizzy,

Page 12

Elizabeth.  She stays with my grandmother.
Q.  Okay.  And were you the oldest, youngest, or in the middle?
A.  No, I was the youngest of the boys.  I was kind of like second to the last of the kids, so --
Q.  Okay.  On Deposition Exhibit 1 would you mind putting an X in the approximate location of your house in May of 1975?
A.  I'd say right around in here (indicating).  Right about in there (indicating) because, you know, we had the other houses right in here, and so Frank Avenue, yeah, that's about right.
Q.  And turning to page two of Deposition Exhibit 1.  That is an aerial map printout of the area around 108th and Frank Avenue.
   Do you see the corner of Stokes and Petrarca?
A.  Yeah.  Yes.  Uh-huh.
Q.  Back in 1975 did Stokes have a different name?
A.  It was called East Boulevard, if I'm not mistaken.  East Boulevard.
Q.  Do you recall if it was called Fairhill?
A.  Fairhill, yeah.  Because East Boulevard was on the other side where we came down the hill.  But, yeah, this was -- this was --this here was Fairhill (indicating).

Page 13

Q. Okay. And so for the record, you're pointing to Stokes Boulevard, that was Fairhill?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Okay. Do you see on the map there there's a corner of what used to be called Fairhill and Petrarca, there's a church there on the corner?

A. Uh-huh. Yes.

Q. Was that -- was there -- was that church there in 1975, do you know?

A. Yes.

Q. Okay. And at the corner of Fairhill and Petrarca in May of 1975, was there a drugstore?

A. Yes.

Q. What was that drugstore called?

A. Let's see, Fairmount Cut-Rate.

Q. Fairmount Cut-Rate?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Just for the record, because the court reporter is taking down what you say, you'll just need to try to avoid saying uh-huh or nuh-uh, things like that. Instead say "yes" or "no" or --

Page 14

A. No problem.

Q. Okay. Thank you. Could you mark the location of where the Fairmount Cut-Rate was on that map that's been marked Deposition Exhibit 1 page two?

A. Uh-huh.

Q. Actually, you know what, strike that. I'm going to give you a closer up map. Here, I'm going to have this marked --

- - - -

(Thereupon, Plaintiff's Exhibit 2 was marked for purposes of identification.)

- - - -

Q. Handing you -- you can put this away for a minute.

Handing you what's been marked as Deposition Exhibit 2 --

A. Uh-huh.

Q. -- that is an aerial view of the area around Petrarca, Fairhill and Cedar Avenue in Cleveland. Do you recognize that --

A. Yes.

Q. -- area?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Page 15

Q. It's a hard habit to break. And do the locations of the streets on that map fairly and accurately represent what the streets looked like in May of 1975?

A. Yes.

Q. Okay. And could you mark where the Fairmount Cut-Rate was on that map that's been marked Deposition Exhibit 2?

A. About here (indicating).

Q. Okay.

MR. FUNK: Can I -- just a second --

MS. WANG: Yeah, sure.

MR. FUNK: -- I'm sorry, I just want to be able to see it. Okay. Thanks.

THE WITNESS: Uh-huh.

BY MS. WANG:

Q. And so you've marked in red, with a red dot, the location of the Fairmount Cut-Rate --

A. Uh-huh.

Q. -- on the Deposition Exhibit 2; is that correct?

A. Yes.

Q. And so it's right at the corner of Fairhill and Petrarca on the west side of Petrarca; is that right?

Page 16

A. That's correct.

Q. Okay. And back on May 19th of 1975, do you recall hearing about a shooting that took place there outside of the store?

A. Yes.

Q. And did you at some time later learn the name of the person who was shot there?

A. Yes, I did.

Q. And what was that person's name, if you recall?

A. Well, I know it was the money order man --

Q. Okay.

A. -- okay.

Q. And could you describe what you mean by "money order man"?

A. That's what he did, he delivered the money orders.

Q. Okay.

A. And also Ms. Robinson, the store owner.

Q. Mrs. Robinson?

A. Yeah, the store owner's wife.

Q. Okay. And what did you hear had happened to Mrs. Robinson?

MR. FUNK: Objection. Go ahead.

I'm sorry --

Q. What did you mean by Mrs. --

Page 17

MR. FUNK:  -- I'll object from time to time.  You can go ahead and answer the question.

Q. Let me re-ask that question.  Strike that. You said and Mrs. Robinson?

A. Uh-huh.

Q. What did you mean by that?  What happened to her?

A. She was one of the people that got shot, too.

Q. Okay.  And she was the store owner's wife you said?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. On May 19th of 1975 did you see anyone shoot the money order salesman?

A. No.

Q. On May 19th of 1975 did you see anybody shoot Mrs. Robinson?

A. No.

Q. Do you know who Ricky Jackson is?

A. Yes.

Q. Do you know who Wiley Bridgeman is?

A. Yes.

Q. Do you know who Ronnie Bridgeman is?

A. Yes.

Page 18

Q. Did you see Ricky Jackson shoot anyone on May --

A. No.

Q. -- 19th of 1975?

A. No.

Q. Did you see Wiley Bridgeman participate in any crime on May 19th, 1975?

A. No.

Q. Did you see Ronnie Bridgeman participate in any crime on May 19th, 1975?

A. No.

Q. And did you testify at the criminal trial of Ricky Jackson in 1975?

A. Yes, I did.

Q. And did you testify at the trials of Ronnie Bridgeman and Wiley Bridgeman in 1975 and 1977?

A. Yes.

Q. And at Ricky Jackson's criminal trial, what did you testify then about his role in the crime involving the money order salesman?

A. I testified that he was the one that shot the money-order man and Ms. Robinson.

Q. And what did you testify at Ronnie and Wiley's trial back in the '70s about their roles in the crime involving the money-order salesman?

A. I said that Ronnie Bridgeman was the one that hit

Page 19

him over the head with a stick and threw something in his face.

Q. Do you remember what you testified about Wiley?

A. I said Wiley was driving the car.

Q. Okay.  Was any of that true?

A. No.

Q. Did you see any of them participate in any crime on May 19th, 1975?

A. No.  No, I didn't.

Q. On May 19th of 1975 were you going to school?

A. Yes.

Q. What school did you go to?

A. Audubon Junior High.

Q. And do you recall where Audubon Junior High was located?

A. Yes.

Q. And where was that?

A. On Corlett.

Q. Do you recall how to spell that?

A. C-o-r-l-e -- l-e-t-t, Corlett.

Q. Okay.  Was it -- in what direction, like north, south, east, west, was it from where your house was?

A. Well, the front part of Audubon was on East Boulevard, okay?  And the back part was on -- I

Page 20

mean not off of Corlett.  I'm mistaken, not off of Corlett.  But the backside was just the backside, but East Boulevard, let's put it that way.

Q. Does East Boulevard have a different name today, do you know?

A. I'm not sure.

- - - -

(Thereupon, Plaintiff's Exhibit 3 was marked for purposes of identification.)

- - - -

Q. I'm showing you what's marked as Deposition Exhibit 3.  For the record it is a --

A. Martin Luther King Boulevard, yeah.

Q. -- it is a four-page exhibit of maps of the area around what is now called Martin Luther King Junior Drive and Manor Avenue near Woodland Hills Park.

A. Uh-huh.

Q. Could you take a look at that and let me know if you see the location of where your school was in 1975?

A. Yeah.  Continental.  Uh-huh.  Yep.  Continental. It's the backside which would have been Continental runs down, but East Boulevard, yeah,

Page 21

right here (indicating) -- right here where the little --

Q. Where the little balloon is?

A. Yes, uh-huh.

Q. Just for the record, you've marked with red pen on Deposition Exhibit 3 the location of the Audubon school in 1975?

A. Right.  That's correct.

Q. And it's where the little balloon is?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. So, was East Boulevard Martin Luther King Drive or is that a different street, I just want to clarify?

A. No.  If I'm not mistaken, that's what they called it back then --

Q. Oh, okay.

A. -- I believe.

Q. Okay.  All right.  So, how did you generally get to school in the mornings in May of 1975?

A. We would take -- we would take the school bus.  They picked us up in front of -- right there in front of -- actually where the store was.  Coming up, which is now called -- well, back then was

Page 22

called Fairhill.  And go up Fairhill.

Q. So, let's take a look at Deposition Exhibit 2.  This one (indicating).

A. Uh-huh.

Q. That's the map of Fairhill and Petrarca.

A. Right.

Q. Do you see the location where the bus would pick you up in the morning to take you to school?

A. Uh-huh.  The bus stop right about here (indicating).

Q. Can you put maybe a "B" for "bus"?

A. Uh-huh.  (Indicating).

Q. Okay.  So, for the record you've marked in red pen with a B the location of your morning pickup --

A. Uh-huh.

Q. -- at the bus stop to go to school --

A. Yes.

Q. -- to the Audubon School --

A. Yes.

Q. -- is that correct?

Okay.  And so that's on the -- okay.  So, that's on the west side of the street on Fairhill?

A. Yes.

Page 23

Q. Okay.  And it was up the street from the store; is that right?

A. Yeah.  You know, coming around the corner and you've got the little house there which is connected to the store and then you had a couple more houses, and then you got the bus stop right there.  Sohio gas station was right in here (indicating).

Q. So, just for the record, you're saying there was a couple houses in between where the store was, the Fairmount Cut-Rate, and the bus stop?

A. Yeah.  They kind of set back a little bit --

Q. Okay.

A. -- off of the sidewalk there.

Q. And you're saying that Ohio -- Sohio?

A. It was a Sohio gas station there, uh-huh.

Q. Is that where that parking lot is now?

A. Yes.  Uh-huh.

Q. Okay.  And which direction would the bus -- so the bus would be going south?

A. No.  It would be coming up this way, yes.  (Indicating).  Uh-huh.

Q. Okay.  And so you're pointing south, you would be going south --

A. Yes.

Page 24

Q. -- down the street --

A. Yes.

Q. -- down Fairhill?

A. Yes.

Q. Okay.

A. Going up.

Q. And I get a little confused because you're saying --

A. Going up.

Q. -- up -- oh, because it's uphill?

A. Yeah, it goes up --

Q. Okay.

A. -- it goes up.

Q. All right.  When I think up/down, I think north, south.

A. That's okay.

Q. Okay.  So, when you're referring to going up Fairhill, you're saying it's going up the hill?

A. Yes.

Q. But it's going south?

A. Yes.

Q. All right.  So, then which bus did you -- how did you -- after -- so that's in the morning, right, to go to school?

A. Huh?

Page 25

Q. That's -- what we were just talking about, in terms of the bus, was to go to school in the mornings, right?

A. Uh-huh.

Q. Okay.

THE COURT REPORTER: "Yes"?

Q. Is that a "yes"?

A. Yes.

Q. After school what bus would you normally take home?

A. We'd take the school bus home.

Q. Where would you pick up the school bus?

A. Right behind, because the school sits here, the front part, and you would have, which is Continental, and you have a little -- I don't see it, but it's a -- I'll just say right here (indicating) where Continental is.  Because Continental, it runs down from 116th and it runs -- it ends at -- oh, man, I don't know that little side street that goes all the way down, but it's about right here (indicating) where this little dot is.  That will be like behind, behind Audubon --

Q. Okay.

A. -- that's all.  And it would pick us up on the

Page 26

back side of the school.  That's where it dropped us off in the morning and that's where it picked us up in the morning.

Q. And do you recall what route the bus would take home, take you home after school?

A. Yeah.  After it would leave there --

Q. And you can mark it with red pen on that exhibit, if you'd like.

A. Right.  Because it would come down and it would come back up, and it would come up to 116th and then it would go down 116th, down, down, down, down, down, and it would come all the way down and it would go -- do I see it?  Do I see it?  Do I see it?

Q. If you look on the next few pages, there's a zoom-down map that shows a little bit more.  Maybe the third or fourth page.

A. It would come straight down and come down to, which is now called Stokes Boulevard.  So, it would be 116th all the way down to Stokes Boulevard and go around those little bends and come down to right here (indicating).  This is kind of like the route here almost like, I guess this would be 116th right here (indicating).  So, it would come this way

Page 27

(indicating) and it would come down and it would come down, and then it would get there (indicating).

And after it gets to, then it would come down and -- let's see -- oh, man, this is so -- I don't know, it's like a zoom, zoom -- okay.  And once it came down, all the way down and it would come up to Cedar Avenue and make the turn on Cedar and then it would come up Cedar Avenue -- I think that's Cedar there, right?  So, that would be Cedar there.  It's kind of hard to read these lines, so --

Q. Okay.  So --

A. -- but anyway.

Q. -- let's just -- I'll just ask you to clarify.  So, the school bus that you take after school --

A. Uh-huh.

Q. -- to get from school to home --

A. Uh-huh.

Q. -- would go up a hundred and --

A. 116th.

Q. -- 116th --

A. Uh-huh.  Down 116th.

Q. -- turn -- or down 116th --

A. Uh-huh.

Page 28

Q. -- turn on somewhere around Fairhill --

A. Uh-huh.

Q. -- or Park Boulevard?

A. Probably at Park Boulevard, right.

Q. Park Boulevard?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. And then it would continue down Cedar?

A. Come down those little winding roads and then it would come down to Cedar Avenue, right, at University Circle --

Q. Okay.

A. -- uh-huh.

Q. And then taking you back to Deposition Exhibit 2, that's the zoom, closer-in map --

A. Right.

Q. -- the bus would continue down Cedar going west?

A. It would, it would -- okay.  If this here was extended a little bit more (indicating), then you'll be able to see University Circle, where the Rapid and all of that is.

And coming down that hill, it would make that turn.  And it would make the turn, the bus would turn here (indicating) and it would continue up,

Page 29

continue up, and continue up, and it would cross Cedar. And this would be the first bus stop that it stopped at. And then it would continue on and when it got to 108th and where the Ohio Bell and all of that is, it would make another stop there. That would be the second stop.

Q. And so just for the record, you marked in red pen on Deposition Exhibit 2 --

A. Uh-huh.

Q. -- a line representing the way -- the direction of the bus would go --

A. Uh-huh, yes.

Q. -- west on Cedar --

A. Yes.

Q. -- after school?

A. Yes.

Q. And then you marked with a little -- can you just put a little X there at the first stop?

A. Yes, I can.

Q. All right. So, the first bus stop after the bus would cross Fairhill on Cedar, was pretty much just past Fairhill; is that right?

A. That's correct.

Q. And then it would continue down Cedar and stop in front of where the Ohio Bell was?

Page 30

A. The Ohio Bell Telephone Company is, yes, right there (indicating).

Q. And that's near 108th?

A. Yes.

Q. You've marked those with the two Xs on that map?

A. (Indicating).

Q. Okay. Great. So, was that the bus that you took on May 19th of 1975 coming home from school?

A. Yes.

Q. Do you recall about what time you left school that day?

A. I think we left school about 3:00, 3:30.

Q. Do you know how long it took you to get home from school on the bus?

A. Normally about 20 minutes or so. Something like that.

Q. And when you were on the bus going home from school on May 19th of 1975, was there a time when you heard a shooting?

A. Yes.

Q. And were you on the school bus with -- who -- you were on the school bus at that time, right?

A. Yes.

Q. And where were you -- in terms of the map -- where were you on the bus when you heard what

Page 31

sounded like a shooting?

A. All of this is like -- when you come up Cedar here it's like a, it's a hill. So, all of this is kind of like (indicating), you can't even see the store, but about right about here (indicating) we heard shots. After we turned coming up, we all heard two shots. And everybody looked to the left to see where it was coming from.

So we continued to come on up the hill, and we stopped at the light because I remember it was a red light and we stopped. And everybody was anxious to get off the bus to see what was -- where the shots came from. And we were all trying to get off the bus, but the bus driver wouldn't let us off, but anyway that's where we heard the gunshots, right there (indicating).

Q. Okay. And so you marked on Deposition Exhibit 2 in red pen near the D where it says Cedar Avenue --

A. Uh-huh. Yes.

Q. -- you marked with a little circle there --

A. Yes.

Q. -- where the bus was when you heard the shots?

A. Yes.

Page 32

Q. Okay. And could you see the store from there?

A. No. Like I said, when it's coming up the hill, the store is like -- you really have to be further up in order to see all of this area right here (indicating). To see this area, you have to be like a little bit further up to see all of this. Down here (indicating) you can't see the store from that point.

Q. Okay. And so when you're saying "down here", you're saying that when you're on Cedar Avenue if you're looking to the left -- or if you're traveling west on Cedar Avenue and you're looking left, there's a hill there, right?

A. Yeah, Yes. Because you're coming up the hill, yes.

Q. Okay. Now, do you recall if there were other kids on the bus with you at that time?

A. Well, it's a bunch of us on there, yeah. The bus was always full, yes.

Q. Do you recall any specific classmates or friends or kids that were on the bus with you?

A. Just the normal ones that normally would catch the bus.

Q. Do you recall any of their names or no?

A. You know, a lot of names I remember, a lot of

Page 33

names I don't remember.  And can I specifically say that they were on the bus, I can't.  All I can say is that I was on the bus.

Q.  Okay.  And where did you get off the bus after you heard the shots?

A.  I got off the bus here (indicating), the first bus stop.

Q.  Okay.  Just past Fairhill?

A.  Yes.

Q.  Were there other kids that got off the bus with you?

A.  There was other kids that got off the bus, yes.

Q.  And what did you do when you got off the bus?

A.  Well, we ran across the street and we came up, came back up Fairhill.  And after we ran across the street, and as we got a little bit closer and closer to the store, we could see someone laying on the ground.

Q.  And just for the record, you got off -- after you got off the bus at the first bus stop just past Fairhill, you crossed the street to the south side of Cedar; is that right?

A.  Yes.

Q.  Okay.  And when you turned the corner, could you see anything then?

Page 34

A.  No.  There was no turn.  We didn't have to turn the corner.  It was like a --

Q.  Oh, okay.  You just went across the street?

A.  Yeah, yeah.  Because the crosswalk is there, so yeah.

Q.  Okay.  And what did you see, if anything, at that time?

A.  We didn't see anything there.  It's, like I said, as we got closer up to the store.  Because a lot of times after school we'd either go to this store (indicating) or we'd go to the store on the corner of Frank and 108th.  So, you know, you get snacks and different things, so, yeah.

Q.  Okay.  Did you get closer to the store?

A.  Yes, we did.

Q.  And how close did you get to the store before you stopped?

A.  We actually didn't stop.  We got to -- close enough to the bus stop to where we could see somebody laying on the ground.

Q.  Okay.  And did you recognize that person?

A.  No.

Q.  Was there -- did you see anybody running away from the scene?

A.  No.

Page 35

Q.  Now, backing up for just a moment.  Before you got off the bus, but as the bus was going west on Cedar and crossing Fairhill, did you have an opportunity to turn and look in the direction of the store as the bus was crossing the Fairhill?

A.  Yes.  Yes, we did.  I did, yes.

Q.  Do you recall seeing anything at that time?

A.  No.

Q.  Okay.  All right.  You don't recall -- I'm sorry, that was a bad question.

Did you see anything at that time?

A.  No.

Q.  Okay.  When you got -- after you got off the bus and you were standing at or near the bus stop, you were saying you didn't see anybody run away from the scene; is that right?

A.  That's correct.

Q.  Did you see Ricky Jackson there?

A.  No.

Q.  Did you see Wiley Bridgeman?

A.  No.

Q.  Did you see Ronnie Bridgeman?

A.  No.

Q.  Did you see anybody driving away in a car?

A.  No.

Page 36

Q.  Was there anybody else who had arrived at the scene at that point, like any onlookers or anything like that?

A.  No.

Q.  All right.  So, after you were -- how long did you stand there near the bus stop?

A.  We didn't stand, we just kept walking towards the store.

Q.  Oh, okay.  Okay.  And then how close did you get to the store?

A.  We went all the way up to the store.

Q.  Okay.

A.  Uh-huh.

Q.  And do you recall who you were with at that time?

A.  Just the kids, you know.

Q.  And how close did you get to the store?

A.  We actually went right in front of the store.

Q.  Oh, right in front of the store.  Okay.

A.  Uh-huh.

Q.  And then what did you see then?

A.  Well, we seen the white man laying on the ground.

Q.  Did he appear to have any injuries on him?

A.  Well, it looked like he had a hole in, right somewhere right in here (indicating) somewhere, and he was kind of gasping for air.

Page 37

Q. Okay. And for the record you were pointing to your chest?
A. Yes.
Q. Okay. And what did you do then?
A. We just stood around. And, you know, by then the other kids were beginning to come up and the police came after that. It was like, I don't know, maybe three or four minutes after that the police started to come, so --
Q. Okay. And do you recall how long you stayed there before the police come, came?
A. I don't know.
Q. And then what did you do after the police came?
A. Well, they made us all kind of back up a little bit because, you know, they went into the store. We all just stood around, you know.
Then other people started to come up from, from Petrarca and -- excuse me -- and Frank, and Frank Avenue.
Q. Did you recognize anybody who started coming up from Petrarca and Frank?
A. Just people from the neighborhood. People I lived around, yes.
Q. And how long did you stay there before you went somewhere else?

Page 38

A. Stayed there long enough, I saw Ms. Robinson being put into the ambulance, and after that they put a sheet over the guy, I guess his name was Mr. Franks, put a sheet over him.
And, I don't know, maybe a few more minutes and I begin to walk home. And at that time met up with Tommy Hall.
Q. Okay. And which direction did you walk home?
A. From here coming up -- coming down Petrarca, coming down, coming down this direction (indicating), and then from there to Frank Avenue.
Q. Okay. And so, just for the record, you've indicated on Deposition Exhibit 2 with red pen that you walked -- you drew a line down south on Petrarca and then west on Frank; is that right?
A. That's correct.
Q. Okay. And that's the direction that you walked with Tommy Hall?
A. Yes. Uh-huh. And we got about right here (indicating), which would have been -- which would have been where the church is, I'm going to say that. And here's where he told me, he told me that he knew who did it.
Q. Okay. And just for the record, you've marked a

Page 39

little dot near the parking lot on Frank Avenue. That's where there's a church?
A. Well, yeah, I guess it's a church -- it should be a building right in there. I don't know what's there now, but I know it was a church right about there (indicating).
Q. Okay.
A. Because when you got to the corner and 108th.
Q. Okay. And what did Tommy Hall say to you in that conversation?
A. He just told me that he knew who did it and he said that Ricky and Wiley and Buddy had did it.
Q. Did he use the name Wiley or did he -- is that exactly what he said?
A. Yeah. Bitsey.
Q. Oh, he said Bitsey?
A. Bitsey, yeah, uh-huh. Because see Ricky was Ricky, and Ronnie was Bitsey and Wiley was Wiley, uh-huh.
Q. Did you ever know Wiley by a nickname?
A. No. They were older than I am, so I didn't really -- they were like my, my sisters' and them age, my sister, older sister and them age.
Q. Did you ever know Wiley as Buddy?
A. Buddy, yeah.

Page 40

Q. Okay. Did you know Wiley and Ronnie's last name at the time?
A. Yeah.
Q. And what about Ricky, did you know him by his last name, too?
A. Yes. Uh-huh.
Q. And did you know them, you know, at all from the neighborhood?
A. I grew up -- yeah, I grew up with them. I delivered papers to their house. I -- Ricky's younger brother, me and him, went to school together.
Q. Did you ever hang out with Ricky's younger brother?
A. Yeah. Yeah. We were all friends. I didn't hang out with Ricky and Wiley or Buddy because they were older than -- older than we are, you know, but I hung out with him, uh-huh.
Q. While you were standing at the store, and before you started walking home with Tommy Hall, did you see anybody in the crowd that you knew?
A. Did I see anybody? The whole neighborhood was there, everybody. Yeah --
Q. Okay.
A. -- yes. Yes.

Page 41

Q. All right.  Going back to the conversation with Tommy Hall --

A. Uh-huh.

Q. -- what did you say to Tommy when he said he knew who did it?

A. No, I didn't say anything.  I don't recall asking him how -- did I say anything to him or did I -- no.

Q. Okay.  Where did you go after that?

A. Home.

Q. Did Tommy live near you, by the way?

A. Tommy stayed on Arthur, yeah -- well, he stayed -- if you -- this is 108th (indicating), if you come -- if you come down 108th, after you cross over, off of Frank, Arthur would be the next street over.  And he stayed right there off of a hundred and -- at that time it was called 107th and Arthur.

- - - -

(Thereupon, Plaintiff's Exhibit 4 was marked for purposes of identification.)

- - - -

Q. I'm going to hand you what's been marked as Deposition Exhibit 4.  That's a map with several pages that's got a wider view, a wider aerial

Page 42

view of the area around where your house was and the store.  If you can just take a look at that first page and let me know if you see Arthur Avenue on it.

A. Yes.

Q. And you said Arthur -- or Tommy Hall lived at about 107th and Arthur?

A. Right.  This is 108th right here (indicating), and this is where I lived between Frank Avenue.  If you continue down, you run right into Arthur Avenue, which was right there (indicating).  He stayed on Arthur right about -- I don't know -- when you come out of 108th, it runs right into Arthur, and you would run right into, almost right into their house.

Q. The -- all right.  So, then you went home, right?  After your conversation with Tommy?

A. Yes.

Q. What did you do then?

A. I put my books down and I went back up to -- I went back up to the store and that's what I did.

Q. When you stopped at home, did you tell any of your family members what you had seen after you got off the bus?

A. Everybody was up there.

Page 43

Q. Okay.

A. There wasn't anybody at home.

Q. All right.

A. Matter of fact, my mother was the only person that was at home, but she was -- she wasn't going up there.  She kind of heard what went on.

Q. When you walked back up to the store, were you by yourself or did anybody go with you?

A. I was by myself.

Q. And where did you go when you went back up to the store?  Did you stand right outside the store or --

A. Well, I went back up to the store and I was standing there and a police officer was asking, did anyone see anything or anyone know anything about what happened up here, and I told him I did.

Q. Do you remember the name of that police officer?

A. No.  No.

Q. Was he -- what race was he or did he appear to be?

A. Caucasian.

Q. Was he in uniform or plain clothes?

A. Uniform.

Q. And what exactly did you tell that officer?

Page 44

A. I just told him that I knew who did it.  And so they took down my name, telephone number, and address.  And he said that somebody will get back with me and talk with me about it.

Q. Okay.  Did you talk to any other police officers at the scene?

A. I can't remember, but I don't think I did.

Q. After that -- well, how long did you stay there?

A. Well, by that time, you know, it was -- it was getting kind of late, so after I had told him that, I went on back home, so --

Q. Why did you tell the police officer that you knew who did it?

A. Because I thought I was doing the right thing by coming forth and telling what I knew.  I just believed in telling the truth and I just believed that I was doing the right thing by helping.

Q. You hadn't actually seen what had happened; is that right?

A. No.

Q. But you were communicating information that you got from Tommy Hall?

A. Right, that's correct.

Q. And when was the next time -- well, strike that.  Did you speak to any other police officers

Page 45

that day?

A. Like I said, I just explained to you, I can't recall if I did or if I didn't.

Q. Okay.

A. I'm not sure.

Q. Then when is the next time you -- well, strike that.

Do you recall at some point viewing a lineup at the police station?

A. Yes, I do.

Q. Was the lineup on May 25th, 1975?

A. May 25th, 1975.

Q. And so in between the day of the shooting, which was on May 19th and the day of the lineup of May 25th --

A. Yes.

Q. -- did you speak with any Cleveland Police detectives?

A. Yes. Detective Terpay and Detective Farmer.

Q. When is the first time you recall speaking with Detective Terpay after the shooting?

A. I believe it was -- I believe it was the next, the next day. I believe it was the next day.

Q. And could you describe how that conversation came about?

Page 46

A. Well, he came and he introduced to us, to me and my mother and father wasn't there, but he introduced himself. And he said that he wanted to take me down to the police station and for me to give a statement about what happened. And to see if I could recognize anybody that -- maybe photographs that they might have to recognize some people.

But on that particular day, the city wanted to take me down there and talk with me and to get a statement from me.

Q. Okay. Was Detective Terpay with Detective Farmer at that time?

A. Yes, yes.

Q. Were there any other detectives with them?

A. Not that I recall.

Q. And do you remember whether -- what time of day it was that he came -- they came to speak with you?

A. After school.

Q. Was it at night?

A. After school.

Q. Was it like soon after school or at nighttime?

A. I want to say about 5:00 or so, something like that. 5:00 or 6:00.

Page 47

Q. And did your mother say anything to either of the detectives when they came to your house and said they wanted to take you to the station?

A. Yes, she did. She wanted to go with me. And they told her, no, he'll be all right, he'll be all right. We know that it's a school night and we'll have him back home before it's too late, before it gets too late.

Q. Then did you go with the detectives to the police station?

A. Yes, I did.

Q. When you got to the police station, what happened next?

A. Well, they asked me the names of the people who did it, and I gave them the names of the people who did it. And they asked me about how tall they were and how -- you know, what they looked like and all of that, all those things.

Q. Do you remember any other specific questions that Terpay or Farmer asked you at that time?

A. I don't think they got into any of the real questions about everything like what I saw and everything like that.

Q. You don't think they did?

A. I don't think they did. They might have, but I

Page 48

don't know, I'm not quite sure.

Q. Where were you at the police station when they were asking you these questions? Was it in a room or an open area? Can you describe it?

A. No, it was an open area because it was other police detectives around and stuff, so, yeah, it was an open area.

Q. Okay. When -- what did you -- during that conversation with Detective Terpay and Farmer, what did you say to them about what you knew?

A. I told them who the names were and --

Q. And what names did you give them?

A. I gave them Ricky and I gave them Wiley and I gave them Buddy.

Q. Did you say -- well, strike that.

What happened --

A. He --

Q. I'm sorry, go ahead.

A. No, I was saying I gave them Ricky, Wiley and Bitsey.

Q. Ricky, Wiley and Bitsey?

A. Yeah. You have to remember, I've got to call them by the names that they were called --

Q. Okay.

A. -- then, yes.

Page 49

Q.  Okay.  So, just to be clear, did you give the name Wiley or did you call them by nickname, Buddy?

A.  No, I called -- Wiley is Buddy, yeah, right.

Q.  Okay.  And Ronnie was Bitsey?

A.  Uh-huh.

Q.  Okay.

A.  Uh-huh.

THE COURT REPORTER:  "Yes"?

THE WITNESS:  Yes.

Q.  All right.  After that conversation, what happened next at the police station?

A.  They -- well, they took me back home.

Q.  Did you see -- did they show you -- did Detective Farmer or Terpay show you any photos at that time?

A.  I think the photos came the next day, the next day -- they came and got me the next day and they began to show me photographs.

Q.  Do you recall -- during the time that you were having this conversation with Detective Terpay and Farmer, were they taking notes?

A.  Yes, they were.

Q.  Could you see whether they were writing on a legal pad or what kind of paper they were writing on?

Page 50

A.  All I can say is they were writing on paper.  And I can remember them giving me like, like information.

Q.  What information were you given by Terpay and Farmer?

A.  Well, it wasn't so much Farmer, it was mostly Detective Terpay.  And he was like, he said, well, you know, a guy got hit over the head, there was a stick involved, wasn't there?  The guy got hit over the head with a stick, didn't he?

You know, and then he told me about -- kind of put it in -- he goes, they threw something in his face, in his face, it was in a cup or something, wasn't it?

And he said he was, he was shot, right?  Yes.  I guess.  Yeah, I saw he was shot, yeah.

He was shot with a big gun.  Probably a .38 or something like that, huh?  I was like, I guess so, yeah.

So -- you know -- so, they was like -- they said it was a car involved, it was like a light green or dark green car.  Do one of them own a light green or dark green car?  I was like, yeah.

Page 51

I said Buddy and them has a light green and dark green car with a convertible.

He said how do you know that?  I said because I deliver papers, you know, I deliver papers there.  I'd see them drive around in the car, but I deliver papers there at the house.

Q.  I'm sorry, I didn't catch the last part.  So, you told Detective Terpay that Wiley -- that you knew what Wiley's car looked like?

A.  Buddy.

Q.  Oh, Buddy.  I'm sorry.  I'll use their names that they were called at the time.

A.  Uh-huh.

Q.  Did you tell Detective Terpay that you knew what Buddy's car looked like?

A.  I told them that it was a car that was in their driveway that I guess that's the car they were talking about.

Q.  Do you remember what -- did you tell Detective Terpay at that time what color car Buddy had?

A.  No, they told me.

Q.  Okay.  And what did Detective Terpay tell you?

A.  They told me it's like, well, don't he -- don't he drive a light green or dark green car?  I was like, yes, I said I see a light green and dark

Page 52

green car in the driveway when I, you know, deliver the papers in the morning.

Q.  So, did you just -- I just want to clarify.  Had you actually seen a light green or dark green car in Buddy's driveway or you were just agreeing with the officers?

A.  Well, no, I know that they had a light green and dark green car, yes, I did.

Q.  And Detective Terpay also told you that the money-order salesman had had something thrown in his face?

MR. FUNK:  Objection.

A.  Yes.

Q.  Is that what you said?

A.  Yes.

Q.  And what else did Detective Terpay tell you about that?

A.  What else did he tell me?

Q.  Yes, did he say anything else about that in particular?

A.  That day and that night -- pretty much told me that he had a briefcase.  It was like a briefcase.  I said, yeah, that's what the money-order man carried, he carried a briefcase.  He's like, oh, okay.  We had a briefcase, so --

Page 53

Q. Okay. Is there any other information that you remember Detective Terpay telling you about the crime or the money-order salesman?

A. Not that I can remember.

Q. All right. And during this conversation where Detective Terpay was telling you information about the crime, was Detective Farmer present, too?

A. Yes, he was.

Q. Did he say anything, that you recall?

A. Detective Farmer was -- he was really quiet. He really didn't say a whole lot, no.

Q. Where there any other detectives present besides Terpay and Farmer?

A. When they were talking -- when he was talking --

Q. During this conversation?

A. I don't know. You know, it's pretty much us.

Q. Do you remember what Detective Farmer looked like?

A. I know he was white. And I could recall him having two marks on his head. And the reason why he had -- he had two marks here (indicating), in his temple area. And he had told me that he had been -- he had been shot like six times or something during a robbery or something, or

Page 54

something happened where he had got shot and it was -- that was one of -- that was one of the injuries, but you could really see like the little round dents in his head right there (indicating). And he was kind of a stocky detective. He was kind of well-built. You know, he wasn't, you know, huge and fat and out of shape, you know. And for the most part, he was -- he was really -- he was really nice. You know, he was down low key, he wasn't a very hyper guy. No. No. He was -- I really liked him.

Q. During the conversations that you were having with Detective Terpay and Farmer, did Detective Farmer ever tell Terpay to stop giving you information?

MR. FUNK: Objection.

A. No.

THE VIDEOGRAPHER: End of tape one. Off the record at 10:30.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER: Okay. This is tape two. We're back on the record at 10:43.

Page 55

BY MS. WANG:

Q. All right. Mr. Vernon, we were talking about this conversation that you had with Detective Terpay and Farmer the day after the shooting at the police station.

A. Uh-huh. Yes.

Q. Is there anything else that you remember either Detective Terpay or Farmer saying to you during that conversation?

A. No.

Q. Is there anything else you recall saying to them?

A. No, not that I can recall.

Q. And then what happened after your conversation was over?

A. Like I said, we -- are you talking about the first day or the second day?

Q. Yeah, did they take you home?

A. Yeah, they took me home, yes, they did.

Q. And do you recall how -- what time was it when you got home that day?

A. It was kind of late. My mother was a little upset because it was like about 10:30 almost 11:00 o'clock.

Q. And so you had spent -- what time had they picked you up from your house?

Page 56

A. About, like I said, about 5:30, 6:00 o'clock.

Q. The next day, two days after the shooting, that would have been May 21st of 1975. Do you recall talking to any Cleveland Police detectives on that day?

A. Yes.

Q. Who do you recall speaking with?

A. Detective Terpay and Detective Farmer.

Q. And how did that come about?

A. They wanted to know if I knew where they lived, where everybody lived.

Q. Where --

A. Where Ricky and where Buddy and where Bitsey lived.

Q. Okay. And what time was it when they came, when Detective Terpay and Farmer came to speak with you?

A. It was after school. It was after school.

Q. And did they come to your house?

A. Yes.

Q. And what -- was your mother home?

A. Yes.

Q. Did they have any conversation with your mother at that time?

A. They had very little conversation with my mother.

Page 57

And I'm just going to speculate, but I believe that's really what made my mother upset is that they really didn't include her in a lot of things.

Q.  And then what did you -- where did you go -- sorry.  Did Detective Terpay and Farmer take you from your house then?

A.  Yeah.  Yes.  Yes, they did.

Q.  Where did you go?

A.  I went back down to the police station.  We looked at some more pictures again, and after that we came back home.

Q.  How long were you at the police station?

A.  This time I got home about 9:00.

Q.  P.m.?

A.  Yeah, uh-huh.

Q.  What did you do at the police station?

A.  I looked at some pictures.  They fed me and, you know, they talked with me a little bit more about what went on at, at the store.

Q.  Okay.  And what do you recall Detective -- sorry.  So, while you were at the police station looking at photos, was it just yourself and Terpay and Farmer?

A.  Pretty much.  And, you know, they had the other

Page 58

detectives that were around and stuff, but pretty much us.

Q.  Okay.  There were no other detectives that you recall being part of the conversation you were having with Terpay and Farmer; is that right?

A.  Not that I can recall.

Q.  Okay.

A.  It could have been, but not that I can recall.

Q.  Okay.  And then what do you recall -- what's the first thing that you recall doing at the police station once you got there?

A.  Just sitting down, sitting down and looking at the pictures.

Q.  What did Detective -- who showed you the pictures?

A.  Well, Detective Farmer brought the pictures out.

Q.  Okay.  And what -- do you remember what format the pictures were in?

A.  They were basically like -- I don't know.  They were the long ways like this (indicating).  So it had like one, two, three, four, five, six, seven -- about nine people on one page, you know, on one sheet, so or something like that.  Six to nine people on one sheet.

Q.  Okay.  And was it in a binder or were they

Page 59

looseleaf?

A.  I feel like a binder like.  I mean, it's like a -- I'm not going to speculate.  I believe it was like a binder or sheets.  I'm not -- I'm not going to -- I can't recall.

Q.  If you're not sure, that's okay.

A.  Yeah.

Q.  All right.  And then what did Detective Farmer say to you when he brought out the pictures?

A.  He said just take your time, look through them.  We have more, and they had more.  They had more.  They had a lot.  I think that, you know, it took up a lot of time to look through there.  And I didn't see anybody, I didn't see them, I didn't recognize them.

Q.  Okay.  And so when you say you didn't see them, what do you mean by that?

A.  I didn't recognize any of the -- any of -- I didn't recognize Ricky, Buddy or Bitsey in any of the pictures that I was shown.  And I think it was shown -- the pictures were shown according to the height and the weights, so it was -- and it was quite a few.

Q.  And what do you mean the pictures were shown according to heights and weights?

Page 60

A.  That's the way they -- that's the way it was given to me.  He said these are the people that are, at that time, five-five, five-six, that according to the weight 130, 140 pounds.  And that's just the way they gave them to me.

Q.  Did either Detective Terpay or Farmer tell you what the heights and weights of the suspects were?

MR. FUNK:  Objection.

A.  No, they didn't.  They just asked me how tall did I think they were.  And that was in the initial -- in the beginning.  You know, they already had asked me about how tall they were.  Were they taller than you?  Were they this tall?  This tall?  I was like yes, yeah.

Q.  So, just to be clear, on this day where you were shown the photos, was it Detective Terpay or Farmer -- well, strike that.  What do you recall Detective Farmer saying to you?

A.  Nothing too much.  He just brought the pictures out.  He said take you time and look at them.

Q.  What about Detective Terpay, do you remember him saying anything to you when the pictures were brought out?

Page 61

A.  Nothing.  He -- like I said, they gave me the pictures and I just sat there and I looked, you know, and he would come and, you know, tap me on the back, rub me on the shoulder, say relax, just keep looking at the pictures.

Q.  And do you recall any other conversations that you had with the detective during this time when you were looking at the photos?  How about after you were done looking at the photos, do you recall any conversations with the detective then?

A.  No.

THE COURT REPORTER:  No?

THE WITNESS:  No.

Q.  I'm sorry, I'm going to -- it looks like the sun is in your face.

A.  That's okay.

MR. FUNK:  The question before that did he say "no" to that one, too?

THE COURT REPORTER:  He didn't say anything.

Q.  All right.  Now, earlier you were saying that Detective Terpay had asked you how tall the suspects were?

A.  Yeah.  They asked me about how -- the height and everything, and how tall they were.

Page 62

Q.  Was that the day before or was that during the time that you were looking at photos?

A.  That was before I even got to the photos, yeah.  It was before.

Q.  All right.  And what did you say to them at that time?

A.  I just gave them an estimated height and weight.

Q.  Okay.  What did you do after you looked at the photos?

A.  On that particular day?

Q.  Yes.  On that day.

A.  Went back home.

Q.  Did one of the detectives drive you home?

A.  Yes, they did.

Q.  Do you recall if they were both in the car?

A.  They were both with me, yes.

Q.  And at some point, did you -- did you go in a car ride with Terpay and Farmer to look at -- to look at the houses of the suspects?

A.  Yes, I did.

Q.  Okay.  Was that on the same day as the photos or a different day?

A.  That's a different day.

Q.  Okay.  So, after the day involving where you looked at the photos -- by the way, do you recall

Page 63

during the conversation you had at the police station with Terpay and Farmer where you were looking at the photos, do you recall either of the detectives taking notes?

A.  Yeah.  They wrote everything down.

Q.  And the day -- so after the -- after the -- strike that.

After the day where you reviewed the photos, did you speak with either Terpay or Farmer the next day?

A.  Yes, I -- yes.

Q.  And what occurred -- what do you recall occurring on that day?

A.  It was -- I believe that day was a short day because they was saying that they were going to -- go back down here and they had to do some, whatever they do.  And that they would see me the next day to see if I could point out where they live.

Q.  And where were you when the detectives first came to speak with you?

A.  Where was I?

Q.  Did they come to your house again?

A.  Yes.

Q.  Did they ever pick you up from school, by the

Page 64

way?

A.  I think -- I believe one time.  I believe one time they picked me up from school.  I think, I want to say I think.  I'm not exactly sure.

Q.  Okay.  So, on the occasion where you went with the car ride -- went on a car ride with Terpay and Farmer, you were saying they came to your house?

A.  They came and picked me up that day from my house, yes.

Q.  Was that after school again?

A.  Uh-huh.  Actually, I want to -- I don't know if that day was after school or not.  And the reason why I say that is because it was -- it might have been or it might have not been, but I think it was early.  It was like, like in the morning time.

Q.  Do you remember if it might have been at night?

A.  It might have been in the evening because -- no, it was in the evening.  Because you know why?  Because all the kids were out playing.

Q.  In the evening?

A.  Yeah.  Everybody was out, they was playing.

Q.  So, what do you recall about what Detective Terpay and Farmer said to you when they came to

Page 65

pick you up from your house before the car ride?

A. They said they were going to take a ride and you show me where they live.

Q. Okay. And then where did you go next?

A. Say -- well, we went down -- he picked me up and then we went down 108th to Cedar. Went down Cedar to 105. Came back up 105 and came up Arthur.

Q. Okay. And who was in the car?

A. Those two, Detective Terpay and Farmer.

Q. Do you recall if there was a third officer or detective in the car?

        MR. FUNK: Objection.

A. There might have been. There might have been.

Q. Do you recall anything about that officer?

A. Vaguely. Vaguely.

Q. You're not sure if there was one?

A. I'm not sure, but I believe there was.

Q. Okay. Do you recall anything about what that officer looked like?

A. No.

        MR. FUNK: Objection.

Q. Do you recall if he -- whether he was in plain clothes or in uniform?

A. Plain clothes like a detective.

Page 66

Q. And were Detective -- what did Detectives Farmer and Terpay usually wear?

A. Just like the normal detective clothes, suit and tie, or a shirt and tie.

Q. When you drove down Arthur with Detective Terpay and Farmer, what conversation did you have with them at that time?

A. They told me -- they asked me would I point out the houses and where they lived.

Q. When you say "they", do you remember whether it was Terpay or Farmer who said that?

A. Detective Terpay.

Q. Okay. And who is he referring to when he was asking you to point out houses?

A. He asked me to point out where Ricky lived, where Bitsey lived and where Buddy lived.

Q. And then what did you say in response?

A. I said okay.

Q. And then did you point out their -- what did you do next?

A. Well, we drove down Arthur slow and they told me to kind of duck down in the car a little so -- because everybody was outside. And as we came up Arthur, on the right-hand end of Arthur, I want to say about a quarter of the ways up Arthur --

Page 67

in the back where Ricky stayed, I pointed out that house. And we drove up a little bit more, maybe about -- one, two, three -- one, two, three, four -- one, two, three, four -- five houses up, and on the left-hand -- on the left-hand side is where Wiley -- or I mean Bitsey and Buddy stayed and I pointed that -- the house out.

Q. And then do you remember what other conversation you had with them at that time?

A. No.

Q. Where did you go after that?

A. Home.

Q. Did you go to the police station on that day at all?

A. I mean, they took a little -- they wrote down everything that I said, you know, and pointed out the houses and everything, and then they took me back home. So it was like a short day. It was a short day.

Q. Okay. And did both detectives write down notes about what you said?

        MR. FUNK: Objection.

A. I can't recall. I know that Detective Farmer -- I mean Detective Terpay was the one that did most

Page 68

of the writing, I mean everything.

Q. So, just to be clear, on this car ride that you had with the detectives, did you see any of the detectives -- either of the detectives write anything down?

A. I was in the back seat, so I couldn't tell if they were writing something down in the front or not.

Q. At some other occasion after your car ride, did you see either of the detectives write anything down?

A. At the police station.

Q. Okay. When -- the day after the car ride, do you recall talking to any detectives on that day?

A. The day after the car ride?

Q. Yes.

A. The day after the car ride, some detectives came and got me and -- yeah.

Q. Okay. Well, I guess let me try and clarify. The -- at some point there was a lineup on the 25th, right?

A. Yes.

Q. Was there any interaction or conversation that you had with Detective -- any detective between the car ride and the lineup?

Page 69

A. The car ride -- the next day is when they came --

Q. Okay.

A. -- the next day.

Q. Okay. And who came to get you?

A. I could recall the detectives, that's -- now, was it -- I can't remember the names and all that.

Q. Were they -- it wasn't Detective Terpay or Farmer?

A. No.

Q. Where did these -- how many detectives were there?

A. Two.

Q. And what race were they?

A. Caucasian.

Q. And they were men?

A. Yes.

Q. And where did they come to talk to you?

A. They came to pick me up from my house.

Q. Oh, picked you up?

A. Yes.

Q. Okay. And did they speak to you while you were at your house?

A. They spoke to me and they spoke to my mother and told her that they were about to take me down and for me to view a lineup to pick -- pick the men

Page 70

out of the lineup.

Q. Okay. So, this was on the day of the lineup?

A. Yes.

Q. Okay. So, then what did your mother say to the detectives while they were talking to her at her house?

A. She wanted to --

MR. FUNK: Objection. Go ahead.

A. She wanted to come down --

Q. Okay.

A. -- and they just -- they told her, no, he'll be all right. We'll bring him back after the lineup.

Q. And -- well, were you present when your mother told the detectives that she wanted to come down for the lineup?

A. Yes. Yes.

Q. So you heard her say to the detectives that she wanted to go?

A. Yes.

Q. Do you remember what either of the detectives looked like?

A. I want to say yes and I want to say no. It depends on how -- how I can recall. I can re-look. I don't know, I would have to -- I

Page 71

don't know, it would -- it's been a while, so --

Q. Okay. So, these two detectives took you to the police station to view the lineup?

A. Yes.

Q. All right. And then do you recall any conversation with them in the car ride on the way to the station?

A. No.

Q. When you got to the station, what did you do -- what did you do next?

A. Sat down for a minute and they explained to me what was about to happen. And they said all you have to do is pick these guys out of the lineup and we'll take you back home.

Q. Okay. And who was present during this conversation when the detective told you that all you had to do was pick these guys out of the lineup?

A. Them, the detectives.

Q. The two of them?

A. Yes.

Q. Was there anybody else present?

A. If there was, I can't remember.

Q. And what did you say in response to that?

A. I just said okay.

Page 72

THE COURT REPORTER: I'm sorry?

THE WITNESS: I just said okay.

Q. And where did you go next?

A. I went to the lineup room and I viewed the lineup.

Q. Okay. What do you recall being the layout of the lineup room?

A. Just some men that were in the room and they told me that they couldn't see me behind this glass, but I could see them.

Q. Okay. And were the two detectives who came to pick you up from your house, were they present in the room with you for the lineup?

A. I believe so, yes. I believe so.

Q. Were there other police officers in the room during the lineup?

A. There probably was, but I can't remember that.

Q. Do you recall seeing Terpay or Farmer there?

A. No, they weren't.

Q. So, were you in the room first before the men came into their side of the room?

A. I was in the room first.

Q. Do you recall seeing anybody else you knew from the neighborhood there?

A. Not that I know of. There could have been, but

Page 73

--

Q. Okay. So what happened during the lineup?

A. Well, they brought them out and they asked me did I know -- did I see anybody that I recognize up there and I said no.

Q. Who asked you did you recognize anybody up there?

A. Whoever was asking, the lineup people, that's all I can tell you. I don't know, I'm not specific with names of people or know who they were.

Q. Okay. Was it one of the two detectives who came to get you from your house?

A. No.

Q. It was a different officer?

A. It was -- all I can say is it was whoever the person was that was doing the lineup, that's all I can say.

Q. Okay. The -- so, after you said you -- well, what did you say exactly when they asked you if you recognize anybody -- well, sorry --

MR. FUNK: Objection.

Q. -- let me clarify. What did they ask -- what did the officer ask -- what did any officer ask you during the lineup?

MR. FUNK: Objection. It's been asked and answered.

Page 74

A. They asked me did I see anybody in there that I recognize and I said no.

Q. Okay.

A. Do you recognize this person? Do you recognize -- no, I don't.

Q. Okay. Do you recall any officer saying anything else to you at that time?

A. No.

Q. Where did you go after that?

A. To a room.

Q. Who took you to that room?

A. The detective.

Q. The two who picked you up from your home?

A. Yes, if I'm not recalling -- if I recall right.

Q. I think you had said earlier you don't recall the names of those two officers; is that right?

A. No. Because the reason why I say that is because I had never been around them before. So, the only two officers -- detectives that I've always been around was Detective Terpay and Detective Farmer.

Those -- you know, for somebody to introduce themselves, you know, the first time, I'm -- no, I don't -- you know, no. It's not something that just like kind of stuck with me for 40 years, no.

Page 75

Q. Sure. Would it refresh your recollection to look at your trial testimony from Ronnie Bridgeman's trial as to the names of the detective?

A. Uh-huh.

MR. FUNK: Objection.

Q. Is that a "yes"?

A. Yes.

Q. I'm showing you page 131 --

A. Uh-huh.

Q. -- form the trial of Ronnie Bridgeman -- and I can give you a couple of the other pages for context if you'd like.

A. Okay.

Q. And for the record, this is your testimony during Ronnie Bridgeman's trial.

MR. FUNK: I'm going to --

A. Okay.

MS. WANG: What's your -- I do want to know what your objection is. What's your objection?

MR. FUNK: Yeah, I don't want to state it in front of the witness, so can we go off the record for a second.

MS. WANG: Do you want -- you don't want him in the room while we discuss

Page 76

your objection --

MR. FUNK: Right --

MS. WANG: -- or --

MR. FUNK: -- yeah.

MS. WANG: Do you mind just stepping out for a minute, I need to know how to fix this.

THE VIDEOGRAPHER: Stay on?

MS. WANG: We're going to stay on the record, but --

MR. FUNK: Yeah.

MS. WANG: -- you're just going to leave the room for a second, if you don't mind --

MR. FUNK: If you're focusing on question 131 --

MS. WANG: Uh-huh.

MR. FUNK: -- I'm sorry, on page 131 Detective Staimpel, yes. The reference to Detective Cummings -- I'm sorry, I took off my mike --

THE VIDEOGRAPHER: That's okay.

MR. FUNK: The reference that Michael Cummings was completely out of

Page 77

context --

MS. WANG: I'm not talking about Cummings.

MR. FUNK: Okay. Well, you showed him a page that mentions his name. Because specifically --

MS. WANG: I'm asking him about who was -- the names of the officers -- the detectives who took him from his house and took him to the lineup --

MR. FUNK: Okay. So --

MS. WANG: -- he said he didn't recall --

MR. FUNK: And his testimony here he didn't actually say he recalled Mike Cummings being there.

MS. WANG: I'm not asking him about Mike Cummings --

MR. FUNK: Okay.

MS. WANG: -- I'm asking him --

MR. FUNK: That's my objection.

MS. WANG: -- about Staimpel.

MR. FUNK: And, in fact, I think there was no testimony from Mr. Vernon at that trial that Detective Cummings was

Page 78

there.

MS. WANG: I understand that --

MR. FUNK: Okay.

MS. WANG: -- that's a question from the prosecutor.

MR. FUNK: It's actually -- that's a question on cross-examination.

MS. WANG: Or --

MR. FUNK: By Mr --

MS. WANG: It's not his testimony about Cummings --

MR. FUNK: Right.

MS. WANG: -- is what you're saying? Okay. But I just want to make sure because I want it to be sort of out --

MR. FUNK: I just don't want you to lead, unnecessarily lead him into the suggestion that he had previously identified Detective Cummings --

MS. WANG: No, I'm not.

MR. FUNK: -- when in fact --

MS. WANG: I'm not.

MR. FUNK: Okay.

MR. GILBERT: And you can obviously clear that up if it is something

Page 79

unexpected.

MR. FUNK: Okay.

MS. WANG: Okay.

MR. GILBERT: Okay.

MS. WANG: Did he go somewhere? He went to the bathroom? Okay.

THE VIDEOGRAPHER: You want to go off?

MS. WANG: Go off for a second.

THE VIDEOGRAPHER: Off the record at 11:13.

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER: Back on the record at 11:16.

BY MS. WANG:

Q. All right. So, I've actually just marked a couple of the lines on page 131 from your testimony at Ronnie Bridgeman's criminal trial. Have you reviewed this?

A. Yes. Okay.

Q. Does it refresh your recollection as to what the name of one of the detectives was at the lineup?

MR. FUNK: Objection.

Page 80

A. I don't know. Sort of. I can't really say. Just sort of, yeah.

Q. Okay. The -- all right. So, then you were saying after the lineup the two detectives who had been present with you at the lineup took you into a room; is that right?

A. Yes.

Q. Was there anybody else with you at that time besides those two detectives?

A. Not that I can recall.

Q. And then in that room what happened next?

A. Well, he began to state that you made a statement and you said that you knew who did it, and he's beating on the table and pushing stuff around, and he says you lied, he said, but you can't go to jail, he said, but your mother and father can go to jail for perjury. I didn't know what perjury is, but I know I didn't want my mother and father to go to jail.

So I'm crying, and, you know, and I'm just so scared. And after that he said we'll fix it, and he left out of the room, both of them. And I don't know, I can't say how much time passed by before they came back in and he told me to sign this statement, but didn't look at it. And what

Page 81

it says, it says that you were scared to pick the -- to pick them out of the lineup. And that was primarily -- that was primarily it.

Q. Okay. And just to back you up a little bit --

A. Uh-huh, go ahead.

Q. -- the detective who said that your parents can go to jail, we can take your parents to jail, was it one detective making that statement to you or did they both take turns talking?

A. It was the one.

THE COURT REPORTER: Sorry?

THE WITNESS: Just the one.

Q. And the other detective, did the other detective say anything?

A. Not that I can recall.

Q. How did you feel when the detective told you that he could take your parents to jail?

MR. FUNK: Objection.

A. I was very sad, I was very hurt, and I was just crying. I was --

Q. And you had said that the detective was banging on the table?

A. Yep. Yeah. Yes.

Q. Were you afraid at that time?

A. Yes.

Page 82

Q. Why did you say during the lineup that you didn't recognize anybody?

A. Well, my mother had already pulled me aside that morning when I -- before I went down -- before they took me out the door and she said all you have to do is not pick them out of the lineup and they'll let them go.

Q. Do you know why she said that to you?

MR. FUNK: Objection.

A. Yes. She said that because she knew that they didn't do it.

Q. By the time of the lineup, how had you started to feel about the fact that you had identified them earlier?

MR. FUNK: Objection.

A. What do you mean "by the time of the lineup"?

Q. Why did you decide to follow your mother's advice and say that you didn't recognize anybody?

A. Because that's what my mother told me to do and there's something that's a part of me that knows they didn't do it.

Q. You didn't see them commit the crime; is that right?

A. No, I didn't.

Q. After the detective came back into the room --

Page 83

I'm sorry, strike that.

Did you tell your mother that you didn't see the crime?

MR. FUNK: Objection.

A. Did I tell her that?

Q. Yes.

A. Nah, my mother knew that.

Q. Okay. The detective who came back into the room for the statement --

A. Uh-huh.

Q. -- actually strike that.

You had described earlier the detectives both after they had made threats to you, they left the room; is that right?

MR. FUNK: Objection.

A. Yes, they did.

Q. And how much longer was it before they came back?

A. I said I didn't know how much time it had been. Yeah, I don't know how much time it was. I don't know if it was 20 minutes, 30 minutes. I'm not exactly sure.

Q. Okay. By the way, when the detective told you that he could take your parents to jail, did you feel threatened?

MR. FUNK: Objection.

Page 84

A. Yes, I did.

Q. Did you know what perjury meant?

A. No, not at that time.

Q. And what was your mother's health condition at that time like?

A. My mother had cancer and she was very sick. And she had just had an operation, so she was very sick.

Q. When the detective came back into the room with a statement -- is that what you said, he came back into the room with the statement?

A. With like a paper for me to sign.

Q. Okay. And did both detectives come back into the room, both of the ones who had been in there with you earlier?

A. Yes.

Q. Was there anybody else there at the time?

A. If there was, I can't remember.

Q. And when they came back into the room, what did either of the detectives say to you at that time?

A. They just told me to sign this paper here and it just states that you were scared to pick them out of the lineup. I didn't -- I didn't get a chance to read anything -- any of it or anything, I just signed down at the bottom.

Page 85

Q. Handing you what has been marked as Deposition Exhibit 5 --

A. Uh-huh.

Q. -- all right. If you can just take a minute to look at that and let me know when you're finished.

A. Okay.

Q. Is Deposition Exhibit 5 a copy of the statement that was brought to you?

A. No. This is something different.

Q. It's something different?

A. This is something -- this is -- no, this is something different.

Q. Do you recall what the statement -- sorry, strike that.
    The statement that was brought to you by the two detectives who were present for your lineup, do you recall what it said?

        MR. FUNK: Objection.

A. I could remember pretty much the headlines, kind of like with my name on top of it and it stated

Page 86

right about in here (indicating) that Edward Vernon, such and such, was scared to pick the men out of the lineup. This is why he did not pick them out of the lineup.
    There was more stuff on there, but then all they did is told me to sign just like at the bottom like here (indicating). And that's all they -- that's the only part that they read to me and I just signed this statement at the bottom.

Q. Okay. Do you recall anything else that was in that statement?

A. No. Like I just said, they read the -- you know, they let me see and read the first part of that right up there and that was that. And like I said, they told me to just sign right there (indicating). And I'm already scared half to death. I'm crying, shaking and just --

Q. Did you tell either of the detectives at that point, I didn't see what happened?

        MR. FUNK: Objection.

A. No.

        THE COURT REPORTER: Sorry?

        THE WITNESS: No. No, I didn't.

Q. Were you scared to pick them out of the lineup?

        MR. FUNK: Objection.

Page 87

A. No. No.

Q. Did the detective who asked you to sign the statement saying that you were scared to pick them out of -- pick Buddy and Ricky out of the lineup, did he ask you to review it to see if it was accurate and true?

A. No.

        MR. FUNK: Objection.

A. No.

Q. He just told you to sign it?

A. Yes.

Q. And then did you sign it?

A. Yes.

Q. Why did you sign it?

A. Because I didn't want my mother and father to go to jail.

Q. During the time that -- prior to being shown the statement that you signed, did any -- either of the detectives call you names while they were banging on the table?

        MR. FUNK: Objection.

A. A lot of things were said.

Q. Do you recall what in particular was said?

A. Well, there was name calling, but -- there was name calling. Yeah. I'd rather not use the

Page 88

words that they used. Okay?

Q. I don't know, it may be uncomfortable, but I do need to ask you if you recall what names you were called by the detectives?

A. Well --

        MR. FUNK: Objection.

A. Well, I guess being black --

        THE COURT REPORTER: You've got to speak up.

A. I guess being black, you would know the names that they called me, so --

Q. Okay. Was it the N word?

A. Yes.

Q. Were there any other names that had a racial context that you were called?

A. That was it.

Q. How did that make you feel to be called that name?

A. Huh, it made me feel really sad, really sad. Because I wasn't used to be being called that.

Q. After you signed the statement, what happened next?

A. Mom -- they took me home -- well, on my way out of the, out of the room it's like -- you know, they have the lineup window and then they had

Page 89

this other little area where they make, I guess they make the phone calls, and so as I walked past, he asked me, well, who is that right there? And I said, ah, that's, I said that's Ricky. He said, oh, okay. And that was it, we kept on walking.

Q. And did you see anybody else you recognized by the telephone?

A. Oh, wow, Wiley was and Buddy was there, but they only -- they only -- he only pointed to Ricky, but at that point I told him who it was and he only pointed to him.

Q. Did you -- did the detective say anything to you after you said, oh, that's Ricky?

A. No. It's, oh, okay.

Q. And then where did you go next?

A. Home.

Q. After that day when's the next time you talked to any Cleveland Police detective?

A. I want to say that Monday, that Monday after the lineup. Because I don't know if that was the day that -- I don't know if that was like one of the days that detective -- they picked me up from school that morning or -- but all I know is I talked to them the next day and the day after the

Page 90

lineup.

Q. Okay. And where were you when you spoke -- was it -- who --

A. I can't remember if I was at home. I know they picked me up from home. I want to say home. I'm going to just say home.

Q. And who is they?

A. Detective Terpay and Detective Farmer.

Q. And what conversation did you have with them then?

A. Well, the conversation that they had, that Detective Terpay have, because like I said, Detective Farmer didn't do a whole lot of -- he didn't do a whole lot of talking. Detective Terpay was very mad. He was very angry. He was --

Q. He was angry at you?

A. Yes.

Q. Okay. And how did he -- what did he say to you?

A. Very loud. And he was like, well, why would you go down there and tell a lie, and say that this is not them? And we sat up and we talked about this. And you made a statement and said that these were the guys who did it and -- he was very angry.

Page 91

Q. Did he yell at you?

A. Oh, yeah. Oh, yes.

Q. Did he call you any names?

A. No, I don't believe. He did a lot of yelling and everything, yes, he did.

Q. Were you in -- where were you when this conversation took place?

A. We were on our way down to the police station.

Q. What did you say in response to his question?

A. I just told him I did what my mother told me to do.

Q. Did you tell Detective Terpay, I didn't -- I didn't see anything?

MR. FUNK: Objection.

A. At that time?

Q. Right.

A. No.

Q. At any time --

THE COURT REPORTER: Sorry?

THE WITNESS: No.

Q. At any time did you say to Detective Terpay anything to the effect of I didn't see the crime or Ricky didn't do it?

MR. FUNK: Objection.

A. When we got down to the police station, that's

Page 92

when I kind of told them that, you know, I didn't see any of this.

Q. Okay. Tell me about that conversation.

A. Right.

MR. FUNK: Objection.

A. He said that, well, you made a statement that you saw these things. And I said, but I didn't. And he says don't worry about it, it's over with now, so -- you don't have to worry about them, you don't have to worry about anything -- they'll be going to trial and you've got to be ready to prepare yourself to go through three different trials.

MS. WANG: What's your objection? What's the basis? I just want to know so I can fix it.

MR. FUNK: You're leading him.

Q. Tell me -- well, after you left the home, your house --

A. Uh-huh.

Q. -- you left with -- who did you leave with?

A. Detective Terpay and Detective Farmer.

Q. What day was this? How many days after the statement that you signed?

A. After the lineup?

Page 93

Q. Yeah. How many days after the lineup?

A. It was the next day.

Q. Okay. And so where did you go?

A. We went to the police station.

Q. And at the police station, did you have any conversation with Detective Terpay or Farmer?

A. Yes.

Q. What conversation did you have with them then?

A. Like it was -- on our way down, Detective Terpay just told me he was mad at me and he told me why he was mad at me. Because I didn't pick the guys out of the lineup.

And, you know, it was a pretty short distance down to the police station, so by that time -- but anyway, he said he was mad because I didn't pick the guys out of the lineup. He said you made a statement in saying that you saw who did it and now you're saying that they didn't do it.

Q. What did you say to Detective Terpay?

A. Well, when I was down there, I told him, I said, that they didn't do it. And he says, no, you know they did it. And I said, no, they didn't. And he said, yeah, you know they did it, right? And he was very angry, you know. And he kept saying that, now, you know that your mother and

Page 94

father are going to go to jail?

So, I said, yeah. I said, yeah, well, I guess they the ones who did it. So things kind of changed around.

Q. So, I just want to be clear I understand, Detective Terpay said to you, you know your mother and father will go to jail if you don't say that will do it -- that they had done it?

A. Yes.

Q. Okay. What words exactly -- and I know this is a long time ago, but what words exactly do you recall Detective Terpay saying to you about your father and mother possibly going to jail?

A. That was it right there, just what I just stated.

Q. Okay. And so what were you thinking at that point about what you needed to do?

A. I was thinking at that time really and truly, I wanted to kill myself.

Q. Can you explain why?

A. Because I was hurt and I know that I had lied.

Q. Why did you end up saying that Ricky and Buddy and Bitsey had committed the crime?

MR. FUNK: Objection.

A. Why did I end up saying it?

Q. Yeah. Why did you go along with that?

Page 95

A. Because --

MR. FUNK: Objection.

A. -- because of the threatening remarks that Detective Terpay made, and also because I didn't want my mother and father, you know, to go to jail.

MS. WANG: What's the basis of your objection, Steve?

MR. FUNK: You -- I'm not going to -- you suggested the answer -- in your question you suggested the answer, I just want --

Q. You had earlier -- okay. Let me ask you again, Mr. Vernon, just so the record is clear.

When you were at the police station the day after the lineup, you had a conversation with Detective Terpay, right?

MR. FUNK: I'm going to object. This is asked and answered. This is now the third time you're going to go through it.

MS. WANG: No, if you're --

MR. FUNK: I objected to one question and --

MS. WANG: -- if you're going to

Page 96

object on foundation, if we have an issue, I've got to fix it, so I'm going to fix it now.

MR. FUNK: Well, actually, let's go back, the question I objected to --

THE COURT REPORTER: Which one is it?

MR. FUNK: My last objection. Your question was, "Why did you end up going along with that?" That's why I objected to it.

BY MS. WANG:

Q. All right. Well, let me say this: During this conversation that you had with Detective Terpay at the police station you had testified earlier that he said that your mother and father could go to jail, right?

A. Yes.

Q. Okay. And what did you understand that to mean?

MR. FUNK: Objection.

A. It means that they're going to jail if I didn't cooperate and tell -- say what they wanted me to say.

Q. And -- did Detective Terpay tell you what he wanted you to say?

Page 97

MR. FUNK: Objection.

A. No.

MS. WANG: What is the basis of your objection?

MR. FUNK: Leading again.

Q. Did he tell you -- what did Detective Terpay tell you?

MR. FUNK: Objection.

A. What did he tell me?

Q. Yeah, what did he tell you.

A. Well, when I was down -- when I was at the police station, all he said was that --

MR. FUNK: This is asked and answered, but go ahead.

A. All he said was that your mother and father will go to jail.

Q. And what -- go ahead.

A. And I'm sitting there and I'm looking and I'm thinking, I'm like, I don't want my mother and father to go to jail because that's the day before they -- the other detectives already had stated that my mother and father would go to jail because of the statement that I made before and saying that I saw them do this. So, I don't know if he was reiterating what they said or what, I'm

Page 98

not sure.

Q. So, what did you say in response to Detective Terpay when he said your father and mother could go to jail?

A. I said I didn't want my mother and father to go to jail.

Q. What did he say in response to that?

A. He said then you'll have to tell the truth.

Q. And what did you say?

A. And I agreed to tell the truth.

Q. What was the truth?

A. On the statement that I made prior to the statement that they gave me at the lineup.

Q. So what did you end up telling Detective Terpay happened?

A. He just told me just to stick with what I had told him in the beginning.

Q. Okay. And what you had told him in the beginning was that -- was what?

A. That I saw who did it and I gave a statement of --

THE COURT REPORTER: Speak up.

A. -- who they were.

THE COURT REPORTER: Repeat that.

THE VIDEOGRAPHER: I've got to

Page 99

change --

MS. WANG: Okay.

THE COURT REPORTER: Repeat that.

THE WITNESS: What?

THE COURT REPORTER: What you just said.

MS. WANG: He's got to change the tape.

THE WITNESS: Okay.

THE VIDEOGRAPHER: End of tape two. Off the record at 11:47.

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER: Tape three. Back on the record at 11:49.

BY MS. WANG:

Q. At the end of your conversation with Detective Terpay, what did you tell him about what you had seen, if anything?

A. At the end of the conversation?

Q. Yes.

A. We just, we talked about what I had said from the beginning.

Q. Okay. And why did you agree -- why did you end

Page 100

up -- why did you say that -- sorry, strike that.

You had not seen Buddy, Wiley or Ricky commit the crime; is that correct?

A. That's correct.

Q. Why did you tell Detective Terpay that you had?

A. Like I just stated, I didn't want my mother and father to go to jail.

Q. Okay. Was there anybody else present for this conversation between you and Detective Terpay?

A. Detective Farmer was there.

Q. Anyone else?

A. If there was I can't recall.

Q. Do you recall how long you were at the police station during that occasion?

A. I don't know. A couple of hours or so.

Q. And what happened at the end of that conversation with Detective Terpay?

A. He kind of comforted me and gave me a hug because I was still crying, I'm scared, I didn't know what to do. And he kept telling me, it's going to be all right, you'll be all right. And he brought me back home.

Q. When's the next time that you recall speaking with any detectives after that?

A. I don't know. I don't know. It was a little

Page 101

while.  It was a little while.  I can't remember.
I know it was a little while.  I don't know.
    I think I remember before the trial started,
one of them's trial started, I can't remember.  I
can't remember an exact time and how many days
and how many weeks or whatever, no.
Q.  Taking a look at Deposition Exhibit 5 --
A.  Uh-huh.
Q.  -- you had said earlier that this was not the
    statement that you signed when you were with the
    two detectives who were not Terpay and Farmer,
    right?
A.  That's correct.
Q.  Do you recall ever seeing this statement before?
A.  This here was a statement that was -- this is
    what I'm referring to, part of this is what --
    because I read over the whole thing -- this is
    what -- the statement that was typed up and given
    to me from the beginning.
Q.  And --
A.  From the beginning.  Like as -- as I was given
    things about the different things that happened
    up at the store, the information, I guess all of
    it was put together and put on a piece -- you
    know, typed up and put on a piece of paper.  And

Page 102

this here is pretty much what -- the statement
that was saying that I had supposedly had saw and
said.
Q.  Okay.  So, do you recall seeing this statement or
    being shown this statement at the time of, you
    know, either before or after the lineup, around
    that time?
A.  Not after the lineup.  After the lineup I didn't
    see any -- I didn't see this.
Q.  Okay.
A.  This was -- this -- this here was done pretty
    much all except for this part right about in here
    (indicating) where it speaks about the lineup and
    all of this stuff.  That part was -- no, no, no.
    That apart was not there in the original part,
    nuh-uh.  Because I hadn't -- I had not yet seen
    anybody in the lineup, so --
Q.  Right.
A.  -- they wouldn't have known, but like the
    descriptions of the car.  The -- I'm just going
    to paraphrase it -- the description of the car,
    the gun, the number of times it was shot, what
    was thrown in their face -- what was thrown in
    Mr. Frank's face, those things were things that
    were given to me in the beginning before all --

Page 103

before all of this.
Q.  Before the lineup?
A.  Yeah.  Now, this here (indicating) --
Q.  Wait.  Let me just clarify that --
A.  Yeah.
Q.  -- who gave that information to you before the
    lineup?
            MR. FUNK:  Objection.
A.  I told you, Detective Terpay.
Q.  Okay.  Okay.
A.  Yes.
Q.  Oh, okay.  And this was what you were describing
    earlier?
A.  This is what I was describing earlier.  Now, the
    rest of this, you know, from -- I want to say
    from May 25th all of that, viewed the lineup, see
    all of that, that had to have come after the
    lineup.  This is not the statement that I signed.
    This one.  Not this one.  It was another one.
    And I already know it was, it was another one.
Q.  Okay.
A.  This is probably the one that they gave me -- I
    don't know, but I know this is not the one that I
    signed.  Because I don't recall all of this being
    on there.  Because like I said, I didn't get a

Page 104

chance to read it all, but it wasn't -- all this
stuff -- all that stuff wasn't on there.
Q.  Okay.
A.  You know, it stated -- like I said, it stated me
    saying that I was scared to view the lineup and
    to pick the guys out, and had my name and stuff,
    just like it did up here (indicating), right
    across here (indicating), yeah.
Q.  Do you recall ever sitting in a room with
    officers and, you know, an officer typing up a
    statement?
A.  There was so many different times where -- yeah,
    there was a time where things were being typed
    up, yes.
Q.  Do you remember which occasion it was?
A.  No.
Q.  Do you remember what was being typed up?
A.  Pretty much just like I said, these -- this here
    (indicating), this here (indicating), and I don't
    know what else, but I know pretty much this part
    right here (indicating) I know for sure.  And --
Q.  And just for the record, you're pointing to the
    top half of --
A.  Top half.
Q.  -- Deposition Exhibit 5?

Page 105

A. Yes. And the part where I knew them, and how long did I know them, and things like that. All of those things. But these things, I had already stated from the beginning of how long I knew them, you know, in the neighborhood. Those things like that. So, I don't know, I'm not exactly sure.

Q. Okay. Do you remember ever signing this statement here or a copy of it that looks like this?

A. I remember something being -- it could have been -- could have been my signature, could have -- you know, but I remember statements, I remember statements, I remember paperwork. I just remember paperwork, you know.

Q. Okay. So --

MS. WANG: Let's go off the record for a second.

THE VIDEOGRAPHER: Off the record at 12:00 o'clock.

- - - -

(Thereupon, a discussion was had off the record.)

- - - -

THE VIDEOGRAPHER: Okay. We're

Page 106

back on the record at 12:07.

BY MS. WANG:

Q. All right. Mr. Vernon, I'm going to show you some photographs. And I just want to ask you if you recognize anyone in the photographs. So I will just show them one by one.

MR. FUNK: You're not going to do them in order?

MS. WANG: What?

MR. FUNK: I thought you were going to do them in order.

MS. WANG: Why do I have to do them in order?

MR. FUNK: Okay.

MR. GILBERT: Does it make any difference, I mean --

MR. FUNK: It's kind of somewhat suggestive --

MS. WANG: Your order.

MR. FUNK: No, I put them in the order of one through eight.

MS. WANG: But you decided the order.

MR. FUNK: Randomly. Go ahead.

BY MS. WANG:

Page 107

Q. So, I've handed you what's been marked as photograph No. 3. Just take your time. And my question is, after you're done taking a look at that, is if you recognize that person or does the person look familiar to you?

A. Uh-huh.

THE COURT REPORTER: Yes?

THE WITNESS: Yes.

Q. And how does that person look familiar to you?

A. That's Detective Farmer.

Q. And how do you recognize him?

A. I remember his face. I remember the -- I told you earlier he had the two, the two dents in his head.

Q. All right. I'm handing you what's been marked as photograph No. 6. Take your time to look at that and let me know if you recognize the person in the photo or if he looks familiar to you.

A. Uh-huh. Yep. That's Detective Terpay.

Q. Can you say that a little louder?

A. Detective Terpay.

Q. Okay. Handing you what's marked as photograph No. 4. Again, take your time to look at it and let me know if you recognize the person in the photograph or if he looks familiar to you.

Page 108

A. Oh, that's the big guy. Yeah, that's the big guy. I don't remember his name, but that's the big guy.

Q. That's the big guy?

A. Yeah.

THE COURT REPORTER: Try and keep your voice up.

A. Yeah, that's the big guy.

Q. And what do you mean by "the big guy"?

A. He's the guy that -- he's the guy that came and picked me up and took me down to the lineup, he's one of the guys, yes.

Q. He's one of the detectives that took you to the lineup?

A. Yes. Yes.

Q. Was he the detective in the room --

MR. FUNK: Objection.

Q. -- with you after the lineup? Well, let me ask you this way: What else do you remember that detective doing?

A. He's the detective that did all of the slamming and hitting on the tables.

Q. The slamming -- I didn't hear.

A. Hitting on the table, pushing stuff around.

Q. Do you recall anything else that the detective

Page 109

did with you?
A. That's the one that used the N word. Okay.
Q. That's the one that used the N word?
A. Yes.
Q. Showing you what has been marked as photograph No. 7. My question to you is: Do you recognize the officer in that photograph or does he look familiar?
A. Not quite, no.
Q. You can't remember one way or another?
MR. FUNK: Objection.
A. No. I don't want to speculate.
Q. Okay. Just for a second, going back to this photograph, photograph No. 4, you had described this officer as "the big guy"?
A. Yeah.
Q. What do you mean by that?
A. He's big, he was a big guy. He was -- he was a big guy. That's all I can say, he was a big guy.
Q. Like big heavy or big tall?
A. Both. He was a big guy.
Q. Okay. By the way, how tall were you in 1975?
A. I don't know. About -- I don't know. In '75 about the height I am now. I haven't grown.
Q. How tall are you now?

Page 110

A. Five-five. So, I might have been about -- I might have been about five feet, maybe --
Q. Okay.
A. -- maybe.
Q. And how much did you weigh then? Or let me put it this way --
A. Probably about 90 pounds, 98, 99 pounds. I was little --
Q. Okay.
A. -- I was thin, real thin.
Q. Have you always been thin?
A. Until I went out for sports, yeah, and kind of built up a little.
Q. Okay. Showing you what's been marked as photograph No. 5. Take a look at that. Take your time. Let me know if you recognize the person in that photograph.
A. Nah, I'm not going to say I do.
Q. Okay. Showing you what's been marked as photograph No. 8. Take a look at that photograph and let me know if you recognize the person in that photograph. No? Do you recognize him?
A. No.
Q. Handing you what's been marked as photograph No. 1.

Page 111

A. Uh-huh.
Q. Take a look at that and let me know if you recognize the person in the photograph.
A. Okay. Give me one minute.
Q. Okay. Do you need a break?
A. No. The photograph I was -- I was just trying to remember the face on eight, but him I kind of remember. I don't know who he is, but him I remember.
MR. FUNK: I'm sorry, you're looking at No. 1 now?
THE WITNESS: Yes, yes. I'm looking -- no, I said, him I kind of remember.
MR. FUNK: And you're referring to photograph No. 1?
THE WITNESS: Yes.
MR. FUNK: I just wanted to make it clear.
A. Yes, I kind of vaguely remember, yes. The marking, yes, uh-huh.
Q. Do you remember what interaction you had with that officer?
A. I'm not exactly sure. I know I could remember the marking right here (indicating).

Page 112

Q. You're pointing to the --
A. Yes.
Q. -- in between the eyebrows?
A. Yes, uh-huh.
Q. Do you remember anything specifically about what that officer did or said to you, if anything?
A. I don't know if that was the officer at -- boy, I remember the face though -- I don't know if he was the officer at the scene when I gave the -- when I talked to him, or was he one of the -- somebody down at the police station, one of the other detectives. I remember the face, that's all I can say, I remember the face.
Q. Okay.
A. Now, what type of interaction we had, I can't remember.
Q. All right.
A. It's something about No. 8 though it's like -- I don't know.
Q. Let me show you No. 8 again --
A. Yeah.
Q. -- and you can take your time.
A. There's something about eight --
MR. FUNK: Objection. Go ahead.
A. It's not coming clear, but -- okay. It's not

Page 113

coming too clear.

Q. Okay. The last one. Handing you photograph No. 2. Could you take a look at that and let me know if you recognize the person in that photograph.

A. Nuh-uh. Nah. Nope. If I do, I don't recall. Okay.

Q. You don't recall?

A. Huh. Not quite. No.

Q. Okay. You don't recognize the person in No. 2?

A. No.

MS. WANG: Okay. I'm going to mark this whole group with the folders Deposition Exhibit No. 6. So, just for the record, the court reporter can -- can you keep the exhibits? Okay. So I'll just clip this like this and I'll keep it like this.

- - - -

(Thereupon, Plaintiff's Exhibit 6 was marked for purposes of identification.)

- - - -

Q. Just for the record the photographs that you viewed, numbers one through eight, are contained in their separate folders and they're marked as Plaintiff's Deposition Exhibit No. 6.

Page 114

MS. WANG: Does everybody agree with that?

MR. FUNK: That's fine.

Q. All right. So, at some point you testified at the trial of Ricky Jackson, right?

A. Yes.

Q. And you later testified at the trials of Wiley Bridgeman and Ronnie Bridgeman, too?

A. Yes.

Q. In between the time when you had viewed those lineups, you know, around that time in May of 1975 and the time of the trial, did you have any further interaction with any of the detectives?

A. You mean like in between the trials?

Q. Before the trials. After --

A. The lineup and everything?

Q. -- the lineup, but before the first trial.

A. Periodically they would come by and talk with me to reiterate and go over what I had already made the statements, and to make sure that I remember what I say when I get up on the stand. It's kind of doing those things.

Q. Okay. Who came by to talk with you?

A. Detective Terpay and Farmer.

Q. Okay. Did you ever see the officer from

Page 115

photograph No. 4 after the day of the lineup?

A. Yeah, I did see him, but it wasn't like -- what do you call it? On a regular basis. I did see him, but I can't remember why I saw him. Okay.

Q. Okay. Do you remember any specific conversation that you had with Detective Terpay or Farmer after the lineup, but before the trial?

A. Nothing. But we talked about what I was supposed to do and what I'm supposed to say once I get up on the jury stand.

Q. And what did --

A. Witness stand.

Q. -- what conversation did you have with either Detective Terpay or Farmer about what you were supposed to say?

A. Nothing. Like I just said, we went over everything that was already stated.

Q. In the statement that you made?

A. In the statement that I made and they told me about something about a cross-examination, to worry about that, and, you know, their lawyer is going to try to, you know, say that you didn't see this and you're saying that you did, and you made a statement. So, he said, you know, don't be scared up there on the witness stand and just

Page 116

tell what you saw, which I didn't see anything.

Q. Before the trial of Ricky Jackson, did you ever tell anyone that you had been threatened by the detectives?

A. Yeah. My mother.

Q. And what did you say to her?

A. My mother and them -- my mother already -- I told her what had went on down at the lineup, and so she already -- you know, she knew. She knew.

Q. And what did she say to you when you told her about it?

A. She said that she didn't want me to go back down there anymore, but I guess when they talked to her, because they talked to her and that was primarily it after they talked to her, and I still ended up going down there and testifying.

Q. Did you ever tell any attorney for Ricky Jackson about the threats that the police had made prior to the trial, prior to his trial?

A. Prior to his trial? I don't know. I don't know if I -- I don't know if I talked to his attorneys or anything. I'm not sure. I can't -- you're talking about which trial? In '75?

Q. Right.

A. There could be a possibility. There could be a

Page 117

possibility. I just can't put it there exactly, okay.

Q. Did you ever tell any prosecutor that you had made -- that you -- sorry, strike that.

That any police detective had made threats against you prior to the trial of Ricky Jackson?

A. No.

Q. And why did you testify against Ricky Jackson at his criminal trial in 1975?

MR. FUNK: Objection.

A. Because I was -- I was made -- I was made to testify because of the statement that I made prior to them -- to him not being identified in the lineup. And what I mean by that is everything that I've said earlier, I had to come forth and make it truth.

Q. What do you mean, you had to come forward and make it true? You mean recently?

A. Yes.

MR. FUNK: Objection.

Q. How did you -- well, strike that.

During the time that Ricky's trial was going on -- or strike that.

Before Ricky Jackson's trial, did you move somewhere else, outside of Cleveland?

Page 118

A. No. Before Ricky Jackson's?

Q. Yes.

A. I moved out of town -- because I'm trying to -- no, no. I moved out of town in September of '75, so I believe I had already been through two trials or three trials already. I think one of them was a juvenile, so and I had to come back and do a trial again when he turned an adult. So -- and I can't remember which one, that was the juvenile at that time.

But I remember Ricky Jackson's trial, no, I was -- didn't move out of town, I had death threats that were put on me from the neighborhood, so what the detectives did is they told my mother and them that it would be best that he didn't stay here at home, so they put me up at the Holiday Inn on Lakeside Avenue.

Q. And is that where you stayed during the trial?

A. Yes. Yes. For all the trials.

Q. After -- sorry, strike that.

Do you know whether Ricky Jackson was convicted at his trial?

A. Do I know?

Q. Yes.

A. None of that information was really given to me.

Page 119

The only thing I was allowed to do was to come to the trial, testify when I needed to testify, other than that, I stayed at the hotel. I didn't even come down here to the courthouse, no.

Q. Did you learn at some point since 1975 that Ricky Jackson went to prison?

A. Yeah, I learned that --

Q. Okay.

A. -- later on --

Q. Right.

A. -- but as far as like the detectives coming and telling me that he had -- you know, he was found guilty and he was going to prison, no, they didn't explain all of that to me, no. After one trial they brought me a whole stack of transcripts that I had to sit and read and go over for the next trial. So, no, I wasn't informed about everything that was going on at the trial.

Q. Okay. Who brought you big stacks of paper?

A. Stack of papers, the transcripts, the detective, Terpay.

Q. What did he say to you about the transcripts?

A. I had to read them, I had to read them, I had to read them, I had to read them. I had to go over

Page 120

everything that I said, so that when I go to the next trial that I won't forget what I said in the first one. And they won't be able to say that, well, you said this here and now you're saying, and now you're saying this, you said this here. So, he kind of explained to me why I had to go through all of those.

Yeah, it was quite -- it was quite devastating. It was quite -- I don't know. I can't even put it into words.

Q. What was devastating?

A. Having to do all of that it was very depressing and just -- you know, it's just -- it was so much it was overwhelming, put it like that. I know a word to use now that I couldn't use then, but it was overwhelming.

Q. Okay. At some point after Ricky went to prison, did any attorneys or investigators come to try to talk to you?

A. Yes. The first time I was -- I was in the tenth grade, so I think that had to be, I want to say 1978 or something like that, and that was the first time.

And I was already told by Detective Terpay that I wasn't allowed to -- I wasn't allowed to

Page 121

talk to anyone. And if anybody came to me about this case, to refer them to him and he would take care of it.

Q. And was anybody else with Detective Terpay when he told you that?

A. No. Just me and him.

Q. Okay. Going back just for a moment to before the trials. Before the trial of Ricky Jackson, did you meet with any prosecutors?

A. I met with -- the one name stuck out really -- I think Frank De Blasio I think his name was, one of the prosecutors. Now, who the other one was -- who the other ones was, I can't remember, but I do remember Frank De Blasio.

Q. What do you remember about De Blasio?

MR. FUNK: Objection.

A. That he was --

THE COURT REPORTER: You need to speak up.

A. I know that he was the prosecutor, one of the prosecutors. And that he just kind of talked with me like the other ones did. It's just his name -- it's like certain names and certain things just sticks with me. And as far as like the other prosecutors, I can't remember exactly

Page 122

their names and everything.

Q. Do you remember what conversation you had with him? Anything in particular sticks out in your mind?

A. He just told me to pretty much stick with what was being said and they would ask me the questions that they asked me the questions in the previous trial and, you know, that's basically it.

Q. All right. Going back -- I'm sorry I jumped around a little bit here, but you said when you were about in tenth grade or so when Terpay came to talk with you -- or, no, when attorneys for -- an attorney for --

A. For Ricky Jackson.

Q. -- Ricky Jackson came to speak with you.

A. He came -- they came to my grandmother's house, yes, uh-huh.

Q. And how many people came?

A. It was two of them.

Q. Was it an attorney or an investigator or --

A. They were -- I don't know what they were. All I know is they represented Ricky Jackson I'll put it like that.

Q. What's your grandmother's name?

Page 123

A. My grandmother, her name is Elizabeth Washington.

Q. Okay. Washington?

A. Uh-huh.

Q. And what -- were you staying there at that time?

A. At my grandmother's? Yes. I stayed back and forth, with my grandmother and my mother, yeah.

Q. What do you remember about that conversation?

A. It wasn't no conversation because --

Q. Oh.

A. -- they -- they told me who they were and why they were there. And I immediately told them that I was not allowed to talk to them. And they say, yeah, we know, you going to say that you're not allowed to talk to me and they left after that.

Q. Okay. What did they say they were there for?

A. They said they were to talk to me about Ricky Jackson, to see if I would tell them the truth about what happened and I said I'm not allowed to talk to you, and that was it --

Q. Okay.

A. -- uh-huh.

Q. When's the next time -- did you have a -- did you ever have another -- or sorry, strike that.

After that time was there another time when

Page 124

any attorney or investigator for Ricky Jackson came to talk to you?

A. Yes. I was -- yeah, I did. That was like maybe about three years later another one came and came over to my grandmother's house. And this time the two of them, because I don't know if it was the same two or not, but the two of them came and they stated who they were and why they were there and he said -- he looked at me and he said, well -- and I started to -- he said I know you want to tell the truth and he said you should go ahead and tell the truth. I said, but I'm not -- he says I know you're not allowed to talk to us, he said, but you should tell the truth.

And so after that he left. I called Detective Terpay and told him what happened. And, you know, each time I called him and told him what happened. And he said don't worry about it, I'll take care of it, you know, so --

Q. Okay. So, just to be clear, after the first time when you were in tenth grade, you called Detective Terpay --

A. Yeah, yeah.

Q. -- after the attorney came to your house?

A. That's what I was supposed to do, uh-huh.

Page 125

Q.  And the second time that people came for Ricky Jackson, do you recall if it was an attorney or an investigator?

A.  Like I just said, all I can tell you is that, you know, they identified themselves, so I want to say -- I wanted to speculate and say that they were attorneys and investigators, but I knew who they were --

Q.  Okay.

A.  -- I knew who they were.

Q.  Okay.  Were you still afraid of Detective Terpay at that point --

MR. FUNK:  Objection.

Q.  -- the second time?

A.  I've been -- I was afraid of Detective Terpay ever since.

Q.  When's the next time -- well, strike that.

Let's take you to 2014, last year --

A.  Uh-huh.

Q.  -- did you testify at a court proceeding last year?

A.  Yes.

Q.  And what court proceeding was that, do you recall?

A.  That was for Ricky Jackson.

Page 126

Q.  And what did you testify -- well, strike that.

Do you understand what the purpose of that court proceeding was?

A.  Yes, I did.

Q.  What was it?

A.  It was to -- to put it in my own words, in other words, to come forth and tell the truth to get Ricky Jackson out of prison.

Q.  And so what did you testify to in general at the hearing?

A.  I testified that -- everything that was told --

MR. FUNK:  Objection to this question.  Go ahead.

A.  Everything that was told, was stated was a lie.

Q.  What did you testify -- and I'm going to clarify my question -- what did you testify about -- sorry, strike that.

Were you asked questions about whether you saw Ricky Jackson commit any crime on May 19, 1975?

A.  Yes, I did -- yes, I was.

Q.  And what did you answer in response to those questions?

A.  I responded no.

Q.  Was that the truth?

Page 127

A.  That was the truth.

Q.  Was that the first time that you had come forward in a court of law to tell the truth?

A.  Yes.

Q.  Why did you decide to come forward?

A.  Well, you have to remember it's like 39 years that I've been carrying this -- I've been carrying that.  And I wanted to come forward throughout the years, but I was scared, scared to come forward and tell the truth, you know, with this battle in my mind, battle in my spirit, battle in my heart.  It's like you need to come forth and tell the truth.  Nah, you know, you'll go to jail if you tell the truth.  If you don't tell the truth, you'll end up going to jail.  If you don't tell the truth -- so, I'm battling with this all -- pretty much all my life, put it this way.

I was -- I was sick in the hospital, I guess that's when I had found out I had fourth stage kidney failure and of course the hypertension also.  And --

Q.  I'm sorry to interrupt, but let me just orient you, when was this that you were in the hospital?

A.  At the time that my pastor came to me.

Page 128

Q.  Do you recall if that was in -- what year that was or how long ago from today?

A.  That was -- that was in two thousand -- it had to be 2013 when that happened, yes.

Q.  Okay.  All right.  Go on.  And so you were saying you were at the hospital?

A.  Uh-huh.

Q.  What were you in the hospital for?

A.  I just stated those things.  My blood pressure was out of control, it was sky high.  Kidney problems.  I already had the congestive heart failure.  And I was doing pretty bad, I was actually doing pretty bad.  And my pastor had came to me and -- after service, him and one of the members, and he was talking with me and he said, you know, I talked to the Innocence Project and he explained to me what the Innocence Project was.

And he said -- and he said why they contacted him.  So, after he stated that and I said, okay, well, you know what -- I got up out of the bed and I just broke down and I cried on his shoulder and I said, well, I'm ready to tell the truth, I'm ready to come forward and tell the truth that Ricky Jackson did not commit the crime that he

Page 129

went to prison for.

Q. When was the next time you spoke to anybody about the case after that?

A. I don't know. I guess it was around -- I don't know. It was kind of a cold day, so I want to say -- I want to say October, I want to say October because I believe I was in the hospital in September of that year, but I want to say October, or it could be the reverse, but --

Q. Okay. And who did you speak with?

A. I spoke with an attorney from --

THE COURT REPORTER: Sorry?

A. -- attorneys from the Innocence Project --

Q. The Innocence --

A. -- they came -- huh?

Q. The Innocence Project?

A. Yes. They came to -- they came up to the church.

Q. Do you recall who you spoke with?

A. I can't remember her name, but his name was -- what is his last name? It's right on the tip of my tongue -- it's not that I don't know these -- the names.

Q. That's okay.

A. It's right there -- oh, man -- Howe -- what was his last name? Howe.

Page 130

Q. Howe?

A. I believe it is --

Q. Okay.

A. -- yeah.

Q. And what did you tell Attorney Howe and the other woman in that conversation?

A. Yeah, I told him exactly what happened. And I told them that I had lied when I was on the witness stand. I told them that I did not see that crime being committed. I was on the school bus when all of this happened and -- yeah, Brian Howe, see it came to me, Brian Howe -- and I was not on the -- I was not anywhere around the area when all of this was committed. I was on the school bus on my way home from school when everything happened.

Q. And did you end up signing any statement or anything like that?

A. Yes, I did. I ended up -- I had to write everything out in my own handwriting, nobody wrote it for me, I wrote it out myself. And once I did that, I gave it -- well, we went and had it notarized that this is the statement that I made. And like they told me, you know, you just write down exactly the way things happened and that's

Page 131

exactly what I did.

Q. Okay. How did you feel about coming forward last year and telling the truth?

MR. FUNK: Objection.

A. I have mixed emotions. On one hand I was very excited about it, coming forward. And on the other hand, I had fear, I was scared.

Q. Why were you scared?

A. Well, perjury, it means you go back to prison, you go to prison, so -- but that part of me was like, don't worry about that. And what I mean by don't worry about it, these are three men's lives that you about to set free, that are about to get out and -- Lord Jesus -- oh, man -- yeah, that's the way I felt. And I felt pretty good about it. That's all I can say.

Q. Did anyone make any promises to you in exchange for your testimony here today?

A. No.

Q. Did anyone make any threats to you concerning your testimony here today?

A. No. Nah, nuh-uh.

MS. WANG: Let's take a quick break.

MR. GILBERT: Well, I just have --

Page 132

THE VIDEOGRAPHER: There's like four minutes left on the tape.

MS. WANG: Oh, okay.

MR. GILBERT: Okay. I was going to ask a couple questions.

THE VIDEOGRAPHER: Do you want to pass your mike?

MR. GILBERT: I'm sorry.

MR. FUNK: Wait a second. Are you done or -- because I'd just assume her finish before you ask your --

MS. WANG: Well, why don't we do this --

BY MS. WANG:

Q. All right. I just a couple questions to clear it up.

So, you also testified at Wiley Bridgeman's trial; is that right?

A. Yes.

Q. And you testified for the state?

A. Yes.

Q. Did you testify at Ronnie Bridgeman's trial?

A. Yes, I testifies.

Q. And at the hearing last year, did you -- were you asked questions about whether Wiley Bridgeman had

Page 133

anything to do with the crime on May 19th, 1975?

A. Was I asked any questions?

Q. Yes.

A. In the hearing --

Q. Yes.

A. -- that I was at? Yeah, I believe so. I believe I did, yes.

Q. What did you testify last year about that?

A. I said no, I said no, that he didn't have anything to do with anything.

Q. Were you asked questions about whether Ronnie Bridgeman had anything to do with the crime at the hearing last year?

A. I was asked and I said no. I said no, he didn't have anything to do with anything.

Q. Was that the truth?

A. That was the truth.

Q. When you were at the hospital having your conversation with Pastor Singleton --

A. Uh-huh.

Q. -- did you tell Pastor Singleton anything about whether Wiley or Ronnie had anything to do with the crime?

A. I told them that they didn't have anything to do with the crime.

Page 134

Q. And what about when the Innocence Project came to talk to you about Ricky, did you -- were you asked any questions by Mr. Howe about whether Wiley and Ronnie had anything to do with the crime?

A. I think I was asked questions and I told them no, they didn't have -- they didn't have anything to do with the crime either.

MS. WANG: Okay. I think --

MR. GILBERT: We don't have to finish. We can take a break --

MS. WANG: Okay. I think we will take a break now.

MR. FUNK: Do you want to take a break and confer?

MS. WANG: Yeah.

THE VIDEOGRAPHER: Okay. This is the end of tape three. Off the record at 12:56.

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER: This is tape four. Back on the record at 1:05.

BY MS. WANG:

Page 135

Q. All right. Take me back to in or around 2003 or 2006, do you recall seeing Wiley Bridgeman in person around that time?

A. Yes.

Q. Okay. Do you remember what year it was?

A. I can't remember the exact year. I think it was -- it might have been 2006 I believe.

Q. And can you tell me where you saw him and what happened -- strike that. Can you tell me where you saw him?

A. Sure. At that time I worked for the City Mission and he came to the City Mission. That's where I saw him at.

Q. And how did -- did you recognize him or how did you recognize him?

A. I didn't recognize him at first. He was holding a conversation with a couple of men in like the little hallway, like a little corridor. When the men come into the -- when you come into the City Mission, you have to come through the door and give your ID and go through the metal detector, take everything out of your pocket, so I worked in the security part. And so he was telling the other guy that he had just got out of prison for a crime that he

Page 136

didn't do. He was in there for like thirty something years. And, you know, I'm just listening because I'm behind the booth. And so he came up, he gave me his ID and I just looked at it, Wiley Bridgeman. Wrote it down, gave him his bed number, and he went in -- you know, they went into the other room where they would sit and wait 'til they have like a seven -- a 6:00 o'clock group where everybody would, you know, get theirs beds called off and everything. After that they would go to chapel and then they would eat. So, during that time they have like a little circle and they sit and they -- and he began to tell a little bit about his story about how he was in prison and how he was wrongfully incarcerated about -- so, I'm like, wow, I know -- and I kept looking at him and I thought about it and I thought, Wiley Bridgeman. And then when he described where it happened, and I was like, wow. So, I didn't come to him that night. You know, I had to work the next morning anyway. So, that morning after the 7:00 o'clock group that they have in the morning, I kind of pulled

Page 137

him aside and I said, you don't know who I am. I said I just found out who you are, and I said I'm Ed Vernon. And I said, man, I'm so sorry, man, and cried on his shoulder and he cried on mine.

And he was like, well, he say, man, we've got to go to the news with this, you know, and he's like -- I said, you know, I said I know that you all didn't -- I know that you all didn't do it and I know you didn't do it.

And he's like, man, well, you need to go to the news. We've got to go Channel 19 and we've got to go to the papers. And I was like, I said I don't know about that. You know, I just told him I would have to think about that.

So, every day he would come to me about that and I'm already -- I went home and I would always tell my wife about it and I would say, you know, it's beginning to be a problem I said, because I don't know if I want to come forth, I said, and do this right now, I said.

You know, I'm scared, I'm just, you know, going through so many emotions right now. And so what happened is I end up talking to my supervisor and he said, well, he's here on parole, so as long as you just call his parole

Page 138

officer and let her know what's going on and she'll probably take it from there.

And that's what I end up doing. That was my first encounter with him.

Q. And what did you say to Wiley's parole officer?

A. Well, I explained to her who I was and what me and his involvement was together. And she's like, oh, okay. And I said -- I said I don't want to talk to anybody right now about this case or anything and he's just like kind of pressing me and pressing me.

So, I know I was off the next two days and when I came back he was gone. I guess they had moved him to another -- what I found out, they had moved him to another facility, so, yeah.

Q. Did you ever come forward and talk to any attorneys at that time?

A. No.

Q. Why not?

A. No. Nah. No. Same reason I had stated earlier. Just not wanting to go to jail and also my emotions is just all over the place. And it's like I want to come forth and tell. No, I don't. And scared.

- - - -

Page 139

EXAMINATION OF EDWARD C. VERNON

BY MR. GILBERT:

Q. Okay. I just have a question or two.

I want to bring you back to the day after the lineup.

A. Okay.

Q. All right. And I believe you testified that you went down to the station and met with Detective Terpay and Detective Farmer?

A. Yes. The day after the lineup, right.

Q. And I want -- I don't want to go through the whole thing, and correct me if I'm wrong, I believe you said he was mad at you?

A. Yeah.

Q. I'm talking about Terpay.

A. Yes.

Q. Do you know -- and just tell me why he was mad at you.

MR. FUNK: Objection.

A. Because I didn't pick them out of the lineup.

Q. Okay. And did Detective Terpay indicate to you what you had to do to make it good?

MR. FUNK: Objection.

A. He told me that I had to come forth and just tell what I had stated from the beginning.

Page 140

Q. And what you had stated from the beginning was not true, correct?

A. It was not true anyway because it was all the information in which they had gave me --

Q. All right.

A. -- he had gave me.

Q. And that's what you -- and you followed that direction throughout the trial; isn't that right?

A. Yes, I did. Yes, I did.

MR. GILBERT: Thank you very much. Nothing further.

MS. WANG: I have nothing further.

MR. FUNK: Okay. So we'll take a lunch break?

MR. GILBERT: Yes.

MS. WANG: Yes.

THE VIDEOGRAPHER: Off the record at 1:13.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER: Okay. We're back on the record at 1:51.

- - - -

EXAMINATION OF EDWARD VERNON

Page 141

BY MR. FUNK:

Q. Okay. Good afternoon, Mr. Vernon --

A. Good afternoon.

Q. -- my name is Steve Funk. I introduced myself earlier today.

A. Yes.

Q. Prior to today have you and I met?

A. I don't know.

Q. No. Okay. I haven't talked to you prior to today?

A. No.

Q. Okay. Prior to today's deposition, have you spoken with any of the other attorneys in the room here today?

A. Prior to today?

Q. Uh-huh.

A. Today.

Q. Yeah, prior to today -- I know that you spoke with people here today, but --

A. Right.

Q. -- prior to today have you spoken to anybody, any of the attorneys in the room, either by phone or in person?

A. By phone, yes.

Q. Okay. And who did you speak with by phone?

Page 142

A. Liz.

THE COURT REPORTER: I'm sorry?

THE WITNESS: Liz.

Q. Plaintiff's counsel --

A. Yes.

Q. -- Elizabeth Wang?

A. Yes.

Q. And did you speak about the substance of your testimony?

A. Nuh-uh. She just wanted to know if I got the transcripts that she sent I guess. I don't know.

Q. Okay. The transcripts -- what transcripts?

A. The same thing that we're doing now from the trial -- from the hearing, that's all.

Q. Oh, from the 2014 hearing?

A. Yeah.

Q. Okay. So, prior to your deposition today, you had an opportunity to review your -- the testimony at the 2014 hearing?

A. Well --

MS. WANG: Objection. Foundation.

Q. I'm sorry?

A. Yes.

Q. Okay. And so when did you -- when did you get to do that? When did you read the testimony?

Page 143

A. Just -- I don't know. Last week or something like that.

Q. Okay.

A. But I have everything in my memory anyway.

Q. Okay. Was there anything in the testimony from the 2014 hearing that you saw and thought was wrong?

A. Nah.

Q. "No"?

THE COURT REPORTER: "No"?

A. No.

Q. Okay. So, what you -- what you testified at the 2014 hearing, you believe was correct?

A. Yes.

Q. Okay. And did you review any other documents in preparation for the deposition?

A. No. No.

Q. Did you review any of the trial transcripts from the 1970s?

A. Nah.

Q. Okay. Had you -- other than Ms. Wang, had you spoken with anybody else?

A. No.

Q. Okay. And then I think you were shown the eight photographs that have been marked as Defendant's

Page 144

Exhibit 6 --

A. Yes.

Q. -- here at the deposition today. Prior to the deposition, had you seen any of those photographs before?

A. No.

Q. Had you been shown any photographs by anyone of City of Cleveland police officers or detectives?

A. No.

Q. And I think you testified about some affidavits that you had completed recently?

A. Yes.

Q. Okay. I'm going to just hand you what we're going to mark as Defendant's Exhibit A.

- - - -

(Thereupon, Defendant's Exhibit A was marked for purposes of identification.)

- - - -

Q. Do you recognize Defendant's Exhibit A?

A. Yes.

Q. And you can just look it over. It's a three-page document.

A. Yes. This is -- this is what I wrote down.

Q. This is your handwriting?

A. Yes, it is.

Page 145

Q. Okay. And then at the last page, that's your signature?
A. Yes, it is.
Q. And then it says that you signed it on April 5th, 2014 --
A. Right, yes.
Q. -- is that correct?
A. Yes.
Q. Okay. And John Lassiter was the notary?
A. Yes. Uh-huh.
Q. And was John Lassiter with the Innocence Project?
A. No.
Q. Do you know who John Lassiter is?
A. It is a -- I think he's a tax -- he does taxes. It's a place on Superior Avenue.
Q. Okay. So -- actually I may have misspoke, I think on your affidavit it says 4/5/13 --
A. Uh-huh.
Q. -- do you see at the top?
A. Yes.
Q. Is that a 13 on the last page then as opposed to a 14 where it says "sworn and subscribed by"?
A. It looks like they pulled -- yeah.
Q. But do you know whether they're both April 2013?
A. I don't know. It looks like a three.

Page 146

Q. Okay.
A. That's all I can say, it looks like a three.
Q. And is this -- remind me of the circumstances of how this affidavit was prepared?
A. The Innocence Project came to the church --
Q. Okay.
A. -- and this is how the affidavit was made. They asked me to make a statement about what happened, to tell the truth about what happened.
Q. Okay. So, you filled it out --
A. Yes.
Q. -- at the church?
A. Yes. I sat in the -- like I said, I sat in the sanctuary at the table.
Q. And so you talked about there were two attorneys with the Innocence Project. Were they there?
A. Yeah, they were there.
Q. Okay. And so did they -- they interviewed you at that time and then after the interview you completed this statement?
A. Yes.
Q. Okay. And then I'm going to show you there was a second affidavit --
          - - - -
     (Thereupon, Defendant's Exhibit B was marked

Page 147

     for purposes of identification.)
          - - - -
Q. Show you what's been marked as Exhibit B.
A. Okay.
Q. Take a look at Exhibit B. Do you recognize this? It's a two page.
A. Yes.
Q. And then this affidavit was sworn and subscribed on March 17th, 2014?
A. Yes, that's correct.
Q. Okay. And this affidavit, who prepared this affidavit, Exhibit B?
A. This one here was -- this affidavit was done, I want to say -- I want to say it was done over the phone.
Q. Yeah. So, do you recall there was a time in which you spoke with two individuals at the Innocence Project over the phone?
A. Yeah. I think this was -- if I'm not mistaken, this one might have been re -- like they did a phone interview, but it was like recorded, so that they could type up everything that was being said.
Q. Okay. So, then -- and do you recall that they -- after typing this up, they e-mailed it to you?

Page 148

A. They --
          MS. WANG: Objection. Foundation.
A. They sent this -- if I'm not mistaken, they sent this to me.
Q. By mail?
A. By either mail or either they delivered it down to the church, one of the two.
Q. Okay. So, and did they, in the phone conversations or any of the conversations they had with you, did they tell you to look over the affidavit closely and make any corrections that you needed to make in order to make sure it was accurate?
A. Make sure everything was right.
Q. So, when you signed this affidavit, you had an opportunity to read it all over --
A. Yes.
Q. -- and make sure it was 100 percent correct?
A. Right.
Q. Okay. And you were comfortable that when you signed this affidavit, it was 100 percent correct?
A. Correct.
Q. Were there any changes that you saw you needed to make in it?

Page 149

A. If there were any changes, they were made before, before any of this was actually sent to me.

Q. Okay.

A. Okay.

Q. So, at the -- by the time that you actually signed it and had it sworn in front of a notary, you had verified that it was 100 percent correct?

A. That's correct.

Q. Okay. And then did you understand that this was going to be -- this affidavit was going to be submitted to the court?

A. Yes.

Q. For purposes of seeking relief from the court on behalf of Ricky Jackson?

A. Yes.

Q. So, you knew it was pretty important?

A. Yes. Well, actually both of them were pretty important.

Q. Right. Okay. Other than these two affidavits, are you aware of any other -- and I'm talking about since 2006, you talked about your conversation with Wiley Bridgeman, since 2006 are you aware of any other written statements that you would have reviewed or signed other than these two affidavits, Exhibit A and B?

Page 150

A. Before 2006?

Q. No, since 2006.

A. Since, no.

Q. Okay. Now, you talked about Brian Howe. Do you recognize the name of a John at the Innocence Project?

A. "Joan"?

Q. "John". Do you know a John?

A. Possibility.

Q. You don't recall one way or the other?

A. I remember a Brian and I think her name was Joan.

Q. I'm sorry who?

A. Joan.

Q. "Joan"?

A. Yeah.

Q. J-o-a-n?

A. I think.

Q. What about a Sierra?

A. Yeah, I remember Sierra.

Q. Okay. And who -- what would be the circumstances of speaking with Sierra?

A. Sierra was with Brian. They were like -- yeah.

Q. And what about Joan?

A. I think Joan -- I don't know. I don't know. She was like somebody who was upcoming in the

Page 151

Innocence Project as a lawyer. I'm not sure.

Q. Like a younger intern type?

A. Yeah, something like that.

Q. So, when you had your phone conversation, who would that phone conversation have been with? The one in which you discussed this affidavit, Exhibit B.

A. I'm not exactly sure --

Q. Okay.

A. -- okay.

Q. Was one of them Brian?

A. Possibility.

Q. Okay. Okay. I have some kind of background questions, and they may be personal, I just want to make sure that I'm just asking you to get general information.

Your mom's name?

A. Sue, Sue Vernon.

Q. Sue Vernon?

A. Uh-huh.

Q. And you said that she was sick in the 1970s. Is she still alive?

A. No, she died in 1990.

Q. 1990?

A. Uh-huh.

Page 152

Q. And then your dad's name?

A. James Cannon.

THE COURT REPORTER: James what?

THE WITNESS: Cannon.

Q. C-a-n-n-o-n?

A. Uh-huh.

THE COURT REPORTER: "Yes"?

Q. Yes?

A. Yes.

Q. And back in 1975 when these events were happening, you said that he lived with you?

A. Yes.

Q. And was he living with you I mean all the time, continuously, in 1975?

A. Yes.

Q. Okay. Was he working in 1975?

A. Yes.

Q. What was he doing?

A. He worked at Franklin Tire Shop.

Q. Okay. So, and he would work what, 9:00 to 5:00 or --

A. I don't know his exact hours. I know he --

Q. Sometime?

A. Yeah.

Q. He didn't have any set hours?

Page 153

A.  No, he had set hours, but I can't tell you like he worked from this time to this time.  All I know he left in the morning.

Q.  I guess what I was trying to get at is would he be there in the evenings?

A.  Sometimes.  Maybe very -- maybe two occasions he was there in the evening maybe, maybe.  Other than that he was out probably doing his thing what he do.

Q.  You mean working?

A.  If that's the case, but I know he worked in the daytime, that's all I can tell you.  Now, nighttime, in the evenings, you know, he did what he did, you know.

Q.  Okay.  What -- so, had you grown up in that house, like you lived there for 12 years at the time --

A.  No.

Q.  -- that this happened?

A.  No.

Q.  When did you first move to the location on -- I forget the address -- Frank and 108th?

A.  Probably in, I want to say '74.  After I graduated from sixth grade, yes.  So, it was something like that, yeah.

Page 154

Q.  Okay.  Now, I want to ask you about the school buses.

A.  Uh-huh.

Q.  Now, I think you testified that you came home on a school bus?

A.  Yes.

Q.  Now, was that like a regular school bus, the yellow school bus or was that --

A.  No.

Q.  Can you describe what the nature of the bus was?

A.  City Transit --

Q.  Okay.  So --

A.  -- CTS.

Q.  So, it was -- and it was a City Transit bus that only had schoolchildren on it?

A.  Yes.

Q.  And there was another bus that was called the 50?

A.  50 Miles.

Q.  50 Miles?

A.  50 Miles, yes.

Q.  And what was that bus?

MS. WANG:  Objection.  Form.

Q.  What was the 50 Miles bus?

A.  That was a city bus, but it was for anybody that wanted to catch it.

Page 155

Q.  Okay.  And so there would be sometimes where --

A.  Some of the school kids we was still -- they would catch the 50 Miles.

Q.  Okay.  So, there was a regular -- what was the -- was there a bus number that you would use for the -- you don't recall?

A.  No.  It was just --

Q.  Okay.

A.  -- we knew the school bus.  And, you know, the 50 Miles would stop at the same bus stop that the school bus stops.  Some kids got on the school bus, some kids caught the 50 Miles bus.

Q.  Okay.  Is that -- but there are two different buses?

A.  They were -- they were both city buses, but they -- one had the name 50 Miles on it the other one had school bus on it.

Q.  I see.  Okay.  And the 50 Miles bus, would there be other people on the bus other than schoolchildren?

MS. WANG:  Objection.  Asked and answered.

A.  Yeah.  I said yes the first time, yeah, uh-huh, with that, yes, 50 Miles, uh-huh.  It was kind of like --

Page 156

MR. FUNK:  Okay.  You can state an objection, but I don't think you can give further -- just state objection, you don't need to state more beyond that.

MS. WANG:  No, I think I'm required to state the basis, but not a speaking -- it's not a speaking objection.  I have to state the basis; otherwise, all your objections are assumed to be relevant.

MR. FUNK:  I don't think so.  I think you can just state objection.

MS. GILBERT:  Don't look at me.

MS. WANG:  That's --

MR. FUNK:  Under the local rules --

MS. WANG:  -- absolutely not the case that I cannot plead the basis of my objection.  As long as I don't make a speaking objection -- I have not, I can state the basis of my objection.

MR. FUNK:  I'm going to object to that.

BY MR. FUNK:

Q.  Okay.  So, the 50 Miles bus, did that bus take a different route than the other bus?

Page 157

A. It primarily took the same route only the school bus came after he got up 116th to Continental. It would come down Continental and it would make a left turn behind Audubon. The 50 Miles kept going up 116th.

Q. Only. Would there be an occasion for the 50 Miles bus to go --

A. No. Not --

Q. -- on Fairhill?

A. On Fairhill, that's the way it came up.

Q. Okay.

A. So, this is Fairhill (indicating) --

Q. Okay. So, we're showing you Exhibit -- I'm going to show you Plaintiff's Exhibit 2.

A. Right. This is Fairhill (indicating), so this is the bus stop, remember I pointed out. The 50 Miles come the same way, it makes that turn. It goes up Fairhill, continues up Fairhill, and when it gets up to the top of Fairhill, which is by the reservoir, it makes the right going down 116th, the same way the school bus would go.

Q. Okay. So the 50 Miles bus would come west on Cedar, take a left onto Fairhill --

A. Yes.

Q. -- go south on Fairhill, which would be uphill?

Page 158

A. Yes.

Q. And so it would go by the store, correct?

A. Yeah. Well, it had to stop there. It was a bus stop there. 50 Miles, the 48A, stopped right there.

Q. Okay. So, if you can mark with a blue pen where the 50 Miles bus would stop.

A. The same spot. The same spot.

Q. So maybe mark an X.

A. (Indicating).

Q. Okay. So, essentially where you had previously marked the stop and where you got on the school bus, the 50 Miles bus would stop at that same spot?

A. Yes, uh-huh.

Q. Okay. Now, and on occasion you would take the 50 Miles bus home?

A. No.

Q. No?

A. If it was, it was very, very seldom --

Q. Okay.

A. -- very seldom.

Q. In the course of the -- in the testimony in the 1970s, did you testify that you took the 50 Miles bus?

Page 159

MS. WANG: Objection. Foundation.

A. That's what I said that I took the 50 Miles bus but actually I didn't take the 50 Miles bus.

Q. Okay. Now, you testified about your conversations with Tommy Hall on May 19th --

A. Yes.

Q. -- 1975. Was Tommy Hall in the same grade as you?

A. No. Tommy Hall is, if I'm not mistaken, about a year older than I am --

Q. Okay.

A. -- so, I think he was like either -- he was either a year older than me or two, but he was in either the eighth grade or the ninth grade. He wasn't in the seventh grade with me.

Q. Okay. So, you were in the seventh grade, Tommy Hall was either in the eighth or ninth grade?

A. Yes.

Q. But he would have gone to Audubon Junior High School as well?

A. Yes.

Q. Okay. And so on that day, May 19th, 1975, were you and Tommy Hall on the same bus?

A. Not that -- since the whole thing, not that I can recall him being on the bus. There's a lot of

Page 160

students that were on the bus.

Q. I see. You weren't sitting next to him or anything like that?

A. Occasionally like --

Q. I'm talking about on May 19th.

A. On May 19th? I can't remember. I don't know who all I was sitting next to on that day.

Q. Okay. So, he could have been on the same bus with you, you just don't know one way or the other?

A. Right, he could have been on it, right.

Q. So, when would you have first seen then Tommy Hall on that day? Is that as you were walking home or explain to me when you would have first --

A. As I was walking home --

Q. Okay.

A. -- from coming up -- coming back from where we were.

- - - -

(Thereupon, Defendant's Exhibit C was marked for purposes of identification.)

- - - -

Q. Just show you what's been marked as Exhibit C. This is a photograph that was an Exhibit from the

Page 161

1975 -- one of the 1975 trials.

Do you recognize this as being an accurate picture of the, of the corner there at Fairhill and Petraca where the Fairmount Cut-Rate store was located?

A. Yes. That's correct.

- - - -

(Thereupon, Defendant's Exhibit D was marked for purposes of identification.)

- - - -

Q. And do you recognize Exhibit D? I just handed you another photograph.

A. Yes, I do.

Q. And I think you testified that you came up and saw the white man lying on the pavement?

A. Yes.

Q. Is this how he would have looked when you first saw him?

A. Yes. Well, he was laying there, but he was -- yeah, gasping for air, yes.

Q. And as I understand it, the children on the school bus who would have been the first ones to see him --

A. Uh-huh.

Q. -- there. Was there anybody there while you --

Page 162

looking at him when you first arrived besides the schoolchildren?

A. Not that I can recall.

Q. Okay. And when you were standing there looking, did you see Tommy Hall in the group?

A. No.

Q. When did you first see Tommy Hall then on that day?

A. On our way back from the store.

Q. Okay. And so where did he live in connection with you -- or actually you already marked that. I'm sorry.

A. Yes.

Q. So, did you start walking back with him or did you see him on your way walking back?

A. Started back walking with him when I left, he left, so I don't know if he was already up there or did he come up there when everybody else started coming up? I'm not exactly sure. But I know that when I got ready to leave, he left at the same time.

Q. Okay. Now, at that point you said you also saw Mrs. Robinson?

A. Yeah. We was all still standing around when the police came and they went into the store. And

Page 163

the ambulance had came and, you know, they pushed us back a little further away from the little area, and then she came, yeah, she came out, uh-huh.

Q. And you knew Mrs. Robinson prior to that, right?

A. Yes.

Q. And you knew her husband?

A. Yes.

Q. Did the Robinsons -- would the Robinsons have known other members of your family?

A. Yes.

Q. So, your mother and your father?

A. Yes.

Q. And you had -- and how long would you say that you were at the scene there before you walked away with Tommy Hall?

A. I want to say about -- I don't know. Maybe about an hour or 30 -- about 30 minutes to an hour.

Q. Okay. And at that time, did you see Charles Loper at the scene?

A. I don't recall Charles Loper, Mr. Loper as he's known, but Mr. Loper stayed on the side over here (indicating) next to the store.

Q. Right. So Mr. Loper lived in some kind of residential building next to the store?

Page 164

A. It's connected, yeah. It was kind of --

Q. Is it like an apartment?

A. No, it was a house.

Q. Oh, it was a house.

A. It was a two-family house, uh-huh. But the way that it's made, it's -- this building is kind of -- it was like -- like they were like that (indicating). So, the house sit back from the corner of this building, I want to say, I don't know, about 10 or 12 feet back.

Q. So, 10 or 12 feet back, but then it was still connected to the actual building that also -- the building that housed the drugstore, or the Fairmount Cut-Rate, store?

A. Yes.

Q. And do you know who else lived there besides Mr. Roper -- Mr. Loper, I'm sorry?

A. I can't remember the lady that -- the lady that stayed downstairs' name, I can't remember her name.

Q. The Robinsons didn't live there?

A. No, the Robinsons didn't live there --

Q. Okay.

A. -- no.

Q. Okay. So, you're walking down the street with

Page 165

Tommy Hall, and you've already testified to this, so just recalling, he said I know who did it --

A. Uh-huh.

Q. -- and then he gave you the names of Ricky, Buddy and Bitsey?

A. Yes.

Q. And at that time you knew who Ricky, Buddy and Bitsey were?

A. Yes.

Q. You knew when he said Ricky, that that was Ricky Jackson?

A. Yes.

Q. And you knew when he said Buddy, that that was Ronny Bridgeman?

A. I knew Ricky Jackson because the Jackson name, like I said, I delivered papers, so everybody, back then everybody has cards, so you'd know who you delivered papers to, so --

Q. And --

A. -- and I know that -- I knew that where Bitsey and Buddy stay, the Bridgemans, those were the Bridgemans, that's the family of the Bridgemans. So, now as far as me knowing their full name? No.

Q. Okay. But you knew that when he said Buddy and

Page 166

Bitsey, that that was the Bridgemans?

A. I knew who he was talking about.

Q. And you knew where -- you knew where Ricky Jackson lived?

A. Yes.

Q. And you knew where the Bridgemans lived?

A. Yes.

Q. And so you knew that on May 19th, 1975 based upon -- when -- after -- after you had that conversation with Tommy Hall, you knew who those three people were and where they lived?

A. Yes.

Q. Okay.

A. Prior to that.

Q. Okay. I think it's Exhibit 4. Oh, I see, this is all kept together.
So, you had previously marked on Exhibit 4 where Tommy Hall lived?

A. Uh-huh, yes.

Q. Are you able to point out -- and as I understand it, Ricky Jackson at that time lived on Arthur Avenue?

A. They both did.

Q. Ricky Jackson --

A. Everybody stayed on Arthur Avenue.

Page 167

Q. Okay. Do you recall where Ricky Jackson lived on Arthur Avenue?

A. It's not, it's not long enough to pick up -- to pick the street out.

Q. Okay.

A. Let's see --

Q. Hold on --

A. -- let me see. All right. Okay.

Q. Maybe you can mark with an X with this blue pen just to differentiate. And actually just to differentiate, if you can mark an X for where Ricky Jackson lives and then an O for where the Bridgemans lived, or a circle.

A. (Indicating). See, this is what I'm saying about Arthur. Because Arthur is much wider, so if I put a mark up over here (indicating), it's going to look like it's closer to Frank Avenue, which it's not.

Q. Okay. But don't mark it yet, maybe you can explain what you mean first.

A. Arthur is -- it's a wider street. So, one stayed on the right-hand side, the other one stayed on the left-hand side. You have two rows of houses, so --

Q. So, Arthur Avenue you'll have a row of houses on

Page 168

one side of the street?

A. On each side of the street, right.

Q. Right. So, if one lived on the south side and one lived on the north side?

A. If you coming from 105 and you turn up Arthur, Ricky and them stayed on the right-hand side. The Bridgemans and them stayed on the left-hand side.

Q. Okay. So, if -- and they stayed somewhere between 105th and 107th?

A. No. They stayed -- let's see, there's a corner store here (indicating), right there. They stayed maybe one, two, three, four, five, six -- maybe seven houses up.

Q. And when you say "they", who are you referring to?

A. Ricky Jackson, the Jacksons, about right here (indicating). And like I said, one, two, three, four, five, six --

Q. Don't mark on it yet.

A. No, I ain't. That's it. So --

Q. So, you pointed out where Ricky Jackson stayed. Could you put an X there.

A. (Indicating).

Q. Okay. So, they kind of lived across the street

Page 169

from each other; is that fair to say?

A. Not across the street, but diagonally across the street.

Q. Okay.

A. Because across the street would have meant that they were like that (indicating), and it wasn't like that. It was like one, two, three -- about four houses down. And the way that the Jacksons and them house sat, it sat in the -- it sat in the rear. It sat in the rear. It didn't sit off like, like up front on the -- like on the curb part.

Q. Okay. It was back a little bit from the street?

A. Yes.

Q. Was there an alley there or something?

A. No.

Q. So, both of their houses faced onto Arthur?

A. Well, both of them houses were on Arthur.

Q. Okay.

A. All right. And both of them houses -- like I said, Ricky Jackson's and them house sat like (indicating) the Lopers and them house sat, it sat kind of back off of the street, but it was still considered Arthur.

Q. Okay. And I think you testified that you had

Page 170

delivered papers to both of their houses?

A. Yes.

Q. And that you knew Ricky Jackson's family?

A. Yeah.

Q. You knew his -- did he have -- he had a brother?

A. He had several brothers.

Q. I mean a younger brother that was --

A. My age.

Q. -- around your age?

A. Uh-huh.

Q. And you would see Ricky Jackson and the Bridgeman brothers in the neighborhood?

A. Yeah. I lived in the neighborhood.

Q. I mean, yeah, you lived in that neighborhood, so you would see them around the neighborhood, it was not just from delivering papers?

A. Right. That's correct.

Q. Now, did -- when you -- after you went home, you said you went back to the scene?

A. Yes.

Q. At any point -- and then you were back at the crowd a second time -- at any point during the time you were at the scene at the Cut-Rate -- Fairmount Cut-Rate either before or after, at any point did you see either Ronnie or Wiley

Page 171

Bridgeman at the scene?

A. I really didn't pay that much attention per -- you know to, per se, to be particular with those three people that I say I saw them. There was enormous people.

Q. Okay. So, you can't say whether you saw them or not?

A. That's right.

Q. Do you recall this coming up at any of the 1970s trials --

A. Do I remember that being brought up? Yes, I do.

Q. That you had --

A. And I remember them asking me and I was stated in saying that they were in the crowd.

Q. And is that just something that --

A. That was given to me, yes, it was. I didn't actually see them.

Q. Did your father ever come to the scene with you?

A. I don't remember him coming up there. He might have did come up there.

Q. You don't recall?

A. Him coming up there to the scene?

Q. Uh-huh.

A. He might have came up there. I mean, there was a lot of people up there.

Page 172

Q. At some point did you speak with -- on that day was there any point in which your father took you to the hospital to get a shot?

A. On that particular day?

Q. Yeah.

A. I had to get -- I came home to get -- yeah, I had to go home to get a shot, yeah.

Q. So when would you have gotten the shot?

A. I don't know.

Q. It was after the first -- when you went home after seeing it the first time?

A. I can't remember if it was the first time or the second time, but I remember getting the shot, yes.

Q. And it was your father that took you to the hospital to get a shot?

A. It was to a clinic, it wasn't no hospital.

Q. To a clinic?

A. Yeah.

Q. And do you recall what time of day that would have been?

A. It was -- it was still daytime.

Q. On May 19th did you tell your mother or your father that you knew -- or that you had told the police that you had -- that you knew who did

Page 173

the --

A. No. No.

Q. Now, was there a point in time in which you would have spoken, or that you got a call from Robert Robinson, the storeowner?

A. I don't remember, but probably. I'm not sure, but I probably did. I'm not sure.

Q. But do you remember speaking with Mr. Robinson?

MS. WANG: Objection. Asked and answered.

A. I can't remember offhand.

Q. Do you remember that coming up during your testimony at the trial, that you spoke with Mr. Robinson?

A. Yeah, I was asked that.

Q. And you testified that you did, had spoken to him?

A. I testified that, if I'm not mistaken, I testified that I did I believe, so --

Q. Okay. And was that true?

A. No.

Q. You had not spoken with Mr. Robinson?

A. I had not spoken to him.

Q. Now, in terms of your -- you talked -- you previously testified about certain times in which

Page 174

you did certain things. Do you recall -- I know you testified that the lineup was on May 25th and the date of the, of the murder was on May 19th. Do you recall that?

A. Yes.

Q. Okay. May 19th was a Monday --

A. Yes.

Q. -- is that correct?

A. Yes.

Q. So May 25th would have been a Sunday.

A. Yes.

Q. All right. With respect to the dates of when things happened in the testimony you gave earlier, are you confident of what -- that those dates happened in the way that it did?

A. Yes.

Q. Okay. Now, you testified about the initial meeting with the Detective Terpay and Farmer. That they came to your house?

A. Yes.

Q. All right. And your mother was home at that time?

A. Yes.

Q. And was your father home at that time?

A. He probably could have been.

Page 175

Q. And when the detectives came to your house prior to that, had you said anything to your mother about the fact that you had told the police that you had --

A. Yes.

Q. -- you knew who did it? I'm sorry?

A. Yes.

Q. What did you tell your mother?

A. I told her that I had told them who did it. And she's like, well, how you know? I said because Tommy Hall told me who did it and I told the police that day. And she was like, but you didn't see it. I was like no, no, I didn't see it.

Q. Okay. So, when the detectives came to see you to speak with you, at what point did you tell the detectives that you had witnessed the murder?

A. I didn't tell them that I witnessed the murder that day. I told them --

Q. That you knew --

A. -- what I had seen, what I had known that Tommy Hall had told me.

Q. And did you tell them that you had witnessed the crime?

A. Not at that day. Not at that time.

Page 176

Q. When did you tell them that you witnessed it?

MS. WANG: Objection. Foundation.

A. I never told them that I witnessed it. As I stated earlier today and even in my testimony, that everything was given to me and presented to me.

Q. So, you told the officers that you had -- who the people were --

A. Right.

Q. -- Ricky, Bitsey and --

A. Yes.

Q. Okay. They did not suggest that to you?

A. Who? The --

Q. They didn't tell you who the people were?

A. No. You talking about the officers, right?

Q. Yeah. Detective -- I'm talking about the very first conversation you had.

A. No.

Q. You were the one that said that Ricky Jackson was the shooter, right?

A. I said Ricky, not Jackson.

Q. You said Ricky.

A. I didn't put any last names with none of the people.

Q. Okay. But you were the one that said that Ricky

Page 177

was the shooter?

A. Yes.

Q. And you were the one that said that Bitsey -- and I get them confused too -- that Buddy was the person that was driving the car?

A. These are all the things that -- yes -- that were like I said before, that were hand given to me. It wasn't something that I sat up and said, you know, Ricky was the shooter, Bitsey was the one that hit him over the head, Buddy was the one that was driving. No.

Q. But you -- but you were the one that identified these three individuals?

A. I was the one that said that these are the three individuals --

Q. Okay.

A. -- who did the -- who had committed the crime. As far as identifying them, I never identified them in the lineup.

Q. Okay. Then the second time that you spoke with the detectives they took you down just to look at photographs?

A. Took me down to look at photographs.

Q. Okay. And at that time when they came to pick you up at your house, your mother was also at

Page 178

home at that time?

A. Yes, she was.

Q. And was your father at home?

A. Like I said, he probably was. It's hard to keep up with him and when he was home --

Q. Okay.

A. -- and when he wasn't home.

Q. Okay. At that point had you -- did you tell your mom that you had told the police that Ricky, Bitsey and Buddy had committed the crime?

A. I told her that I had gave them the name. I didn't told them -- I didn't tell her that they had committed the crime or anything like that.

Q. Okay. And the police officers then took you to the station to look at photographs, right? You testified to this earlier I'm just --

A. The detectives, yes.

Q. At that point in time, you looked through a large number of photographs?

A. Yes.

Q. And the officers were not pointing out any particular photographs to you or trying to suggest to you anything regarding the photographs?

A. No.

Page 179

Q. And you, in fact, after being there for several hours did not identify anybody in the photographs?

A. That's correct.

Q. And that's because you didn't actually see Ricky or Buddy or Bitsey in any of the photographs?

A. That's correct.

Q. So, when you were looking through the photographs, you were just looking to see if you could see Ricky, Buddy or Bitsey in the photographs, right?

MS. WANG: Objection. Foundation.

A. That's correct.

Q. Okay. So, then you testified about the time in which you drove in their car to point out where Ricky, Buddy and Bitsey lived. Do you recall that testimony?

A. Yes.

Q. Is it -- now, you said that was on a different day. Is it possible that that could have been on the same day as when you reviewed the photographs?

A. No.

Q. You recall it being a different day?

A. I recall it being a different day.

Page 180

Q. Okay. But you said that that was just a short trip, that you were just simply showing them where they lived?

A. That's correct.

Q. You didn't have to look for it, you knew where they lived?

A. That's correct.

Q. And do you recall who was driving?

A. Yes. Detective Terpay.

Q. Okay. So, let's see, if that was on the third day, if you interviewed with them on Tuesday and then looked at the photographs on Wednesday, and then you would have done pointing out the cars on Thursday?

A. I don't know if it was Thursday. It could have been, it could have been Friday, it could have been Saturday. I'm not exactly sure which day it was.

Q. And what about the day that you looked at the photographs, could that have been Thursday?

A. No. The photographs were like not all in one day. It's not like I sat down there and reviewed all these photographs in one day. I reviewed some, came back the next day and reviewed some more, so.

Page 181

Q. Now, so the lineup then was on Sunday?

A. That's correct.

Q. So, prior to the lineup, you had been with the police on three different -- police detectives on three different occasions?

A. Or more.

Q. And prior to the lineup, you already knew who the people were, or you had told them the names of the people who had actually committed the crimes -- or you had told them the names of Ricky, Buddy and Bitsey?

A. That's correct.

Q. You told them where they lived?

A. That's correct.

Q. And at any point prior to -- okay. So, when the lineup occurs on Sunday, they picked you up at your house?

A. That's correct.

Q. And your mother was there then?

A. That's correct.

Q. And did your mother know that you were going down for the purposes of doing a lineup?

A. That's what they stated to her, yes.

Q. Okay. And at any point did you or your mother tell the detectives that you did not witness the

Page 182

crime?

A. No.

THE VIDEOGRAPHER: I've got to change the tape.

MR. FUNK: Okay.

THE VIDEOGRAPHER: End of tape four. Off the record at 2:44.

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER: This is tape five. Back on the record at 2:47.

BY MR. FUNK:

Q. Okay. Mr. Vernon, when the police officers picked you up for the lineup, was your father at home at that time?

A. I don't know. I'm not sure. I don't think so. I'm not sure.

Q. Okay. Prior to the lineup, had you told your father anything about your involvement with the police?

A. He knew. He knew everything.

Q. What did you tell him?

A. Well, it wasn't so much what I told him, it was so much what my mother told him. Like I said,

Page 183

you know, I was still in school, so about -- they had their talks, so --

Q. Okay. So, both your mother and your father knew prior to the lineup that you had not witnessed the crime?

A. I know my mother did.

Q. Okay. And what do you think your father knew?

A. Probably what my mother had told him.

Q. You just don't know for sure?

A. Right.

Q. Okay. So, when you went to the -- I think you said the two detectives picked you up --

A. Yes.

Q. -- for the lineup. When you went to the lineup, did -- were there -- who was -- you were on one side of either a glass or a screen?

A. Yes.

Q. Okay. And the suspects were on the other side?

A. That's correct.

Q. And on your side of the screen, was it just the two detectives standing with you?

A. If I can recall, yes.

Q. Okay. And the same two that picked you up?

A. The same two that brought me down to the station, yes.

Page 184

Q. So, the person that asked the questions, do you recognize anyone, that was somebody on the other side of the screen or would that have been the two with you?

A. I know that it was somebody on the other side that gave like commands and made them turn this way, turn that way, and stuff like that --

Q. Right. Okay.

A. -- and that's -- but where I was, I know the two detectives were in there and they just told me to take my time and look at them and make sure that, you know, I identified the right people.

Q. Okay. And so when you looked at the lineup, in the lineup -- Ricky Jackson was in the lineup, right?

A. Ricky Jackson was in there.

Q. And Buddy --

A. Wiley Bridgeman, yes, Buddy was in there.

Q. -- was also in there?

A. Yes, he was.

Q. Was Ronnie Bridgeman in the lineup?

A. No.

Q. So, you did -- I'm sorry, let me back up.

So, the officer on the other side of the screen who was with the suspects, was telling the

Page 185

suspects to turn right or turn left or --
A. I don't know if it was an officer or whatever --
Q. Yeah.
A. -- all I know it was somebody over there that was telling them.
Q. Okay. And that was one person?
A. Like I just said, all I know is that they were telling them to turn this way, turn that way, and turn back around.
Q. Okay. And --
A. Go ahead.
Q. Did any of the officers on the other side of the screen with the suspects, or did any officer or detective on the other side of the screen with the suspects say anything to you?
A. No. You have to excuse me, I just have to get up sometimes.
Q. That's okay. We can take a break if you want --
A. No, no --
Q. -- this is not intended to be --
A. -- no. It's just a normal thing. It's a normal thing. Yeah.
Q. That's okay. Just take your time --
A. It's a normal thing.
Q. -- it's not intended to be --

Page 186

A. No, it's okay. It's all right. Some things you just have to deal with in life and this is one of them.
Q. Okay. So, when you looked at the lineup, you did recognize Ricky Jackson as being in the lineup?
A. But I didn't rat -- but I didn't identify him, yeah.
Q. And when you looked at the lineup, you did recognize Wiley Bridgeman as being in the lineup?
A. Yes, I recognized Buddy in there, yes.
Q. At the time?
A. At the time.
Q. Okay. Now, I want to go to the part where you went to the other room. Okay? Do you remember --
A. After I couldn't identify --
Q. -- that testimony?
A. -- yes.
Q. Okay. And I think you testified earlier that there were two detectives in the room with you?
A. Oh, yes.
Q. I want to point out to you in your affidavit --
A. Uh-huh.
Q. -- could you look at Exhibit B, the typed-written one.

Page 187

A. Uh-huh. Yes.
Q. Can you look at paragraph 12. Now, this affidavit was signed in March of 2014, right? And you stated at that point a detective there took me into this other room --
A. Uh-huh.
Q. -- as far as I can remember it was just the two of us in this room. Do you see that?
A. Uh-huh.
       THE COURT REPORTER: "Yes"?
       THE WITNESS: Yes.
Q. Is that correct?
A. That's correct.
Q. Okay.
A. But it was both detectives.
Q. Well, you stated here that as far as I can remember it was just the two of us in this room.
A. Well, the two of us, the two detectives.
Q. Well, you said here, at that point a detective there took me into this other room?
A. And it was just the two of us, there was two detectives and me.
Q. And then you're referring to he got really loud and angry. He was slamming his hands. Do you see that?

Page 188

A. Yeah. Yeah. Yeah.
Q. So, it was just one detective that was doing that?
A. That's the one, yeah, that I remember, yes.
Q. So, in paragraph 12 you're only speaking about one detective, right?
A. I'm really speaking about two detectives and that's just the way that it's typed up, but only one detective came out, yes, out of my mouth in that -- in this particular paragraph, yes.
Q. Okay. So, in this particular paragraph, paragraph 12 --
A. Uh-huh.
Q. -- you're only describing the actions of one detective?
A. Yes.
Q. And this other detective did not --
A. He didn't do anything. He was just there.
Q. Okay. He didn't say anything to you?
A. No.
Q. Other than -- and there were no other detectives in the room?
A. No.
Q. No other police officers in the room?
A. No. No.

Page 189

Q.  What kind of a room was it?

A.  It was just like a, I don't know, like a room like this.

Q.  Okay.

A.  Just a little bit smaller.

Q.  Now, until this, your two affidavits --

A.  Uh-huh.

Q.  -- 2013 and 2014 and your discussions with the Innocence Project, until then you had never told anybody about what happened in the -- in the room with the detective?

A.  My mother.

Q.  When would you have told your mother?

A.  And my father -- when I came back home.

Q.  And you told your father, too?

A.  Yeah.  He was at home then, yes.  That was one of the times where he was at home.

Q.  But you had never told any other police officers?

A.  No.

Q.  And you never told the prosecutors, and you never told the defense attorneys?

A.  Well, of course --

Q.  Until 2013?

A.  Until -- oh, until 2013.  Of course Detective Terpay and Detective Farmer knew what happened

Page 190

that day, you know, when they came and picked me up the next day.

Q.  They knew what happened with regards to the lineup?

A.  Right, right.

Q.  Did they know -- but did you ever -- my question is more specific, did you ever tell Detective Terpay what happened in the room after the lineup?

A.  Oh, yeah, yeah, yeah.  They knew, yes.  They -- I told them and they also already knew, too.

Q.  Okay.  Other than --

A.  Other than them, no.

Q.  Okay.  So -- okay.  So, after -- now, I think you said that you saw Ricky Jackson by the phones?

A.  Yes, I did.

Q.  Okay.  And I think you said that was after you -- I'm sorry, let me backtrack.

If you look at paragraph 14 of your affidavit.

A.  Uh-huh.  Okay.

Q.  You said that you would -- he took me back out to see Ricky Jackson by the phones.  Do you see that?

A.  Uh-huh.

Page 191

Q.  Okay.

A.  Yes.

Q.  And so then you said it was right after that is when the police had me sign another statement.  Do you see that paragraph 14?

A.  Yes.

Q.  Is that correct?

A.  It's actually correct in the form, but it's not the correct way that it actually happened.  Because after being in the room with them, this is when they brought the statement back.  On my way leaving to go home is when they were on the phones.

Q.  Okay.  So, the order that you have in paragraph 14 --

A.  Yes.

Q.  -- is not correct?

A.  It's kind of in the reverse order, but it happened right there in that same, the same way, yes.  Yes.

Q.  And with regard to the statement that you testified about that was presented to you, it was short?  Can you describe it?  It simply stated that you were scared?

A.  That was it.  Just like I said about the other

Page 192

statement, it had my name and everything up top.  And it stated that Edward Vernon was scared to pick out Ricky Jackson and such and such, and a few more things.  And it was -- it came about right about, right about here (indicating) I want to say on this right about to about line six.  And then up under that it had the little place where you would sign your name.

Q.  Okay.  So, showing you what had been marked as Exhibit 5.  It did not have any information about the actual crime?

A.  On it?

Q.  Right.

A.  The rest of the stuff I couldn't really say what was involved on it.  All I could tell you is that up here just like it is here, Edward Vernon on such and such date, which would have been May the 26th, 1975 -- I can remember that being up there, and I can remember it saying that I was scared to pick, pick them out of the lineup.  And Ricky Jackson, such and such and such.  And as it came down it had more stuff.  And then it was about, like I said, about that short (indicating), and then I signed it.

Q.  Okay.  So, Exhibit 5, do you recall that during

Page 193

the trial that you were cross-examined about that statement?

A. Yes, I do.

Q. Okay.

MR. GILBERT: You mean the trial or the hearing?

MR. FUNK: During the 1970s trial.

MR. GILBERT: Okay.

A. '70s trials. Yes.

Q. Yes.

MS. WANG: Objection. Foundation.

Q. Do you recall that you were -- that you were cross-examined about this statement at all of the trials?

A. Yes.

Q. All right. And let me get my copy of it. Hold on a second.

Okay. Do you see towards -- I'm referring to Exhibit 5, there's a question, how long have you known Buddy, Wiley Bridgeman and Ricky Jackson? And you state that Buddy about three years and Ricky about the same, three years. We was friends and I knew them from the neighborhood. Do you see that?

A. Yes.

Page 194

Q. Is that true?

A. That's pretty much accurate. That's probably about the time that they moved around the neighborhood.

Q. And with respect to this statement, there's a reference to Vincent. Do you see that?

A. Yeah, Bitsey.

Q. Did you ever refer to a Vincent?

A. No, I called him Bitsey. Evidently they didn't spell it right. I don't know who Vincent is.

Q. And so Vincent is what you mean is Bitsey?

A. Yes.

Q. Okay. And you recall you were cross-examined about that?

A. Yes.

Q. Okay. So, you called him -- how did you say it again, Bitsey?

A. Bitsey --

Q. Okay.

A. -- is his name -- was his nickname. Yeah, I recall it.

Q. Okay. And in this statement there's a reference to No. 1 was Buddy and No. 7 was Ricky?

A. Okay. Where is that at? Let's see --

Q. In the lineup No. 1 was Buddy and No. 7 was

Page 195

Ricky.

A. Okay. Yeah, I see that.

Q. And is that correct, No. 1 was Ricky and No. 7 -- I'm sorry, No. 1 was Buddy and No. 7 was Ricky in the lineup?

A. In the lineup I remember being asked that.

Q. So that's correct?

A. That's correct.

Q. Now, towards the end it says that you saw Buddy -- okay. Never mind.

Okay. So, after the lineup you told your parents what happened --

A. That's correct.

Q. -- right? And when you went to the Holiday Inn during the trials your parents stayed with you?

A. My father was supposed to -- my mother stayed with me temporary. And what happened is I didn't know -- well, we didn't know that we were being watched. And my mother --

Q. When you say "being watched", being watched by people in the neighborhood?

A. Watched by -- no, watched by the detectives.

Q. Okay.

A. So, my mother had told them she had the cancer. She had the operation where she had to wear --

Page 196

she had to wear Pampers because I guess from the cervical cancer there that she had and the surgery, whatever they did, but anyway, she was so weak that day that she -- me and her left out of the building and we were walking down to Gray Drugstore.

And we went down there and she could barely, could barely make it there and barely make it back.

And we got back, and the next day when the detectives came to pick me up and, you know what, he cussed me out, and he said I thought I told you not to leave this building. And I said, I left the building, I said -- I went with my mother to go get her some Pampers because she needed them for -- well, you weren't supposed to -- do you know we've got people watching you? There's a detective that sits down there and he watches you to make sure that you not suppose to leave. And I said I didn't know this.

And, yeah, my mother at that point decided it was too much for her and so my father said he would stay down there with me. And I never seen the guy except for like 2:00 or 3:00 o'clock in the morning. And he would come into the room and

Page 197

-- that's a whole 'nother story of who he wanted to have in there --

Q. Okay. So, that was really -- my question was: In the hotel room your mother stayed with you for a while and then your father stayed with you as well?

A. Yeah. Well, I guess he stayed there when he did. Like I said, I very seldom seen him.

Q. And your mother and your father knew that you were testifying at the trials?

A. Yes.

Q. And did your mother and your father come with you to the trial, any of the trials?

A. No one came with me to the trials but me. I was the only one that -- because I stayed in the hotel and I wasn't allowed interacting, contact, with none of my family.

Q. Well, your father testified at the trials, didn't he?

A. But he didn't come down with me to the courthouse.

Q. Okay. And your mother, did she testify at the trials?

A. I think she did, but they didn't come with me. Everything was done separate from me.

Page 198

Q. And are you aware of any time in which your mother or your father told either the police or the prosecutors that you did not actually witness the crime?

A. I can't say that I was around when they did. If they did tell them that, I wasn't present.

Q. Okay. So, you don't know?

A. Yes, for sure.

Q. They never told you that they had done that?

A. Like I just told you, I had -- they limit me to very little contact with anybody, anybody.

Q. I'm just saying your mother and your father never told you that they had said anything to the police or the prosecutors?

A. Did you just hear what I said? They limit me to any interacting with -- my father stayed there, but he stayed there, but he didn't stay there. So, if they talked to him or he came or my mother talked to them, it wasn't in my presence when they talked. It was not in my presence, so I don't know.

Q. Okay. So, after the trial -- or the trials in 1975, you said you stayed -- you moved to New Jersey?

A. Detective Terpay said since I had all of these --

Page 199

since I had these death threats, that it would be a good idea for me not to go back to the neighborhood. And asked my mother that could I go and stay somewhere else. Did I have some more relatives that I could go live with until things died down, that I maybe -- probably come back to Cleveland after then.

Q. And who did you stay with in New Jersey?

A. My auntie and my uncle. I stayed with my mother's brother and his wife.

Q. Okay. So, when would you have moved back to Cleveland?

A. About a year or so later.

Q. Okay. And I think there was another trial in 1977?

A. '77.

Q. Would you have moved back after that trial?

A. After that trial because they, they came and got me.

Q. From New Jersey?

A. Right.

Q. To bring you in for the second trial?

A. Yes.

Q. So, how long after that second trial would you have moved back to Cleveland more permanently?

Page 200

A. Not long after that.

Q. And after you moved back to the neighborhood, would you have occasion to see family members of Ricky Jackson or the Bridgemans?

A. Yes.

Q. Did they ever have occasion to speak with you about the trials?

A. Ricky's brother always -- his younger brother always assured me that he didn't have any hard feelings against me and that we were okay. And that he just said he know that I -- that I lied and that, you know, I didn't tell the truth, but, you know, he said we were still good friends and that's basically it.

Q. Did you ever say anything to him about whether you lied or not?

A. No, I didn't get into all of that with him.

Q. So, when you moved back to Cleveland, did you live in the same house?

A. No. No.

Q. Where did you live when you moved back?

A. Actually, when I came back, we lived on East 71st and Lawnview.

THE COURT REPORTER: And what?

THE WITNESS: Lawnview.

Page 201

Q. So, that's a different neighborhood, right?

A. Yeah. That's between Wade Park and Lexington.

Q. And were you living with your mother or father then?

A. My mother. My father was deceased.

Q. Did I ask you that? When did your father pass away?

A. No, you didn't ask me.

Q. Okay. When did your father pass away? Sorry.

A. 1976.

Q. Oh, so I'm sorry, so he passed away before the second trial?

A. Yes. Yes. And my mother, my mother was already sick at that time. She had went back into the hospital with the cancer. He developed -- I don't know what he had, but all I know is he lost one of his lungs. And I remember coming back in May because he died in May, and I was in school, and they brought me back here. I wasn't really allowed to go anywhere. Detective Terpay said just stay around the house there. You don't venture off over into the other neighborhood where you grew up at and where everything happened.

And, yeah, he died, yep. And then like I

Page 202

said, my mother -- we moved -- well, when I came back from -- to live, we lived on 71st and Lawnview. That's, like I said, we were always staying there when my father died -- well, she was anyway.

Q. So Princeton, New Jersey you were living during that time --

A. Uh-huh.

Q. -- is that right?

A. Yes.

Q. Okay. When you were in Princeton, New Jersey you flew back for the second trial?

A. Yes.

Q. Okay. And when you flew back for the second trial, did you stay at the same Holiday Inn again during the second trial?

A. During the second trial, I think I did stay down there.

Q. I'll say the 1977, second trial.

A. Yeah, I want to say I did. I didn't stay at home, I don't think I did.

Q. And did you stay there with your mother?

A. No. I stayed there by myself.

Q. But you saw your mother when you came back?

A. Yeah, yeah.

Page 203

Q. And --

A. I want to say I could have been at home too, but go ahead.

Q. So, your mother knew of all of these trials, four trials, that you were testifying that you had seen the murder and you were testifying that these three had done -- that Ricky was the shooter, that Wiley was driving the car and that Ronnie was the one who --

A. She knew.

MS. WANG: Objection.

Q. Your mother was aware that you were testifying to that?

MS. WANG: Objection. Form, foundation.

A. My mother knew that these men did not do it.

Q. But your mother also knew that you were testifying in court that they did do it?

A. Yes, she did.

MR. FUNK: Okay. Let me take a moment. Let's take a break.

THE VIDEOGRAPHER: Off the record at 3:20.

- - - -

(Thereupon, a recess was had.)

Page 204

- - - -

THE VIDEOGRAPHER: Okay. We're back on the record at 3:32.

BY MR. FUNK:

Q. Okay. So, I want to go back to your testimony. You said you spoke -- or you saw Wiley Bridgeman at the City Mission in 2006. Do you remember that?

A. Yes.

Q. Okay. And at that time did you tell him that -- what -- or just explain again what -- I don't want to re -- put words in your mouth, what did you tell him about what you did at the trial, the criminal trials?

A. No, I told him that -- when I saw him, I explained to him who I was, and like I said, we cried on each others shoulders. And I told him that I know that they didn't do it. And he says, well, you need to come forward and tell the newspapers and the media, and I was like, nah, I'm not coming forward with none of that, no. At that time I'm thinking to myself, but I didn't tell him that.

Q. Right. So, up until that time, 2006 --

A. Uh-huh.

Page 205

Q. -- had you told anyone other than your mother and your father that you had lied at the criminal trials?

A. No.

Q. And prior to 2006 had you spoken with anyone about the truth of what happened?

A. No.

Q. Now, after that, after you spoke with Wiley Bridgeman, were you called by Cleveland Scene magazine?

A. Yes.

Q. And at that time, you didn't want -- you refused to speak with them?

A. I refused to speak with them, yes, I did.

Q. Okay. So, the next time that this subject came up it was actually brought up by your pastor?

A. As far as the Scene magazine is concerned, yes.

Q. No, about the whole subject of the -- of your testimony at the Jackson and Bridgeman trials.

A. Actually Scene magazine, I guess, they contacted him. And he came to me, and I told him I said it's something happened in my past and I really don't even want to talk about it.

Q. Okay. So then after that --

A. Then that's when --

Page 206

Q. -- the next time would have been in 2013 --

A. '13, that's right.

Q. -- when you spoke with your pastor?

A. Yes.

Q. So, prior to that time -- and I think you already testified about that, so I don't want to go into it in great detail, but that was the time in the hospital --

A. That's correct.

Q. -- with your pastor?

A. That's correct.

Q. Prior to that, had you spoken with anyone?

A. Prior to that, no.

Q. Okay.

        MR. FUNK: I'm going to mark this as the next exhibit. Do you know where we're at? Are we at E?

        THE COURT REPORTER: We're at E, yeah.

        MR. FUNK: I'm going to use capital letters.

        - - - -

        (Thereupon, Defendant's Exhibit E was marked for purposes of identification.)

        - - - -

Page 207

Q. I'm going to show you what's been marked as Exhibit E. This is your testimony at the 2014 hearing.

A. Uh-huh.

Q. Okay. And you said you reviewed this prior to your deposition here today?

A. What this?

Q. Well, you reviewed -- I don't know if you reviewed Exhibit E, but you reviewed the testimony of your -- the transcript of your testimony at the 2014 --

A. Yes.

Q. -- hearing, right?

A. Yeah.

Q. And you recall there was nothing in the testimony that you felt you needed to correct or change?

A. Correct.

Q. Now, prior to this testimony -- and I think you were the -- it says here Mr. Howe did the direct examination. That's Brian Howe?

A. Yes, correct.

Q. And prior to your testimony, did you meet with Mr. Howe to prepare for the testimony?

A. Did I meet with him to prepare for it?

Q. Yeah.

Page 208

A. I spoke with Mr. Howe.

Q. To discuss what kind of questions he would be asking you and so you could be prepared to answer them?

A. All I can say is that we spoke together and that's about it.

Q. So, if you refer -- go to page 126, which is about three-fourths of the way in.

A. Okay.

Q. There's a question about, on line 15, do you see that?

A. Yes.

Q. "So, up until the point where you told Wiley Bridgeman that you made all this up, you hadn't told anyone else?" Do you see that?

A. Yes.

Q. Did you tell Wiley Bridgeman that you had made all of this up?

A. Yes. That's what I meant by everything was a lie.

Q. And you had -- and so then you said up until that point in time when you told him that you made all this up, you hadn't told anyone else and you said no?

A. No.

Page 209

Q.  So, you're saying no, I hadn't told anybody else?
A.  Exactly.  That's correct.
Q.  And then the next question is, "Not the police?"  And then you said "no."
A.  That's correct.
Q.  Okay.  Now, during this testimony, if you remember your testimony here today, you testified about conversations that you had with Detective Terpay after the lineup?
A.  Correct.
Q.  Okay.  During your testimony on the -- on November 17th, 2014, you didn't testify about that, did you?
A.  I was never asked about it.
Q.  Prior to 2014 did you ever tell anybody about that?
A.  I was never asked about it.
Q.  And you never told anybody at the Innocence Project about it?
A.  About Detective Terpay and them?
Q.  About the specific conversation the day after the lineup with Detective Terpay that you testified to --
A.  Yes, I told the Innocence Project, yes, I did.
Q.  Okay.  And the Innocence Project didn't put that

Page 210

in your affidavit --
A.  I don't know.
Q.  -- Exhibit B?
A.  I don't think they asked the question, because I think I would have put that in there.
Q.  But you didn't put it in there, right?
A.  No, I said I don't think they asked the question --
Q.  Okay.  So did you --
A.  -- because I would have put it in there.  And when I wrote out the statement, no, I did not include that.
Q.  Okay.  So, did you tell the Innocence Project about your conversation with Detective Terpay the day after the lineup?
A.  I told them about everything that happened prior to the lineup and after the lineup.
Q.  And did you tell them your conversation with Detective Terpay the day after the lineup?
A.  Like I just said, they didn't ask me the question about the day after the lineup.
Q.  Okay.  Well, that's all I'm trying to confirm.  So, then because they didn't ask you the question, you never told them anything about your conversation with Detective Terpay about the day

Page 211

after the lineup?
A.  I don't believe -- I could have, but I didn't put it down in writing.
Q.  And they didn't ask you about it on the November 17th --
A.  They didn't ask me about it, no one asked me.
Q.  Okay.  So, when is the first time that you told anyone about that conversation with Detective Terpay the day after the lineup?  Is that, the first time you talked about it is that today?
A.  No.
Q.  Between 2006 with Wiley Bridgeman and today, did you tell -- have you ever told anybody that you had a conversation with Detective Terpay the day after the lineup or the substance of what you testified to today about that conversation?
A.  If I'm reading this right -- because it sounds like you're trying to confuse me here --
Q.  No, actually I'm not trying to confuse you, I just want to know --
A.  And I'm just trying to -- you know --
Q.  Let me ask you a different --
A.  I'm going to state it again --
Q.  Okay.
A.  -- and I said it again is that I talked with them

Page 212

about everything that went on before the trial, everything that went on after the trial.  To make a statement about what I talked to them about Detective Terpay talked to me after the lineup, that question was not brought up about what I said.  And I stated that --
Q.  Okay.
A.  -- okay?
Q.  So, I know, and I just want to make sure I understand.  From 2006 with Wiley, your conversation with Wiley Bridgeman until the present day, had you -- have you ever had a conversation with anybody in which you told them about the conversation that you testified to today that you had with Detective Terpay the day after the lineup?
A.  Of course my mother and father knew.
Q.  No, I'm talking about -- your mother and father weren't alive?
A.  Uh-huh, that's correct.
Q.  Okay.  So, in 2006 -- since 2006 --
A.  Since Wiley Bridgeman.
Q.  -- until today --
A.  Uh-huh.
Q.  -- had you told anybody about the conversation

Page 213

you had with Detective Terpay the day after the lineup?

A. I just -- it's like I'm repeating the same thing over --

Q. Right. But isn't that --

A. -- I was never asked the question, so how could I tell anybody what I -- what I said.

Q. Okay. So, the answer is, yes, you never told anybody until today?

A. If I'm not mistaken, no, I haven't told anyone until today. I believe -- I believe I talked in general about what happened about the day after and it could have been with the Innocence Project, could have been with my pastor, could have been just in general.

Q. Okay. But that conversation is not in any of the affidavits?

A. It's not in any of the affidavits.

Q. And it's not in the transcript of the hearing?

A. Nuh-uh.

MS. WANG: Objection. Asked and answered.

Q. And, so to your knowledge, it was not anything that you can recall specifically discussing with anybody until today?

Page 214

MS. WANG: Objection. Asked and answered.

A. I think I've already said what I needed to say.

Q. I just want to confirm, is today the first day that you discussed that conversation?

MS. WANG: Objection. Asked and answered.

A. I think if you go back and have him look, I answered that question already. And I think you're trying to put it in a different format again to make me answer it again and I refuse to answer it again. I've already --

Q. Okay. Now, earlier you said you do not recall whether Tommy Hall was on bus with you that day?

MS. WANG: Objection. Asked and answered.

A. That's correct.

Q. Okay. I want to refer you to Exhibit B, it's your written affidavit, paragraph four.

A. Uh-huh.

Q. You stated Tommy Hall was on bus with me that day. He was a couple years older than me. We got off the bus at the same stop.

A. Uh-huh.

Q. Does that refresh your recollection that --

Page 215

A. I mean that's correct, but so many -- like I just said earlier, so many people got off the bus. Everybody gets off -- well, not everybody gets off at that bus stop, but so many people gets off at that bus stop, that is correct.

Q. And Tommy Hall got off at the same bus stop that you did?

A. And if this is what I stated here, then that's what happened.

Q. Okay. So paragraph four is correct?

A. That's correct.

Q. All right. And then in paragraph six you said, I don't know where Tommy Hall got the names Ricky, Buddy and Bitsey. Tommy was on the bus with me when we heard the shots, so he couldn't have seen the shooting. Do you see that?

A. That is correct.

Q. Okay. And that's a correct statement, too?

A. That's a correct statement.

Q. Did you ask Tommy Hall how -- why he thought Ricky, Buddy and Bitsey did it?

A. No, I didn't.

Q. And why did you -- but you believed him that they did?

A. That's what he told me and I believed it.

Page 216

Q. Did you tell Detective Terpay in any of your conversations with him that Tommy Hall was the person who told you that Ricky, Buddy and Bitsey --

A. Possibility, not correctly. I'm not sure.

Q. Now, you had talked -- you testified earlier about when you were staying at the Holiday Inn you were aware that there was death threats from the neighborhood at that time?

A. That's what Detective Terpay told me.

Q. Okay. Had you received any threats from anybody in the neighborhood?

MS. GILBERT: Do you mean directly from somebody else?

Q. Yeah, directly from somebody else in the neighborhood?

A. No, I didn't.

Q. Had anybody in the neighborhood talked to you about -- and I'm going back to 1975 -- about whether or not you had seen the crime?

A. Had anybody talked to me about that?

Q. Yeah. Other than the detectives, did anybody in the neighborhood talk to you about it?

A. Everybody in the neighborhood talked to me about it. They knew I didn't see it.

Page 217

Q. They knew that you didn't see it?
A. Yeah, everybody knew I was on the school bus.
Q. And what did you say back to them?
        MS. WANG: Objection. Foundation.
A. I will put it this way to you, I didn't say anything back to them.
Q. Okay. And -- but people actually talked to you about --
A. People had their comments about it --
Q. Okay.
A. -- okay. Put it like that.
Q. And did you -- people were mad at you because you were testifying, right?
        MS. WANG: Objection. Foundation.
A. Correct.
Q. And were you at all concerned -- or did you believe that there would potentially be death threats against you from people in the neighborhood?
A. I didn't believe anything like that.
Q. Okay. And were you concerned about the fact people in the neighborhood --
A. No.
Q. You weren't concerned at all about what people in neighborhood were saying?

Page 218

A. No.
Q. But after the trials you -- the 1975 trails -- you did move to New Jersey, right?
A. Not on -- not on my behalf.
Q. I mean your parents --
A. Like I just said, not on my behalf, not on my parents' behalf. Only because of what the detectives said and I'll state that until the day I die.
Q. Okay. But your parents --
A. My parents --
Q. -- allowed you to go to New Jersey?
A. -- only -- agreed to it because of what the detectives said. If the detectives had not brought it to her, then I would have still stayed right there in that house.
Q. Do you recall ever telling Robert Robinson, the owner of the store, that you knew who did it?
A. I don't recall talking to Bob about who did it. Matter of fact, I wasn't too much allowed to go up there to the store. I went to the other store. Occasionally I would come up there to the store, but the store was actually closed for, I don't know, two or three days or something or another.

Page 219

Q. Yeah. No, my question was not did you tell him who did it, but did you tell him at any point that you knew who did it?
A. I don't recall.
Q. So you may have done that?
A. I said I don't recall.
Q. Okay. Do you recall that being a subject of testimony at the trial?
A. At the trials, yes, I do.
Q. That you testified that you had spoken to Mr. Robinson about that?
A. I testified to that -- well, that's what was said.
Q. That you had told Mr. Robinson that you knew who did it?
A. That's what was said.
Q. Okay. And -- okay. I just need to get this out for the record, so I want to ask you: Have you been convicted of any crimes?
        MS. WANG: Objection. Relevance. 403, 404, 609. Go ahead.
A. I think you already know the answer to these questions that you're asking.
Q. Well, I need to know from you.
A. No, you already -- you already know, the city

Page 220

knows, the state knows, the county knows. And you being an investigator, you know the answer to these questions and I refuse to answer.
Q. Okay.
A. Thank you.
Q. So, you have been convicted of a crime?
A. What did I just say? Yes.
Q. Okay. And how many convictions do you have?
A. What did I just say?
        MS. WANG: Objection. Well --
Q. I don't know.
        MR. GILBERT: You can answer.
        MS. WANG: -- hold on. Let me --
        MR. GILBERT: You can answer.
        MS. WANG: -- just make my objection -- I'll just make my objection for the record and then you can answer the question.
        MR. GILBERT: You can answer it.
        MS. WANG: Objection. Relevance. Rule 403, 404, 609. Go ahead.
A. Two convictions, sir.
Q. Okay. And what --
A. Does that make you a little bit more happier?
Q. I'm actually -- Mr. Vernon, I'm just asking the

Page 221

questions, I'm not trying to be happy or not happy.

So, two convictions. When were the convictions and what were they for?

A. I have no idea. It's a public record. People can look them up. Because this is like --

Q. And did you serve any time, any time in jail or in prison for this?

A. Yes, I did.

Q. When were you in jail?

A. That's back around to the same question that you just asked me before.

Q. I don't know when you served in jail.

A. Okay.

Q. Served time in jail.

A. I'm pretty sure it's public record, so you ought to be able to look that up. It was a time. I can't remember.

Q. How long were you in jail?

A. I don't want to remember. I just don't want to remember. I know how long. I know when the dates. I know all those things.

Q. All right. This is the only information I have.

MR. FUNK: If we can go ahead and mark this as an exhibit.

Page 222

- - - -

(Thereupon, Defendant's Exhibits F, G were marked for purposes of identification.)

- - - -

THE VIDEOGRAPHER: Can I go off and change the tape real quick?

MR. FUNK: Yeah, go ahead and change.

THE VIDEOGRAPHER: End of tape five.

MR. FUNK: I'm almost done.

THE VIDEOGRAPHER: Off the record at 3:59.

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER: This is tape six. Back on the record at 4:00 o'clock.

BY MR. FUNK:

Q. All right. I'm showing you two documents, one is marked Exhibit F and one is marked Exhibit G. I'm sorry, did I -- I may --

A. All right. Let's just get to the real point, I don't even have to look at these --

Q. Okay.

Page 223

A. Hold on. Let's just get to the real point. You want to know if I came in contact with any of these individuals while I was in prison and no, I didn't.

Q. Actually I just want to verify -- handing you Exhibit F, just want to verify that that is -- this is something that all I've done is printed it off from the Cuyahoga County Court's website, I just want to verify that that is you, Edward Vernon, that was convicted of the crime of gross sexual imposition as reflected in Exhibit F on -- in 1991; is that correct?

A. You have the information, right?

Q. No, I'm just -- I'm asking you to verify that you are that same person.

A. But you have the information, right?

Q. But I'm --

A. This is what -- see, all of these --

Q. It's -- all I'm asking, Mr. Vernon, is just to identify --

A. -- all of these shenanigans --

Q. -- that you are the person that's reflected in this record.

A. -- and everything that you're trying to do is, like I just said, I was in prison, you all

Page 224

already know what I was in prison for, all right? You already know the count, you brought it up, so you already know the things that I was in prison for. Did I have any interaction with these men? No, I didn't. Did I cross -- our paths cross? No, they didn't. Okay?

Q. And I apologize because actually I referred to these wrong --

A. Okay.

Q. -- exhibit --

A. That's drug trafficking.

Q. -- Exhibit F is drug trafficking. And that is -- you are the Edward Vernon reflected in that?

A. Like I just said, you all have the evidence right there.

Q. And then Exhibit G is --

A. That's gross sexual imposition. You have all of the evidence right there, sir.

Q. And you are the Edward Vernon in Exhibit G, correct?

A. Yes, sir.

MR. FUNK: Okay. I have no further questions. Thank you.

- - - -

RE-EXAMINATION OF EDWARD VERNON

Page 225

BY MS. WANG:

Q. I just have a few follow-up questions of you, Mr. Vernon.

And I just want to clarify for the record, the conviction that's reflected in Defendant's Exhibit G for gross sexual imposition, that conviction occurred over ten years ago; is that correct?

A. Yes. Both of those.

Q. Okay. And were you released -- you served -- did you serve some time in jail for that?

A. Yes. For that about six months or something like that.

Q. Did you leave jail over ten years ago?

A. I think I was released in nineteen ninety -- 1998 or '99, something like that.

Q. All right. Could it have been 1997?

A. Or seven, yeah. Something like that, yeah. Yeah, that's correct.

Q. And then the conviction that is reflected in Defendant's Exhibit F for trafficking in drugs, was that conviction over ten years ago?

A. Yes.

Q. Okay. And how long did you serve in jail for that?

Page 226

A. I don't know. I don't know. Three and a half years or something like that.

Q. Okay. So that conviction --

A. Two and a half years, something like that.

Q. You would have been finished serving your time for that particular conviction over ten years ago; is that correct?

A. Yes.

Q. I just have a few clarifying questions on a few things so I might jump around a little bit.

Just to clarify about Tommy Hall. Did you walk down the street with Tommy Hall after you left the scene?

A. Yes, I did.

Q. And you had that conversation with him that you told us about earlier; is that right?

THE COURT REPORTER: "Yes"?

MR. GILBERT: You have to say yes.

A. Yes. Yes.

Q. Do you know -- strike that.

Did your mother ever try to stop you from testifying at the trials of Ricky, Wiley or Ronnie Bridgeman?

A. My mother didn't want me to cooperate any more, but she was also threatened I guess with the

Page 227

perjury thing. So her and my father knew that they would end up going to jail if I didn't.

Q. So, your mother was threatened with perjury too?

MR. FUNK: Objection.

A. They both knew what the detectives meant when they said about perjury. And they knew that when I came home and told them what happened and they knew.

Q. Did your mother ever tell you that she was afraid of the police?

A. Yes.

MR. FUNK: Objection.

Q. And on -- did she tell you that -- when did she tell you that?

A. Numerous occasions.

Q. Was it before or after the trial of Ricky Jackson?

A. Before.

Q. Did she also tell you that she was afraid of the police in between the trials of Ricky Jackson and the Bridgeman brothers?

MR. FUNK: Objection.

A. Yes.

Q. And in what context did she tell you this?

MR. FUNK: Objection.

Page 228

A. She told me that she was afraid that, that they would do something to her and my father and myself, so she just said it's too late now, you just got to go ahead and cooperate with what they want you to do.

Q. All right. Just to be clear -- and you may have said this earlier and I apologize if I'm asking you this again, but were you on the 50 Miles bus on May 19th of 1975?

A. No. I was on the school bus.

Q. Earlier when Mr. Funk was asking you some questions, he asked you about whether you remember testifying at the trials in the 1970s that you had seen Wiley and/or Ronnie at the scene. Do you remember that question?

A. Yes.

Q. And you had said that you do remember it being brought up at your trial but this was given to me?

A. Yes.

Q. Who gave that information to you?

MR. FUNK: Objection.

A. I'm just saying the detective.

THE COURT REPORTER: Sorry?

THE WITNESS: I said, the

Page 229

detective.

Q. Do you remember which detective?

A. Detective Terpay.

Q. Do you recall at any time, either before or after the lineup, ever sitting in a room with any detective and giving them a statement about the crime and one of the detectives typing it up?

MR. FUNK: Objection. Asked and answered.

A. Me giving a statement and them -- yes, and them typing it up, yes.

Q. Do you remember being in the same room as the typing -- as a detective who was typing?

A. No --

Q. Oh.

A. -- just everything written down.

Q. Oh, okay. And so I just want to be clear to make sure I understand. You're saying that in what you had described earlier was that after the detective you identified from photograph No. 4 --

A. Uh-huh.

Q. -- yelled at you and made threats against your parents, he left the room and came back with a statement already typed up; is that right?

MR. FUNK: Objection.

Page 230

A. That's correct.

Q. Okay. And talking -- speaking of the detective who is in photograph No. 4 -- actually take a look at your affidavit right there and take a look at page two, paragraph 12. And in that paragraph you stated, you described the detective who got really loud and angry and started yelling at me and calling me a liar. He was slamming his hands on the table and pushing things around, calling me this and that. I was frightened and crying. You know, it's a scary thing for someone that young.

Do you see that paragraph?

A. Yes.

Q. And that was true?

A. That's correct?

Q. Was it the detective who's in photograph No. 4 who did that to you?

MR. FUNK: Objection.

A. Correct.

THE COURT REPORTER: Sorry?

THE WITNESS: Correct. Yes.

Q. Okay. And how about the next paragraph, paragraph No. 13. In paragraph 13 you state the detective said that I was too young to go to jail

Page 231

but he would arrest my parents for perjury because I was backing out. My mom was sick at that time and that really scared me. I didn't want my parents to get in trouble over this.

A. That's correct.

Q. And the detective who said that to you, was that also the detective that's in photograph No. 4?

A. That's correct.

MR. FUNK: Objection.

Q. Paragraph No. 14 of your affidavit you state, when I was crying the detective said don't worry about it, we can fix this. That was when he took me back out to see Ricky Jackson by the phones. I don't remember ever really pointing him out again, but I think right after that was when the police had me sign another statement.

Now, earlier you had said you got the order a little bit mixed up in terms of seeing Ricky at the phone?

A. That's correct.

Q. Okay. But in terms of what you're here about the detective saying "we can fix this", was that detective, the detective that's in photograph No. 4?

MR. FUNK: Objection.

Page 232

A. That's correct.

Q. Okay. In paragraph 15 of your affidavit you state, the detective said he wanted me to say that I was scared during the lineup and that was the only reason I couldn't pick out Ricky and the Bridgeman brothers. I think this is what he meant when he said everything would be okay and that he would fix this.

Which detective was that?

MR. FUNK: Objection.

A. The detective in photograph No. 4.

MS. WANG: All right. Let's take a quick break and then see if we have anything else.

THE VIDEOGRAPHER: Off the record at 4:11.

- - - -

(Thereupon, a recess was had.)

- - - -

BY MS. WANG:

Q. Could you just take a look at -- so just for reference and for the record, this is a document Bates Stamped CLE-O111 and 0112. The date indicated at the top, date of this report says May 20, 1975. And at the bottom it appears to

Page 233

have a signature of J.T. Farmer on it.

Could you take a look at the last paragraph on the first page of this report and just read that to yourself and then I'll ask you a question about it.

A. The last paragraph?

Q. Yes.

MR. FUNK: I'm going to state an objection for the record that I think this exceeds the scope of cross-examination, but go ahead.

A. It says there in the first sentence of that paragraph, while in this area we were able to locate a young citizen who reveals that he was getting off the bus -- and then it continues on describing the incident.

Did you -- my question is: Did you give this information to Detectives Farmer or Terpay or did they give the information to you?

MR. FUNK: Objection. Foundation.

A. No, this information was given to me.

Q. And do you recall if this information was given to you on May 20th of 1975?

MR. FUNK: Objection.

A. It was given to me then.

Page 234

Q. And let me just clarify, earlier on, in the beginning of your testimony today, you had described an interview or an interrogation with Detectives Terpay and Farmer where they were providing you with some information the day after the shooting. Do you recall that?

A. Uh-huh.

THE COURT REPORTER: "Yes"?

THE WITNESS: Yes.

- - - -

(Thereupon, Plaintiff's Exhibit 7 was marked for purposes of identification.)

- - - -

Q. And was the information that's in paragraph one -- or paragraph -- page one, the last paragraph of Deposition Exhibit 7, is that the information that the detectives were providing you on that occasion?

MR. FUNK: Objection.

A. This is some of it.

Q. Okay. And take a look at page two, the first full paragraph of page two of that report, and just look at it and to yourself and let me know when you're done.

A. Okay.

Page 235

Q. Okay. Did you give any of that information in the first paragraph of the second page of Plaintiff's Deposition Exhibit 7, did you give any of that information to the detectives?

A. No.

Q. Was that information that they provided to you?

A. Yes, it was.

Q. And the same thing with the last paragraph on the first page of that exhibit, was the information in that paragraph provided to you by the detective?

A. Yes, it was.

Q. One quick question about that incident at the Holiday Inn that you had mentioned where you had left the hotel to get something for your mother.

A. Well, me and my mother left.

Q. For you and your mother?

A. No. Me and my mother left. We left together.

Q. Oh, you and your mother left?

A. Yes, uh-huh.

Q. Okay. Which detective was it who cussed you out?

MR. FUNK: Objection.

A. Detective Terpay.

THE COURT REPORTER: Sorry?

THE WITNESS: Terpay.

Page 236

MS. WANG: I have no further questions.

- - - -

RE-EXAMINATION OF EDWARD VERNON
BY MR. FUNK:

Q. Referring to Exhibit 7, just so I understand that when you talk about, fed you the information, did they say -- was it the kind of thing where they asked you the question like, did you see -- I'm going to use it as an example -- did you see both suspects running south on Petraca, and at the corner of Frank and Petraca enter a dark green car with a light green top and then you would say yes. Is that how that worked?

A. They asked me, they said, well, it's two guys involved in this, that were outside the store, right? Yeah.

Q. Okay.

A. You know, stuff like that, yeah.

Q. And that's kind of the way it would go, they would ask you a question that would have facts in the question --

A. And --

Q. -- suggesting the answer and then you would say "yes" to the question?

Page 237

A.  Yes.

Q.  So, all the information that they conveyed in the reports --

A.  Kind of gave me.  Was --

Q.  Let me get the question out first, I'm sorry.

A.  Go ahead.

Q.  The last paragraph and the first paragraph on page two that was just described for you that you reviewed --

A.  Uh-huh.

Q.  -- the information on this, when they asked you the questions whether what was on here was true, you said "yes"?

A.  Yes.

MR. FUNK:  Okay.  No further questions.

MS. WANG:  Nothing further.

THE VIDEOGRAPHER:  This concludes the deposition.  We're off the record at 4:24.

MS. WANG:  So, you have the option of either reserving signature for your deposition or waiving signature.

Reserving signature means that you would like to review the transcript, make

Page 238

sure everything in it has been transcribed accurately by the court reporter, and you can make any, you know, corrections if he didn't hear you right or something.

THE WITNESS:  Uh-huh.

MS. WANG:  Waiving means you just trust that the court reporter has recorded everything correctly and you don't need to review it.  Which one would you like to do?

THE WITNESS:  Both.

MS. WANG:  Would you like to reserve, that means you can just review it for accuracy?

THE WITNESS:  You know, I trust the court reporter.

MS. GILBERT:  It's also on tape by the way, so --

THE WITNESS:  I trust, I trust, I trust.  We're good.

MS. WANG:  Okay.

- - - -

(The reading and signing of the deposition was expressly waived by the witness and by stipulation of counsel.)

- - - -

Page 239

C E R T I F I C A T E

The State of Ohio, ) SS:
County of Cuyahoga.)

I, Brian A. Kuebler, a Notary Public within and for the State of Ohio, authorized to administer oaths and to take and certify depositions, do hereby certify that the above-named witness was by me, before the giving of their deposition, first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition as above-set forth was reduced to writing by me by means of stenotypy, and was later transcribed by computer-aided technology under my direction; that this is a true record of the testimony given by the witness; that said deposition was taken at the aforementioned time, date and place, pursuant to notice or stipulation of counsel; and that I am not a relative or employee or attorney of any of the parties, or a relative or employee of such attorney, or financially interested in this action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office, at Cleveland, Ohio, this _____ day of _____ A.D. 20 _____.

_____
Brian A. Kuebler, Notary Public, State of Ohio
55 Public Square, Suite 1332
Cleveland, Ohio  44113
My commission expires June 12, 2017