IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| KWAME AJAMU, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:15-CV-1320 |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, et al. | ) | Judge Christopher A. Boyko |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT KAREN LAMENDOLA'S
MOTION FOR SUMMARY JUDGMENT [Dkt. 63]**

Terry H. Gilbert (OH 0021948)
Jacqueline C. Greene (OH 0092733)
FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, OH 44113
(216) 241-1430
tgilbert@f-glaw.com
jgreene@f-glaw.com

David E. Mills (OH 0075400)
THE MILLS LAW OFFICE LLC
1300 West Ninth Street, Suite 636
Cleveland, OH 44113
(216) 929-4747
dm@MillsFederalAppeals.com

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF MATERIAL FACTS ...............................................................................2

    I.      The Murder of Harold Franks Was Not Committed by Jackson or the Bridgemans.....2

    II.    Edward Vernon Did Not Witness Anyone Commit the Crime....................................3

    III.   Detectives Fed Vernon Information in order to Fabricate a Statement ........................4

    IV.   Jackson, Ajamu, and Bridgeman Were Falsely Arrested ............................................6

    V.    Detectives Coerced Vernon into Signing a Fabricated Statement ...............................6

    VI.   Detectives Tried to Physically Coerce Jackson into a False Confession.....................10

    VII.  Terpay and Farmer Continue Threatening Vernon into Giving His Fabricated,
          False Testimony at Trial ...........................................................................................11

    VIII. Jackson, Bridgeman, and Ajamu Were Falsely Charged Based on Vernon's
          Fabricated Statement and the Withholding of Exculpatory Evidence ........................12

    IX.   Plaintiffs Were Tried, Wrongfully Convicted, and Sentenced to Death.....................14

    X.    Plaintiffs Were Exonerated Decades Later ................................................................15

LEGAL STANDARDS .......................................................................................................15

ARGUMENT......................................................................................................................16

I.    Stoiker Is Not Entitled to Qualified Immunity on Plaintiffs' Claim that He Fabricated
    Evidence in Violation of Due Process .................................................................................16

    A.    There is sufficient evidence for a reasonable jury to conclude that Stoiker
         fabricated evidence against Plaintiffs ....................................................................16

    B.    It was clearly established in 1975 that fabrication of evidence is a due process
         violation ................................................................................................................19

II.   Stoiker Is Not Entitled to Qualified Immunity on Plaintiffs' *Brady* Claim.......................20

    A.    There is sufficient evidence for a reasonable jury to conclude that Stoiker
         violated Plaintiffs' *Brady* rights to exculpatory and impeachment evidence ........20

B.      It was clearly established in 1975 that withholding of exculpatory and impeachment evidence by police officers is a *Brady* violation ............................21

III.    Stoiker Is Not Entitled to Qualified Immunity on Plaintiffs' Fourth Amendment Claims for Continued Detention without Probable Cause ........................................................23

    A.      There is sufficient evidence for a reasonable jury to conclude that Stoiker violated Plaintiffs' Fourth Amendment rights ........................................................23

        1.      Stoiker influenced the decision to prosecute ............................................24

        2.      There was a lack of probable cause ..........................................................25

    B.      It was clearly established in 1975 that police officers violate the Fourth Amendment when they cause continued detention without probable cause.........26

IV.    Stoiker Is Not Entitled to Qualified Immunity on Plaintiffs' § 1983 Conspiracy Claim.........................................................................................................27

    A.      There is sufficient evidence that the detectives participated in a conspiracy ........27

    B.      The intracorporate conspiracy doctrine does not apply .......................................28

    C.      Stoiker's argument that it was not "clearly established" that the intracorporate conspiracy doctrine did not apply in 1975 is irrelevant and nonsensical ..............29

V.     Plaintiffs Are Entitled to a Trial on Their State-Law Claims ...........................................29

    A.      Malicious Prosecution..........................................................................................30

    B.      Civil Conspiracy .................................................................................................30

CONCLUSION...............................................................................................................................30

**TABLE OF AUTHORITIES**

*Adcock v. City of Memphis*, 2007 WL 784344 (W.D. Tenn. Mar. 13, 2007) .............................. 28

*Albright v. Oliver*, 510 U.S. 266 (1994) ..................................................................... 26, 27

*Anderson v. Creighton*, 483 U.S. 635 (1987) ...................................................................... 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................... 15

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) .............................................. 18, 21, 23

*Ayers v. City of Cleveland*, 2013 WL 775359 (N.D. Ohio Feb. 25, 2013) ................................... 30

*Banks v. Dretke*, 540 U.S. 668 (2004) ............................................................................... 21

*Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842 (4th Cir. 1964) ......................................... 22

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................................... passim

*Briner v. City of Ontario*, 2010 WL 3982755 (N.D. Ohio Oct. 7, 2010) ................................... 29

*Brown v. Mississippi*, 297 U.S. 278 (1936) ........................................................................ 19

*Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210 (9th Cir. 2015) ............................................ 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................... 15

*Crowder v. Lash*, 687 F.2d 996 (7th Cir. 1982) ................................................................... 18

*Curran v. Delaware*, 259 F.2d 707 (3d Cir. 1958) ................................................................ 19

*DiLuzio v. Village of Yorkville*, 796 F.3d 604 (6th Cir. 2015) ................................................. 28

*Engel v. Buchan*, 710 F.3d 698 (7th Cir. 2013) ................................................................... 23

*Evans v. Kropp*, 254 F. Supp. 218 (E.D. Mich. 1966) ........................................................... 21

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ................................................................ 21

*Fillmore v. Page*, 358 F.3d 496 (7th Cir. 2004) ................................................................... 17

*France v. Lucas*, 836 F.3d 612 (6th Cir. 2016) .................................................................... 26

*Gerstein v. Pugh*, 420 U.S. 103 (1975) .............................................................................. 26

*Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988) ...................................................................... 22

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................................... 21, 23

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) ........................................ 23, 24, 16

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................................. 29

*Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556 (6th Cir. 2011) ........................................... 27

*Hilliard v. Williams*, 516 F.2d 1344 (6th Cir. 1975) .................................................................. 21

*Hope v. Pelzer*, 536 U.S. 730 (2002) .................................................................................... 21

*Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008) ...................................................................... 22

*Kinkus v. Vill. of Yorkville,* 289 F. App'x 86 (6th Cir. 2008) ...................................................... 29

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................................................. 22, 23

*Malley v. Briggs*, 475 U.S. 335 (1986) .................................................................................. 16

*McKenna v. Edgell*, 617 F.3d 432 (6th Cir. 2010) ...................................................................... 16

*McMillian v. Johnson*, 88 F.3d 1554 (11th Cir. 1996) .................................................................. 22

*McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997) .................................................................... 19

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ............................................................ 22

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ......................................... 28

*Napue v. Illinois*, 360 U.S. 264 (1959) ............................................................................ 19, 20

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) .................................................................. 22, 23

*Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379 (4th Cir. 2014) .................................. 21

*Painter v. Robertson*, 185 F.3d 557 (6th Cir. 1999) .................................................................... 25

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................................. 16

*Pyle v. Kansas*, 317 U.S. 213 (1942) ........................................................................... 19, 20, 22

*Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014) ...................................................................... 26

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015)..................................................................... 23

*Smith v. Florida*, 410 F.2d 1349 (5th Cir. 1969) ............................................................... 19

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999)..................................................... 16, 19, 22, 26

*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997). ........................................................... 17

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) ............................................................ 23, 24, 25

*Tinney v. Richland Cnty.*, No. 14-703, 2015 WL 542415 (N.D. Ohio Feb. 10, 2015)................. 29

*United States v. Bagley*, 473 U.S. 667 (1989) ..................................................................... 19, 20, 22

*United States v. Lanier*, 520 U.S. 259 (1997). ......................................................................... 20

*United States v. Lochmondy*, 890 F.2d 817 (6th Cir. 1989)......................................................... 19

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992)............................................................. 22

*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) ....................................................... 16, 25, 27

*Womack v. Conley*, 595 F. App'x 489, 2014 WL 6997493 (6th Cir. Dec. 11, 2014)................... 27

*Woodcock v. City of Bowling Green*, __ F. App'x __, 2017 WL 633385,
(6th Cir. Feb. 16, 2017) .......................................................................................................... 28

## <u>STATUTES, RULES, CONSTITUTIONAL PROVISIONS</u>

Fed. R. Civ. P. 56(a) ................................................................................................................... 15

R.C. 2744.03(A)(6)...................................................................................................................... 29

U.S. Const. Amend. IV ................................................................................................................ 26

**INTRODUCTION**

Three innocent men spent decades in prison based on the statements of a 12-year-old boy named Eddie Vernon. He never saw the crime, but he later testified that police fabricated his statements and forced him to falsely claim to have seen these men commit the crime. Prosecutors never knew that he actually had not seen the crime, and they had no idea police knew this and had fabricated his statements and testimony.

This brief provides the underlying facts regarding the misconduct of all the individual officers involved in this travesty, because a constitutional violation committed by any individual officer can serve as the requisite constitutional violation for the *Monell* claim against the Defendant City of Cleveland. This is true regardless of whether any individual officer (or his estate administrator) is a named defendant or ultimately found liable. The *Monell* claim is separately addressed in Plaintiffs' response brief to the City's motion for summary judgment.

With respect to Detective Frank Stoiker, who is one of the two remaining living defendants, taking the facts in the light most favorable to Plaintiffs and crediting Vernon's testimony, Stoiker violated Plaintiffs' clearly established constitutional rights, and a jury trial is required. Stoiker and his partner John Staimpel worked together when they threatened Vernon into falsely implicating Plaintiffs. They, along with Detective Englehart, also created Vernon's false statement that said Vernon identified Plaintiffs as the perpetrators when they knew Vernon had not seen the crime and had not identified the Plaintiffs. Among other misconduct, this requires a jury trial on Plaintiffs' various constitutional claims, including violation of due process for fabricating evidence and violation of *Brady* for failing to disclose any of this exculpatory information. If Vernon's testimony is true, egregious constitutional violations occurred here. Defendant Lamendola's motion for summary judgment on behalf of Stoiker must be denied.

1

**STATEMENT OF MATERIAL FACTS**[*]

In May 1975, Ricky Jackson was 18 years old. Ex. 1 (Jackson Dep.) at 9. He lived with his family in Cleveland. *Id*. at 9–10, 33. Wiley and Ronnie Bridgeman lived a few houses up the street. *Id*. at 11, 19. Ronnie was 17, and Wiley was 20. *Id*. at 19–20. Jackson and Ronnie ("Bitsey") were best friends. *Id*. at 20–21. Wiley Bridgeman's nickname was Buddy.[1] *Id*. at 21.

May 19, 1975, began for them like many other summer days. Jackson was at home. *Id*. at 36. In the afternoon, Bridgeman came over to take Jackson's mother grocery shopping. *Id.* When she came back, Jackson went over to the Bridgemans' house to hang out with Ajamu. *Id.* at 37. Bridgeman was in the driveway washing his car, which was a black and white '71 Plymouth Sebring. *Id.*; *see also* Ex. 2 (Ajamu Dep.) at 48. Jackson and Ajamu eventually went to a friend's house nearby where they sat outside together on the porch. Ex. 1 at 39–40.

## I. The Murder of Harold Franks Was Not Committed by Jackson or the Bridgemans.

Meanwhile, a few blocks away, 16-year-old Karen Smith—whom they all knew from the neighborhood—was walking over to the Fairmount Cut-Rate drugstore at the corner of Fairhill and Petrarca to pick up some things for her mom. Ex. 3 (Smith Dep.) at 8–25; *see also* Ex. 4 (Brown Dep.) at 13. As Smith entered the store, she saw two black men standing outside—she testified that neither of them was Jackson, Bridgeman, or Ajamu, who were all blocks away. *Id*. at 9–10, 15–18; Ex. 5 (11/17/14 Hrg. Tr.) at J6346–52; Ex. 6 (Jackson Trial Tr.) at J1179–81.[2] Harold Franks, a money-order salesman, was inside the store finishing up his regular business. After Smith walked in, Franks walked out. Smith then heard a scuffle outside. She saw one of the

---

[*] For ease of the Court, Plaintiffs' filings regarding summary judgment are substantially the same in the *Jackson* and *Ajamu* cases. An exception: the *Jackson* filings discuss his claim for infliction of emotional distress. Additionally, the 56 Exhibits for these filings have been electronically filed only in *Jackson* case, No. 15-989.

[1] Ronnie Bridgeman's name is now Kwame Ajamu. Since there are two Bridgemans, Ronnie will be referred to as "Ajamu" and Wiley will be referred to as "Bridgeman."

[2] Documents Bates-stamped "JACKSON__" are cited as "J__". Leading zeros are also omitted.

two men who was standing outside throw something in Franks' face, and then she heard gunshots. Ex. 3 at 19, 25–26, 74. Smith hid in the back of the store. *Id*. at 29–30. A bullet had struck the store owner's wife, Anna Robinson, but she survived. Franks died at the scene. Witnesses saw two black male perpetrators flee. *See* Ex. 7 (Petro Report 5/19/75) at CLE127.[3]

## II.    Edward Vernon Did Not Witness Anyone Commit the Crime.

Around this time, a school bus bringing local kids home from school was approaching the red light at Fairhill and Cedar, north of the store. Dkt. 63-1 (Vernon Dep.) at 10, 30–31. Twelve-year-old Eddie Vernon was on the bus, and he heard the shots as the bus approached the light. *Id*. at 30–33. When the bus stopped at the light, he and other kids looked to the left, towards the store, where the shots were coming from. *Id*. at 31; *see also* Ex. 4 at 17–18, 21. Vernon did not see anything. Dkt. 63-1 at 35; Dkt. 63-3 (Vernon 3/17/14 Aff.) ¶ 3. Vernon got off the bus at the first stop past Fairhill, which was 108th.[4] Dkt. 63-1 at 29–30, 33. Vernon ran towards the store, and he saw Franks on the ground. *Id*. at 33, 36; Dkt. 63-3 ¶ 5. Vernon did not see anyone running or driving away, or see Jackson or the Bridgemans (who he knew from the neighborhood) at the scene. Dkt. 63-1 at 15–19, 34–35, 100; Ex. 5 at J6405. Vernon saw Robinson being put into an ambulance, and the police put a sheet over Franks. Dkt. 63-1 at 37–38.

After a few more minutes, Vernon began walking home. He walked with Tommy Hall, a kid a year or two older than him. *Id*. at 38–39. Hall told Vernon that he knew who did it—that it was Ricky, Bitsey, and Buddy. *Id*. at 39. But Hall was on the bus with Vernon, so he did not see the shooting. *Id*. at 215; Dkt. 63-3 ¶¶ 4, 6; Ex. 10 (Hall Dep.) at 23. Vernon didn't say anything in response. Dkt. 63-1 at 41. Vernon went home, put his books down, and went back up to the

---

[3] Ex. 8 at No. 5 (City admitting authenticity of documents it produced, including police reports).

[4] That day, Vernon attended Audobon Junior High School. Dkt. 63-1 at 10, 19. He took the school bus home, which took him down Cedar. *Id*. at 25–30; *see* Ex. 9 (Vernon Dep. Ex. 2). Vernon did not take the 50 Miles bus, which would have stopped on Fairhill near the store. Dkt. 63-1 at 158-59, 228.

store by himself. *Id*. at 41–43. When Vernon was standing outside, a uniformed police officer asked if anyone knew anything about what happened up there, and Vernon said he did. *Id*. at 43. Vernon told the officer that he knew who did it, even though he had not seen it. *Id*. at 43–44; Dkt. 63-3 ¶ 7. Vernon thought he was doing the right thing at the time by communicating what Hall told him. *Id*. The officer took down Vernon's name, number and address and said that somebody would get back in touch with him to talk about it. Dkt. 63-1 at 44.

Jackson and Ajamu were still on the porch when they heard that something had happened at the store. They went to the store to see. Ex. 1 at 39, 42–43. When they arrived, Jackson saw that the police had arrived, and he caught a glimpse of Mr. Franks' body covered by a sheet. Many people were outside, and, after a short time, Jackson and Ajamu left. *Id*. at 44, 46. Jackson, Ajamu, and Bridgeman had nothing whatsoever to do with the crime. Ex. 6 at J1541.

### III. Detectives Fed Vernon Information in order to Fabricate a Statement.

The day after the shooting, Detectives Eugene Terpay and James Farmer went to Vernon's home. Dkt. 63-1 at 45–46, 107; Dkt. 63-8. Terpay said that he wanted to take Vernon to the police station so Vernon could give a statement about what happened. Dkt. 63-1 at 45–46. Vernon did not tell Terpay and Farmer that he had witnessed the murder. *Id*. at 175. He told them what he had seen and what Hall had told him. *Id*. At the time, Vernon knew Jackson and the Bridgemans only by their nicknames, Ricky, Buddy, and Bitsey. Ex. 5 at J6490–91. Vernon's mother said that she wanted to take Vernon to the station, but Terpay and Farmer told her no. Dkt. 63-1 at 47. So they brought Vernon to the station by himself.

At the station, Terpay and Farmer asked Vernon the names of the culprits, and Vernon told them only what Hall told him: Ricky, Buddy, and Bitsey. *Id*. at 47–49, 53, 175. Vernon never told Terpay or Farmer that he witnessed the crime. *Id*. at 176. Instead, during their

interview, Terpay fed Vernon details about the crime that Vernon did not know, including the following: the man was hit over the head with a stick; the suspects threw something in his face from a cup; the man was shot with a big gun, probably a .38; the man had a briefcase; and there was a light-green or dark-green car involved. *Id*. at 50–52. All this information about the how the crime supposedly occurred was provided to Vernon. *Id*. at 176, 177, 234. Terpay and Farmer claimed in their police report dated May 20 (that day), that Vernon gave them this information, even though they were the ones who gave that information to him. *Id*. at 233–37; Ex. 5 at J6437–40, 6455–58, 6463, 6483–89; Ex. 11 (Farmer Report 5/20/75). All of this was information that the detectives already knew. *See* Ex. 12 (Terpay Report 5/19/75);[5] Ex. 7.

After Terpay and Farmer fed him this information at the station, Vernon recalls sitting in a room at some point when things were being typed up, *see* Dkt. 63-1 at 104. As he explained at the evidentiary hearing, this was when Terpay and Farmer were interviewing him on May 20, 1975, and giving him information about the crime. Ex. 5 at J6488–89. Terpay and Farmer were taking notes. Dkt. 63-1 at 49–50. The police report that Farmer signed that day contained the summary of this information, but falsely stated that it was all provided to them by Vernon. *See* Ex. 11 at CLE111. And during their conversations, Farmer never told Terpay to stop giving Vernon information. Dkt. 63-1 at 54. After the report was typed up, Terpay and Farmer then took Vernon home around 11:00 p.m. *Id*. at 49, 55–56.

The next day, May 21, 1975, Terpay and Farmer picked up Vernon again from his house and again refused to let his mother come along. *Id*. at 49, 56–57, 177–78. Vernon's mother was upset that she couldn't be with her 12-year-old son during the interviews. *Id*. at 56–57. At the

---

[5] The City refers to Terpay's "purported" signature on the report, apparently to avoid admitting that it really is Terpay's signature. Ex. 8 at Nos. 25–26. But the City has already admitted the authenticity of the police reports. If the City is suggesting that Terpay's signature was forged, that would only bolster Plaintiffs' claims of fabrication. Terpay testified at Jackson's trial that he wrote a report on May 19, 1975. Ex. 6 at J830.

station, Terpay and Farmer told Vernon more details about what happened at the store. They also showed Vernon photos, and Vernon didn't see Ricky, Buddy, or Bitsey in the photos. *Id*. at 57–59. Terpay and Farmer took notes. *Id*. at 63, 68. Terpay threw his notes relating to the case away. Ex. 6 at J975–977 (Terpay Testimony).

Terpay and Farmer also took Vernon on a car ride to show them where Ricky, Buddy, and Bitsey lived, and he did. Dkt. 63-1 at 56, 62–67, 179. Again, Terpay and Farmer wrote down everything that Vernon said. *Id*. at 67–68. Detective Allen testified that it was Terpay and Farmer's practice to take notes while interviewing witnesses. Ex. 13 (Allen Dep.) at 65–67.

## IV.     Jackson, Ajamu, and Bridgeman Were Falsely Arrested.

In the early morning hours of May 25, 1975, Terpay, Farmer, and other officers arrested Jackson, Ajamu, and Bridgeman. Ex. 1 at 48–49; Ex. 2 at 57–58; Ex. 6 at J853–54, 1530–32; Ex. 14 (Farmer Report 5/25/75). Jackson, Bridgeman, and Ajamu did not know why they were being arrested, and they were not given the reason. Ex. 15 (Bridgeman Dep.) at 65–67; Ex. 1 at 49–50.

Even though the police prosecutor would not approve a search warrant for Jackson's or the Bridgemans' houses, Ex. 16 (Staimpel Report 5/24/75), Terpay and other officers searched their houses anyway, Ex. 1 at 178–79; Ex. 6 at J805 (Staimpel Testimony), J968–975 (Terpay Testimony); Ex. 17 (Ajamu Trial Tr.) at J2247–48 (Terpay Testimony). No physical evidence of any kind was found at either home—no money orders, briefcase, or gun. *See* Ex. 18 (Bridgeman Trial Tr.) at J3939 (Terpay Testimony). At the end of their shift on May 25, Terpay and Farmer wrote reports and requested that the next shift follow up on their investigation by doing a lineup and getting a statement from Vernon. Ex. 6 at J855 (Terpay Testimony).

6

**V. Detectives Coerced Vernon into Signing a Fabricated Statement.**

Two other detectives, Frank Stoiker and John Staimpel, worked the second shift and were teamed on the case with Farmer and Terpay, who worked the earlier shift. Ex. 14; Ex. 19 (Stoiker Report 5/25/75); Ex. 6 at J771–78, 808 (Staimpel Testimony); Ex. 20 (Cummings Dep.) at 51; *see also* Ex. 13 at 41 (Staimpel and Stoiker were partners). Pursuant to policy and practice, detectives from one shift communicated information to detectives on the next shift about the same case. Ex. 13 at 81–82. The incoming shift of detectives would look at the reports in the investigative file completed by the previous shift so that they knew what work to continue on a case. *Id*. at 83–86; Dkt. 66-2 (Manual of Rules) at CLE3264 (Rule 42); Dkt. 66 (Tomba Dep.) at 46–50, 53–54. By May 25, 1975, the Franks homicide file included numerous reports that contained known information about the crime, including Farmer's May 20, 1975 report detailing Vernon's purported statements. *See* Exs. 7, 11, 12, 14; Ex. 21 (Jackman Report 5/20/75); Ex. 22 (Staimpel Report 5/20/75); Ex. 23 (Farmer Report 5/23/75).

Stoiker and Staimpel were at the station after the arrests, and they were asked by Farmer and Terpay to set up a lineup and have the "eyewitnesses" pick out the culprits. Ex. 6 at J855; Ex. 14. When Staimpel and Stoiker picked up Vernon from his home for the lineup, his mother once again wanted to go with him, but they refused and told her, "he'll be all right." Dkt. 63-1 at 69–70. They also brought in Karen Smith, who saw the real perpetrators outside the store just before the shooting. Ex. 3 at 35–37; Ex. 19;[6] Dkt. 63-1 at 68–69, 107–08 (Vernon identifying the detective in photo 4), 181, 183; Dkt. 63-8 (Staimpel was photo 4).

---

[6] *See* Ex. 24 at Nos. 14–17 (admitting Stoiker's signature is on his reports). Smith could not recall the detectives' names or identify them from photos at her deposition 40 years later, but there is no dispute that Staimpel and Stoiker were the two detectives who conducted the lineup that day and brought Vernon and Smith to the police station. *See* Ex. 19; Dkt. 63-1 at 68–69, 107–08, 181, 183.

Jackson and Bridgeman were placed in the lineup. Ex. 1 at 49–50; Ex. 15 at 65–67; Ex. 14; Dkt. 63-1 at 184. When Smith viewed the lineup, she told the detectives that she recognized two boys from the neighborhood (Jackson and Bridgeman), but that she didn't see the two men who were standing outside the store at the time of the crime. Ex. 3 at 41–43. Smith told one detective (Stoiker or Staimpel) that neither of the two men she saw outside the store were Jackson, Bridgeman, or Ajamu. *Id*. at 49. Stoiker or Staimpel tried to make Smith feel bad about not identifying anyone. *Id*. at 43–44. He talked about people getting away with the crime, and how he would feel if one of them robbed and killed her mother. *Id*. Smith said that if that happened, it would be really bad, but she was sure her mother would not want her to lie. *Id*. Smith understood that the detective wanted her to identify the two boys she recognized from the neighborhood, Ricky and Buddy. *Id*. at 45. Staimpel or Stoiker also told her details about the crime: that there was a third person in a green getaway car; acid was thrown in Mr. Franks' face; he was beaten with a pipe of some kind; he was shot; and the two men who were standing outside were the culprits. *Id*. at 97–98, 105–07. After she said that her mother would want her to tell the truth, she felt that the detective was "done" with her. They had no further conversations with her. *Id*. at 46–47. Their attention was turned off her and turned on to Vernon. *Id*. at 46.

At the police station, Staimpel and Stoiker told Vernon, "All you have to do is pick these guys out of the lineup and we'll take you back home." Dkt. 63-1 at 71. But when Vernon was asked if he recognized anybody in the lineup who was involved in the crime, he said no. Ex. 5 at J6453–54, 6509, 6511; Dkt. 63-3 ¶ 10; Dkt. 63-1 at 72–73. The reason Vernon didn't identify Jackson and Bridgeman as the culprits is because he did not see them commit the crime. Dkt. 63-1 at 82. He knew that they did not do it. *Id.*

The detectives were furious. Staimpel and Stoiker took Vernon into a separate room. *Id*. at 74, 80. Staimpel told Vernon angrily, "You made a statement and you said that you knew who did it." *Id*. at 80. Staimpel beat on the table and pushed things around. *Id*. at 80–81, 187–88. Staimpel said, "You lied, but you can't go to jail, but your mother and father can go to jail for perjury." Staimpel said he would arrest Vernon's parents because Vernon was backing out of his earlier statement. *Id.* at 80, 230–31. Staimpel called Vernon a "liar" and the "n-word," meaning "nigger." *Id*. at 87–88, 108–09, 230. At that time, Vernon didn't know what perjury was, but he didn't want his parents to go to jail. *Id.* at 80. Vernon felt threatened. *Id*. at 83–84; Ex. 5 at J6468–69. His mother was sick at the time and had just had an operation. Dkt. 63-1 at 84; *see also* Dkt. 63-3 ¶ 13. Vernon was "so scared," "very sad," "very hurt," and "crying." Dkt. 63-1 at 80–81.

Then, Staimpel said, "we'll fix it," and he and Stoiker left the room. *Id*. 80–81, 88, 230–32; *see also* Ex. 5 at J6401. Staimpel and Stoiker returned to the room some time later with a typed statement, which Staimpel told Vernon to sign. Dkt. 63-1 at 80–81, 83–84, 229–30; Ex. 5 at J6509–10; Ex. 6 at J1031–32. Vernon was not brought into a room where a detective was typing things down as he answered questions. Dkt. 63-1 at 229 ("No … just everything written down."). This typed statement was Staimpel and Stoiker's way of "fixing it." Ex. 5 at J6511–12. Vernon did not look at the statement and did not have a chance to read it. Dkt. 63-1 at 80–81, 84–86. Staimpel told him that he wanted Vernon to say that he was scared during the lineup and that this was the reason he didn't pick out Jackson and Bridgeman. *Id*. at 232. That was not true. *Id*. at 86–87. As he was being made to sign the statement, Vernon was "scared half to death," "crying, [and] shaking." *Id*. at 86. He signed it because he didn't want his parents to go to jail. *Id*.

The statement was typed by Detective Jerold Englehart and signed by Staimpel, Stoiker, and Vernon. *Id.*; Ex. 25 (Vernon 2/20/17 Decl.) ¶ 2; Ex. 6 at J1031–32 (Vernon Testimony); Ex. 26 at 24–25; Dkt. 64-13. When Staimpel and Stoiker had conferred with Englehart about what they wanted Vernon's statement to say, Englehart typed it up, and Staimpel and Stoiker brought the prepared statement back to Vernon for him to sign.

Vernon's fabricated statement was comprised of the same information that Terpay had given to Vernon and that Staimpel and Stoiker saw in the investigation file. Dkt. 63-1 at 101–03; Ex. 5 at J6391, 6397–99, 6454–57, 6508–09. The statement claimed that Vernon saw Ricky and "Vincent" (Bitsey) at the store, Dkt. 63-1 at 194;[7] Vincent threw "pop" in the victim's face, hit him with a stick, and tried to take a briefcase from him; Ricky shot the victim twice; Ricky shot Mrs. Robinson; Ricky and Vincent ran down Petrarca; Wiley was the driver; the car was a green convertible; Ricky had a gun; and Ricky and Wiley were in the lineup, but Vernon didn't pick them out because he was scared. *See* Dkt. 64-13; Ex. 5 at J6455–58 (police gave Vernon all of this information except the names, which Vernon told them came from Hall). All of this was information that the detectives already had—it wasn't provided by Vernon. *See* Ex. 12 at CLE114–18. Stoiker's report about the lineup dated May 25, 1975, recounting how Vernon's statement was taken, similarly included fabricated information. Ex. 5 at J6449–51; Ex. 19.

A signed copy of Vernon's statement was introduced against Jackson, Bridgeman, and Ajamu at their trials. Dkt. 64-13; Ex. 6 at J423, 1588–89; Ex. 18 at J3758–60; Ex. 17 at J2035. Vernon testified about this statement at the trials and gave false testimony consistent with it. Dkt. 63-1 at 193–94; Ex. 6 at J1014–16, 1029–39; Ex. 30 ¶ 3.

## VI.     Detectives Tried to Physically Coerce Jackson into a False Confession.

---

[7] *See* Ex. 27 (Farmer Report 5/27/75) (claiming that "Vincent" was really Bitsey).

The detectives tried to bolster their case by attempting to extract a false confession from Jackson. After the lineup, Jackson was interrogated twice by Terpay and Farmer, on different days. Terpay and Farmer told him to sign a confession, but Jackson refused. During these interrogations, Jackson was slapped, shoved, beaten while handcuffed, and punched in his face and torso through a phone book so as not to leave marks. taken back to his cell Ex. 1 at 50–51, 55–61, 179–81. Terpay asked Jackson if he was "the nigger that likes to shoot people with guns." *Id*. at 56. Jackson told them he didn't shoot anyone. *Id*. at 56–57. Terpay and Farmer kept saying, "This is your last chance. I don't care if you want to die." *Id*. at 59. When Jackson continued to refuse, they said, "To hell with him, if he wants to die in the electric chair, let him die." *Id*.

**VII.    Terpay and Farmer Continue Threatening Vernon into Giving His Fabricated, False Testimony at Trial.**

The day after the lineup, Terpay and Farmer once again picked up Vernon from his home. Dkt. 63-1 at 90, 92–93. Vernon told them what happened with Staimpel and Stoiker and how he didn't identify anyone, but they already knew. *Id*. at 189–90. Terpay was very angry at Vernon. *Id*. at 90–91. On the way to the police station, Terpay yelled at him and said, "we sat up and talked about this." *Id*. Terpay told Vernon that he was mad at him for not picking out Jackson and Bridgeman in the lineup. *Id*. at 93, 139. At the police station, Vernon told Terpay and Farmer, "I didn't see any of this." *Id*. at 91–92. Terpay again said, "You made a statement in saying that you saw who did it and now you're saying that they didn't do it." *Id.* at 93. Vernon said, "But I didn't," to which Terpay responded, "it's over with now, … they'll be going to trial and you've got to be ready to prepare yourself to go through three different trials." *Id.* at 92.

Vernon testified that he told Terpay and Farmer repeatedly that he didn't see Jackson, Ajamu, or Bridgeman commit the crime: "**I said, that they didn't do it.** And he says, no you know they did it. **And I said, no, they didn't.** And he said, yeah, you know they did it, right?

11

And he was very angry, you know." *Id.* at 93–94 (emphasis added). That is when Terpay told Vernon again that his parents would go to jail, and Vernon caved: "And he kept saying that, now, you know that your mother and father are going to go to jail? So I said, yeah. I said, yeah, well, I guess they the ones who did it. So things kind of changed around." *Id.* Terpay told Vernon that his parents would not go to jail if he went back to saying what he said in the beginning, which was all information that the detectives had fed him. *Id.* at 97–99, 139–40. Farmer was present for this conversation. *Id.* at 100. Vernon was crying and felt, "I wanted to kill myself." *Id.* at 94, 100.

Terpay told Vernon he had to prepare himself for the trials. *Id.* at 92. Vernon believed that his mother and father would go to jail if he didn't cooperate and say what the detectives wanted him to say. *Id.* at 94–97. Thus, he agreed to falsely testify against Jackson, Bridgeman, and Ajamu. *Id.* at 94–95, 100; Ex. 30 (Vernon 2/8/17 Decl.) ¶¶ 3–4.

## VIII. Jackson, Bridgeman, and Ajamu Were Falsely Charged Based on Vernon's Fabricated Statement and the Withholding of Exculpatory Evidence.

In light of Vernon's fabricated statement, the police prosecutor, Almeta Johnson, issued papers charging Jackson and Bridgeman after consulting with Staimpel and Stoiker.[8] Ex. 28 (Stoiker & Staimpel Report 5/28/75); Ex. 29 (Del Balso Dep.) at 31–33. Johnson did not investigate cases on her own. Ex. 29 at 35. This caused the case to be presented to the grand jury. *Id.* at 33–34. Vernon testified at the grand jury hearings. Ex. 30 ¶ 5. Vernon gave false testimony at the grand jury hearings because of the detectives' actions. *See id.* ¶¶ 6–8. As Vernon had described in his deposition, the detectives threatened to take his parents to jail if he did not cooperate in giving false statements and testimony against Jackson and the Bridgeman brothers. *Id.* ¶ 7. Vernon's testimony before the grand jury was the only testimony that implicated Jackson and the Bridgeman brothers in the robbery and murder of Franks. *Id.* ¶ 9. The case against

---

[8] Almeta Johnson is deceased. Ex. 29 at 32-33.

Jackson, Bridgeman, and Ajamu hinged entirely on Vernon's testimony; there would have been no prosecution without Vernon's testimony.[9] Ex. 29 at 89–90. Vernon was the only witness who could tie these three men to the crime. *Id.* at 91. Based on Vernon's fabricated testimony, Jackson, Bridgeman, and Ajamu were indicted by the grand jury. *Id.* at 98–100.

The trial prosecutor, Dominic Del Balso, also had no reason to know anything was amiss. All he knew was that Vernon claimed to have seen the three guys from the neighborhood commit the crime, and Vernon had information about it. Del Balso interviewed Vernon before trial, but Terpay was present each time, and Terpay brought Vernon to and from Del Balso's office. Ex. 29 at 42–46, 48, 50, 91–92. Del Balso was familiar with his *Brady* obligations. *Id*. at 21. He did not know that Vernon said that he did not see these men commit the crime. He did not know that Vernon had been threatened or coerced into a statement falsified by the detectives. *Id*. at 26–28, 55–56, 68. What Del Balso knew was what was in the police reports and Vernon's written statement. *Id*. at 27, 69, 80–81; *see* Ex. 31 (Reports from CCPO file). If the police had exculpatory information that they did not tell him or did not include in the file that was given to him, he would not have known about it. Ex. 29 at 23–26, 125–27; *see also* Dkt. 67 (Tell Dep.) at 163–64. Del Balso never saw any handwritten notes by the detectives. Ex. 29 at 127. He relied on the detectives to give him all of the witness statements, reports, and other documents in a case. *Id*. at 24–25. He did not conduct any independent investigation of the case. *Id*. at 66. He would have turned over whatever exculpatory evidence he had. *Id*. at 40, 67.

Nobody besides Vernon and the police knew that Vernon's statements were fabrications based on threats made by police. Jackson, Ajamu, and Bridgeman did not know. Ex. 54 (Jackson

---

[9] Karen Smith also testified to what she saw at the grand jury hearing. Ex. 3 at 47–48, 64–65. Smith's testimony in 1975, as today, was that Plaintiffs were not the men she saw outside. Ex. 6 at J1182. Smith saw Mrs. Robinson outside the courtroom at the grand jury and found out from her that she did not see anything other than seeing someone with a hat. Ex. 3 at 48. Mrs. Robinson could not identify Plaintiffs as either of the culprits. Ex. 6 at J657–58 (Anna Robinson Testimony).

Aff.) ¶¶ 4–5. And Del Balso did not know. Vernon never told any prosecutor or defense attorneys that any detective had made threats against him before Plaintiffs' trials. Dkt. 63-1 at 117, 189–90; Ex. 5 at J6403. Del Balso testified that if he had known any of this, he would have told the Prosecuting Attorney, and the prosecution would have been stopped. Ex. 29 at 28–29, 82, 93.

**IX.     Plaintiffs Were Tried, Wrongfully Convicted, and Sentenced to Death.**

Because of the detectives' threats, Vernon falsely testified at the criminal trials of Jackson, Bridgeman, and Ajamu in 1975 and 1977. Dkt. 63-1 at 18–19, 114, 117, 132–33. He testified consistently with the statement that had been fabricated for him by the detectives. *See* Ex. 6 at J979–1131; Dkt. 63-1 at 18–19, 140; Ex. 5 at J6473, 6508; Ex. 30 ¶¶ 2–4. Before the trials, Terpay and Farmer periodically talked with Vernon and went over the statements he had already made, so that he could remember what to say when he got up on the stand. Dkt. 63-1 at 114–15; Dkt. 63-3 ¶ 16 ("The more we would talk about it, the more details they would hand me. Like they would bring up acid in a cup or a description of a green car, and I would take that information and add it into the story."). During the trials, Vernon was not allowed to have contact with his family. Dkt. 63-1 at 197. As a 12-year-old boy, he did not know anything about the legal system and did not think of telling the prosecutor or judge about what the detectives had done. Ex. 5 at J6473. Vernon believes that none of this would have happened if his mother had been allowed to go with him to the police station on the day of the lineup. *Id*. at J6510.

Between the trials of Jackson, Ajamu, and Bridgeman, Terpay brought Vernon copies of transcripts to read to prepare for the next trial. Dkt. 63-1 at 119. Terpay told Vernon that he "had to read" the transcripts so that "when I go to the next trial that I won't forget what I said in the first one." *Id*. at 119–20.

14

All three men were convicted and sentenced to death. Ex. 1 at 70. Their sentences were eventually commuted to life in prison. *Id.* at 71.

After Plaintiffs went to prison, some investigators or attorneys tried to speak with Vernon on various occasions, but Vernon was told by Terpay that he wasn't allowed to talk to anyone, and that if anyone came to him about the case, to tell Terpay about it and he would "take care of it." Dkt. 63-1 at 120–24; Ex. 5 at J6467–68. Vernon has been afraid of Terpay ever since. Dkt. 63-1 at 125. Vernon did not know that Plaintiffs had been sentenced to death. Ex. 5 at J6468.

## X.     Ajamu, Bridgeman, and Jackson Were Exonerated 39 Years Later.

After Plaintiffs spent decades in prison, Vernon finally came forward to tell the truth. Dkt. 63-1 at 117. Vernon had wanted to come forward throughout the years, but he was scared and did not want to go to jail for perjury. *Id.* at 127, 131. He did not know that Terpay and some of the other detectives had died in the meantime. Ex. 5 at J6470–71.[10] In 2014, Vernon testified at a hearing on a motion for new trial for Jackson, and Vernon told the truth, which was, "[e]verything that was told … was a lie." Dkt. 63-1 at 125-27, 133. The recantation was so powerful that the prosecutor announced that it "has no evidence tying any of the three convicted defendants to the crimes, **considers the defendants innocent**, and joins in the defense motions to declare them so. They have been the victims of a terrible injustice." Ex. 32 (Notice at J12046). All charges against Jackson, Bridgeman, and Ajamu were dismissed, and the Court of Common Pleas determined that they did not commit the offenses of which they were charged. Exs. 33–34.

## LEGAL STANDARDS

---

[10] Defendants suggest that Vernon came forward only after learning Terpay, Farmer, and Staimpel had died. Vernon has said, "that's a lie from the pit of hell." Ex. 5 at J6470. "I wasn't waiting until the detectives died to decide oh, I am going to come forth now. Who sits round and thinks stuff like that?" *Id.* at J6471; *see also id.* at J6472–73.

15

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears this initial burden for showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

When a defendant invokes qualified immunity, the Court assesses whether the facts make out the violation of a constitutional right and whether the right at issue was clearly established at the time of the defendant's misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A defendant is not entitled to immunity if it is obvious that no reasonably competent law enforcement officer would have concluded that the defendant's actions were lawful. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In order to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted). "[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010) (internal quotation marks and citation omitted).

## ARGUMENT

**II.     Stoiker Is Not Entitled to Qualified Immunity on Plaintiffs' Claim that He Fabricated Evidence in Violation of Due Process.**

**B.     There is sufficient evidence for a reasonable jury to conclude that Stoiker fabricated evidence against Plaintiffs.**

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir.

16

2006); *see also id.* at 744–45 (denying qualified immunity to police lab analyst for fabricating notes); *Spurlock v. Satterfield*, 167 F.3d 995, 998–99, 1005–06 (6th Cir. 1999) (police fabrication of witness testimony violates due process and is not entitled to qualified immunity); *Webb v. United States*, 789 F.3d 647, 667–70 (6th Cir. 2015) (false statements in police reports give rise to a due process fabrication of evidence claim). Moreover, "a claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).

Viewing the evidence and inferences in Plaintiffs' favor, there is more than enough evidence for a jury to conclude that Stoiker fabricated (1) Vernon's false statement and testimony against Plaintiffs, and (2) his police report dated May 25, 1975, which contained Vernon's purported statements, *see* Ex. 19. As Vernon testified, Stoiker and Staimpel were together when Staimpel yelled at him, called him the "n-word," and threatened to take his parents to jail because he was "backing out" from identifying Jackson and Bridgeman. Dkt. 63-3 ¶ 13. Stoiker was present when Staimpel said that "they" would "fix it." According to Vernon, Staimpel and Stoiker together left the room and returned with a prepared statement for Vernon to sign. Stoiker was present when Staimpel told Vernon to sign the statement, which was falsely attributed to Vernon. As Vernon describes it, he never gave any information about the crime to Stoiker and Staimpel, and he never implicated Jackson or the Bridgeman brothers. Instead, Vernon told them the opposite: that he didn't recognize anyone in the lineup who participated in the crime. In the face of this, Staimpel and Stoiker together left the room and fabricated a statement from information that was already in the investigative file.

Defendant argues that Vernon did not recall Stoiker's name or identify his photo 40 years later, and that Stoiker did not talk while Staimpel threatened and yelled at Vernon. But none of

17

that makes Stoiker any less a participant in the fabrication of Vernon's statement. The coercion took place with Stoiker's knowledge and consent. "[An] official satisfies the personal responsibility requirement of § 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights," *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004), "or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent," *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). There is also sufficient evidence for a reasonable jury to conclude that Stoiker created evidence that he knew to be false. Stoiker was present when Vernon said that he didn't see anyone in the lineup who participated in the crime, and Jackson and Bridgeman were both in the lineup, so Stoiker knew that Vernon was saying that they did not commit the crime—or at least, he didn't see them commit the crime. Despite this knowledge, Stoiker, Staimpel, and Englehart together created a statement for Vernon to sign that said that Vernon saw Jackson and the Bridgeman brothers commit the crime, even though they knew that Vernon said the opposite. "[C]onvictions premised on deliberately falsified evidence will always violate the defendant's right to due process." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017).

Defendant argues that Vernon answered, "No" when asked at his deposition, "Did you tell either of the detectives at that point, I didn't see what happened?" *See* Dkt. 63-1 at 86. That may be, but Vernon also testified that he told Stoiker and Staimpel, "I don't know nobody in this lineup participating to this particular crime." Ex. 5 at J6454. Vernon has explained that the detectives asked him to *identify* the perpetrators, not merely whether he knew them or recognized them from the neighborhood. Ex. 5 at J6453; *see also id.* at J6509–11.

Furthermore, Stoiker's police report dated May 25, 1975, which was provided to the prosecutor, was fabricated. This report contained falsified information about what Vernon

supposedly said to Stoiker and Staimpel after the lineup. *See* Ex. 19. In light of Vernon's testimony, a reasonable jury could find that Stoiker knew his report was false when he wrote it, and that report—as well as Vernon's fake statement—was used at trial to convict Plaintiffs. *Avery*, 847 F.3d at 440 (false police reports used at trial constitute a due process violation).

**B.      It was clearly established in 1975 that fabrication of evidence is a due process violation.**

The Defendant cursorily argues that it was not clearly established as of 1975 that fabrication of evidence by police officers violates due process. *See* Dkt. 64 at 18. This argument is so undeveloped that it should be deemed forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.").

It is apparent why the Defendant does not seriously pursue this argument: The Supreme Court has long held that the due process clause of the Fourteenth Amendment prohibits the use of false evidence, including fabrications by police officers, in state criminal prosecutions. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (*per curiam*) (state actors violate due process rights when they "depriv[e] a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured"); *Brown v. Mississippi*, 297 U.S. 278, 286 (1936) (same); *Pyle v. Kansas*, 317 U.S. 213, 215–16 (1942) (allegations of false statements and perjured testimony made under threat by local police violates due process); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (same principle).

The circuit courts, of course, apply this binding guidance. *See, e.g.*, *Spurlock*, 167 F.3d at 1005 (relying on *Mooney* and *Pyle* when holding that police fabrication and coercion of witness testimony violated due process); *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)

(relying on *United States v. Bagley*, 473 U.S. 667, 679 n.8 (1989), which in turn relied on *Mooney*, *Pyle*, and *Napue*); *see also, e.g.*, *Curran v. Delaware*, 259 F.2d 707, 713 (3rd Cir. 1958) (stating that when law enforcement officers procure false testimony it violates the right described in *Mooney* and *Pyle*); *Smith v. Florida*, 410 F.2d 1349, 1350–51 (5th Cir. 1969) (same).

These decisions would have put a reasonable officer in Stoiker's position on notice that any participation in coercing and fabricating Vernon's statement was unlawful. "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *United States v. Lanier*, 520 U.S. 259, 271 (1997). Stoiker argues that there is no pre-1975 law allowing him to be found liable for failure to intervene in other detectives' violations of Plaintiffs' constitutional rights. *See* Dkt. 63 at 17–18. But, as discussed above, Stoiker's participation was not merely passive; a reasonable jury could find that he directly participated in creating Vernon's false statement with Staimpel and Englehart. Stoiker's signature is on Vernon's statement. *See* Dkt. 64-13.

## II. Stoiker Is Not Entitled to Qualified Immunity on Plaintiffs' *Brady* Claim.

### A. There is sufficient evidence for a reasonable jury to conclude that Stoiker violated Plaintiffs' *Brady* right to exculpatory and impeachment evidence.

In its 1963 *Brady* decision, the Supreme Court held that the State's withholding of exculpatory evidence (a witness statement) deprived the criminal defendant of his constitutional right to due process, regardless of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This holding was based on the well-established principles of *Mooney*, *Pyle*, and *Napue*. *See id.* at 86–87; *Bagley*, 473 U.S. at 679 n.8. *Brady* had been firmly in place for more than a decade when the events underlying this case occurred in 1975.

A reasonable jury could conclude that Stoiker violated *Brady*. Stoiker knew Vernon did not see Jackson and the Bridgeman brothers commit the crime, and he did not disclose this

critical information to the prosecutor. Nor did Stoiker disclose that Staimpel threatened Vernon into sticking to the fabrication that he and Staimpel created and the false statement they made him sign. Stoiker also never disclosed the fact that his May 25, 1975 police report contained falsehoods about what Vernon purportedly said. Even the prosecutor, Del Balso, admitted that the prosecution would have been stopped had he known that Vernon did not see the crime and was coerced into a false statement. Ex. 29 at 28–29, 82, 93. All of this is sufficient evidence to reach a jury on Plaintiffs' *Brady* claim. *See Avery*, 847 F.3d at 436–39 (detectives withheld fact that they coerced and falsified witness testimony and reports); *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014). "Armed with the *Brady* disclosure, the accused can impeach the coerced testimony by pointing to the *tactics the officers used to extract it*, and the jury has a fair opportunity to find the truth." *Avery*, 847 F.3d at 439 (emphasis added).

B.      **It was clearly established in 1975 that withholding of exculpatory and impeachment evidence by police officers is a *Brady* violation.**

The right to have exculpatory and impeachment evidence disclosed was firmly established in 1975. As noted, *Brady* had been in place for more than a decade before the detectives investigated the homicide.[11] Contrary to Defendant's suggestion, *see* Dkt. 63 at 15, Plaintiffs need not show that a police officer had been found *liable* in a Section 1983 suit for withholding exculpatory evidence before 1975: "[I]t is the plaintiff's constitutional *right* that must be clearly established, not a plaintiff's access to a monetary remedy." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 398–99 (4th Cir. 2014) (emphasis added) (citing

---

[11] Moreover, the Supreme Court's cases governing disclosure of evidence and those prohibiting fabrication of evidence share precisely the same due process foundation, and their constitutional rules apply equally to all state actors. *See, e.g., Banks v. Dretke*, 540 U.S. 668, 694 (2004) (citing *Mooney* and *Giglio v. United States*, 405 U.S. 150 (1972); *see also Clarke v. Burke*, 440 F.2d 853, 855 (7th Cir. 1971) ("knowledge of the police is knowledge of the prosecutor"); *accord Smith*, 410 F.2d at 1351; *Evans v. Kropp*, 254 F. Supp. 218, 222 (E.D. Mich. 1966).

21

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). A criminal or habeas case, statute, or constitutional provision may provide clearly established law. *Id.*

Not only was this right clearly established in 1975, the Sixth Circuit also had concluded at that time that a police officer could be held liable for violating *Brady*. *See Hilliard v. Williams*, 516 F.2d 1344, 1349–50 (6th Cir. 1975), *vacated in part*, 424 U.S. 961 (1976) (holding that investigating officer who falsely testified at a defendant's trial and withheld exculpatory evidence violated due process principles as set forth in *Brady* and *Mooney* and could be liable in a § 1983 suit);[12] *see also Spurlock*, 167 F.3d at 1005–06 (relying on *Pyle*, *Mooney*, and *Brady* to deny qualified immunity where officers allegedly fabricated evidence, manufactured probable cause, and withheld this information from the prosecution).

Other circuits have long recognized this right as well. *See Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir. 2009) ("Decisions from other circuits recognizing the type of "*Brady*-derived" claims that Moldowan asserts here date back as far as 1964.") (citing *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964)); *see also Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) (clearly established in 1971 that police had duty to disclose *Brady* material); *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1220–22 (9th Cir. 2015) (clearly established as to police at least as of 1978); *Newsome v. McCabe*, 256 F.3d 747, 752–53 (7th Cir. 2001) (1979 police conduct); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (1982 police conduct); *McMillian v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996) (1987 police conduct).

Defendant is therefore mistaken that the applicability of *Brady* to police officers was not clearly established until the Supreme Court decided *Kyles v. Whitley*, 514 U.S. 419 (1995). Dkt.

---

[12] *Hillard* was decided on May 28, 1975, before Plaintiffs' trials. The officers withheld the exculpatory evidence before the trial and throughout the appellate process, in violation of *Brady*.

63 at 15. The Sixth Circuit squarely rejected this argument in *Moldowan*, explaining that the right had existed before *Kyles* and that, as just noted, other circuits had recognized it as far back as 1964. 578 F.3d at 382. *Kyles* did not announce a new principle of law. *Jackson v. Brown*, 513 F.3d 1057, 1073 (9th Cir. 2008). *Kyles* explicitly rejected the state's argument that "it should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor." 514 U.S. at 438. As the Court explained, such a holding would "*amount to a serious change of course* from the *Brady* line of cases." *Id*. (emphasis added). *Kyles* is merely an application of the Supreme Court's 1963 *Brady* decision and its 1972 *Giglio* decision.

Defendant is similarly mistaken to suggest that police officers cannot be liable under *Brady* for "keeping quiet about their wrongdoing." *See* Dkt. 63 at 17 (citing *Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015)). As noted, police officers who have failed to disclose or lied about their misdeeds can be liable for *Brady* violations. The evidence withheld here— Vernon's statement that he never saw Jackson or the Bridgemans commit the crime, threats to Vernon, the fabrication of his statement, falsified police reports—is classic *Brady* material. The language quoted from *Saunders-El* does not suggest otherwise; it was dicta concerning evidence that the plaintiff already knew about. Indeed, the Seventh Circuit rejected the argument Defendant makes here just last month in *Avery*, 847 F.3d at 443 (reaffirming that police violate *Brady* when withholding the "pressure tactics" they employed to threaten witnesses into falsely implicating and testifying against a criminal defendant); *see also Newsome*, 256 F.3d at 753; *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013).

In sum, Plaintiffs' *Brady* rights were clearly established in 1975 and throughout the decades they were wrongfully imprisoned when the exculpatory information could have been disclosed. Accordingly, Stoiker is not entitled to qualified immunity.

23

**III.   Stoiker Is Not Entitled to Qualified Immunity on Plaintiffs' Fourth Amendment Claims for Continued Detention without Probable Cause.**

    **A.   There is sufficient evidence for a reasonable jury to conclude that Stoiker violated Plaintiffs' Fourth Amendment rights.**

Plaintiffs have a right to be free from continued detention without probable cause under the Fourth Amendment. *Gregory*, 444 F.3d at 750; *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). Stoiker argues only that he did not influence or participate in the decision to prosecute and that there was probable cause for the prosecution. There is sufficient evidence that Stoiker influenced the decision to prosecute or caused the detention to be unlawfully continued by fabricating evidence and withholding exculpatory evidence. *See Gregory*, 444 F.3d at 747.

        **1.   Stoiker influenced the decision to prosecute.**

To show an officer influenced the commencement of criminal proceedings, a plaintiff can present evidence that the impact of an officer's misstatements and falsehoods in his investigatory materials extended beyond the initial arrest and ultimately influenced the plaintiff's continued detention. *Sykes*, 625 F.3d at 316. Such "influence" can be based on "misstatements … to the prosecutor" or "pressure or influence" over an individual who either made the decision to prosecute or testified at the preliminary hearing. *Id.* That is satisfied where the officer's investigatory materials, which were in the prosecutor's file, contained "knowing misstatements," and the prosecutor relied on them in filing criminal charges. *Id.* at 316–17. A plaintiff does not have to show that the officer actually spoke to the officer. *Id.*

A reasonable jury could conclude that Stoiker influenced the decision to prosecute because Stoiker and Staimpel's police report shows that they conferred with the police prosecutor about filing charges against Jackson, Bridgeman, and Ajamu, and she decided to bring charges against them as a result. A reasonable inference is that Stoiker and Staimpel

24

conferred with the police prosecutor about Vernon's fabricated statement, which Englehart helped create. This, according to Del Balso, set in motion the grand-jury proceedings. Also, Stoiker participated in the fabrication of Vernon's false statement and withheld his knowledge of the coercive circumstances of Vernon's statement from the prosecutor. As Del Balso testified, Vernon's statement was the only inculpatory evidence against Plaintiffs, and he had it in his file.

Moreover, Plaintiffs need not show that Stoiker actually spoke with the prosecutor who initiated proceedings to satisfy the "knowing misstatements" prong. Instead, Plaintiffs have provided sufficient evidence that Stoiker made "knowing misstatements" through Vernon's statement and his May 25, 1975 police report, which—taking the evidence and inferences in Plaintiffs' favor—were (1) fabricated by Stoiker and Staimpel (and Englehart, in the case of the statement), and (2) given to the prosecutor's office. The impact of the misstatements and falsehoods occurred *after* Plaintiffs' arrests (because Plaintiffs were arrested prior to the lineup) and ultimately influenced Plaintiffs' continued detention. *Malley*, 475 U.S. at 337 (normal causation principles apply to Section 1983 actions); *accord Sykes*, 625 F.3d at 314–15.

Furthermore, a reasonable jury could also find that Stoiker caused Plaintiffs' detention to be continued beyond their initial seizure because he withheld the fabrication and other exculpatory evidence from the prosecutor. As Del Balso testified, if he had known this information, he would have told the head prosecutor, and the prosecution would have been stopped.

### 2. There was a lack of probable cause.

"In section 1983 cases, the existence of probable cause usually poses a jury question." *Painter v. Robertson*, 185 F.3d 557, 570 (6th Cir. 1999); *Webb*, 789 F.3d at 665. The entire basis of Plaintiffs' arrests and prosecution was Vernon's fabricated statement—and the fact that the

prosecutor had no idea Vernon told police he never saw Jackson and the Bridgeman brothers commit the crime. The grand jury indicted Plaintiffs on the basis of Vernon's false testimony. As Vernon explained, he falsely testified at the grand jury because he had been threatened into doing so by the detectives, and his testimony was falsified by the detectives. Ex. 30. According to Del Balso, there was no other inculpatory evidence against Plaintiffs.[13] A reasonable inference is that Vernon's false testimony, fabricated by Stoiker and the other detectives, was the sole basis for the grand jury's finding of probable cause. And, as Stoiker concedes in his brief, an indictment does not establish probable cause when it "was obtained wrongfully by police officers who knowingly presented false testimony to the grand jury …." *France v. Lucas*, 836 F.3d 612, 626 (6th Cir. 2016). This includes the situation where a defendant officer "'either knew or w[as] reckless in not knowing that [a witness] gave false testimony that tainted the finding of probable cause.'" *Id.* at 626 (quoting *Robertson v. Lucas*, 753 F.3d 606, 619 (6th Cir. 2014) (issue is whether any of the defendants influenced the witness's grand jury testimony, "causing him to lie or mislead the grand jury")). Here, a reasonable jury could find that Stoiker either knew or was reckless in not knowing that Vernon gave false testimony that tainted the grand jury's finding of probable cause. Moreover, a reasonable officer in Stoiker's position would have known that there was no probable cause for Plaintiffs' prosecution because the only inculpatory evidence was Vernon's falsified statement.

> **B.      It was clearly established in 1975 that police officers violate the Fourth Amendment when they cause continued detention without probable cause.**

---

[13] Moreover, as discussed above, neither Karen Smith nor Anna Robinson would have provided inculpatory testimony at the grand jury. It is also reasonable to infer that if any of the detectives (such as Terpay) testified at the grand jury, their testimony would have been false as well, and they would only have been testifying falsely to what Vernon supposedly told them, since none of the detectives had any independent knowledge of the crime. Jackson attempted, but was unable to, obtain a copy of the grand jury hearing transcript. *See* Ex. 55 (Decl. of Elizabeth Wang with Exs. A & B).

Established precedent forecloses Stoiker's qualified-immunity argument, as this right has been clearly established since before 1975. *See Spurlock*, 167 F.3d at 1005–06 (relying on the pre-1975 cases *Pyle*, *Mooney*, *Brady*, and also citing *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (malicious prosecution of and continued detention of individual without probable cause clearly violate rights afforded by the Fourth Amendment)). "The requirement of probable cause is one of the cornerstones of Fourth Amendment protection." *Id.* at 1006 (citing U.S. Const. Amend. IV and *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)). "Thus, a police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Id.*; *accord Webb*, 789 F.3d at 667; *Albright*, 510 U.S. at 279 (Ginsburg, J., concurring).

## IV. Stoiker Is Not Entitled to Qualified Immunity on Plaintiffs' § 1983 Conspiracy Claim.

### A. There is sufficient evidence that the detectives participated in a conspiracy.

Plaintiffs are entitled to have their civil conspiracy claim resolved by a jury. "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 563 (6th Cir. 2011). Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. *Id.* Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. *Id.* All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. *Id.* "Because direct evidence of civil conspiracy is often unavailable, it is enough for the plaintiff to produce circumstantial evidence from which the existence of a conspiracy can be reasonably inferred." *Womack v. Conley*, 595 F. App'x 489, 2014 WL 6997493, at *4 (6th Cir. Dec. 11, 2014).

27

There is sufficient evidence for this conspiracy claim to proceed, as the detectives all contributed to ensuring that Vernon gave his false statement and testified to it accordingly, even though he had not seen the crime. With regard to Stoiker in particular, circumstantial evidence requires that this claim be decided by the jury: Vernon did not sit in a room with Stoiker and Staimpel while Englehart typed his statement (contrary to Englehart's standard practice); after threatening Vernon, Staimpel told Vernon that he and Stoiker would "fix it," and Staimpel and Stoiker left the room; when Staimpel and Stoiker returned after some time, they had a typed up statement full of false statements for Vernon to sign; Englehart typed that statement that Vernon, Staimpel and Stoiker signed. Moreover, the evidence shows that Stoiker and Staimpel would have conferred with Terpay and Farmer about what tasks needed to be done during each other's shifts, and according to Vernon, Terpay knew what happened with Staimpel and Stoiker the following day. In light of these facts, and with the inferences viewed in Plaintiffs' favor, the evidence regarding whether Stoiker conspired with others is to be decided by a jury.

**B.    The intracorporate conspiracy doctrine does not apply.**

Stoiker claims that the intracorporate conspiracy doctrine bars this claim, but the doctrine does not apply. Less than two weeks ago, the Sixth Circuit rejected Defendant's argument and reiterated that it has "never held that the [intracorporate conspiracy] doctrine applies to claims under § 1983." *Woodcock v. City of Bowling Green*, __ F. App'x __, 2017 WL 633385, at *5 (6th Cir. Feb. 16, 2017) (citing *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 615–16 (6th Cir. 2015)). There is no basis for applying it to the claims in this Section 1983 case.

The intracorporate conspiracy doctrine arose in corporate law from the idea that a person or entity cannot conspire with itself; similarly, an agent acting on behalf of a principal cannot conspire with that principal. Section 1983, by contrast, does not involve vicarious liability.

28

Indeed, *Monell* makes clear that governmental entities are *not* liable based on *respondeat superior* through the mere acts of individual employees. Thus, individual employees (such as police officers) can be held individually liable, their acts are not automatically attributed to the local government entity, and that local government entity itself is considered a separate "person" under the statute. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 689 (1978).

To the extent the doctrine has any application in the § 1983 context, it shields only the local government entity from a conspiracy claim—not the individuals. *See Adcock v. City of Memphis*, 2007 WL 784344, at *5 (W.D. Tenn. Mar. 13, 2007); *Kinkus v. Vill. of Yorkville*, 476 F. Supp. 2d 829, 841 (S.D. Ohio 2007), *rev'd sub nom. on other grounds*, *Kinkus v. Vill. of Yorkville,* 289 F. App'x 86 (6th Cir. 2008); *Briner v. City of Ontario*, 2010 WL 3982755, at *14 (N.D. Ohio Oct. 7, 2010), *on reconsideration*, 2011 WL 866464 (N.D. Ohio Mar. 9, 2011). *Tinney v. Richland Cnty.*, No. 14-703, 2015 WL 542415, at *27–28 (N.D. Ohio Feb. 10, 2015).

Here, there is no authority for this Court to apply the doctrine, especially because the conspiracy claim is not alleged only against the individuals, not against the City.

C. **Stoiker's argument that it was not "clearly established" that the intracorporate conspiracy doctrine did not apply in 1975 is irrelevant and nonsensical.**

Stoiker claims that he is entitled to qualified immunity because it was not "clearly established" that the intracorporate conspiracy doctrine did not apply in 1975. The state of this purported legal defense (which is inapplicable here) has nothing to do with qualified immunity, which asks whether the *constitutional right* at stake was "clearly established." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendant cites no cases suggesting that whether it was *not* clearly established that an *alleged defense* was *not* applicable has any relevance to assessing qualified immunity. Plaintiffs' basic rights, including their due process rights, have been clearly

29

established. The only question regarding this count is whether there is sufficient evidence for a jury to decide whether there was a conspiracy. As shown above, there is.

**V.     Plaintiffs Are Entitled to a Trial on Their State-Law Claims.**

Defendant agrees that Stoiker is not entitled to immunity under R.C. 2744.03(A)(6) if he acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." Dkt. 63 at 26. As discussed above, there is sufficient evidence that he acted in such a manner, but Plaintiffs agree that Count Ten can be dismissed as a stand-alone count. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 399 (6th Cir. 2016) ("As an initial matter, reckless, wanton, or willful conduct is not a stand-alone cause of action; it is instead "a level of intent [that] negates certain defenses in a negligence action.").

### A.     Malicious Prosecution

Plaintiffs have presented sufficient evidence of Stoiker's influencing or continuing the prosecution and lack or probable cause, as discussed above. Under Ohio law, Plaintiffs also have to show malice. There is sufficient evidence of malice because a reasonable jury could conclude that Stoiker fabricated Vernon's statement and withheld exculpatory evidence to convict an innocent man.

### B.     Civil Conspiracy

Plaintiffs are entitled to a trial on their state-law conspiracy claim for the same reasons as they are entitled to a trial on his Section 1983 conspiracy claim.

**CONCLUSION**

Concrete evidence demands a trial against Defendant Lamendola, as Guardian ad Litem for Frank Stoiker, on Ajamu and Bridgeman's claims. This case is one in which all material facts are disputed. Defendant's motion for summary judgment should be denied.

Respectfully submitted,

/s/ David E. Mills

Terry H. Gilbert (OH 0021948)
Jacqueline C. Greene (OH 0092733)       David E. Mills (OH 0075400)
FRIEDMAN & GILBERT                      THE MILLS LAW OFFICE LLC
55 Public Square, Suite 1055           1300 West Ninth Street, Suite 636
Cleveland, OH  44113                    Cleveland, OH  44113
(216) 241-1430                          (216) 929-4747
tgilbert@f-glaw.com                     dm@MillsFederalAppeals.com
jgreene@f-glaw.com

*Attorneys for Plaintiffs*
*Kwame Ajamu and Wiley Bridgeman*

31

**CERTIFICATE OF COMPLIANCE**

I certify that this case is currently assigned to the complex track and that the foregoing response to Defendant Lamendola's Motion for Summary Judgment complies with the 30-page limitation for complex cases set forth in Loc. R. 7.1(f).

/s/ David E. Mills
David E. Mills

**CERTIFICATE OF SERVICE**

I certify that on March 1, 2017, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David E. Mills
David E. Mills