**MONDAY AFTERNOON SESSION, NOVEMBER 17, 2014**

THE COURT: Mr. Howe.

MR. HOWE: Thank you, your Honor.

Movant Ricky Jackson calls Edward Vernon to the stand.

THE COURT: Come on up, Mr. Vernon.

- - - -

The **MOVANT/DEFENDANT**, to maintain the issues on his part to be maintained, called as a witness, EDWARD C. VERNON, who, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION OF EDWARD C. VERNON

BY MR. HOWE:

Q. Mr. Vernon, would you state your name for the record, please?

A. My name is Edward C. Vernon.

Q. Hold are you, Mr. Vernon?

A. 52.

Q. Where do you currently live?

Exhibit A

DEFENDANT'S EXHIBIT

E

PENGAD 800-631-6989

A.      East Cleveland, Ohio.

Q.      Where?

A.      1681 Avalon.

Q.      Are you employed right now?

A.      Yes.

Q.      Where do you work?

A.      You say am I employed?

Q.      Yes.

A.      Yes.  7-Eleven.

Q.      What do you do at 7-Eleven?

A.      Cashier.

Q.      Do you have brothers and sisters?

A.      Yes.

Q.      Is Liz Kilgore a brother or sister to you?

A.      Yes.  One of my sisters, yes.

Q.      Is she older or younger than you?

A.      She is older.

Q.      Do you know if Liz Kilgore has any other younger brothers besides yourself?

A.      No.

Q.      Is that you don't know or does she have any?

A.      No, she doesn't.

Q.      I would like to take you back to May of 1975 as best you can remember.

        How old were you at that time?

A.    Twelve.

Q.    Do you remember where you lived?

A.    Yeah.  I stayed on 108th right between Frank and Arthur.

MR. HOWE:    May I approach the witness, your Honor?

THE COURT:    Sure.

Q.    I have little stickers for you, Ed.  Do you mind placing a sticker where your house was at the time?

A.    Yeah.  This is Frank right here.  This is 108th.  So my house would have been like right about in here (indicating).

Q.    Okay.  So for the record, you are pointing to the west side of 108th, south of Frank Avenue?

A.    Uh-huh.  It didn't stick.

Q.    Here.

A.    I will try that one.  Okay.

Q.    So were you in school back then?

A.    Yes.

Q.    Where did you go to school?

A.    Audubon Junior High School.

Q.    Is that in walking distance from your house?

A.    No.

Q.    How would you get back and forth to school in

1975?

A.    In the mornings we would catch either the 50 or either the school bus.

Q.    Can you point out on the map, place a sticker where the bus stop is where you caught the bus in the morning going to school?

A.    Yes.

Q.    Can you put a sticker?

A.    It is like right in this area right here (indicating).

Q.    So for the record, you are pointing to the south side of Fairhill Avenue between Petrarca and Cedar?

A.    Uh-huh.

Q.    Just north of the intersection of Petrarca?

A.    All right.  Well.

MR. GODSEY:        Do you have another sticker?

Q.    Here, we have these white stickers you can use.

A.    Okay.

Q.    So in the morning you get on the bus there, and which way does the bus go?

A.    Which way does it go?

Q.    Right, going down to school in the morning.

A.     You are talking about going to school; right?

Q.     Yes, sir.

A.     It would leave here and go up Fairhill.

Q.     So after school how would you typically get home on a normal day?

A.     Take the school bus home.

Q.     Can you describe the school bus?

A.     Yeah.  The school bus was a bus that sat on the back side, it was an RTA.  We have RTA now but it was called CTS back then.  They would give us a bus that we would catch.

Q.     So it wasn't a regular school bus?

A.     No.

Q.     But was there anyone else besides school children on that bus coming home?

A.     No.  That bus was just particularly for the students that stay there in our area at the bus, picked up and dropped off.

Q.     Where would the bus pick you up?

A.     In the back of Audubon, on the back side.

Q.     Would you mind stepping up to the map and showing us how that school bus would come as it was getting closer to your neighborhood house?

A.     Sure.  The bus would, it would come down, I believe that's East Boulevard.  And after it comes

40

down East Boulevard it would turn on Cedar. And back then they had the one lane and then they had the turning lane. And this is the lane in which we would come down. And then we would get here, which is Fairhill. We would cross Fairhill, and there is a bus stop right here when you cross Fairhill, like right after the light. And then the next bus stop was here next to Ohio Bell. At that point that was Ohio Bell.

Q. So for the record, you are saying the school bus came west down Cedar Avenue, crossed Fairhill, going straight through Cedar and made two stops there?

A. Yes.

Q. Would you take those stickers you have and mark off where the two bus stops were?

A. Sure.

Q. Is there any other way for you to have gotten home from school besides that school bus?

A. Yes. It was a bus called 50 Miles, and it went the same way as the school bus, but only thing about the 50 Miles, if you got on the 50 Miles, which was on 116th, when they came down East Boulevard and made that turn, then after it came out of University Circle rapid station it would turn right up here and

stop at this bus stop there.

Q.    Let's back up a little bit.

Was it typical for you to take that 50 Miles bus?

A.    No.

Q.    Do you remember how far you had to walk from the junior high in order to pick that bus up?

A.    I don't know.  We would walk straight up Continental, so that would be, I don't know, maybe, I can't say how far the distance is.  Like probably walking from -- I don't know.

Q.    That's okay.  That was 40 years ago.

You described how the bus went as it came into your neighborhood.  Would you point that out using the map, please?

A.    When the bus came down the neighborhood?

Q.    Do you see on the map where the 50 Miles bus would have come?

A.    Yes.

It came down East Boulevard, and after it came through the University Circle it would have been in the left-hand lane, yeah, left lane, and would have made the turn right here at Fairhill, turned into the first lane right here and stopped at this bus stop and picked up whoever or drop off whoever was on the

42

bus.

Q.      So that's the same bus, you are pointing to the same bus stop that you would have gotten on in the morning?

A.      Yes.

Q.      For the record, you described the bus going westbound down Cedar, taking a left turn, going southbound on Fairhill?

A.      Yes.

Q.      I would like to turn your attention specifically to the day May 19, 1975.  The day of the shooting.

        Do you remember that day?

A.      Yes.

Q.      Were you in school?

A.      Yes.

Q.      What happened when you got out of school?

A.      Let's see.  What happened when we got out of school.  We boarded the school bus --

Q.      Which bus did you board?

A.      The school bus.

Q.      Again, where did that pick you up?

A.      Behind Audubon.

Q.      Do you remember if anyone was with you at that time?

43

A.     I was just going to say, it was the school kids that normally catch the bus, because to try to remember all the names of the people who caught the bus, you know, because you had seventh, eighth graders and ninth graders, so everybody were all on the bus at one time. It is not like I didn't know certain people who were in the neighborhood that were on the bus, it is just that there was so many. That's at least about 50 people that were on the bus.

Q.     I understand I am asking you about who was on the bus 40 years ago.

A.     Yes.

Q.     So you got on the school bus?

A.     Uh-huh.

Q.     The school bus is going home?

A.     Right.

Q.     Did anything happen while you were on the school bus?

A.     Oh, well, the kids always throw rocks and stuff at our bus all the time, and sometimes they threw stuff back out the window at the kids that were throwing stuff at us. You know, they throw rocks and bricks and stuff at the bus.

Q.     Was there ever a time when you heard a shooting on the bus?

A.    Yes.

Q.    Can you describe that?

A.    Yes.  On my way, after we came down East Boulevard and we made our turn to come up Cedar Avenue, that's when we heard two gunshots, pow pow.

Q.    Would you take the stickers that you have and point out about where the bus was on that map when you heard a shot?

A.    Yes.  About right here (indicating) when we heard the gunshots.  It is like two of them.

Q.    What happens when you heard the gunshots?

A.    Well, I was already sitting in the window seat, so we all looked over toward that way to see where it came from.

Q.    When you say over towards that way, which way do you mean?

A.    Huh?

Q.    What way do you mean?

A.    Over toward the direction which the shots came from, like up there by the store and the gas station area.

Q.    Is that this left -- the left or the right?

A.    The left-hand side, yes.

Q.    And you said towards the store.  Which store are you talking about?

45

A.    I am talking about Fairmont Cut-Rite.

Q.    So you hear the shots.  What are the other school children doing at this point, do you remember?

A.    Everybody was looking.  Everybody heard it and we stopped talking and looked, and everybody was looking in that direction but we couldn't see anything.

Q.    Did you personally look out the bus at that time?

A.    Yes, I did.

Q.    What did you see?

A.    Nothing.

Q.    Were you ever on the city bus at all that day?

A.    No.

Q.    From the bus did you see the victim in this case, Mr. Franks, being beaten?

A.    No.

Q.    Did you ever see him get shot?

A.    No.

Q.    What's going on in your mind as all this is happening?

A.    Well, I wanted to go up and see where the shots had came from, what was going on, because usually in our neighborhood at that time, you know, you hear gunshots, we were like running around trying

to find out what was going on.

MR. HOWE: I will show the witness what we will have marked as Defendant's Exhibit 2.

Q. Mr. Vernon, do you recognize the photograph that I have shown you?

A. Yes.

Q. What does it depict?

A. This is Fairhill and Cedar.

Q. Can you tell which direction you are looking from Fairhill to Cedar?

A. Well, this direction here, if you keep going that would be west, and this would be Fairhill going what, south.

Q. Okay. Can you see Petrarca from this picture at all?

A. Yes, I can.

Q. Can you describe in words where you see Petrarca?

A. Right here where the intersection turns off to the right, that's Petrarca. You have got --

Q. For the record, you are pointing to just in between that orange construction sign and a building?

A. Yes.

Q. Does this picture fairly and accurately

47

represent the distances between the streets as far as you know today, or -- or in 1975? I am sorry.

A. Well, in '75, yes, this is basically the same setup.

Q. They haven't moved Cedar Avenue?

A. Just buildings moved.

Q. Other than the buildings, the distances between the streets and the basic layout of the streets is the same as it was in 1975?

A. Yes.

Q. Now, from this picture how does it compare to where you were when you heard the gunshots on the bus?

A. It was further back.

Q. You say further back. What do you mean?

A. We weren't this close because if we had been this close we might have been able to see anything. But we weren't this close.

Q. Would you mind, using the sticker, can you estimate where about this picture was taken from?

A. On here?

Q. Yes, sir.

A. This picture was taken probably about right here. So that's more of -- you know, and I said this is where we heard the gunshots up here.

48

Q.      I have what I would like to show you as Defendant's Exhibit 3.

Do you recognize what's depicted in this photograph?

A.      Yes.

Q.      Can you tell us what this photograph shows?

A.      It shows Fairhill going south.

Q.      Okay.

A.      And also the bus stop.

Q.      Can you see Petrarca from this picture?

A.      Yes, I can.

Q.      Can you describe where it is?

A.      Right beyond the bus stop, where the red construction sign is.

Q.      Are you able to estimate where this picture was taken from?

A.      Can I estimate where?

Q.      Say, looking up Fairhill, where on Fairhill was this picture taken from?

For the record, you are pointing to the middle of the intersection?

A.      Yes.

Q.      Again, this photo truly and accurately represents the distances between the streets at the time of the shooting?

49·

A.    Yes.

Q.    You testified you heard shots, you looked out the window, you didn't see anything.

      What happened next?

A.    Once we got up to the light and we stopped at the light, because it was a red light --

Q.    Which intersection is that?

A.    The intersection of Cedar and Fairhill.

Q.    Okay.

A.    When we got to, after the light turned green we crossed over, and I remember, I can only speak about myself, I remember getting off the bus right here at the first bus stop.

Q.    Just for the record, you are referring to the first bus stop just west of Fairhill Avenue on the north side of Cedar?

A.    Yes.

Q.    So the bus went through -- I am sorry. As you pulled up to the light did you see anything, were you still looking towards the store at that time?

A.    No.  We was trying to get off the bus, that's all, so that we could see what was going on.

Q.    What about when the bus was stopped at the stop light?

A.    No.  Couldn't see anything.

50

Q.    You got off at that first stop there on Cedar Avenue.  Where did you go then?

A.    After that waited for the light to turn red and we all ran up toward the store.

Q.    Can you point out on the map what route you traveled?

A.    Sure.  From here I ran up to the crosswalk and we came down, and this is the route we took right here, straight down (indicating).

Q.    Where is Mr. Robinson's store on this map?

A.    Right here (indicating).  But it would have been about right in there.

Q.    For the record, you are pointing to the intersection of Petrarca and Fairhill on the west side of Petrarca?

A.    Correct.

Q.    Do you remember who was with you at this time?

A.    No.  Just all I could say, it was a bunch of kids.  That's all I can say.

Q.    A bunch of kids from school?

A.    Yeah.

Q.    Do you remember what you saw when you got to the store?

A.    Well, as I came up to the store I saw a white man laying on the ground and there was some gasping

51

from like, you know, and breathing like that.

After that the police came, because we heard the sirens coming. And as the police came up I guess he died. Well, I know he died. But they went into the store and they brought Mrs. Robinson out. She was bleeding from her neck. And basically after that, you know, they put a sheet over him and they started asking people did they see anything, you know --

Q. Had you ever seen a dead body before?

A. No.

Q. What were you feeling?

A. I don't know. It is just scared, because I had never seen anything like that before.

Q. Did you see anyone running away from the scene?

A. No.

Q. As you approached the store did you see anyone with a pipe or a stick?

A. No.

Q. Did you see anyone take anything off of the body that was lying on the ground?

A. No.

Q. Did you see any green car?

A. No.

Q.      You say you saw, at some point you saw Mrs. Robinson being taken out of the store?

A.      Yes.

Q.      Who is Mrs. Robinson?

A.      The store owner's wife.

Q.      Well, the store owner was Bob Robinson?

A.      Yes.

Q.      What was your relationship like with the Robinsons?

A.      I mean, they knew me because I came in and out of the store. They knew my family. Everybody knew the Robinsons. They grew up in the neighborhood. So it was like our relationship was good, like any other corner store or person that you went into their store enough, you know what I am saying.

Q.      How did you feel when you saw her being taken out of the store?

A.      I was pretty sad about it. She looked like she was hurt really bad. I was pretty sad.

Q.      So you were at the scene of the crime, there is a dead body, they have taken out Anna Robinson. What do you do next?

A.      Well, just standing around until like the police kind of, because I guess a lot of people were starting to come up to the store, so the crowd was

53

getting like bigger and bigger, so they kind of pushed everybody back. So at that time I decided well, I am going on home, and me and Tommy Hall left there walking together --

Q. But you said earlier you weren't sure who exactly you were with.

A. Well, you said on the bus. But you got to remember, all the people that were coming up, it was so much going on at one time, to basically say who's who, who's who, I couldn't do that. Because as I stated, Tommy Hall, like when we caught the bus to school every day, that me and him was together. I had other friends that I played with or sat with or talked with, because Tommy Hall was older than I.

Q. What was your relationship with Tommy Hall?

A. He was just a friend. Just a friend.

Q. You said you were with Tommy and you decided to go home. How would you have gone home?

A. Walked down Petrarca, came across to Frank. And as he got in front of the church, that's where it is like, he said man, I know who did it. And I was like how do you know who did it?

THE COURT: Who said I know who did it?

THE WITNESS: Tommy Hall.

54

A.      He said I know who did it.  So he named -- he named Ricky, he named Buddy, and he named Bitsey. And I was like oh, okay.  So I went in.  I went home, dropped my books off, went back up and I told the police, I said, well, I know who did it, because I am thinking I am doing the right thing by telling the police yeah, I know who did it.  But anyway, that's what happened.

Q.      Do you remember the exact words that Tommy used when he told you who had done it?

A.      That's what I said.  I just said that.

Q.      Now, when you got back up to the scene, when did you decide that you were going to say something to the police?

A.      Oh, when I went back up to the scene I immediately told one of the police officers.

Q.      How many police officers were there at that point around?

A.      I don't know.  It was a lot.

Q.      Okay.  Do you remember what the first police officer you talked to looked like?

A.      No.

Q.      Do you remember what you told the police officer basically?

A.      I just told him that I know who did it.

Q.    Did you give him the names that you heard, Ricky, Buddy and Bitsey?

A.    No.  I just told him I know who did it.  He took my address and name down and my phone number.

Q.    How were you feeling at this point?  What's going on in your mind?

A.    I was feeling pretty good about it because, like I just said, I was thinking I was doing the right thing by coming forward and saying that.  So I was feeling pretty good about it.

Q.    Feeling pretty good.  Fair to say you were excited?

A.    I wouldn't say I was excited but I was feeling good about doing something good.  That's what I felt.

Q.    So after you told the police that you had seen something, did you have any other contact with the police that day?

A.    No.

Q.    What happened next that day?

A.    I went home.

Q.    You went home?

A.    Uh-huh.

Q.    Now, at some point in this case there was a police lineup?

A.    Yes.

56

Q.      In between the day of the crime and when the police lineup occurred did you have any more conversations with the police?

A.      Yes.

Q.      Do you remember what you talked about?

A.      Yeah.  I can't give you the exact dates and times, but I remember they came and got me.  And my mother was supposed to go with me down when they went to talk to me, and they told her, said no, you can just stay here, he will be all right.  We just want to talk with him and show him some pictures.

Q.      When you say they come and got you, who are you talking about?

A.      The detectives.

Q.      So they came and got you and took you someplace and they showed you pictures, you said?

A.      Yeah.  They showed me some pictures.

Q.      Were they asking for more details about what you had seen?

A.      Yes, they did.

Q.      Do you remember what you told them?

A.      I gave them some information about how I saw it when I got off the bus or something like that.  Something to that.  I am not exactly sure, so I won't say all of that.  I can't go back on all of the other

57

information that I did give them.

Q.    You testified earlier that you didn't actually see anything occur. Where are you getting this information you are telling them?

A.    Well, the information that I did get is when I was -- when they took me down and they were talking to me they gave me a lot of information.

Q.    Can you explain what you mean by that?

A.    They told me about how the things occurred. Like I didn't know that the man had got shot in the heart. Well, I knew Mrs. Robinson had got shot in the neck. I didn't know that acid was threw in his face and that he was hit over the head. I didn't know all of that. But they gave me all of that information and then they said is that what you saw. Yeah, that's what I saw. So I agree, yeah, that's what I saw.

Q.    So at this point you are saying things to the police that -- to be clear, did you actually see any of those things?

A.    No, I didn't. No.

Q.    So you are saying things to the police that are untrue.

    What's going on in your mind at the time?

A.    That, like I just said, in my mind I am

58

thinking I am doing what's right.

Q. Why is that?

A. Because, like I said before, to be able to tell and to be able to give information about something that had happened, I thought I was doing the right thing and doing a good thing.

Q. Has there been times in between the shooting and the lineup that you felt that it wasn't a good thing?

A. Yeah. My parents -- put it this way, my mother was very -- she didn't want me to do this, and she knew that I didn't see any of this.

Q. How did she know that you didn't see?

A. My mother knows, okay. She knows when I am lying and when I am telling the truth. And she knew that besides that that I was on the school bus. She already knew this. And she told me that when I go down for the lineup, she said all you got to do is not pick him out, and she said they will let him go. And I said okay, that's what I will do.

So when I went down for the lineup to pick them out, I didn't pick them out.

Q. I am sorry. Let's back up.

So at some point you went down to a lineup. Can you tell us what it looked like?

59

A.      What?

Q.      What did the room, what did the lineup look like?

A.      It is just a room.  But they told me that they can't see me but I could see them.

Q.      Okay.

A.      So it is like a room with a glass, and that's how I saw it.  So I looked through there and I saw them.

Q.      Who did you see?

A.      Well, I saw the three defendants, Ricky, Bitsey and Buddy.

Q.      Did the police ask you any questions when you got through?

A.      Yeah.  They asked me did I recognize anyone in the lineup.  And I said no.

Q.      Did you recognize anyone in the lineup?

A.      I said no.

Q.      But you said that you -- well, let's back up. What was your relationship with Ricky, Buddy and Bitsey?

A.      Well, I grew up in the neighborhood with them, but they are older than I am.  I know who they were. I delivered papers, because I was a paper boy.  I delivered papers to their houses.  Ricky, me and his

60

youngest brother, Ernest, we were good friends.  So, I mean, it is not like I didn't know his family, like he didn't know my family.

Q.    So you did actually recognize --

A.    I recognized all of them, uh-huh.

Q.    How did you know Ricky, Buddy and Bitsey at that point?  I'm sorry.  What names did you know the three defendants by?

A.    Those are names I know them by.

Q.    Did you know the name Ronnie Bridgeman?

A.    No.

Q.    Did you know the name Wiley Bridgeman?

A.    No.

Q.    How did you end up knowing those names?

A.    Later on, during the trials and stuff like that.

Q.    So you went to the lineup, the police asked you if you recognized anyone, and what did you say?

A.    No.

Q.    What happened then?

A.    Well, what happened next is I came out of the room.  They brought me out the room.  And when they brought me out of the room, as we walked past they were on the telephones and said is that them.  I said that's Ricky on the phone right there.  And that's

61

the only thing that I said. I didn't say anything more than that.

Q.    What happened next?

A.    They brought me into another room and they were pretty mad. The detective was pretty mad, I know, and at that point he began to call me names and he began to push stuff around, and started beating on the table. He said you lying. He said, you know that's perjury. He said your mother and father can go to jail.

So I begin to cry and I didn't understand.

And he said you said that these are the people who did it. Why did you say that? Why?

And I am like, I am just sitting there and I am crying. And then he said we will fix it. And he said we will fix it.

So after that they took a statement from me saying that I was scared and that's why I didn't pick them out in the lineup. But I wasn't scared. I didn't pick them out because I know that they didn't do it.

Q.    The statement that they gave you, or the statement that you later took -- I'm sorry. Let me back up. After they said they would fix it, you said that you did a written statement?

62

A.    Now, I had already did a statement before. I don't know when it was done, but they took everything down that I was saying, from the description of the car and all of those things. They had took all of that stuff down way before I did this lineup. And then when I did the lineup they did this statement.

Q.    When you are saying you did -- can you clarify? They didn't bring you a prewritten statement?

A.    He typed it up. As he began to type it up, yes.

Q.    But they were asking you questions and stuff?

A.    Yes. He said I am going to say on the statement that you were scared, that's why you didn't pick them out. Now, that's typing it up. I didn't say I was scared. They said it.

Q.    Did you give them more details, or did you give them details about what you supposedly saw?

A.    Got more and more of the details and different things that I didn't even know about.

Q.    And, again, how then are the police getting this information, or how are the police knowing this information?

A.    It was being fed to them, it was being given to them.

63

Q.      Did you ever tell the prosecutors about threats, about the actions of the detective when you were in the room after the lineup?

A.      No.  I am 12 years old.  I don't know nothing about going to a prosecutor and talking to them about anything.

Q.      Did you ever tell any of the defense attorneys?

A.      No.  I didn't tell anybody.

Q.      Why not?

A.      For one thing, how would I know how to go and approach somebody about something that I don't even understand myself?  I am 12.  I don't see the -- anyway.

Q.      At some point did you offer testimony in this case, back in 1975?

A.      Yeah.  I had to testify to everything that was written, yes.

Q.      How did you feel about going into court and testifying at that time?

A.      I didn't like it at all.  I didn't like it at all.

Q.      Did you testify in more than one trial?

A.      Yeah.  Three trials.

Q.      Did you prepare at all when you went to

64

testify in those trials?

A.     I was supposed to memorize only my part of what I testified in one trial, because the prosecutor said that what's going to happen is if you say this in this trial and you change any of the words in the next one, then the defense is going to say well, you said this here and you said that over here and you said that.

Q.     Were you worried about saying different things to different trials?

A.     I am just all confused anyway, so it didn't matter because when they gave me those transcripts to go over I didn't remember all that stuff, and every time I went to a different trial it was quite a difference.

       I can remember just the emotional stress that it was now, you know, and the pressure that they put on me.  And he said that, that it was going to happen.  You said this in that trial.  I was like, you know, I just couldn't, I couldn't take it.

Q.     Do you remember what you testified to as to the role of the defendant Ricky Jackson?

A.     Do I remember what I testified?

Q.     What's his role in the crime?

A.     Yeah.  I said that he was the shooter.

65

Q.      Did you ever actually see Ricky Jackson involved in the shooting that day?

A.      No, I didn't.  No.

Q.      Did you ever see Ronnie Bridgeman involved at all that day?

A.      No.

Q.      Did you ever see Wiley Bridgeman involved in the crime that day?

A.      No.

Q.      Did you ever see any three of them at the scene?

A.      No.

Q.      Did you ever see a green get-away car?

A.      No.

Q.      Did you understand at the time that these were capital cases, these were death penalty cases?

A.      No.  No, I didn't.

Q.      How did you feel about testifying to something that you knew was not true?

A.      I felt really bad, guilty about what I was lying about.  I was carrying all of that.

Q.      And how old were you by the time of these trials?

A.      What did you say?

Q.      How old were you at this time?

A.      I was 12, and I just turned 13 after that.

Q.      After the trials were over, at let's say in between the end of those trials and the earlier part of 2000, did anyone ever contact you about the case?

A.      After the trials were over with.

Q.      Did an attorney ever contact you about the case?

A.      Yeah.  I believe I was in the eleventh grade, so it had to be about 1979 or '78, somewhere around in there.  I don't know the date but yeah, they did.

Q.      Why did they contact you?

A.      Well, they came to me and asked me, they came to my grandmother's house and they explained who they were, and they said that they were representing Ricky Jackson, if I am not mistaken, and they wanted me to give a statement about what I saw.

Q.      What did you say?

A.      I said I am not allowed to talk to him. That's what I was told.

Q.      By who?

A.      By the detectives.  He said if I get anybody that wanted to talk to me about that case, to contact them and they will take care of it.

Q.      Was there ever another defense attorney that contacted you?

A.    Yeah.  I was about 21 when another one contacted me.

Q.    Something about the case?

A.    Yes.

Q.    Did you say anything at that time?

A.    No, I didn't.  Immediately I told him, you know, I am not allowed to talk to you.  And I contacted the detectives and let them know that they had tried to contact me again.

Q.    How are you feeling when these people are contacting you about this case?

A.    Well, I wanted to, at that particular time, each and every time I wanted to come forth and tell, but because I was, I want to say scared, not only scared but fearful on the detectives because they kept like pursuing it, make sure that I didn't say anything to anyone else besides them.

Q.    How did you feel about talking about this case in general?

A.    In general?  You are talking about now or then?

Q.    Back then, years after.

A.    I didn't like talking about it because it made me sad and it made me feel very guilty about what I did.  But I did want to bring it out into the open

68

but I was afraid that I would end up going to prison or to jail.

See, now I know what perjury is because I got older. So now I know a little bit about the law. So when they told me back then at 12 about perjury, I was like I don't understand what that means because, you know, I wasn't like in college, you know what I am saying, old enough to know what perjury was.

Q.    Did you ever have contact with Wiley Bridgeman on or around the year 2006?

A.    Who?

Q.    Wiley Bridgeman.

A.    Yeah. I was working at the City Mission Downtown.

Q.    When did you do that for the Mission?

A.    What?

Q.    What did you do for the City Mission?

A.    Security.

And he came in that evening and he was talking to another guy. We got like -- I am not there anymore. I don't work there anymore, but at the booth that all of us stand in, the security. But on the outside is where the people come in and they have to hand their I.D. up under. And it is like three or four people in the hallway.

69

So he was telling them, the one guy he was talking to, he said man, I just got out of prison. He said what?  I did 37 years in prison and for a murder I didn't do.

And so when he came up to the window he handed me his I.D.  It is like Wiley Bridgeman.  It didn't really dawn on me until it is like, once he came in and then we had to have like a group session in the evenings --

Q.      I am sorry.  Let's stop there.

Did you recognize -- you say you didn't recognize Wiley Bridgeman?

A.      Not physically, but the name is kind of what stuck out.  And I was like man.

Q.      How did you know what his name was?

A.      Because of what he was saying.  And it brought me back to the remembering of this case, of the case.

Q.      Did you have a conversation with him at that time when you were in the line -- when he was in the line coming through?

A.      No.  No.  The next day.

Q.      What was the conversation the next day?

A.      The next day after the group was over with I held him back and I told him, I said, you don't know who I am, and I said but my name is Ed Vernon.  And

70

he looked at me and he began to cry. And I cried with him. And I said I am sorry, man, for sending you to prison. And I said can you forgive me? And he said yeah. He said man, we got to go to the news people with this. And I was like oh, no, no, no. No. No. No. I am already scared.

Q.    Why were you scared?

A.    I am scared of going to prison for all of this perjury, and everything is running through my mind.

Q.    At that point how do you feel about your involvement? How do you feel about your involvement back in 1975?

A.    I mean, I felt guilty about what I did. And I was also scared of -- just scared.

Q.    Did you go to the newspapers?

A.    No. No. No.

Q.    What did you do?

A.    Well, he kept coming every day, so what I did is I went to my supervisor and I said I have a gentleman, and I explained to my supervisor what was going on. So he said well, just call his parole officer and explain to her what's going on. And that's what I did.

Q.    When you say you explained what's going on, did you tell your supervisor that you had falsely

71

testified at trial?

A.      No.  I told him that, I said I was a witness to a murder is what I told him.  And I said, and I sent these boys to jail.

Q.      After you called Wiley's parole officer, have you heard from him again since then?

A.      No.

Q.      Have you ever seen Wiley Bridgeman since then?

A.      No.

Q.      After that when was the next time that someone called you about the case?

A.      The Scene Magazine.

Q.      What did the Scene Magazine want?

A.      They wanted to do an interview with me about this case.

Q.      What did you tell them?

A.      No.

Q.      Do you remember when that was?

A.      Some years ago.

Q.      Can you estimate about how many years ago that was?

A.      I am not going to sit up here and try to give an exact date or the year and stuff.  I don't know.  2000.  I don't know.  I can't remember.

                THE COURT:          Can we recess?

72

Is this a good time to break?

MR. HOWE:          I don't have much more, your Honor.

THE COURT:          All right.

Q.      After you told the Scene you didn't know what happened, what was the next time you talked about the case, if you can remember?

A.      The next time after that I was in the hospital and my pastor came to me and he had talked to me.  He said this magazine, the Scene came and tried to talk to me.  And then he said oh, yeah, I didn't talk to them.  And he said I didn't talk to them.  He said -- no.  He came to me and he said the Scene Magazine came up here and tried to talk to me.  And he said I told them I didn't know anything about what they were talking about.  So he said did you want to talk to them.  And I said no, I don't.  And he didn't ask me any more about that.

Q.      To be clear, you are in the hospital when this is going on?

A.      No.  This is the time before.  They came to the church to talk to him about it, the Scene Magazine.

Q.      And you told your pastor that you didn't want to talk about it?

73

A.    Right.  And the next time we talked about this, about the case, because I didn't even mention anything about the case to him then, is that when Sierra called him from the Innocence Project.  And when she called I was in the hospital, and he had came up there to see me.  And he said this young lady called from the Innocence Project and she said that she wanted to talk with you about this, about Ricky Jackson's case.  And I told her I would come up and ask you about it.  I asked you about it, so what do you think.  And I said well, I think I want to do it.  I think I want to tell the truth.

Q.    Did you tell your pastor what happened?

A.    At that time?

Q.    Yes.

A.    I didn't get into all a lot of the details about it because I was in the hospital, remember, so.

Q.    What were you in the hospital for?

A.    At that time my kidneys, high blood pressure.  What else.  What else was going on at that time?  Well, the congestive heart failure.  There was a whole lot going on.

Q.    Can you describe what you were feeling as you told your pastor this?

A.    I was feeling -- I was feeling pretty, pretty

74

emotionally sad, but happy at the same time because I felt like I was getting ready to get all of this off of me.

Q.      Very quickly, Mr. Vernon.

When you testified in 1975 do you remember what you told the Court, which bus stop you got off in 1975?

Can you point to what bus stop you said you got off of?

A.      Yeah.  This one right here (indicating).

Q.      To be clear, you did not get off that bus stop that day?

A.      No.

Q.      When you were in this lineup room was anyone else, were your parents with you?

A.      No.  They weren't allowed to come down.

Q.      So you went back yourself with the detectives?

A.      Yes.

Q.      Has anyone promised you anything in exchange for your testimony here today?

A.      No.

Q.      Has anyone threatened you in order for your testimony today?

A.      No.

Q.      Other than what we have talked about with

75

Wiley, have you had any contact at all with Ronnie Bridgeman since 1975?

A.     No.

Q.     Have you ever had any contact with Wiley other than what we talked about?

A.     No.

Q.     Have you had any contact with Ricky Jackson since 1975?

A.     Not that I know of.

Q.     What do you mean by that?

A.     Well, because I was, from my understanding, they said I was when I was incarcerated, that we were at the same facility, but --

Q.     Do you remember ever having any contact with Ricky Jackson since 1975?

A.     No.  No.  No.  No.

Q.     Have you ever seen Ricky Jackson since 1975?

A.     No.  No.  No.

Q.     Are you scared today?

A.     No.

Q.     How do you feel seeing him?

A.     I feel -- I feel really good about seeing him. I feel really good about seeing him.

                MR. HOWE:          No further questions.

THE COURT: We are going to recess for about 15 minutes.

Don't talk to anybody about this. Okay?

(Thereupon, a recess was had.)

THE COURT: Come on up, Mr. Vernon.

MS. McGRATH: Thank you, your Honor.

- - - -

CROSS-EXAMINATION OF EDWARD C. VERNON

BY MS. McGRATH:

Q.    Mr. Vernon.

A.    Hi.

Q.    Hi.  Where do we begin?

A.    I don't know.

Q.    May 19, 1975, you are telling us now that you got off the bus on Cedar; is that right?

A.    Yes.

Q.    Okay.  1975 you testified in Mr. Jackson's trial?

A.    Yes.

Q.    1975 you testified in Ronnie Bridgeman's trial?

A.    Yes.

77

Q.    1977 you testified in Wiley Bridgeman's trial?

A.    Yes.

Q.    So you would have been 13, 13 and 15; is that right?

A.    Yes.

Q.    And back then I believe you testified that you got off at this bus stop?

A.    Yes.

Q.    That would be the one near this Fairmont Cut-Rite store; is that correct?

A.    That's correct.

Q.    Now, ever, ever, ever, have you ever gotten off the bus at this bus stop?

A.    No.

Q.    Never?

A.    No.

Q.    Okay.  Do you remember Mr. Loper?

A.    Yes.

Q.    And who was Mr. Loper?

A.    That's Tony Ray Hoecker's father.

Q.    Who was Tony?

A.    He was one of my sister's friends, best friends.  But we all knew each other.  Everybody knew each other.

Q.    Do you remember where Mr. Loper lived?

78

A.    He stayed right next to the store.

Q.    Show me where the store was on this map, please.

A.    Sure.  The store is here right on the corner, and as you turn the corner here there would have been a house, houses here.  A house next to it.  A house in the back.  Another, a few houses.

Q.    Thank you.  Was Mr. Loper's house attached to the store, if you remember?

A.    Yeah.  Yeah, it was adjacent to the store, yes.

Q.    Like next to it or behind it or whereabouts in reference to the store?

A.    It is like this (indicating).

Q.    Side-by-side?

A.    Yes.

Q.    Okay.

A.    So the store is right here.  When you come around, when you turn the corner to go down Petrarca, it is adjacent to it.  I guess that's the way they built it.

Q.    Can you show me on this map?

You say the store was in this vicinity.  Which side would Mr. Loper's house have been on?

A.    On the Fairhill side.

79

Q.      So this would be the side closest to the bus stop?

A.      Yes.

Q.      Thank you.  I am sure you are aware that Mr. Loper testified at Ricky Jackson's trial?

A.      Yes.

Q.      I am going to show you Mr. Loper's testimony. I am going to ask you to read some lines into the record.  Is that all right?

A.      Yes.

Q.      Would you start at the top, please, and read? This is page 139 of Charles Loper's testimony.

A.      Start at the top?

Q.      Please.

A.      . And is there a bus shelter located anywhere near where you live, sir?

        Beg your pardon?

        Bus shelter.  There is a bus shelter located anywhere where you live, close by where you live, a bus shelter, bus stop?

        Bus stop.  Oh.  It is just about in front of my house, the bus stop, yes.

        And then -- excuse me.  And is that the enclosed shelter?

        Yes.

80

Okay. Sir, on May 19, 1975, about ten minutes to 4:00, do you remember whether or not you had occasion to see Eddie Vernon?

Yes.

And where did you see Eddie at this time?

He was getting off the bus by the bus stop.

Okay. Does that bus stop in front of the bus stop?

Yes.

And you saw Eddie Vernon; is this correct?

Yes. He was walking up the street.

And which street would that have been -- he walk up?

Fairhill.

Okay.

Q. Thank you. So back in 1975 Mr. Loper testified that he saw you get off this bus at this bus stop, correct, the one on Fairhill?

A. Uh-huh.

Q. And that would be the one closest to his home?

A. Yes.

Q. And when Mr. Loper says he saw you get off the bus and walk up the street, he said you were walking up Fairhill.

A. Uh-huh.

Q.    That would be walking toward the store.  Is that how you understand his testimony?

A.    That would have been -- yeah, that would have been correct.  But that's what, about 15 steps.

Q.    About 15 steps from the bus stop to Mr. Loper's house?

A.    Yeah.

Q.    Okay.  All right.  And I am also going to ask you, referring to page 151 of Mr. Loper's testimony, if you would also read this page, sir.

A.    Okay.

Q.    Thank you.

A.    The whole page?

Q.    Please.

A.    This says:

Did he say hello to you?

Yes.  I spoke to him.

Did he talk to anyone else?

No.  Was there a little girl, was there a girl there at the time that he talked to you?

No.

Do you know who Karen Smith is?

Karen Smith?

Karen Smith.

No.

82

Now, you say that the shots occurred almost right after he got off the bus?

Yes.

Let's see.  What did you say to him when he got off the bus?

Who?

Eddie.

I said hello, Edward.

What did he say?

He said -- he spoke back.

He called you Mr. Loper?

Yes.

And then it says:  What did he say?

He called me Mr. Loper.  He said hello, Mr. Loper.

And when did the shots go off?

Q.    Would you continue reading on page 152 up to the point where I crossed it off?  Thank you.

A.    Okay.  It says:

Just about then.  Just about along then.

Okay.  All right.  Almost on time delay at all -- at all?

No.

What did Eddie do?

Who?

83

Eddie.

I didn't know what he did because I was running up -- I was running myself.

Q.    Thank you.

A.    Okay.

Q.    And if I may refer you to page 153.  Would you read that page, please.

A.    Uh-huh.

Q.    Thank you.

A.    And when did you look over --

THE COURT:         You have to speak up.

A.    And when did you look over to see that white man being beaten?

While I was trying to get in the house.

Okay.  So you came down the stairs, got your grandson, picked him up, went back upstairs?

Well, the man fell right there by the picket fence, right there in front of the door of my house.

In the front of --

On the side.

The man who fell was a white man?

Huh?

That man who fell was a white man?

Yes.

Did he move after he was shot?

He tried to get up.

Did he fall down at the place where he was standing when he was shot?

The witness says:  Witness nodded his head.

Well, he was shot right in front of the door of the Robinson store?

Yes, and he fell back -- he fell by the -- by the picket fence opposite the door.

Opposite the door of the Robinsons' store?

Huh?

Opposite the Robinson store.

Q.    And would you continue reading a bit more on page 154, to where I have drawn the line?  Thank you.

A.    Sure.

It says:

Yes.

When you say opposite you mean in front of the Robinson door?

Well, opposite the door because when he fell he fell by the picket fence.  That's when I got a chance to see him, when they hit him on the head -- on the head.

That's right in front of where you live?

Yes.

85

How far were you from where the man fell?  If you were -- it says:  If you were here in the chair right where you are at now, point to something in the courtroom that would show the same distance.

Here you go.

Q.     Thank you.

Would you read that little bit that I crossed off at the bottom of the page 157, please?

A.     Sure.

Who else got off the bus with Eddie?

I didn't see anyone else get off the bus with him.

Now, you did not see anyone else on the street.

That's what you want me to read?

Q.     Thank you.  And if you could continue over to page 158 and read that page, please.

A.     Uh-huh.

Except Eddie, your grandson, yourself, and -- and then later when you heard the shots you saw the white man and someone beating on him.  Was the hand that you saw grabbing the briefcase the same person who beating -- who was beating the white man?

Yes.

What did they do with the iron pipe?

I don't know.

Who took the briefcase?

All I saw was the hand.  I don't know who took it.

Now, I think you said that afterward they ran down Petrarca?

Yes.

How did you know it was -- how did you know it was them?

I did not say it was them.  I said I saw a hand.  I did not know who it was.  I did not know how many there were.

It says:  Did that hand have a gun in it?  Did that have a gun in it?

No, I did not see no gun.

Now, this says:  Was it the hand that had the pipe in it?

Yes.  Well, yep.

The same hand with the pipe was reaching for the briefcase?

No.  He had the pipe in one hand and reached for the briefcase with the other hand.

There you go.

Q.    Thank you.

A.    You are welcome.

Q.     And just a couple more lines, if you don't mind, continuing onto page 159.  Then you can stop where I drew that line.  Thank you.

A.     Okay.

So you saw two hands?

Yes.

Well, what other part of him did you see besides his two hands?

That is all I saw.

Just the two hands?

Yes.

Q.     Thank you.

So to sum it up, Mr. Vernon, Mr. Loper, who lives attached to the store, testified in 1975 that he saw you get off at the bus stop that is on Fairhill near the store, I think you said about 15 steps, walk toward the store, and that's when he heard the shooting begin, and that you two had actually greeted each other and then he heard the shots and he pulled his grandson in the house.

A.     That's what he said.

Q.     Okay.  Why would he make that up?

A.     I don't know.  At that time, a long time ago, Mr. Loper was a chronic drinker.  He was a chronic alcoholic.  So I don't know, but we all knew that he

88

worked for the City.

Q.    He worked for the City for a long time, didn't he? About 30 years, like he testified?

A.    Yes.

Q.    But he testified that he saw you get off at the bus stop and walk toward the house and you greeted each other?

A.    No.

Q.    That's a lie?

A.    That's a lie.

Q.    All right. You testified that you approached a couple of police officers?

A.    Uh-huh.

Q.    And if you would, please, I believe you said that you spoke to one, maybe two police officers? Would you tell us again?

A.    No. I said I spoke to an officer.

Q.    An officer, okay. Do you remember if that officer was African American or white?

A.    I believe he was white.

Q.    And what did you tell the officer?

A.    I told him that I had -- that I knew who did it.

Q.    I am sorry?

A.    I told him that I know who did it.

Q.    Did you give him any other information?

A.    Besides my name, phone number and address.

Q.    But no names at the time?

A.    Not that I can recall.

Q.    Okay.  I am going to ask you to take a look at what's marked as State's Exhibit 1, which is attached to the brief in opposition for the new trial.

Sir, this is the affidavit of Joseph Paskvan, and I am going to show you a copy of it.

MR. HOWE:                Objection, your Honor.

THE COURT:               Yes.

MR. HOWE:                This affidavit, the affiant is not here to be cross-examined.

THE COURT:               Is he available?

MS. McGRATH:             No, your Honor. He is in Arizona.

THE COURT:               Okay.  Was he a detective or police officer?

MS. McGRATH:             He was a police officer.

THE COURT:               Overruled.

Q.    Mr. Vernon, I am going to ask you to read into the record a portion of this affidavit.  If you would read three through whatever the last one was that I

circled.

A.      On May 19, 1975 I was working with Officer Robert -- I don't know his name, but anyway, was responding to Fairmont Cut-Rite store, location 2196 Fairhill, Cleveland, Ohio.  Upon arriving I observed a white male on the ground.  A crowd started to form. Officer, I don't know his name, and I kept the crowd back away from the scene.  The Officer, I don't know his name, Hassel, had asked the crowd gathering did anyone see anything.  About ten or 15 minutes an African American male approached the Officer Hassel and said I saw who shot him while I was in the bus stop coming from school.  I asked who was -- who was it.  The male said -- was that Bridgeman?  I said Ronnie.  And the male looked surprised.  The male said his brother Wiley.  I was not familiar with Wiley Bridgeman.  I was familiar with Ronnie Bridgeman, having arrested him for burglary apparently one month before the murder.  I saw Ronnie Bridgeman coming out of the window of a house in the same neighborhood as the murder, with a gun.  Ronnie Bridgeman threw the gun back through the window.  The gun belonged to the homeowner.  I wrote down the male's name, address, phone number and grade. Officer Hassel had said to the male to stand aside.

I turned to inform -- to conform over to one of the detectives on the scene. Probably Detective Farmer.

Q.    Thank you.

And if I may, I know you had a little difficulty with the officer's name. It is Hassel, H A S S E L. Officer Hassel, fair enough?

This is more than likely then the white officer that you spoke to; is that correct?

MR. HOWE:        Objection, your Honor. That's not what he said.

THE COURT:        Sustained.

MS. McGRATH:        I am just asking.

Q.    Do you believe that that's the white officer that you spoke to?

MR. HOWE:        Objection, your Honor. There is no white officer.

THE COURT:        What were you going to say?

MR. HOWE:        His testimony is not there was a white officer. Maybe I misheard him, but as far as I understand his testimony, that was there was a black officer.

THE COURT:        No. I heard there was a white.

MS. McGRATH:          Mr. Vernon just said he believed he spoke with a white officer.

MR. HOWE:          I apologize.

Q.     Do you think that that is the white officer that you spoke with?

A.     I spoke to an officer.  That's all I said.  I didn't give any specifics of who it was or what he was.  But I gave specific I spoke to an officer.

Now, was it that officer?  I can't say.

Q.     Mr. Vernon, I am also going to ask you to look at State's Exhibit 8, which is the testimony of Robert Hassel, a police officer who testified he was at the scene, all right, at the store.

THE COURT:          Is he available?

MR. HOWE:          We don't have any objection.

Q.     The top of page 254.  Would you read those couple of first questions?

A.     It says:  Who is your partner?

Patrolman whatever his name is.  I don't know these folks.  Joseph.

Would you spell that?

Okay.  Badge number 2501.

Were there other officers asking people

93

questions besides you and your partner?

Q.      Thank you.

        And Officer Hassel, when he testified, Mr. Vernon, actually did spell out P A S K V A N, and he did testify Joseph Paskvan; correct?

A.      I don't know.

Q.      All right.

A.      I don't know.

Q.      You don't think Officer Hassel was making this up, do you?

A.      Do what?

Q.      Do you think he was making this up when he testified?

A.      I don't know what goes on.  I don't know what went on.  Okay?  That's all I can tell you.  I can only tell you about what I said.  I can't tell you about what any officer did or what they didn't do.

Q.      All right.  And page 251 of Officer Hassel's testimony, would you read that, please?

A.      Sure.  You want me to read this whole thing?

Q.      Please.

A.      Okay.  It says:

        We approached different members of the crowd asking them -- asking if anyone had observed anything when this incident occurred.

And did this young man indicate that he had?

Yes, sir, he did.

And this was on the 19th, the day that it happened; is that correct?

Yes, sir.

Okay. In response to Edward Vernon indicating he had witnessed what occurred, did you take any information from this young man?

Essentially we took his name, address and phone number, which was turned over to the crew that was -- the other car which was in procession of handling the original assignment.

Whatever all that means.

I see then -- I see. Then did you question him whatsoever as far as he observed?

Nothing but to ask him where he had been at the time.

I see. As far as the details of the commission of this crime, then, you did not have any questions?

No, sir.

You simply attained his name, home address and phone number, is this correct?

Yes, sir.

Q.     Thank you.

95

And, Mr. Vernon, do you remember giving your name, address and phone number to an officer at the scene of the murder?

A.  When I came back up there, yes, I did.

Q.  When you came back up.

A.  Yes, I did.

Q.  Mr. Vernon, you testified that you did meet with the police at some point after the murder.

A.  Yes.

Q.  And at one point you went to look at photos?

A.  Yes.

Q.  Do you remember if you had any contact with the police before you went to look at the photos?

A.  I can't remember.

Q.  Okay.  The day that you looked at the photos do you remember how long that was after the murder?

A.  I can't remember.

Q.  I am going to ask you to take a look at State's Exhibit 2 attached to the brief in opposition for the new trial.  I am going to ask you to read a couple things off this, please.

MR. HOWE:          What is this?

MS. McGRATH:          Number two.  It is a police report, May 20.

Q.  As you can see on the top of this report the

date is May 20, 1975. When would that be in relation to the murder, Mr. Vernon?

A.      I assume the next day.

Q.      I circled that top paragraph. Would you read that, please?

A.      It says: Contacted Lakeside Hospital about the condition of Anna Robinson, and information about the nursing service, that the condition was satisfactory, but attending doctor had entered orders that the victim was not to be interviewed at this time.

Okay.

Q.      Thank you.

And would you read the last paragraph, please?

A.      While in this area -- while in this area were able to locate a young citizen who revealed that he was getting off the bus walking south on Fairhill in the direction of the store and observed two colored males attacking the white male with the brown bag. They threw some liquid in his face and, what's it say, and approached and intend to hit him several times with, apparently with a stick as the victim fell to the sidewalk, and one of the suspects bent over him and shot twice. The other male had a gunshot -- a gun but did not fire it. He grabbed the

97

brown bag and ran south on Petrarca. At that same time the other fired into the glass of -- into the glass door. From his position in the bus shelter he could see Mrs. Robinson getting struck with the shot.

Q. Thank you.

Mr. Vernon, are you the young citizen that the detective is speaking about in this paragraph?

A. Probably so.

Q. All right. And so we are clear, on May 20 you are telling -- this was written by whom?

A. I don't know.

Q. Well, detectives Farmer and Terpay. Do you remember Detectives Farmer and Terpay?

A. Yes.

Q. How do you remember them?

A. Because those were the detectives who I guess was in charge of the case.

Q. And you dealt with them throughout the case; is that correct?

A. Yes.

Q. So on May 20 you were able to tell detectives you were getting off the bus, walking south on Fairhill in the direction of the store, and you saw two African American males attack the victim with a brown bag. You also told them you saw the male, one

male throw some liquid in his face and hit him with what appeared to be a stick.

You were able to tell the detectives the day after the murder of this information; correct?

A.    That's what was said.  I didn't say it, though.

Q.    Well, you are the young citizen; is that correct?

A.    That's what was fed to me because I didn't know any of that information, because I didn't get off the bus at that bus stop, ma'am.

Q.    When did they have a chance to feed this information to you?

A.    When they were talking to me that day.

Q.    Where do you think that they got this information to feed to you?

MR. HOWE:    Objection.

A.    I have no idea.

THE COURT:    Overruled.

A.    I have no idea.

Q.    All right.  Well, the same report, Mrs. Robinson could not be interviewed.

A.    Okay.

Q.    This is the day after the murder?

A.    What does that have to do with me?

Q.    That's what I would like to know.  Who knew this information, other than you and Mrs. Robinson, to give the police this information?

A.    No.  No.  I would have never knew anything if I am on the bus with all the rest of the kids.  How would I know to give that information?

Q.    Because you were there.

A.    No, I was not there.

Q.    You saw liquid thrown in his face?

A.    You can smile and laugh at me all --

Q.    No, I am not laughing at all.

A.    I wasn't there.

Q.    You described liquid being thrown in the victim's face.  You described the victim being hit several times with what appeared to be a stick.  You described the victim falling to the sidewalk.  You even described that one of the suspects was actually bent over him --

A.    Like I said --

Q.    -- and shot.

A.    Like I said, all the information was given to me.

Q.    By the police?

A.    It was fed to me.

Q.    On May 20?

100

A.     Because I don't have any knowledge of what went on that day, because I was not at the scene.

You know, just a while ago you gave me some statements from Mr. Loper. I never saw Mr. Loper sitting anywhere because I was never around there.

Q.     So you did say this, though?

A.     No, I didn't.

Q.     Well, let's back up.

You were the young citizen that they are discussing?

A.     That's right. Because they had me Downtown talking to me. Yes, they were. Yes, I am the young citizen.

Q.     And you did tell the police this information?

A.     No, I didn't.

Q.     Well, how is it that they knew this to write this?

A.     I just told you. It was information that was fed to me. That you got to realize they came, I don't know, that particular day and picked me up maybe after I got out of school. I didn't leave from Downtown until like 10:00, 11:00 that night, because my mother was considerably worried about me.

Now, you tell me. Does it take from 10:00, 11:00 at night to do a statement just like that? No.

101

Does it?

Q.    Mr. --

A.    No.  Can you answer my question?  Would it?

THE COURT:    Just a second.

A.    No, because --

THE COURT:    Just a minute.

We got rules.  There is another lawyer who will ask you maybe some other questions to try to, my term, rehabilitate you if necessary, trying to get your story out.  But she is entitled to ask you questions.

THE WITNESS:    I understand.

THE COURT:    All right.

Okay.

Q.    Mr. Vernon, you are saying that you were fed this information by the police.

Is it your memory then that this was the day you were taken Downtown?  You were talking about an interview.

A.    From what I read, then, that would have had to have been the day that I was taken Downtown.

Q.    So that would be the day after the murder?

A.    That would be correct.

Q.    Mr. Vernon, I am going to ask you to look at State's Exhibit No. 4, which is another police

102

report.    I can get a better copy but I can tell you that this police report was made on May 22, 1975. And I have drawn a line across and I am asking if you would please read what is beneath that line.

A.      It says apparent -- I can't read this stuff. It is so vague.  So vague.

Q.      Is this a little easier for you to see?

A.      I will do the best I can.

Q.      Thank you.

MS. McGRATH:        And I am referring to my brief in opposition, your Honor.

A.      It says -- no.  No, I can't read none of this stuff.  It is too blurry.

Q.      Well, I will read it.

At approximately 10:45 p.m. by arrangement met with informant.

THE COURT:        Not too fast.

Q.      And conveyed same to SIU for the purpose of viewing photographs.  The victim could not identify any of the subjects as the suspects he saw while standing in the bus stop, which is directly north of the Fairmont Cut-Rite store.

This informant again repeated the same story as he told us previously, and stated that he would

103

like to help Mr. Robinson but is very scared. He now tells us that one of the males is named Ricky and lives on Arthur Avenue near -- no -- rear house.

With this male in our car he pointed out the home of Ricky to be the rear house, three houses west of 10532 Arthur. He believes Ricky's last name to be Copeland or Jackson.

While making a brief inspection of this address we found two cars parked in the driveway. EG-7287 and Z-23915. EG-7287 belonging to Randal Elliott of 10618 Crestwood, for a '72 Olds, and Z-23915 belonging to John Stanberry, Jr., of 2325 89th Street, for a 1967 Pontiac.

It says "now," but I believe they meant none of these cars fit the description of the car, green, and left the scene with the suspects.

Our informant also says that the other suspect lives at 10611 Arthur, and drives a white Dodge with a black top. In front of this address we find two autos. One being a white Dodge bearing license CC5679.

This informant then observed both suspects south on Petrarca, and at the corner of Frank and Petrarca enter a dark green auto with a light green top. There was also another person in that auto.

This informant -- I am sorry. The auto then turned the corner onto Frank and operated east.

This informant stood around for a few minutes and went home. After some time he returned to the scene, was watching the police. While doing this he observed the same two suspects walking north on the east side of Petrarca. They stood in front of the Fairmont floral store, looked at the scene for a few minutes, walked around the corner onto Fairhill and out of his sight.

This informant definitely stated that he can't identify because he didn't get a look at the faces, and appears to be very scared. We could only get this information after promising the subject that his name would not be used.

We also feel he knows more and will make arrangements to talk with him on our next tour.

So, Mr. Vernon, this would be May 22 you went Downtown with the detectives to view photographs.

A.     Uh-huh.

Q.     Does that sound right?

A.     I can just tell you I just went Downtown to see photographs. I can't give you all the exact dates and times.

Q.     Okay. And at that time you gave the name

Ricky who lives on Arthur Avenue.

A.    I imagine so, yes.

Q.    Do you know if Ricky Jackson lived on Arthur Avenue?

A.    Yes, he did.

Q.    You knew Ricky Jackson and Wiley Bridgeman and Ronnie Bridgeman?

A.    Yes, I did.

Q.    And they all lived in your neighborhood; is that right?

A.    Yes, they do.

Q.    Did Wiley Bridgeman live at 10611 Arthur?

A.    I don't know the address.  All I know, they lived on Arthur.

Q.    Do you know if Wiley Bridgeman had a white Dodge?

A.    No, I don't.

Q.    But you provided this information to the police, according to this police report?

A.    I don't think I told them that he had a white car and all that stuff, no.

Q.    But did you tell them you were standing --

A.    It sounds like when you were reading the report it says they observed cars in front of these houses and they took it down.  I didn't say that I

identified anything.

Q.      Well, I will read it.

        Our informant also says that the other suspect lives at 10611 Arthur and drives a white Dodge with a black top.

        You are saying you didn't tell the police that?

A.      Uh-uh.

Q.      Did you tell them one of the males is named Ricky and lives on Arthur Avenue?

A.      I remember this day.  I told them where they stay.  I didn't tell them anything else.  They had me down in the police car and, you know, riding through the neighborhood, and had me squinch down and everybody in the neighborhood could still see that it was me in the car.  But I still pointed the houses out to them.

Q.      And what did you tell the police?  Why were you pointing the houses out?

A.      Because they wanted to know where they lived at.

Q.      And how did they know who to look for?

A.      Because that's the people that they were looking for, Ricky, Wiley and Ronnie.

Q.      How did they know to look for Ricky, Wiley and

Ronnie?

A.     Because these are the names that was given to me from Tommy Hall.

Q.     And when was that?

A.     The day of the murder.

Q.     Tell us what happened, if you would.

You are saying that Tommy Hall gave you those names. And I believe you testified previously that Tommy Hall went to school with you or was on the bus with you?

A.     I didn't say he was on the bus with me. I said we all went to school together. I didn't give any specification of who was on the bus. I said it was a bunch of kids from the neighborhood. And I said I am not going to try to remember 50 to 60 people's names that were on the bus at that time.

Q.     I am not trying to put words in your mouth.

So you tell us, how did Tommy Hall become involved in this?

A.     All I know is Tommy Hall, after we -- after I got off the bus and I walk up there, and me and some other kids, and by the time we got up there and we were all standing around and, like I said, we seen the man laying on the ground, and by that time the police came up, and by that time it was crowds had

gathered, there was a bunch of people coming and there was a bunch of people around, so we were all setting there, and once they took Mrs. Robinson out of the store, you know, and put the sheet over the white guy that was laying on the ground, and we decided, I decided to go home. And at that time Tommy Hall, I don't know where he came from, I don't know how he got up there, but me and him end up walking back from Petrarca and down Frank Avenue.

Now, I can't say he was on the bus with me because the bus, it is so many kids and we are -- everybody is everywhere. Everybody is playing one another. Nobody is really knowing who is on the bus. So he could have been on the bus, he could have been at home. He could have not went to school that day. I have no idea.

Q. Mr. Vernon, I am going to ask you to take a look at the affidavit that you prepared in this case.

Would you read paragraphs three and four for me, please.

THE COURT: Is that an exhibit?

MS. McGRATH: This was Defendant's Exhibit 2 to their motion for new trial and petition for post conviction relief.

109

I can mark it, your Honor, if you like, as a State's Exhibit.

THE COURT:                Yes.

MS. McGRATH:              I will mark it as State's Hearing Exhibit No. 3.

Q.    Would you read those two paragraphs, please?

A.    It says: On May 19 I rode the school bus home and we could hear gunshots while on the bus. I did not see anything from the bus. We just heard popping noises. I got off the bus with most of the other kids on Cedar. Tommy Hall was on the bus with me that day. He was a couple years older than me.

When I got off the bus, we got off the bus at the same bus stop.

Q.    Does this help you remember whether Tommy Hall was on the bus with you?

A.    Like I just said, there was a bunch of people on the bus, so he could have been on the bus, too. That's all I could say.

Q.    You swore that he was.

A.    I see it.

Q.    Mr. Vernon, I am going to ask you to take a look at another police report. That would be State's Exhibit No. 6 attached to our brief in opposition. And this police report is dated May 25, 1975.

Do you remember what day you looked at the lineup, how many days it was after the murder?

A.    May 25?

Q.    Would you read that portion, please?

A.    I can't read that.  I can look at this and tell you that I don't know what kind of copies that were made but you can't even read them, as far as I am concerned.

Q.    The lineup was conducted by Sergeant White of the detective bureau.  The lineup consisted of seven colored males including Ricky Jackson, colored male, 18, of 10522 Arthur Avenue, and Wiley Bridgeman, colored male, 20, of 10611 Arthur Avenue.

Witness Karen Smith viewed the lineup and was unable to make any picks.  The second witness, Edward Vernon, viewed the lineup and was silent after Sergeant White asked if he recognized any of the males.  Actually, leaving the lineup room Edward Vernon stated that the male standing in number one position he knows as Buddy.  The male in this position was Wiley Bridgeman.  And the male in number seven position was Ricky Jackson.  He stated the reason he remained silent was that he was very afraid of these males.

He further stated that Wiley Bridgeman, Buddy,

was the driver of the auto, a blue Pontiac Bonneville convertible. This auto was parked on Petrarca near Frank Avenue. Ricky Jackson was the male that shot the victim and a colored male by the name of Vincent grabbed the victim's briefcase and ran to the waiting auto. Edward Vernon describes Vincent as a colored male, 18, 19, a little taller than Ricky, and this male lives in the vicinity of Arthur Avenue.

Is that what you told the police, Mr. Vernon?

A.    No.    The part at the beginning where they said that I was scared of them, no, that isn't what I told them.

I said no.    They asked me could I identify anybody, and I said no.    And, like I said, that's when they got mad.    They took me out there after coming down past that room, and then I started -- I said oh, that's Ricky Jackson right there.    And that's all I said was just Ricky Jackson.    I didn't say anything else.

That man took me into that room and started throwing stuff off that desk and banging on it and everything.    And then all the rest of that stuff, no. No.

Q.    The police just made this up?

A.    Yes, ma'am.

112

Q.    And you testified to it in four trials?

A.    Yes, I did.

Q.    And the report states that you were unable to make any picks and you were silent.

You were asked if you recognize any of the males.

Did you recognize them?

A.    Did I recognize them?

Q.    Did you recognize Ricky and Ronnie?

A.    I didn't identify them.

Q.    That's not what I asked you.

Did you recognize them?

A.    I didn't identify them. Ask your new question. I didn't identify them.

Q.    Did you recognize them as someone you know?

A.    I didn't identify them.

Q.    You knew them? Can we agree to that much? You knew them?

A.    If we are going to say that we knew them then we can go back to all the stuff that you just read. Then you know that I knew them from the neighborhood.

Q.    All right. Why didn't you just tell the police I know them from the neighborhood?

A.    They asked me did I see anybody in the lineup that I know, and I said no.

113

Q.      But that wasn't true.

A.      It was true.

Q.      They asked you if you saw anyone in the lineup that you knew, and you knew these guys from the neighborhood.

A.      You know what -- and it is -- I am going to say this, and I don't mean any harm to you, Judge, but you sound just like these prosecutors and these detectives did back then.  You are trying to trip me up with questions, you know, and get me to say things that are not true.

'I am saying it was a lineup.  I was supposed to identify the person that was involved in the crime.  Okay?

I am not stupid, okay?

And I understand you are supposed to ask me questions, but I am tired of you trying to make me look like I am stupid, I am senile, I am crazy, you know. So to know somebody and to identify somebody is two different things.  This is a situation where there is a lineup going on.  So if there is a lineup going on, they asked me to identify.  They didn't say do you know these people.

Q.      Then perhaps I misunderstood.

I believe you just testified that they asked

114

you if you knew anyone.

Why couldn't you simply say --

A.    I said no.  And that's what I meant.  No.  No. I don't know nobody in this lineup participating to this particular crime.

Q.    Okay.  But you did know them?

THE WITNESS:    Do we have to keep going on?

Q.    Okay.  After the lineup -- by the way, did you say that the lineup, when you looked through the room, it was a two-way glass?

A.    Yes, if I remember right.

Q.    And earlier did you testify that Bitsey, who I believe was Ronnie Bridgeman, was also in this lineup?

A.    I believe so.  I believe that's what I said. I am not sure.  All I know is I didn't identify the men in the lineup.  That's all I know.

Q.    But you could have said I know these guys, they are not the ones, and you didn't say that.

A.    There you go again.

Q.    All right.  And State's Exhibit 7, finally, can you identify that, please?

A.    What is that?  What is it?

Q.    Is that the statement that you gave to the

police officers, to the detectives after the lineup?

A.       This is probably the statement that they wrote.   They fed me information.

Q.       Okay.   So from the day after the murder they fed you information as to their investigation?

A.       They sure did.

Q.       All right.   Now, you will agree, though, that the police report says they couldn't speak to Mrs. Robinson on May 20 because she was in the hospital?

A.       That's correct.

Q.       All right.   But they fed you the information about you being in the bus stop?

A.       Uh-huh.

Q.       They told you to say you were in the bus stop?

A.       Uh-huh.

Q.       They told you to say it was two males?

A.       Uh-huh.

Q.       They told you to say Ricky Jackson -- not Ricky Jackson.   You didn't name him at the time.   But that one of the males was actually bent over the victim and shot him twice?

A.       Uh-huh.

Q.       They told you to say all that?

A.       They told me what was going on at the crime scene.   I didn't know anything about any of this

116

stuff because I wasn't there.

Q.    So they actually pretty much shared their entire investigation with you and then wrote in their report our young citizen told us that they threw something in his face?

A.    Right.

Q.    They gave you that information the day after the murder?

A.    Right.  Tell me this, how would I know about battery acid?  I don't know nothing about no battery acid being in a cup and all this kind of stuff.  How did I know that?

Q.    You didn't say that.  You said they threw something in his face.

A.    Exactly.  But this is what they told me, that it was battery acid in a cup.

Q.    But the day after the murder they told you to say to them that I saw two males -- I saw one male bent over the victim, I saw him being robbed, I saw him beating with a stick while I looked through the bus stop?

A.    Yes.

Q.    And they also told you to say that you saw Mrs. Robinson peering through the door window and that she was shot through the window?

117

A.      That is correct.

Q.      They told you to say that, too?

A.      That is correct.  I couldn't have saw Mrs. Robinson because I wasn't in that area.

Q.      Okay.  So that would be May 20, the day after the murder.  They haven't had a chance to interview Mrs. Robinson yet but they share this information, wherever it came from, and tell you you are telling us this and we are going to put it in our report.

A.      Yes.

Q.      Do I have this right?

A.      That's correct.

Q.      Okay.  If I understand this correctly, then, what you are saying is the police gave you every bit of information?

A.      Every bit of information except for the information that I brought to them about that I saw the crime and the names that I gave them.

        As far as anything else, as far as knowing how many people it was and how the man died and how Mrs. Robinson got shot, no.  I was on the school bus so I couldn't have seen any of those things.  Descriptions of a car.  Yeah.

Q.      So just the part about Tommy Hall telling you Bitsey, Ricky and Ronnie?

A.      Yes.

Q.      Everything else the police shared with you --

A.      Everything else was lies.

Q.      And then they wrote it in a report --

A.      They were lies.

Q.      -- saying that you told them?

A.      They were lies.

Q.      It was all lies?

A.      They were lies.

Q.      Mr. Loper was a lie, all the detectives lied, as far as what we just read?

A.      This is a lie, yes it is.  Yes, it is.

Q.      Okay.  Mr. Vernon, I am going to show you what is State's Exhibit 4.

                MS. McGRATH:        Your Honor, I believe that was attached to the brief in opposition to the post conviction motion.

Q.      This is the testimony of Mrs. Robinson.  And I am going to ask you to read portions from a couple pages.

        Would you read the bottom, please, of 241 and then continue on to 242?

A.      This says:  How long were you in intensive care, please?

        Three days.

119

The first surgery was on May 19?

And it says: Yes. I stayed there Tuesday and Wednesday and they took me -- it took me Thursday after lunch, I think, after lunch time over to McDonald Three.

Would that have been on the 22nd of May?

Yes, about the 22nd.

And how long were you at McDonald Three?

I was there for the rest of the three weeks.

Q. Thank you.

Do you remember what day May 19 was, what day of the week it was?

A. I believe it was a Monday.

Q. I am going to refer you to Mrs. Robinson's testimony at page 200.

Would you just read that portion that I blocked out there? Thank you.

A. It says: With my knuckles just like this, what's going on out there. I saw Mr. Franks on the ground and then I happened to look and this man was bending over him. He had a black coat on and it looked like a black cap, and was bending over him when I saw his pocket was turned inside out. But before I could get back, someone shot twice and then I got shot in the neck. And I put my hand -- I put

my hand up like this and I took the lock and locked the lock on the door, kind of a dumb bolt lock.

Q. Mrs. Robinson then, when she was interviewed -- I am sorry -- when she testified was able to say that the man wearing a black coat and a black cap was bending over the victim. He was bent over him. That's what she testified to.

A. Correct.

Q. That's also what you told the police the day after the murder, that the man who did the shooting was bent over the victim.

A. Not correct.

Q. All right. Mrs. Robinson goes on to describe briefly what the men were wearing. Page 228.

Would you just read that blocked out portion, please.

A. And you saw someone stooped over him?

Yes.

Will you describe that person? Will you describe that person to us, please?

He had a black coat, short black coat, and the other part is covered up, and a suit coat like black, and a black cap, and he was dark-brown skinned.

Q. And on page 199, when Mrs. Robinson described the second person, would you read that for us?

121

A.      Sure.

I went to the door and looked out.  At first I looked to the right and I saw a tall person with a light printed flower shirt.

Do you recall what color the shirt was?

It was yellow and orange and red, and I believe some different colors it had in it.  And it did not.  I just glanced at the shirt and turned around, and I looked at the left-hand corner of the glass down on the ground and I saw Mr. Franks lying on the ground, and I -- and I had hit the glass before I had thought.  I hit the door and said what's going on out there.

Q.      Thank you.

A.      You are welcome.

Q.      So what Mrs. Robinson testified to matched what you told the police the day after the murder.  Two males, one male bent over the victim.

A.      What was said, I didn't say that.

Q.      You didn't say that?

A.      No, I didn't.

Q.      Mrs. Robinson also testified, and I will find the page, that something was splashed on the window.  And you had told the police the day after the murder that the two men that you saw threw something at the

victim.

Okay. Page 210. Would you please read what I blocked out? Thank you.

A. It says: It was all over the glass.

Before you were shot, right?

Yes.

All right. This says: Was the substance on the front window before you heard Mr. Franks moaning?

Yes. It was on the glass, then I heard his moan.

Q. Thank you.

Did you think Mrs. Robinson is referring to the liquid that the men splashed, that they threw into the victim's face?

A. I guess. I don't know.

Q. But the day after the murder, before Mrs. Robinson was interviewed, you knew and you told the police someone threw something in the man's face?

A. I didn't know anything. That's what I was told.

Q. So essentially the police created this information, told you --

MR. HOWE: Objection.

THE COURT: Overruled.

Q. -- told you to say that you said it, put it in

123

a report.

THE COURT: Answer a question when it is completed.

Q. The police made this up?

A. Uh-huh.

Q. Put it in a report and essentially said Mr. Vernon, you and we are going to say that this is what you saw?

A. Yes.

Q. Okay. So it was spot-on with what Mrs. Robinson told them days later when she was healthy enough to be interviewed?

A. I don't know. All I know is what was said to me. That's all I can say. I can't speak about what Mrs. Robinson spoke about.

Q. Mr. Vernon, you have told us that you testified at multiple trials as to the events that we were just talking about, that you said were created by the police.

A. Yes.

Q. Okay. And then I believe you testified that you also told Wiley Bridgeman's parole officer that you had witnessed a murder?

A. That's correct.

Q. And somehow Wiley Bridgeman's parole was

124

revoked?

A.    I don't know.  All I know is I called.  I don't know nothing about that.

Q.    Do you know when roughly that was?

A.    I don't know.  I can't give you the exact dates.  All I know is it was around maybe 2005, 2006, something like that.  I am not sure.  I can't give you the exact dates.

Q.    I believe in your first affidavit you said it was in 2006.

How did that first affidavit come about, your handwritten affidavit that was attached to Mr. Jackson's motion for a new trial?

A.    I wrote it.

Q.    And who did you give it to?

A.    I gave it to Sierra on the Innocence Project.

Q.    How did Sierra know to contact you about this?

A.    How did she know how to contact?  She had contacted my pastor.

Q.    Okay.

A.    And I think I already stated that he came to the hospital to talk to me about he had been in contact with the Innocence Project contacted him.

Q.    So how did they know to contact the pastor?  Had you told your pastor about this before?

125

A.     No.  They got in contact with the Scene Magazine.  Scene Magazine and someone in there.  I am going to say this, I am not for sure, it was either the Scene Magazine or either Wiley that asked what church I went to.  And when he found out what church I went to, this is how they got in contact with my pastor.  The Scene Magazine did.

So I don't know how Sierra and them got in contact with him.  I don't know any of that information, because I was in the hospital so I wouldn't know.

Q.     And then your second affidavit, the one that I have marked has No. 3, the one that was typed out, who typed that out for you?

A.     What do you mean?

Q.     Did you type that affidavit?

Who made this?

A.     That affidavit?

Q.     Your affidavit, No. 3.

A.     That was probably, I think that was made by, by the Innocence Project.

Q.     So they met with you, typed this up and you signed off on it?

A.     Yes, I did.

Q.     Do you remember who you met with?

A.      No, I can't remember.  It is like three or four different people I have met with since.

Q.      Just briefly I am going to show you what's marked as State's Hearing Exhibit No. 4.

It reads at the top Adult Parole Authority Revocation Order.

Could you read the name as to who this applies to?

A.      It says Wiley Bridgeman.

Q.      All right.  And can you read the date upon which his parole was violated effective?

A.      I guess it is 6-17-'03.

Q.      So you are off by a few years at least?

A.      Yeah.  But nevertheless, it did happen.

Q.      So up until the point where you told Wiley Bridgeman that you made all this up you hadn't told anyone else?

A.      No.

Q.      Not the police?

A.      No.

Q.      Not the prosecutors, defense attorneys, no one?

A.      No.

Q.      All right.  And you testified that some attorneys came to talk to you, and you said you were

127

not allowed to discuss this?

A.      That's correct.

Q.      When was that?  Was it after the trials were over or was it while the trials were still going on?

A.      That was after the trials were over.

Q.      Did anyone ever after that ask you to talk about it?

A.      What do you mean?  After those --

Q.      Right.  After those attorneys.

A.      After those three times no one but besides Wiley and then the Scene Magazine.  That was it, besides my pastor when they came to me and asked me what are you going to do.  I said I am going to go ahead and tell the truth.

Q.      And when those attorneys came to talk to you the trials were finished?

A.      Yes.

Q.      You still felt you could not speak about this?

A.      Yeah.  That's what I was told by the detectives, that I wasn't to talk to anyone about this case, and if anyone came to me to talk to me about this case to let them know.

Q.      So did you understand that to mean even after the trials were finished you were not allowed to talk about it to anyone?

128

A.    That's correct.

Q.    Did you know that Mr. Jackson was sentenced to the electric chair?

A.    No, I didn't.  See, I don't know anything. All I know is when I was going to court the only thing I did was just came in, testified, went out through the Judge's chamber, and I never seen anybody.  Went back to the hotel and that was it. They would not let me read or be in the courtroom while anything was going on.  I didn't even know -- once the trial was over with, then I wasn't even around for what you would call sentencing.  I was on my way to New Jersey.

Q.    Why did you go to New Jersey?

A.    Well, the neighborhood was kind of mad at me. It was kind of some threats on my life.  So that's why they kept me in a hotel Downtown.  Some death threats.

Q.    Why was the neighborhood mad at you?

A.    Because they knew that I was lying and they knew that Ricky and Buddy and Bitsey didn't do it. And they knew that I was lying.

Q.    Okay.  And you waited 39 years, almost 39 years.  And you stated earlier that these detectives threatened you with perjury at the lineup but you

didn't know what perjury meant. Then why were you afraid?

A. At the time they told me that they were going to send my mother and father to jail. They said you are too young to go to prison. We are going to send your mother and father to jail for perjury. And I was like, I didn't understand, so I didn't want my mother and father to go to jail. And at that time my mother had, well, I didn't know at that time but she had cancer and she was really sick.

Q. Is your mother still alive?

A. No. She died in 1990.

Q. Okay. I am sorry.

A. Uh-huh.

Q. But you came to learn what perjury was?

A. Yeah, I came to learn what perjury was and I was like uh-uh. And every time that I wanted to go forth and come forth and tell the truth, I was like no, I am not trying to go there.

Q. And yet you kept repeating the same story. You told Wiley Bridgeman's parole officer you were a witness for murder.

A. Yes. And that's when I was living the lie that I have been living all these years. So I didn't go forth and say you know, it was a lie back then, I

wasn't a witness to that, no, I didn't do that.

Q.      You waited until Detective Terpay is dead?

A.      No.  I didn't even know none these people were dead.  It wasn't like I kept tabs on people.

And I see where you are going with this.  You are trying to make it seem like I waited until all the detectives and all of the people were dead before I would come forth.  And that's a lie from the pit of hell.

Q.      But it is a fact they passed away --

A.      No, it is not.

Q.      -- and now you are telling your story?

A.      No, it is not.  It is a fact that the fear and a person being scared inside.  All of you people that sit up there and assume and make your expectations of what a person feels inside, but you are not inside of me.  You ain't never had to live like I lived.  So you -- you don't know what I have been through.  And for you to set up here and just say that I waited for somebody to die, when I tried to do the right thing and get out of it, man, yeah.

Q.      But while waiting --

A.      12 years old, 13 years old you have no rights.  You know, you have no rights.  And these people knew what they were doing, now that I look back on my

life.

Q.    Who knew what they were doing?

A.    They knew what they were doing. And I wasn't waiting until the detectives died to decide oh, I am going to come forth now. You can say I have been sitting up thinking about how long it is going to take the detectives to die. How old they were when they arrested me -- I mean, when they arrested these guys and how old I was when I went on trial.

Man, who sits around and thinks about stuff like that? Who in their right mind would just like to, you know, I will sit back and wait. Only thing I thought about was telling the truth.

You don't know how much pain and suffering I have been going through throughout these years. You and nobody else knows. You can ask a thousand questions and it is still not going to free me from the pain and the hurt and the lies that I had to live.

Then when I got -- excuse me, your Honor. When I had to get to New Jersey, they told me I could not tell anybody where I was from. Could you imagine, I am in a whole 'nother town, another state. I can't even tell my family that I live. I couldn't even tell the kids that I was going to school with

who I was, where I came from.

So I looked at the map one day and said -- they said, well, we know you from Cleveland. They said where you from. And I say, in Florida. I am from Cleveland, Florida. I couldn't even tell the people.

These are lies that I had to live. You don't understand what I went through, that these people made me go through. You don't understand this. I have people that I was close to that I couldn't even tell who I was.

I don't trust nobody to the day. I don't trust in relationships. I am going on somewhere that I shouldn't be, but this thing has been emotional, it has separate ties in my relationships with my kids' mothers, with my family, with people. I don't trust people because I don't trust, I don't believe them. I don't believe them. I don't believe them.

This has got me to the point where you say something, I will be like yeah, right, okay, I will see it when I believe it. Because I don't believe. I don't trust. I don't trust.

You set up and you say I wanted to wait until these people died before I came forth. No. That's not the type of person I am. That's not the type of

133

person I was raised to be.

Why would I be, you know, I came up in the era where there was different things going on.  And I know I am going off track, but I have to say this.  I went to school with kids, mothers and fathers who were professors and teachers at Princeton University.  I went to school with different dialects, Chinese, Japanese, and all these kids, and we got along just fine.  And I didn't think about racial discrimination and all this old crazy stuff.  We got along as kids.  These kids, some of them couldn't even speak English, but we know how to play, we know how to have fun.  Wasn't no barriers.

But then I think about this trial and I think about what I went through in Cleveland, Ohio.  And there was some barriers.

And you sit up and you say well, why didn't you go to the prosecutor.  Man, I am 12 years old.  What did I know about going to a prosecutor saying well, they made me do this?  What did I know about going to the Judge?  I am not that smart.  I don't know anything about the legal system.

Q.      So the bottom line is the police made you do this?

A.      Yes.

Q.    Okay?

A.    Yes.

Q.    Mr. Vernon, I am going to show you what has been marked as State's Hearing Exhibit No. 1.  This is a competency report from the Court Psychiatric Clinic.

MR. HOWE:              Your Honor, we are going to enter our objection for the record.

THE COURT:              Let me see it.

THE WITNESS:              What does that have to do with this?  I am so tired.  Oh, Jesus, I am so tired.  Oh, Jesus, got to give me strength.

MR. HOWE:              Your Honor, it might be a time for a break.

THE COURT:              We will break.

Don't talk to anybody, all right?

All right.  We will recess for ten minutes.

(Thereupon, a recess was had.)

THE COURT:              Okay.

MS. McGRATH:              Thank you.

BY MS. McGRATH:

Q.    Mr. Vernon, I am going to show to you what is

135

marked State's Hearing Exhibit No. 1.  It is entitled competency report.

I guess I should back up and ask you, do you have a criminal record, sir?

A.    Yes, I do.  Is that relevant to this case?

Q.    And what were you convicted of?

MR. GODSEY:        Objection.

THE COURT:        Overruled.

A.    Oh, my God.  I am not going to answer.

THE COURT:        I am aware of the record.

MS. McGRATH:        Okay.

Q.    Do you recall speaking to a psychologist as part of one of your convictions at the Court Psychiatric Clinic here in this building?

A.    Probably.  I don't remember.

Q.    Well, I will show you the report.  And it is dated November 17, 1992.

A.    Okay.

Q.    Today.  And I am going to ask you to just take a look at it.  See if you remember making these statements, see if you remember that process.

How old, sir, were you when you were interviewed?

A.    1992, I don't know, 27, 28.  I am not sure.

Q.    How about 30?

I am going to read a portion from page number two.

1975 when the defendant was 13 years old he was a witness to a murder.  He was on his way home from school and saw two men in front of a store and a third man in a car.  A man drove up carrying money and the two men hit the money courier on the head with a stick and threw something in his face.  One of the men then shot the money courier, also shot a store owner.  The store owner lived.

The defendant said he knew these men from the neighborhood and testified against them in court.  Described this as being very traumatic for him because he had thought he had done right, but his neighbors turned against him for testifying.

His parents then sent the defendant -- I think they do mean you.  I am sorry.  It says:  His parents then sent the defendant to live in Princeton, New Jersey because of the stress from the murder trial.  He lived in Princeton, New Jersey from the ages of 14 to 16.  He said he became very depressed when he was in New Jersey.

Does that sound correct, sir?

A.    That sounds about correct.

137

Q.    Did you have some psychiatric issues at that time?

A.    Yes.

Q.    At the time of this report?

A.    Yes.

Q.    What were they?

A.    Suicidal.

Q.    Did you have a drug problem?

A.    At that time, yes.

Q.    And what drug were you using?

A.    Alcohol and cocaine.

Q.    And I am going to ask that you read Impression, and this would be signed by the psychologist.

If it is all right with you, I will simply read from it.

Impression.  Number one, major depression, recurrent with mood congruent psychosis.  Two, post traumatic stress disorder.  Three, cocaine dependence.  And four, cannabis dependence.

Does that sound right, sir?

A.    I guess that's what they wrote.

Q.    So as far as back as when you were 30 you were still telling people the story that you had witnessed a murder?

A.    Uh-huh.

Q.    Did the detectives tell you to say that story at that time?

A.    I just wasn't coming forward telling the truth. That's all.

Q.    But you kept repeating the same story?

A.    Kept repeating the same story, yes, I did.

Q.    And this was the information that was fed to you by the detectives?

A.    Yes, it was.

Q.    Some of the information, the names told to you by Tommy Hall?

A.    Yes.

Q.    So this information that they fed to you, you keep repeating. Did they keep feeding it to you or did you take it from the first time and continued to repeat it?

A.    I just continued to repeat it.

Q.    You had access to a lawyer at this time, didn't you, when you went through the court system?

A.    Yes, I did.

Q.    Had you considered telling your lawyers about what you had done?

A.    No, I didn't.

MS. McGRATH:    Nothing further.

139

Thank you.

THE COURT:    We will recess. Tomorrow morning 8:30.

MS. McGRATH:    Thank you.

THE COURT:    You got to be here.

THE WITNESS:    Okay.

MR. S. AWADALLAH:    Still is no communication with this witness?

THE COURT:    Yes.   Don't talk to anybody about this matter.

THE WITNESS:    Thank you, your Honor.

- - - -

(Proceedings adjourned.)

- - - - -

**TUESDAY MORNING SESSION, NOVEMBER 18, 2014**

THE COURT:          Yes.

MS. McGRATH:          The State would request that Ricky Jackson's PSI be released to this Court for purposes of review.  The PSI was likely prepared in 1975.  I have no idea whether it still exists.

MR. HOWE:          Your Honor, this is the first I have heard of any sort of a request for a PSI.  The hearing for the motion has been pending for over six months.

There are statutes that provide very specific circumstances under which a PSI be released.  This is not under these circumstances.

We would ask that you deny the motion.

THE COURT:          All right.  What I am going to do is order it released to me for an in camera inspection.

MR. HOWE:          Your Honor, would we have a chance to review it and be able to ask Mr. Jackson to explain whatever is in there and research whatever is in there in

141

order to present the case?

I mean, you know, the State has some indication that it is requesting this because of suggestions by the people in this office. They may know what is prepared in there. We have no idea what's in there.

It seems like the defendant would be at a severe disadvantage in that circumstance. The Court would know --

THE COURT:             I am not going put anybody at a disadvantage, but I want to just look at it myself.  I mean, if there is an admission, for instance, by Mr. Jackson that, parenthetically, he has committed some other crime and felt guilty about it, who knows what it would say, it might be admissible.

MS. McGRATH:           Thank you.

MR. HOWE:              We would just ask that if the Court is going to consider it that the defendant also be allowed to fully review it and be allowed to explain any information that's in there and/or use whatever information is in there.

THE COURT:             There is not

going to be any surprises.  But if I look at it and say there is nothing in there, then it is not going to go any further.  But if I use it, you will certainly get a preview of it.

MR. HOWE:          Okay.

THE COURT:          Come on up, Mr. Vernon.

Good morning, Mr. Vernon.

THE WITNESS:          Good morning, your Honor.

THE COURT:          Yes, sir.

- - - -

REDIRECT EXAMINATION OF EDWARD C. VERNON

BY MR. HOWE:

Q.     Mr. Vernon --

MR. GODSEY:          One second.  He has been placed back under oath?

THE COURT:          He is still under oath.

BY MR. HOWE:

Q.     Mr. Vernon, you remember the Court ordered you yesterday not to discuss the case with anyone in between our recess yesterday and this morning.

Have you actually discussed the case with anyone since the recess?

A.      No, I haven't.

Q.      The State yesterday asked you a lot about your statement to the police on the day after the crime. This is May 20.

A.      Yes.

Q.      And you remember that the State kept asking you how you could have possibly given this information to the police on the 20th if the police themselves didn't even know it on the 20th.

        Do you remember those questions?

A.      Yes, I do.

Q.      I would like to turn your attention to police reports dated May 19, 1975.  These were attached to the original motion filed back in March.

A.      Okay.

Q.      I would just like to go through these and see if you can explain some things in these police reports from the day of the crime.

        I will read you a section aloud.  This is from May 19.

        Patrolman Petro, 63, reports two colored male suspects meet leaning against the wall on outside of the building.  The victim walked out of the front door, which is located on the east side of the building.

THE COURT:          Take it slow, please.

MR. HOWE:          Sorry.

Q.     Threw a liquid in his face and then shot him. The suspects then grabbed his attache case and then ran south on Petrarca and then east on Frank, and then the suspects got into an auto and drove east on Frank.  Suspects' auto was a dark green over light green, make and model unknown, Ohio license unknown.

This is the day of the crime.  Did you give police any of that information on the day of the crime?

A.     No, I didn't.

Q.     Okay.  Let's turn to, this is a report by Eugene Terpay, also from the day of the crime, May 19.

THE COURT:          Would you call this Exhibit 3?

MR. HOWE:          Your Honor, this has been attached to the defendant's motion from March, and I believe all of that has been as a joint stipulation.

THE COURT:          Fair enough.

Q.     Down at the bottom of this page it has a detailed description of two suspects.

145

Suspect number one, colored male 17, 18 years old, five foot eight, medium build, et cetera.

Suspect number two, a colored male, 18 to 19 years old, five-eight, thin build, dark brown skin.

Did you give police any of that information on May 19?

A.    No, I didn't.

Q.    It says one of the suspects armed with a revolver, caliber unknown.  Suspects last seen running south and Petrarca, then west on Frank Avenue.  Suspects seen entering a dark green over light green Olds, thought to be a convertible, bearing license number CC-9020.

Did you give police any of this information on May 19, 1975?

A.    No, I didn't.

Q.    Move on.  Beginning at the bottom of the next page.

Also observed what appeared to be a bullet hole in the lower portion of the left door glass.  The suspects apparently fired a shot through the glass and struck the owner's wife in the neck as she came towards the door from behind the counter inside of the store.  Also found a paper cup on the counter.  This cup had been in the hand of one of the suspects.

Same apparently contained a soft drink which had been thrown in the victim's face prior to the shooting.

Did you give police this information on May 19, 1975?

A.    No.  No, I didn't.

Q.    Continuing the follow paragraph.

During our interview of the below-listed witness to this crime learned the following:  The two aforementioned suspects were outside the store --

THE COURT:    Take it easy.

Q.    -- outside the store drinking a soft drink from a cup.  The victim parked his auto and entered the store to pick up any money order business.

Mrs. Anna Robinson, who was present in the store at that time, had not conducted any money order business since the last visit of the victim.

Let's skip ahead.

As the victim was leaving the store a female customer entered and ordered some pork skins.  As she was being waited on the victim left the store and was jumped by two suspects, who appeared to beat him and then shot him and took his brown briefcase previously mentioned.

When the owner's wife heard the shots she started for the door and was shot in the neck, the

suspects shooting through the glass in the door.

Did you give the police any of that information on May 19, 1975?

A.    No, I didn't.

Q.    Just one more page of this report.

Turning to the following, what's marked as 6 on the attachment to the defendant's motion.

In interviewing a Charles Loper, police report states:  Loper, who was seated on his front porch next to the store, saw two colored males accost the victim as he came from the store.  They appeared to beat him with an object, a piece of pipe.  One of the suspects was armed with what appeared to be a .38 caliber revolver.  The suspect fired three shots at the victim and then took a tan-colored briefcase from him and ran south on Petrarca.

THE COURT:    See, I don't have that page.

MR. HOWE:    I am sorry, your Honor.

THE COURT:    I have the bottom where it says Charles Loper, and then it says page five.

MR. HOWE:    It is the following page, your Honor.  I apologize.

THE COURT:    Okay.  Sorry.  Fair enough.

BY MR. HOWE:

Q.    Mr. Vernon, did you give the police any of that information on the day of the crime?

A.    No, I didn't.

THE WITNESS:    Is it possible I can say something, your Honor?

Q.    One moment, Mr. Vernon.  I just want to continue asking you some questions.

So all of the information that the State was asking you about that you gave the police, that you say was fed to you on the 20th, you didn't give them any of that information on the 19th?

A.    No, I didn't.

Q.    You testified that the police were feeding you this information.

A.    Yes, they did.

Q.    So does that mean that they were saying Ed, here is what happened, I would like you to state that back to me and I will write it down in the report?

A.    What they did was, after I told them that I was a witness, that I saw who did it, they begin to give me information, and they were typing, he was typing stuff up on the typewriter.

Q.     Can you give us an example of how they would give you information, Ed?

A.     They asked me, they said that when you saw what happened, did you see who it was, did you see somebody standing out in front of the store, was it two males standing out in front of the store.

       This is the kind of stuff that they were giving me.

Q.     So they were asking you leading questions?

A.     Yes.

Q.     With information contained in the questions?

A.     Yes.

Q.     And that's how you were learning this information on the 20th?

A.     Yes.

Q.     The State also asked you yesterday, had you read into the record an affidavit from a gentleman, who is not here today to be cross-examined, by the name of officer Joseph Pascal.  Do you remember that -- I am sorry.  Paskvan.

A.     Yeah, I remember reading that yesterday.

Q.     And Mr. Paskvan claims that you told him the person involved, when he asked who it was, the male said Bridgeman.  He said Ronnie, and the male looked surprised.  The male said his brother Wiley.

And this is on the day of the crime.

Can you clarify, did you actually give that information to any police officer on the day of the crime?

A.      No.

Q.      You had lots of conversations with the police around this time.  Did they ever explain to you why none of this information made it into the police reports?

A.      No, they didn't.

Q.      In your discussions with the police did you ever learn why Officer Paskvan didn't testify at any of the four trials?

A.      No.  I was 12 years old.  I don't know nothing about all of that.  They kept me -- how can I say?  They kept me from knowing anything but what they wanted me to know.  I wasn't involved in any of the court proceedings, different things that went on.  All I was, I don't want to say I was just kept pacified.

Q.      I understand.

Paskvan, it is pretty clear that he says you said "his brother Wiley."

Now, you testified that you knew Wiley Bridgeman, the person, back in 1975; correct?

151

A.      Uh-huh.

Q.      How did you know him?  I am sorry.  Let me rephrase that.  What name did you know him by?

A.      Buddy.

Q.      At the time of the crime did you know any other name for Wiley Bridgeman?

A.      No.

Q.      Okay?

A.      No.

Q.      Now, you know today who Ronnie Bridgeman is; correct?

A.      Yes.

Q.      And you knew in 1975 who Ronnie Bridgeman the person is; correct?

A.      I know Bitsey.  That's what I know.

Q.      You knew Ronnie Bridgeman as Bitsey?

A.      That's it.

Q.      Did you know his actual name, first and last name?

A.      No.

Q.      Now, yesterday the State also asked you about a competency evaluation as part of a presentence investigation report.

        Do you remember that?

A.      Yes, I do.

152

Q.     The circumstances of this, do you remember, you said you were convicted of a crime; correct?

A.     Yes.

Q.     And before you were sentenced you met with the psychiatrists or a psychologist and said some things to him or her; is that correct?

A.     Yes.

Q.     Did you understand at that point that what you said to that person would determine or have an effect on what sentence you would receive from the judge later?

A.     No.

Q.     So you didn't think that what you said to the psychiatrist would have any effect on whether or not you had to go to jail for that crime?

A.     No.

Q.     Did you think that that was -- did you ever have a thought as to whether that would be an appropriate time for the first time to admit that you lied at three separate trials and put three innocent people in prison?

A.     No, because only thing I said was what I have been saying all along.  I didn't say that they didn't do any crimes or anything.  I didn't say that.

Q.     You mentioned before that you did preparation

153

in connection for each of those trials?

A.     Yes.

Q.     To be clear, as part of that you read trial transcript?

A.     I read only the transcripts that was pertaining to what I said in court.  I wasn't allowed to read any other people's testimonies and different things that went on in this Court.  Only thing they wanted me to remember is what I said when I was on the stand.

Q.     Okay.  So when you were testifying yesterday you had never read Tommy Hall's testimony from Ricky Jackson's original trial?

A.     No.

Q.     You never read that Tommy Hall testified that he was on the school bus with you at the time?

A.     No.

Q.     The school bus up on Cedar?

A.     Right.

Q.     Did you ever read Kim Dixon's testimony back in 1975?

A.     No.

Q.     You weren't aware that Kim Dixon also testified that you were on the school bus with her back in 1975?

A.      No.   Only thing, when I was talking yesterday, that it is a lot of kids, you know what I mean, on the school bus.  And I wasn't allowed to read any other testimonies.  I wasn't even allowed in the courtroom while these people testified.  I was held in the Judge's chamber and then I came out and I testified and I went through the back of the Judge's chamber.

So I was never allowed to be involved around any of the people or anything.  And I wasn't in my neighborhood so I didn't talk to anybody.  I was put up at the hotel Downtown at the Holiday Inn, so I had no contact and information with nobody.  I was just by myself.

Q.      I understand.

But in contrast to those people, the State spent a long time yesterday having you read portions of Charles Loper's testimony into the record.  Do you remember that?

A.      Yes, I do.

Q.      Because Charles Loper testified at Ricky Jackson's trial that he saw you get off the city bus on Fairhill.

A.      Uh-huh.

Q.      Now, you did know Charles Loper at that point;

right?

A.   Yes, I did.

Q.   How well would you say you knew him?

A.   I guess Mr. Loper was, I don't know, I was 12 at that time, so all my life, I knew him all my life up until that point.

Q.   Did he know your family at all?

A.   Yes, he did.

Q.   How would you describe his relationship with the family?

A.   It was good.  He had a daughter named Toni, and Toni and my older sister Darlene, they were best friends.  Then even myself, I was friends with his grandkids, because I would spend the night over there sometimes.  We were a pretty close-knit family.

Q.   So he knew your sisters?

A.   Yeah, he knew my whole family.  He knew my mother, my father.  He knew everybody.  Grandmother. Everybody grew up in the neighborhood.  It is a neighborhood where everybody knew each other.

Q.   Can you tell us, I think you testified yesterday, can you tell us again who Liz Kilgore is?

A.   Yes.  It is my sister.

Q.   Is she older or younger?

A.   That's older than I am.

156

Q.      Now, beside you, Ed, this is very important, does Liz Kilgore have any other younger brothers?

A.      No.

Q.      So you are her only younger brother?

A.      That's right.

Q.      Did Mr. Loper know that you were her only younger brother?

A.      Probably so.  I can't say that he didn't, but I am pretty sure he knew.

Q.      I am going to read from this police report from May 20, 1975.  And this is the police go up to re-interview Charles Loper.  This is the day after the crime, May 20.  The same day that you gave your initial interview to the police.

It says:  At 2196 Fairhill re-interviewed Charles Loper.  He can add nothing more than his original statement.  He did say that his daughter Toni had told him that her friend Liz Kilgore has made remarks that she witnessed the robbery and shooting while getting off the bus.  At the time Liz was supposed to be in the company of her younger brother.  We did not interview these subjects.

So you knew Mr. Loper pretty well.  If he had seen you with his own eyes that day -- I am sorry -- May 19 get off the city bus, can you explain why he

would have given the police a secondhand rumor that he saw through his daughter that his daughter's friend Liz Kilgore might have seen it with her younger brother?

Can you explain why he would have given that information to the police?

A.    No, I don't.  I can't understand it.

Q.    The fact is Mr. Loper did not see you get off the city bus that day, did he?

A.    No, he didn't.

Q.    Why couldn't he have seen you get off the bus that day?

A.    Okay.  Can I get up?

THE COURT:          Sure.

Q.    Let me withdraw and rephrase the question.

Where were you when the shooting happened that day?

A.    On the school bus.

Q.    Okay.

A.    That's it?  It is no way that he could have saw me.  I am going to use this --.

Q.    I understand.

A.    -- as the store is here.  Say the store is here, right here.  So if you come around the corner to the store, the house where Mr. Loper stay, it sits

back here.  Now, you can see a little bit of this part of the store, but you can't see all the way around the corner.

Q.      I think I may have asked you a confusing question.

A.      But I am just saying.

Q.      Is there any way that Mr. Loper could have seen you get off the bus at this location on the day of the crime?

A.      Yeah.  That's a straight shot at the bus stop.

Q.      I mean, did he see you get off the bus on this day?

A.      No.

Q.      Because you were on the school bus?

A.      I was on the school bus.  There you go.

Q.      Did you see Ricky Jackson shoot anyone at all on that day?

A.      No.

Q.      Did you see Ronnie Bridgeman shoot anyone that day?

A.      No.

Q.      Did you see anyone beat Mr. Franks?

A.      No.

Q.      Did you see anyone steal his briefcase?

A.      No.

159

Q.    Did you see anyone throw a cup in his face?

A.    No.

Q.    Did you see anyone escaping in a green car?

A.    No.

MR. HOWE:        No further questions.

               — — — —

RECROSS-EXAMINATION OF EDWARD C. VERNON

BY MS. McGRATH:

Q.    Good morning, Mr. Vernon.

A.    Good morning.

Q.    Going back to yesterday, the May 20 police statement or police report in which the police said they spoke with a young citizen who you said was yourself.  Part of the information in that statement was that you had told the police that the shooter was bent over the victim and shot him twice; is that correct, that that's what the report said?

A.    That's what the report says.

Q.    Did anyone tell the police that information on 5-19?

MR. HOWE:        Objection.

Q.    According to the reports that have just been read to you?

THE COURT:        Overruled.

160

A.      I don't know.

Q.      On May 22 the police interviewed Mrs. Robinson, and at that time the police learned for the first time that the shooter was bent over the victim.

MR. HOWE:               Objection. That's a misstatement of the record.

MS. McGRATH:            I can find it.

MR. HOWE:               For the first time.

MR. GODSEY:             The first time is the misstatement.

MR. HOWE:               The misstatement is that the police learned for the first time. I don't doubt that Mrs. Robinson said that he was bent over.  The objection is to the question stating the fact that that was the first time the police learned that information.

THE COURT:              Overruled.

MS. McGRATH:            Well, I am sure you will correct me if I am wrong, but I have not seen in any of the police reports that information was given that the victim -- sorry -- that the defendant, that man, was bent over the victim and shot him.  And Mrs. Robinson

provided that information on May 22.  And if I may, it was State's Exhibit 4, attached to the brief in opposition to the motion for new trial.

On May 22 interviewed Ms. Anna Robinson.  She heard the shooting, heard the man hollering, started in the direction of the door.  She describes the men, one with a black coat -- I am sorry -- black cap and coat.  The other wore a sports shirt and wasn't that tall.

Mrs. Robinson's testimony at page 228.  I understand you saw Mr. Franks laying on the ground?  Yes.  And you saw someone stooped over him?  Yes.  Will you describe that person to us, please.  He had a black coat, short black -- sorry.  He had on a black coat, short black coat, you know, suit coat, like black and black cap, and he was dark with brown skin.

Q.    Do you have any knowledge from the police reports that have been read to you that anyone told the police at that time that the individual who did the shooting was bent over the victim?

A.    No, I don't.

Q.      Okay.    Now, we talked about you providing the name Ricky to the police according to the reports on the 22nd when you spoke to them at about the time you looked at some photographs.

Do you also recall giving Mr. Robinson the name Ricky?

A.      No, I don't.

Q.      Then if I may read from Mr. Robinson's testimony, which was State's Exhibit No. 7, attached to the brief in opposition for post conviction relief.

I sent for him, asking you, Mr. Vernon, that for the first time I let him relate to me what he had saw.

And do you recall whether or not he indicated to you whether or not he witnessed this particular crime?

Yes.    He told me definitely that he got off the bus there just about when the thing was in procession and he saw Mr. Franks being attacked.

I see.

One fellow threw something out of his pocket he thought into his face, and the other was beating him with a stick or iron pipe and that they knocked him down and one of them took the briefcase and the

other one was down.

Objection.

Sustained.

Sir, did he provide you with the names of any of the parties that might be responsible for this alleged crime?

Ed provided me with one name. First I asked him how old they were, and he said late teenage, 18, 19 years old. And then I asked him did he know? He gave me one name. He gave me a name Ricky.

Ricky?

Yes. At that time it didn't register anything to me at all.

The name Ricky didn't register to you?

No. And then he said he knew the other one, and that he also told me that the car, the one was in the car down the street there and when shooting began he was at the bus stop and he saw them running down the street. And he said that he saw my wife when she came to the door, and when she was shot she fell on the floor or something.

Okay, sir, but he did provide you with one name and that name was Ricky?

Answer, Ricky.

And he indicated ti to you?

164

He said he knew the others but he didn't know their names.

He didn't know their proper names, but he knew them. Did he indicate whether or not he knew where they lived?

Not then, but I think the next conversation I finally asked him again and he told me they lived in a gray house on Arthur.

Did the police tell you to give Mr. Robinson that information?

A.      No, they didn't.

Q.      If you recall, did you tell Mr. Robinson this information before you told the police the name Ricky?

A.      No, I didn't.  I don't remember telling anybody any of that information like that.

Q.      Okay.  And that includes Mr. Robinson?

A.      We talked, I talked to Mr. Robinson, but that was like I didn't give him any names or anything.  He just asked me, because the police had told him that I was the one who saw it.

Q.      Okay.

A.      Okay.  Now, I didn't give him any names.  I didn't give any of that information that is being read right there.

Q.      We agree that's what Mr. Robinson testified to?

A.      I can't agree to it because I wasn't there.

Q.      And do you recall when you first spoke to Mr. Robinson about this?

A.      No, I can't recall.

Q.      And, Mr. Vernon, you are telling us that the police fed all this information to you?

A.      Yes, I did.

Q.      Two black males standing in front of the store throwing something in the victim's face, but that they were posing it to you did you see, is this correct, did you see two black males, did you see something thrown in the face?

        Am I correct in understanding what your testimony was this morning?

A.      That's correct, ma'am.

Q.      How do you know that they were telling you the truth?

A.      I don't know.

Q.      How do you know they weren't testing your knowledge of what you had seen?

A.      I don't know how they were doing anything. All I know is that this is the way that it was presented to me.

Q.     And your testimony today then is that Mr. Loper essentially lied when he testified to seeing you get off the bus?

A.     Yes.

Q.     In front of his home?

A.     Yes.

Q.     And walk to the store and then hearing shots?

A.     Yes.

Q.     All right.  But also we have heard that Mr. Loper's daughter indicated that she had heard that your sister did in fact get off that school bus with her younger brother, but that Mr. Loper did not name you.

A.     My sister couldn't have got off the bus with me because my sister was not even in junior high school.  She was in high school.  So how could she had got off the bus with me?

Q.     I don't know.

A.     I don't know.  But I am just saying, I understand what you are saying, but my sister was born in 1959.  I am born in '62.  So you tell me what grade she was in.  And there is no way that she couldn't have been on the bus with me.

Q.     Looking specifically at information that was repeated and put into a police report.

167

A.      I am just saying, this is what he is saying. I am telling you what I am saying, that I was not on the bus and neither was my sister.

Q.      Could one explanation be Mr. Loper knew who you were, he knew your name, that he simply wasn't going to name out of fear for you, out of protection for a 12 year old who witnessed a murder?

A.      I don't know how all this information came about because all I did was gave my name, telephone number to the police.

Now, what happened after that, I don't know where they got all this information from. I don't know when they talked to Mr. Loper. I don't know how they talked to him. Like I said, I was 12 years old. I wasn't thinking about who the police was talking to and everything else. I have gone on about my normal everyday life as a kid.

Q.      All right. In the police report that we discussed this morning and yesterday from May 20, when the police make the report that they located a young citizen, you, who gave his information two males attacked the victim, the information in the report was that the young citizen told the police that he observed this from the bus shelter.

And I am happy to show it to you.

168

At the same time the other fired into the glass door, and from his position in the bus shelter he could see Mrs. Anna Robinson get struck with this shot.

In the prior police reports that Mr. Howe read to you was there any report of a witness peering around the bus shelter watching this happen?

A.    No, it wasn't.

Q.    All right.  And in your subsequent testimony in the trials you did testify that, did you not, that after you heard the shot, the first one or two shots, you ran and hid in the bus shelter and peeked out to watch the remainder of this?

A.    That's what was fed to me, told to me.

Q.    So the police created the story that you ran to the bus shelter and peeked out and watched this occur from the bus shelter?

A.    I was on the school bus so I couldn't have seen anything.  Couldn't have been in the bus shelter.

Q.    But the police made that fact up, that information up, is that what you are saying?

A.    All of this information, like I just said, was typed up and written and it was fed to me.  And only thing I did was follow along and agree to it.  I was

not there, nowhere near all of this stuff.  I was on the bus, like I said, along with other kids that heard the same shots that I heard.

Q.    Okay.  We talked about the lineup yesterday, and you stated you were asked whether you could identify someone, anyone in the lineup which you understood to be connected to the murder, and that you shook your head.

A.    I said no.

Q.    After that you made a written statement detailing --

A.    No.  They made a written statement.

Q.    They made a written statement.

A.    I didn't write anything.

Q.    All right.  There was no middle ground at that time, Mr. Vernon?

A.    What do you mean?

Q.    Could you have not said, and I understand that you were 12, I understand, but did you realize at the time that what you were signing was saying that details, Ricky Jackson was the shooter, Wiley Bridgeman drove the get-away car, Ronnie Bridgeman was also there and he is the one that was tugging at the briefcase, that's what your statement said?

A.    That's what they wrote up.  Like I said,

170

before the lineup I did not pick them out and I didn't want to go on to proceed with what was going on.  Especially my mother, she was really behind me about telling the truth.  She said just don't identify them in the lineup and they will let them go.

She was too sick to even come and be around me.  And I truly believe that if they would have let my mother proceed and come with me down to the court that we wouldn't be sitting here today.  But they kept telling my mother oh, no, he will be fine, we will bring him back.  We know he got school tomorrow, we will bring him back about 8:00 or so, but we need to take him away.  But my mother always said I need to go with my son.  Oh, no, he would be all right, we will take care of him.

Q.    Well, despite what your mother said, you did end up identifying them, and not only identifying them but put it in a written statement that Mr. Jackson was actually the shooter?

A.    I did not identify him.  I did not identify.  Show me where I identified, where in the lineup that I identified them?  Where?

Q.    I think it was pretty well-established yesterday that when you were asked if you could

identify anyone, you shook your head.

A.    And I said no.

Q.    And that afterward --

A.    You asked a question.  You said well, does that mean that you didn't know them?  See, you are trying to twist this thing up.  And I said knowing and identifying is two different things.  And I said when they asked me to identify them in there, I said no.  Okay.  So that should have been that.

You asked me another question to well, didn't you know them?  What does knowing them and identifying them have anything to do with the lineup?

I didn't identify them in the lineup, therefore, they should have been released.  That's what I have learned is that they should have been released.  I didn't identify them.

No one says well, do you know them?  No.

They said do you recognize anyone in this lineup that was involved in this crime?  And I shook my head no.  No.

Q.    All right.  Thereafter you signed a written statement stating that Ricky Jackson was the actual shooter?

A.    They said they was going to fix it, and I guess that was their way of fixing it.  Okay?

172

Q.      Did you understand at the time the importance of what you were saying, though?

A.      No, I didn't.

Q.      Was there no middle ground?  If you are saying that you didn't identify them, what was to stop you from saying I know who I am seeing but those are not the men who committed the murder, or I know who I am seeing, Mr. Jackson and Wiley Bridgeman, but Tommy Hall gave me those names, I didn't see this?

A.      Okay.  12 years old and you really think that my mind was really subject to think like that?

I am not these kids that they have nowadays where you have all of this information and everything and you are taught well.  I come up in a poor community.  You think I am sitting around in my mind saying well, you know what, maybe I can think this way.  No.  Come on, lady.

Q.      But you are telling us now that that was the truth?

A.      I am telling you that it was a lie.  And I am telling you that what was done was done because they wrote all of this stuff up and they said they would fix it.  I didn't say I would fix it.  They said they will fix it, because I guess they knew because I didn't identify these people.

173

You making it seem like I have all of this logic and this education, that I am so smart that I can justify these things out at 12 years old.

Yeah.  Yeah.  Yeah, I was really that smart, yeah.  Yeah.  Oh, Jesus, I am tired.

MS. McGRATH:  May I have one second, your Honor?

THE COURT:  Was this covered in redirect?

MS. McGRATH:  No.

MR. HOWE:  No, your Honor. Your Honor, this is outside the scope of redirect certainly.  And, your Honor, we have had multiple hours worth of testimony from this witness.

THE COURT:  I just asked a question was it covered.

MS. McGRATH:  Well, it is covered to the extent, your Honor, that Mr. Vernon has testified that he told the story and told the story, and that the police were feeding this information to him.

What I am showing Mr. Howe is an exhibit that was introduced at the trial, and it is the defense investigator's notes of a

statement that he took from Mr. Vernon in July of '75, and Mr. Vernon's father was present and they both signed off on it.

MR. S. AWADALLAH:    It is his statement.

THE COURT:    It is his statement or a statement of the interpretation of an investigator?

MR. GODSEY:    These were the notes of the investigator.

MR. S. AWADALLAH:    No.  It is the note, my name is Edward Vernon, and it is a statement signed off by them.  It was introduced as a trial exhibit.

THE COURT:    I understand. We have been going in circles here, I understand that.

MS. McGRATH:    Okay.  May I?

THE COURT:    No.

MS. McGRATH:    It is part of the record, your Honor, the original record, so we ask that that be considered.

THE COURT:    I just wish this would have been brought up earlier.  I mean, how far back do you go?  I understand the

interest of fairness with everybody here.

His father was there when the statement was taken?

MR. S. AWADALLAH:    Yes.

MS. McGRATH:    Yes.  His father was James Cannon, and he also signed off on his statement.

THE COURT:    What was the date on that?

MS. McGRATH:    That is July 11, 1975.  And actually, you know, we have asked to introduce the entire trial transcript, and this defense investigator did testify at trial about this statement.  It was attached as an exhibit and admitted.

THE COURT:    It was admitted?

MS. McGRATH:    If I remember correctly, Mr. Vernon did testify to giving this statement.

MR. HOWE:    Your Honor, the problem is not that it is not admissible.  We agree that it is part of the record.

The problem is that it is outside the scope of redirect.

THE COURT:    In a case like

this I will stretch it.  You can ask him.

MS. McGRATH:          Thank you, your Honor.

BY MS. McGRATH:

Q.     Mr. Vernon, I am going to show you what's already been marked State's Exhibit 5.

Do you remember giving a statement to a defense investigator?

A.     No.

Q.     Okay.  Do you remember the defense investigator coming to speak with you, and I believe the testimony from trial is that you and your father in July of 1975 spoke to this investigator while you sat in his car and he wrote up a statement as you provided him information.

A.     Spoke to him in the car?

Q.     Spoke to him in a car.  And that you provided information to this investigator, and you and your father both signed off on every page.

Do you recall that?

A.     If I did, I don't recall me doing all of this because, like I said, some things that I don't understand.  And even if my father was there, this is something that --

THE COURT:          Hold it.  Let's

just see if you recognize it.

Q. Would you look at that and tell me if you recognize your fathers's signature and your signature as well?

A. I didn't know what my father's signature was. That's my signature, yes, it is.

Q. And, I am sorry, what was your father's name?

A. You just read it. James Cannon.

Q. All right. Mr. Vernon, you provided some information that you lived with your parents, James Cannon and your mother.

The statement also states that on May 19, 1975, about 3:45 p.m., you got off the number 50 bus directly in front of the Robinsons' Fairmont Cut-Rite store.

A. Uh-huh.

Q. This is information that you are giving to a defense investigator?

A. This is information that, now that I remember, it is the same thing, it is the same information that was given to me by the police. So yes, I am saying the same thing over and over and over again. Okay? So yes, I did sign that. That's my signature. And my father, I guess, was present because his signature is there.

So the information that you have on there is the same thing that was written in those statements that you just read. It is the same information.

Q.     Okay.

A.     So did I write it? No, I didn't. But it is the information that was given, because they told me to stick to my story.

Q.     Was there a police officer sitting with you in this car?

A.     I don't remember if it was a police officer sitting there. I don't know.

Q.     All right. But you told the investigator:

There is no question in my mind that I saw the shooting and that Ricky Jackson did all the shooting of Mr. Franks and Mrs. Robinson.

When the police took me Downtown I didn't want to tell him it was Ricky Jackson who did the shooting right away. I could have told them about Ricky Jackson, but I didn't tell them until later. I was worried and scared and afraid to tell anyone about Ricky Jackson doing the shooting of Mr. Franks, but the police told me that if I didn't identify the men they would be free and on the streets to rob and kill again.

I have known Ricky Jackson a long time. I

179

have had trouble with him near my home.  He came to me on the street with a gun as a result of some street fight.  I wasn't part of the street fight but my dad took the pistol away from him.

I am positive Ricky Jackson killed Mr. Franks on May 19, 1975 in front of Robinson Fairmont Cut-Rite store.  I am positive Ricky Jackson shot Mrs. Robinson on the same day during the robbery and murder of Mr. Franks.

But you recall that now, sir, yes?

A.    All I can say is that that was written back then.  I don't know anything about Ricky Jackson, the trouble with him and all this stuff.

Here is another part of your statement laying up here, too.

Q.    Did the police also feed you the information that you encountered Mr. Jackson in the neighborhood at one point and that he had a gun, and did they tell you then to tell this investigator --

A.    No.  All that stuff is just made up.

Q.    . Just making it up as you go along?

A.    That's right.

Q.    That's right.  Okay.

MS. McGRATH:        I have nothing further.  Thank you.

180

MR. HOWE:                    I will be very brief, your Honor.

- - - -

FURTHER REDIRECT EXAMINATION OF EDWARD C. VERNON

BY MR. HOWE:

Q.      Mr. Vernon, the State asked you how it is that you could have possibly known, among all the other details that you knew the police knew on the 19th, how you could have known that the person was bent over when the shots were fired because, as the State read, those words don't exist in the 19th police report.  But you are aware that there were police on the scene at the actual crime scene on that day?

A.      Yes, there were.

Q.      And you see on, this is the May 19 report of Detective Terpay, labeled two of five going over to three of five, they also observed what could be a bullet hole in the lower portion of the left door glass.  So a bullet hole in the lower portion of the left door glass.  And you understood that Mrs. Robinson was shot in the neck.

A.      Uh-huh.

Q.      So could the police have inferred from a bullet hole in the lower portion of the glass and Mrs. Robinson being shot in the neck that someone was

bent over while shooting?  Is that possible?

A.      I don't know.

Q.      Okay.  Just briefly going back to Mr. Loper and what he told the police the day after the crime.

The State asked you if it is possible that Mr. Loper was just looking out for you when he didn't give your name.  But if he had seen you getting off the city bus he didn't have to give your name to say that he was getting off the city bus.

Let me rephrase that.

Can you think of how it would protect you for Mr. Loper to make up a thirdhand rumor from his daughter, that his daughter had heard that Liz Kilgore was with you when you seen the crime, if he had actually seen it himself?

A.      No, I don't.  I don't understand.

MR. S. AWADALLAH:      Could you repeat that question?  I am sorry.  No.  Thank you.

I am sorry.

Q.      The State also mentioned that you told police that you ended up telling the police you were at this bus shelter when you saw the shots?

A.      Uh-huh.  But I was actually on the bus.

Q.      And so when police are asking you, when they are first talking to you, they are asking you where

you were, I assume, when you saw the shots; correct?

A.  Yes.

Q.  So they were asking were you five feet away, were you ten feet away, questions like that, leading questions, giving you information?

A.  Yes.

Q.  Is it possible they asked you if you were in the bus shelter nearby?

A.  Yes, they did.

Q.  The State referred to a pretty detailed statement that you gave on the 25th.  This is after the lineup, after you refused and after the detectives told you they would fix it, they screamed at you.  You did give a detailed statement.

Do you remember giving a detail that as you were walking -- let me start from the beginning.

On Monday, May 19, about 3:50 I was getting off the bus at Fairhill and Petrarca.  I seen two guys, Ricky and Vincent, they were on the side of the store, they were waiting.

THE COURT:            Slow down.

MR. HOWE:             Sorry.

Q.  A white guy got out of his car and was walking towards the store.  When he got up to the guys, Vincent threw pop in his face.

A.      Uh-huh.

Q.      Do you remember whether the police gave you the detail that the victim was getting out of his car when he was attacked?

A.      All I remember them saying is that he was -- in other words, they told me that they said that he was getting out of the car.  That's what they said. And they said did he get out of the car?  When you saw him get out of the car?  Yeah, I saw him get out of the car, yeah, yeah.

        So everything, like I just said, was pretty much led onto what was being said, because I couldn't have seen anything because I wasn't there.  I am going to just stick with that because I wasn't there.

Q.      Okay.  The State just showed you a six-page long handwritten report?

A.      Uh-huh.

Q.      I won't read all of that into the record.  It is already in as part of the record.

        Do you remember that that was used in Ricky Jackson's trial to impeach your story of what happened?

A.      No.

Q.      Because of all the inconsistencies in it?

A.      No.  See --

THE COURT:        Okay. You answered.

MR. HOWE:        No further questions.

MS. McGRATH:        I have one question.

- - - -

<u>FURTHER RECROSS-EXAMINATION OF EDWARD C. VERNON</u>

<u>BY MS. McGRATH:</u>

Q.      Mr. Vernon, in the May 20 statement to the police, according to the report you told them that the shooter was actually bent over the victim.  And Mr. Howe has asked you, if the shooter was bent over the victim wouldn't that have resulted in Mrs. Robinson being shot in the neck through the glass based upon a bullet hole in the glass.

        Can you tell me, was this, was the door to the Cut-Rite a glass door or a wooden door, if you remember?

A.      I can remember the store.  The store has a -- it had a door.  The bottom part of the door was wood. This part up here was glass.

Q.      Okay.  And at least according to what the police wrote, Mrs. Robinson was peering out the window, kind of rapping on the door, at least that's

185

what she testified to, to say kind of what's going on out there.  Then she was shot in the neck through that glass window.

The shooter of the murder victim, if he was bent over, could not have been bending over at the time he shot Mrs. Robinson, could he?

A.    I don't know.  I wasn't there.

Q.    Okay.  Thank you.

THE COURT:        You can step down.  Watch your step.

Off the record.

(Discussion had off the record.)

(Thereupon, a recess was had.)

MR. S. AWADALLAH:    Your Honor, at this time the State, for the purposes of this hearing, is going to call Mr. Thomas Hall.

THE COURT:        Mr. Hall.

- - - -

The **STATE OF OHIO/RESPONDENT**, to maintain the issues on its part to be maintained, called as a witness, THOMAS E. HALL, who, being first duly sworn, was examined and testified as follows: