PRELIMINARY REPORT OF MAYOR'S CRIME COMMISSION

CREATED March 15, 1974

WITH RECOMMENDATIONS

June 4, 1974

---

### NOTE TO THE READER

The paper in this volume is brittle or the inner margins are extremely narrow.

We have bound or rebound the volume utilizing the best means possible.

### PLEASE HANDLE WITH CARE

GENERAL BOOKBINDING CO., CHESTERLAND, OHIO

EXHIBIT 40

CLE001105

RECOMMENDATIONS - A PLAN FOR ACTION

The Cleveland Crime Commission is conducting a thorough review of pertinent materials associated with current trends in investigating police corruption and preliminarily concludes that a long-term investigation of corruption in the Cleveland Division of Police, such as conducted by the Knapp Commission over a period of a year and a half, will only delay the inevitable departmental reforms which can have the greatest impact in eliminating corruption and misconduct.

Indictments and convictions of police officers over the years lead to the inevitable conclusion that corrupt practices have taken place within the Divisions of Police, here and throughout the Nation. The only question that might be answered by a Commission Investigation is the extent or magnitude of the corruption or misconduct. We believe that such a criminal investigation of these practices primarily rests in, and should continue to be a function of the Cuyahoga County Prosecutor's Office and the Cuyahoga County Grand Jury.

However, the Commission does recognize that there are strategies which we hope will eliminate police corruption. These strategies deal with the fundamental organizational and administrative control mechanisms which can be adopted either to insure corruption does not take place or to produce desired changes. The Commission believes that reform in certain structural areas would produce both immediate and long term results and benefits in the operations of the Cleveland Police Department. Thus, it is with confidence in the ability of the institutions of this City to respond to needed change that the Commission presents this first set of recommendations.

The Cleveland Crime Commission is conducting its inquiry in such a way as to focus on the basic structural, organizational and procedural issues associated with the delivery of public safety services to the citizens of the City.

1

As of this date, the Commission is prepared to make the following recommendations:

I.  Eliminate the present Department of Public Safety and vest its functional responsibilities into two separate organizational entities.

A.  Establishment of a Department of Police

Throughout the past fifty years, numerous studies have been conducted dealing with the organizational structure of Cleveland's Department of Public Safety. Beginning in 1914, the newly established Cleveland Foundation undertook, as its initial community action effort, a survey of criminal justice in Cleveland. Directed by the distinguished legal scholars, Roscoe Pound and Felix Frankfurter, the report concluded that the City could best be served by the creation of a separate Department of Police. Each study since has concluded that the Safety Department's basic organization is inherently deficient and produces, consequently, divided authority, responsibility and direction in the provision of police services to the citizens of Cleveland. Today, fifty-two years after the initial analysis was completed, its recommendations are still unheeded.

The Cleveland Crime Commission feels that the establishment of a Department of Police as an individual organizational entity will provide the mechanism for establishing a direct line of responsibility which would emanate from a single chief executive down through the entire structure of the Department. In that manner, needed reforms in a broad range of administrative areas could be accomplished and improvement of the operational efficiency and effectiveness of the Department would result.

B.  The Department of Police be placed in the charge of a single administrative executive, to be titled Director of Police.

The Director of Police should be appointed by the Mayor and be granted full

2

responsibility for administering the Department of Police.  Included in this responsibility would be the exclusive right to name his own immediate assistants, including the chief, who would be charged with supervising the day-to-day operations of the Department of Police.

Vested in the position of Director of Police would be the authority to develop departmental policies, procedures and rules as well as the authority for the assignment of all departmental personnel and the authority to suspend personnel for misconduct.

The Director of Police would be a functioning, identifiable, accountable member of the City Administration as a member of the Mayor's cabinet.  He should be aggressive and willing to utilize both his formal authority and his influence in making the Cleveland Police Department responsive to his direction and the needs of the citizens of Cleveland.  He would be charged with making public stands on issues where his expertise is relevant.  He should be required to introduce effective techniques of personnel management while being forceful in the execution of his responsibilities in the area of invoking the disciplinary process.  The Commission is presently considering the question of whether assured tenure should be offered to the new Director of Police.

The establishment of the position of Director of Police would solidify the presently diffused executive responsibility for the Police Department's Operations. It would establish lines of responsibility and accountability and would foster the changes necessary to correct the structural, organizational and procedural sources that can lead to police corruption and misconduct.  Most importantly, it would create the institutional conditions necessary to provide the citizens of Cleveland with the highest possible quality of police service.

CLE001108

The Mayor alone bears the awesome responsibility of selecting the first Director of Police.  The importance of this selection cannot be overemphasized. The major ingredient to meaningful, long-term improvement of the Cleveland Police Department will be the person who serves as Cleveland's first Director of Police. The Mayor must be certain in his selection that the individual possesses the requisite characteristics of high integrity and criminal justice experience needed to carry out his duties.

C.     The Office of the Director of Police should be supported with adequate staff to assist the Director in developing strategies to deal with issues involving all aspects of the police function.

Special attention should be focused on providing quality staff assistance in the critical areas of policy development and of professional standards.  Among the first tasks to be initiated by the first Director of Police should be a thorough analysis of the Police Department's strengths and weaknesses in the following areas:

1.     Organizational Competency and Integrity - to include the issues of:

      1.    Corruption

      2.    Discipline

      3.    Policies and Procedures

      4.    Professionalism

      5.    Training

      6.    Personnel development

      7.    Delegation of decision-making

      8.    Planning

2.     The Department's External Relationships - to include the issues of:

      1.    Internal secrecy

      2.    Public relations

4

3.    Community Relations

4.    Relations with other City departments

3.    Organizational Effectiveness - to include the issues of:

1.    Motivation

2.    Creativeness

3.    Responsiveness to Change

4.    Organizational flexibility

5.    Leadership

6.    Community Awareness

7.    Use of Outside resources

8.    Use of Civilians

9.    Use of Technology

Appropriate staff support should be provided to conduct this thorough analysis and in correcting any deficiencies which become apparent as a result. The Commission suggests that Federal support be sought in staffing the Office of the Director of Police to assure that the needed highly qualified, professional individuals will be available to support the reforms initiated by the first Director of Police.

The Commission believes that the Director of Police should immediately direct the development of departmental policies, procedures and rules consistent with the values of accountability, responsiveness, openness and innovation. Departmental procedures and rules have not been revised in nearly one-quarter of a century despite the overwhelming changes in society and the police functions which have taken place in that period of time.   The Director of Police should develop policy and procedure in all areas which would improve the operational efficiency of the Department.   These policies should be integrated into the Department's training program and should be communicated to the public.

5

CLE001110

D.    The Director of Police should establish a Division of Professional Standards within the Office of the Director.

The Division of Professional Standards should include attorneys and an investigative staff to investigate complaints of police corruption and brutality.  The Division should operate under procedures developed by the Director of Police and would interface with the established institution of the judicial process (i. e., Cuyahoga County Common Pleas Court Grand Jury) when the investigations reveal evidence of wrongdoing.  This Division could be patterned after the Office of Professional Standards recently established within the Chicago Police Department (see Appendix "J")

E.    The Commission recommends that all positions above the rank of Captain be declassified from Civil Service control and appointed by the Director of Police.

In addition to providing the Director of Police with an adequate professional staff, the Commission feels that he should be supported with command personnel which will vigorously support his leadership.  It is only through the establishment of a command support team that meaningful change will take place in the Cleveland Police Department.

Declassification would provide the new Director of Police with the ability to select command officers who accept the philosophy of accountability and who will demonstrate a commitment to the policies and direction initiated by the Director. Declassification would also provide the promotional incentive for police personnel throughout the ranks of the Department to provide high quality law enforcement services to the citizens of Cleveland.  In addition, we are presently considering further declassification to include the rank of Captain and below.

CLE001111

F.  <u>The Commission further recommends that the Department of Police establish</u> <u>a policy of mandatory retirement at no more than age 65.</u>

Without question, the changing demands of police service require the infusion of younger officers into the ranks of the Cleveland Police Department.  Much of the day-to-day performance of police duties requires a young man's stamina and endurance. The Commission feels that with the improved package of benefits available to retiring police officers and the needs of the private security industry in this area, officers reaching the mandatory retirement age will be better able to lead fulfilling lives during the years of their retirement.

The Commission also recommends that the Office of the Director of Police be charged with studying the possibility of the voluntary retirement of officers from the Police Department predicated on a combination of age, rank and years of service. The Director of Police's staff should prepare a report on the feasibility of implementing a plan for voluntary retirement after 25 years of police service.

II.  <u>ESTABLISHMENT OF A DEPARTMENT OF FIRE AND TRADES</u>

While the Commission has been primarily concerned with improvement within the present Division of Police, we are of the opinion that the present organizational structure of the Department of Public Safety similarly hampers the Division of Fire in carrying out sound management practices and insuring accountability.

The Commission feels that the establishment of a Department of Fire and Trades would present an organizational environment consistent with the principles of responsive administrative control, similar to that called for in the Department of Police, to achieve the objective of more efficient departmental operations.

Traditionally, and by City Ordinance, the maintenance of public safety facilities has been a responsibility of the Division of Fire.  Under the Commission's suggested

7

reorganization, a Division of Trades under the direction of a Commissioner would be established within the Department of Fire and Trades to continue to provide these services, perhaps on a broadened City-wide basis.

The delivery of fire services would continue to be the responsibility of the Division of Fire. This Division of the Department of Fire and Trades would be administered by a Chief of Fire who would be appointed by the newly created position of Director of Fire and Trades. Thus, the position of Fire Chief would be removed from Civil Service control and direct accountability to the Director would be assured so that the Director's policies and direction will be followed by his primary command officer. The Chief of the Division of Fire would be responsible to the Director of Fire and Trades for the day-to-day supervision of the Division's Operations.

Further, as recommended for the Department of Police, it is recommended that all Battalion Chiefs be declassified to insure that proper accountability can be maintained. Similarly, the Department of Fire and Trades should establish a policy of mandatory retirement at no more than age 65.

The Director would be appointed by the Mayor and should be mandated by the Mayor to develop new operational procedures which would result in the improvement of fire and emergency services to the citizens of Cleveland. One suggested area for improvement of services would be to transfer the present police ambulance service to the Division of Fire and utilize present fire stations as bases for a City-wide ambulance service.

Responsibilities for the operations of the Division of Traffic Engineering and Parking Lots (currently under the supervision of the Department of Public Safety) would be transferred to the Department of Public Properties. Operational responsibility for the Dog Pound would be transferred to the Department of Health

CLE001113

and Welfare.

## CONCLUSION:

It is believed that implementation of these recommendations will provide the framework for viable changes in structure, organization and processes which will result in a Police Department and Fire and Trades Department which are more accountable and responsive to the needs of the citizens of Cleveland and will insure that corruption and misconduct will not take place.

9

APPENDICES

CLE001115

Appendices

Report of Cleveland Crime Commission
With Recommendations

Table of Contents

Item A        Mayoral Press Release -- March 21, 1974.

Item B        Recommendations to the Cleveland Little Hoover Commission
              regarding Police Department organization and management.

Item C        Summary and Principal Recommendations of the Knapp
              Commission Report.

Item D        "The Knapp Commission and You, " a two-part article
              reprinted from The Police Chief Magazine of November, 1972
              and January, 1973.

Item E        Confidential Memorandum from Bruce Newman to Lee Howley
              regarding Organizing Public Safety in Cleveland, September 2,
              1970.

Item F        Memorandum from Mayor Ralph J. Perk to Safety Director
              James Carney and Chief Gerald Rademaker regarding
              Police Protection for the Citizens of Cleveland, October 5,
              1972.

Item G        Standards for the Performance of the Urban Police Function
              established by the American Bar Association.

Item H        Organizational Chart of the Cleveland Police Department --
              April 23, 1973.

Item I        "The Study of Official Corruption, " by David Burnham,
              reprinted from Quest For Justice:  A Report of the Commission
              on a National Institute of Justice.

Item J        Article from the Chicago Tribune of May 28, 1974, describing
              the establishment of an Office of Professional Standards
              by the Superintendent of Police of the City of Chicago.

Item K        "Detente at City Hall, " an editorial from the Cleveland
              Press of May 29, 1974.

Item L        "Grand Jury Blasts Police Laxity, " article from the
              Cleveland Plain Dealer of May 31, 1974.

Item M        "Jury Finds Lax Enforcement, " an editorial from the
              Cleveland Plain Dealer of May 31, 1974.

Appendices

Report of Cleveland Crime Commission
With Recommendations

Table of Contents
Page 2
(Continued)

Item N        Complete text of Cuyahoga County Grand Jury Report
             regarding alleged police misconduct

CLE001117



# City of Cleveland

RALPH J. PERK
MAYOR

March 21, 1974

FOR IMMEDIATE RELEASE

Mayor Ralph J. Perk of Cleveland today announced that he is pleased that the United States Department of Justice, Law Enforcement Assistance Administration has indicated a strong interest in providing the City of Cleveland with Federal crime control funds that will finance the work of a blue ribbon Mayor's Commission which will examine possible misconduct in various departments of City government, giving first priority to the Safety Divisions. In addition, the Mayor's Commission will focus on public lack of confidence in criminal justice.

Mayor Perk said he met today with LEAA Administrator Donald E. Santarelli and with Deputy Administrator Charles R. Work and was assured by them that their agency will process the City's proposed application promptly when they receive it. He said his staff will begin preparing that application over the weekend and he hopes to submit it to LEAA by April 1st. The Federal funds will enable the Mayor's Commission to hire staff so that it may function in a highly effective manner independent of any outside influences.

Mayor Perk said: "The Commission will be charged with gathering data on the conduct of City employees, evaluating it, and making recommendations

CLE001118

2.

to me regarding standards that should be set for all such public agencies on matters ranging from personnel conduct to agency procedures, matters which frequently have a bearing upon personal integrity and ways to safeguard against corruption.  LEAA has required that the strictest confidentiality be observed by this Mayor's Commission as a condition of the grant until the final report is submitted.  This Blue Ribbon Commission which already is composed of the five clergymen whom I appointed last week to examine possible misconduct of City employees will be extended to nine members by Monday.  The new members will be laymen."

Mayor Perk noted that the appointment of the clergymen to the Mayor's Commission conforms to the 1973 recommendations of the National Advisory Commission on Criminal Justice Standards and Goals as reported in its Task Force Report on Community Crime Prevention:

"Religious organizations regularly respond to crises in our society . . . . " and the Commission described the way churches, synagogues and other religious groups aid during natural disasters or other emergencies.  And the Commission then said:  "The term 'crisis' can also be used to describe the nature and extent of crime in American society today.  Like the crises created by natural disasters, the problem of crime calls for immediate, mobilized response by large segments of

3

the community. No one expects the religious community singlehandedly to assume the responsibility for crime prevention, but the spiritual centers of the Nation can become part of a massive new effort to reduce and prevent crime."

Another hallmarked recommendation of the Commission was as follows: "Religious institutions [should] use their influence and credibility in the larger community to create a climate of trust and furnish a neutral setting for expanded communication on crime and criminal justice."

Mayor Perk said, "I agree with that wholeheartedly. I believe that these stated standards and goals clearly support the appointment of members of the clergy I made just a week ago."

"The LEAA has told me that funding the Mayor's Commission will be based on my guarantee that the LEAA funds will not involve or conflict with normal criminal investigative work and processes of the Grand Jury. I have given that assurance. LEAA has also requested a guarantee that the same police investigators who normally service the Grand Jury must of necessity service the Mayor's Commission to prevent any duplication of responsibilities and to insure absolute confidentiality in the workings of the blue ribbon Mayor's Commission."

"Further, I have assured the LEAA that this Commission will scrutinize the broad issues of the public's lack of confidence in the entire criminal justice system which is an LEAA priority project nationally."

"Lack of such confidence is frequently directly related very closely to the suspicion or the knowledge that corruption exists in some agencies. I am determined that the City of Cleveland will examine all phases of this problem thoroughly and will stamp out corruption wherever it exists."

CLE001120

DIAL 324-3400 AREA CODE 312 · CABLE ADDRESS: PASHQ

# PUBLIC ADMINISTRATION SERVICE

1313 EAST SIXTIETH STREET · CHICAGO, ILLINOIS · 60637

November 7, 1966

Cleveland Little Hoover Commission
Bulkley Building
Cleveland, Ohio 44115

Gentlemen:

We are pleased to submit herewith our report, <u>Police
Services in Cleveland, Ohio</u>. It was prepared in keeping
with our proposal of May 24, 1966, as accepted on
June 8, 1966 by letter from Mr. Dorward C. Witzke, Executive
Director, Cleveland Little Hoover Commission.

The study was done under the direction of Dr. George D. Eastman,
of our senior staff, who also had major responsibility for
preparation of the report. Basic field work was done by
Frederic W. Keithley, of our regular staff, who was assisted at
various times by Jerry E. Berg, Dewey L. Bryant, James E.
Enright, James L. Fyke, Theodore Sitkoff, and Ronald E. Zechman,
all members of our regular staff, and by Robert Earhart,
Sergeant, Michigan State Police; John P. Finnerty, Deputy
Commissioner, Nassau County (New York) Police Department;
Manuel Mike, Multnomah County (Oregon) Sheriff's Department;
B. Earle Roberts, Professor, Kent State University; Edward Ryan,
Lieutenant, Cranston, Rhode Island Police Department, and
Gordon H. Sheehe, Director, Center for Traffic Safety, Michigan
State University, all special consultants to Public Administra-
tion Service.

We wish to express our appreciation for the cooperation extended
to us by the Cleveland Police Division and by the Cleveland
Little Hoover Commission.

Very truly yours,

*G. M. Morris*

G. M. Morris
Field Services Director

CLE001121

## Organization and Management

Faulty organization and management are basic factors in the problems of the Cleveland Police Division and exist at each level of the divisional structure. As a consequence, conditions susceptible of control through proper organization and management have developed over the years that are inimical to the best interests of the division and the community.

The division's formal organization violates sound organizational concepts in many respects. It is further confused by informal arrangements, power centers, and unusual lines of communications which make the apparent structure of organization virtually meaningless. The latter, presented in Chart 1 (taken from the most recent annual report) is inaccurate in several respects e.g., several units are not identified, and some actual command relationships are not shown.

Minor organizational changes have occurred in recent years, but there have been no basic revisions to correct major faults and weaknesses. For example, one captain has 11 lieutenants reporting to him, many with dissimilar responsibilities and representing a span of control which precludes effective supervision. Inappropriate functions are found in several bureaus; related functions are diffused among multiple divisional elements and there is a lack of uniform policies and procedures, common objectives, coordination, and control. New activities have apparently resulted in new units without adequate consideration to functional consolidation. For example, the task force was created as a bureau rather than, more properly, as a division of the patrol bureau.

Perhaps the division can best be described as a loose federation. Such an organization precludes effective leadership, and encourages tendencies to build small empires, and to create sinecure positions. It promotes reluctance to require competent

CLE001122

performance from subordinate officers and wasteful use of sworn personnel for office and clerical assignments. For example, more than 40 per cent of personnel in one large investigative unit is so assigned and only a few of these have more than nominal responsibilities in relation to their basic work. Misuse and non-use of personnel and other resources seriously mitigate against effective operations. Yet, no realistic efforts are being made to correct this defect and even some persons in intrinsically important positions apparently neither do not intend to accept their management responsibilities fully, nor to perform nor require performance at reasonable levels of efficiency and effectiveness.

The management process of planning is conspicuously absent. Aside from the problem of lack of adequate statistical bases for some planning, as in crime analysis, there is no sense of urgency about planning for the solution of even obviously critical problems.

The management process of directing is but little exercised by many commanders and effective field supervision is virtually non-existent. Some of the commanding officers interviewed could not fully define their own responsibilities, let alone those of subordinate elements or personnel.

The management process of controlling is little exercised in any meaningful sense, because the concept is not recognized, its significance is not appreciated and the administrative processes that make control possible are not present.

No great improvement can be made in Cleveland's police service unless organization and management are brought to higher standards. The division's greatest resource is its personnel who alone can provide the improved service the community needs. Even heavy expenditures for capital improvements, materiel, and salaries will be non-productive without sound organization and management of the personnel resources.

CLE001123

The problems of police and community relations are so critical in Cleveland that they warrant immediate and serious attention leading to the adoption of new concepts, policies, programs, and procedures. Yet, the division stands aloof from very serious community problems, and it has no real program directed toward the analysis of these problems, nor for their solution. Training in police and community relations is not offered in sufficient depth or extent. The division itself is segregated; Negro and other officers do not receive common assignments, and Negro officers are largely restricted to predominantly Negro areas. No serious effort is made to establish community rapport. No tactical or strategical plans have been devised. Neglect of the latter is emphasized by failure even to hold command critiques following serious community incidents.

CLE001124

Commission to Investigate Allegations of Police Corruption
and the City's Anti-Corruption Procedures

# COMMISSION REPORT

(With Summary and Principal Recommendations,
Issued August 3, 1972)

WHITMAN KNAPP
Chairman

JOSEPH MONSERRAT
JOHN E. SPRIZZO
FRANKLIN A. THOMAS
CYRUS R. VANCE

MICHAEL F. ARMSTRONG
Chief Counsel

DECEMBER 26, 1972

CLE001125

# SUMMARY AND PRINCIPAL RECOMMENDATIONS
### (Issued August 3, 1972)

CLE001126

I

# PREFACE

### *The Commission's Mandate*

The Commission was established in May, 1970 by Executive Order of Mayor John V. Lindsay. The Mayor acted upon the recommendation of an interdepartmental committee he had appointed in response to an article appearing in *The New York Times* on April 25 which charged widespread police corruption and official laxity in dealing with such corruption.

We were given the basic tasks of determining the extent and nature of police corruption in the City, examining existing procedures for dealing with corruption, and recommending changes and improvements in those procedures.

Commissioner Leary resigned in August, 1970 and was replaced in October by Commissioner Patrick V. Murphy. Almost immediately, Commissioner Murphy announced—and began to carry into effect—an intention to make sweeping changes in departmental procedures for dealing with corruption. This development had an important effect on the nature of our task. The extent and nature of corruption still had to be determined, but suggesting changes in procedures for dealing with corruption was reduced in importance. It became more important to make our findings on patterns of corruption clear to the public, so that the public would encourage the new Commissioner in his announced intentions of reform, and would support him in putting them into effect.

The ability to carry out our mandate was enhanced by the nature of our appointment. Our authority was derived from the Mayor who, as the City's chief executive officer, is ultimately responsible for the conduct of the Department we were called upon to investigate. This

CLE001127

II

was the first time—in this or perhaps any other city—that the official ultimately responsible for a police department's conduct had authorized public investigation of allegations of police corruption.

The fact that the Mayor appointed us encouraged cooperation between the Department and us. This did not mean that serious differences did not arise between our Commission and the Department but, as the investigation progressed, cooperation became increasingly real and fruitful. While it is too early to say to what extent our investigation will help to bring about permanent changes in the Department, it may well turn out that any such change will result in part from the cooperation that has existed between us.

CLE001128

# SUMMARY

### *The Extent of Police Corruption*

We found corruption to be widespread. It took various forms depending upon the activity involved, appearing at its most sophisticated among plainclothesmen assigned to enforcing gambling laws. In the five plainclothes divisions where our investigations were concentrated we found a strikingly standardized pattern of corruption. Plainclothesmen, participating in what is known in police parlance as a "pad," collected regular bi-weekly or monthly payments amounting to as much as $3,500 from each of the gambling establishments in the area under their jurisdiction, and divided the take in equal shares. The monthly share per man (called the "nut") ranged from $300 and $400 in midtown Manhattan to $1,500 in Harlem. When supervisors were involved they received a share and a half. A newly assigned plainclothesman was not entitled to his share for about two months, while he was checked out for reliability, but the earnings lost by the delay were made up to him in the form of two months' severance pay when he left the division.

Evidence before us led us to the conclusion that the same pattern existed in the remaining divisions which we did not investigate in depth. This conclusion was confirmed by events occurring before and after the period of our investigation. Prior to the Commission's existence, exposures by former plainclothesman Frank Serpico had led to indictments or departmental charges against nineteen plainclothesmen in a Bronx division for involvement in a pad where the nut was $800. After our public hearings had been completed, an investigation conducted by the Kings County District Attorney and the Department's Internal Affairs Division—which investigation neither the Commission nor its staff had even known about—resulted in indictments and charges against thirty-seven Brooklyn plainclothesmen who had participated in a pad with a nut of $1,200. The manner of operation of the pad involved

2

in each of these situations was in every detail identical to that described at the Commission hearings, and in each almost every plainclothesman in the division, including supervisory lieutenants, was implicated.

Corruption in narcotics enforcement lacked the organization of the gambling pads, but individual payments—known as "scores"—were commonly received and could be staggering in amount. Our investigation, a concurrent probe by the State Investigation Commission and prosecutions by Federal and local authorities all revealed a pattern whereby corrupt officers customarily collected scores in substantial amounts from narcotics violators. These scores were either kept by the individual officer or shared with a partner and, perhaps, a superior officer. They ranged from minor shakedowns to payments of many thousands of dollars, the largest narcotics payoff uncovered in our investigation having been $80,000. According to information developed by the S.I.C. and in recent Federal investigations, the size of this score was by no means unique.

Corruption among detectives assigned to general investigative duties also took the form of shakedowns of individual targets of opportunity. Although these scores were not in the huge amounts found in narcotics, they not infrequently came to several thousand dollars.

Uniformed patrolmen assigned to street duties were not found to receive money on nearly so grand or organized a scale, but the large number of small payments they received present an equally serious if less dramatic problem. Uniformed patrolmen, particularly those assigned to radio patrol cars, participated in gambling pads more modest in size than those received by plainclothes units and received regular payments from construction sites, bars, grocery stores and other business establishments. These payments were usually made on a regular basis to sector car patrolmen and on a haphazard basis to others. While individual payments to uniformed men were small, mostly under $20, they were often so numerous as to add substantially to a patrolman's

CLE001130

3

income.  Other less regular payments to uniformed patrolmen included those made by after-hours bars, bottle clubs, tow trucks, motorists, cab drivers, parking lots, prostitutes and defendants wanting to fix their cases in court.  Another practice found to be widespread was the payment of gratuities by policemen to other policemen to expedite normal police procedures or to gain favorable assignments.

Sergeants and lieutenants who were so inclined participated in the same kind of corruption as the men they supervised.  In addition, some sergeants had their own pads from which patrolmen were excluded.

Although the Commission was unable to develop hard evidence establishing that officers above the rank of lieutenant received payoffs, considerable circumstantial evidence and some testimony so indicated.  Most often when a superior officer is corrupt, he uses a patrolman as his "bagman" who collects for him and keeps a percentage of the take.  Because the bagman may keep the money for himself, although he claims to be collecting for his superior, it is extremely difficult to determine with any accuracy when the superior actually is involved.

Of course, not all policemen are corrupt.  If we are to exclude such petty infractions as free meals, an appreciable number do not engage in any corrupt activities.  Yet, with extremely rare exceptions, even those who themselves engage in no corrupt activities are involved in corruption in the sense that they take no steps to prevent what they know or suspect to be going on about them.

It must be made clear that—in a little over a year with a staff having as few as two and never more than twelve field investigators— we did not examine every precinct in the Department.  Our conclusion that corruption is widespread throughout the Department is based on the fact that information supplied to us by hundreds of sources within and without the Department was consistently borne out by specific observations made in areas we were able to investigate in detail.

CLE001131

4

### The Nature and Significance of Police Corruption

Corruption, although widespread, is by no means uniform in degree. Corrupt policemen have been described as falling into two basic categories: "meat-eaters" and "grass-eaters." As the names might suggest, the meat-eaters are those policemen who, like Patrolman William Phillips who testified at our hearings, aggressively misuse their police powers for personal gain. The grass-eaters simply accept the payoffs that the happenstances of police work throw their way. Although the meat-eaters get the huge payoffs that make the headlines, they represent a small percentage of all corrupt policemen. The truth is, the vast majority of policemen on the take don't deal in huge amounts of graft.

And yet, grass-eaters are the heart of the problem. Their great numbers tend to make corruption "respectable." They also tend to encourage the code of silence that brands anyone who exposes corruption a traitor. At the time our investigation began, any policeman violating the code did so at his peril. The result was described in our interim report: "The rookie who comes into the Department is faced with the situation where it is easier for him to become corrupt than to remain honest."

More importantly, although meat-eaters can and have been individually induced to make their peace with society, the grass-eaters may be more easily reformed. We believe that, given proper leadership and support, many police who have slipped into corruption would exchange their illicit income for the satisfaction of belonging to a corruption-free Department in which they could take genuine pride.

The problem of corruption is neither new, nor confined to the police. Reports of prior investigations into police corruption, testimony taken by the Commission, and opinions of informed persons both within and without the Department make it abundantly clear that police corruption has been a problem for many years. Investigations

CLE001132

5

have occurred on the average of once in twenty years since before the turn of the century, and yet conditions exposed by one investigation seem substantially unchanged when the next one makes its report. This doesn't mean that the police have a monopoly on corruption. On the contrary, in every area where police corruption exists it is paralleled by corruption in other agencies of government, in industry and labor, and in the professions.

Our own mandate was limited solely to the police. There are sound reasons for such a special concern with police corruption. The police have a unique place in our society. The policeman is expected to "uphold the law" and "keep the peace." He is charged with everything from traffic control to riot control. He is expected to protect our lives and our property. As a result, society gives him special powers and prerogatives, which include the right and obligation to bear arms, along with the authority to take away our liberty by arresting us.

Symbolically, his role is even greater. For most people, the policeman is the law. To them, the law is administered by the patrolman on the beat and the captain in the station house. Little wonder that the public becomes aroused and alarmed when the police are charged with corruption or are shown to be corrupt.

### Departmental Attitudes Towards Police Corruption

Although this special concern is justified, public preoccupation with police corruption as opposed to corruption in other agencies of government inevitably seems unfair to the policeman. He believes that he is unjustly blamed for the results of corruption in other parts of the criminal justice system. This sense of unfairness intensifies the sense of isolation and hostility to which the nature of police work inevitably gives rise.

Feelings of isolation and hostility are experienced by policemen not just in New York, but everywhere. To understand these feelings

CLE001133

6

one must appreciate an important characteristic of any metropolitan police department, namely an extremely intense group loyalty. When properly understood, this group loyalty can be used in the fight against corruption. If misunderstood or ignored, it can undermine anti-corruption activities.

Pressures that give rise to this group loyalty include the danger to which policemen are constantly exposed and the hostility they encounter from society at large. Everyone agrees that a policeman's life is a dangerous one, and that his safety, not to mention his life, can depend on his ability to rely on a fellow officer in a moment of crisis. It is less generally realized that the policeman works in a sea of hostility. This is true, not only in high crime areas, but throughout the City. Nobody, whether a burglar or a Sunday motorist, likes to have his activities interfered with. As a result, most citizens, at one time or another, regard the police with varying degrees of hostility. The policeman feels, and naturally often returns, this hostility.

Two principal characteristics emerge from this group loyalty: suspicion and hostility directed at any outside interference with the Department, and an intense desire to be proud of the Department. This mixture of hostility and pride has created what the Commission has found to be the most serious roadblock to a rational attack upon police corruption: a stubborn refusal at all levels of the Department to acknowledge that a serious problem exists.

The interaction of stubbornness, hostility and pride has given rise to the so-called "rotten-apple" theory. According to this theory, which bordered on official Department doctrine, any policeman found to be corrupt must promply be denounced as a rotten apple in an otherwise clean barrel. It must never be admitted that his individual corruption may be symptomatic of underlying disease.

This doctrine was bottomed on two basic premises: First, the morale of the Department requires that there be no official recogni-

7

tion of corruption, even though practically all members of the Department know it is in truth extensive; second, the Department's public image and effectiveness require official denial of this truth.

The rotten-apple doctrine has in many ways been a basic obstacle to meaningful reform. To begin with, it reinforced and gave respectability to the code of silence. The official view that the Department's image and morale forbade public disclosure of the extent of corruption inhibited any officer who wished to disclose corruption and justified any who preferred to remain silent. The doctrine also made difficult, if not impossible, any meaningful attempt at managerial reform. A high command unwilling to acknowledge that the problem of corruption is extensive cannot very well argue that drastic changes are necessary to deal with that problem. Thus neither the Mayor's Office nor the Police Department took adequate steps to see that such changes were made when the need for them was indicated by the charges made by Officers Frank Serpico and David Durk in 1968. This was demonstrated in the Commission's second set of public hearings in December 1971.

Finally, the doctrine made impossible the use of one of the most effective techniques for dealing with any entrenched criminal activity, namely persuading a participant to help provide evidence against his partners in crime. If a corrupt policeman is merely an isolated rotten apple, no reason can be given for not exposing him the minute he is discovered. If, on the other hand, it is acknowledged that a corrupt officer is only one part of an apparatus of corruption, common sense dictates that every effort should be made to enlist the offender's aid in providing the evidence to destroy the apparatus.

### The Commission's Actions

The Commission examined and rejected the premises upon which the rotten-apple doctrine rested. We concluded that there was no justification for fearing that public acknowledgment of the extent of corruption would damage the image and effectiveness of the Depart-

CLE001135

8

ment.  We are convinced that instead of damaging its image a realistic attitude toward corruption could only enhance the Department's credibility.  The conditions described in the Commission's public hearings came as no surprise to the large numbers of City residents who had experienced them for years.  If, then, the Department makes it a point to acknowledge corrupt conditions the public already knows to exist, it can hardly damage its image.  On the contrary, it can only promote confidence in the Department's good-faith desire to deal with those conditions.

The Commission looked at the question of morale in much the same way.  We did not—and do not—believe that the morale of the average policeman is enhanced by a commanding officer who insists on denying facts that the policeman knows to be true.  We believed —and continue to believe—that such false denials can only undercut the policeman's confidence in his commander.  If a policeman listens to his commander solemnly deny the existence of an obvious corrupt situation, the policeman can draw only one of two conclusions: Either the commander is hopelessly naive or he is content to let the corruption continue.

Once we had rejected the premises of the rotten-apple doctrine, the Commission determined to employ one of the techniques that adherence to the doctrine had made impossible, namely to persuade formerly corrupt police officers to work with us in providing evidence of continuing corruption.

The mere decision to use the technique did not automatically produce a body of officers able and eager to assist us in this manner.  Indeed, knowledgeable persons assured us that the code of silence was so strong that we would never find a corrupt officer who could be persuaded to assist in exposing corruption.  We ultimately did persuade four officers, including Detective Robert L. Leuci and Patrolmen William Phillips, Edward Droge and Alfonso Jannotta to undertake undercover work.  Of these, all but Detective Leuci did so under

CLE001136

9

the compulsion of having been caught by Commission investigators. Patrolmen Phillips and Droge testified at public hearings held in October 1971. Patrolman Jannotta was unavailable due to illness at the time of the hearings. The information disclosed by Detective Leuci was so vital that we did not, since our time was limited, feel justified in keeping it to ourselves. Leuci and the Commission staff members who had debriefed him and worked with him on his initial undercover operations were turned over to the Federal Government for the long-term investigation which was required. Leuci's work as a Federal undercover agent is now resulting in the series of important narcotics-related indictments being obtained by United States Attorney Whitney North Seymour, Jr.

Success in persuading these officers to assist in the investigation was a first step in demonstrating that the rotten-apple doctrine was invalid. Patrolman Phillips' three days of testimony about systematic corruption in various parts of the Department, corroborated by tape-recorded conversations with many police officers and others, was in itself enough to make the doctrine seem untenable. Patrolman Droge described how departmental pressures gradually converted an idealistic rookie into an increasingly bold finder of bribes and payoffs. Former Patrolman Waverly Logan, who volunteered to testify about corruption in which he had been involved, corroborated Droge's testimony and went on to tell about policemen in Harlem who received monthly as much as $3,000 each in narcotics graft. Patrolman Logan also introduced the Commission to two addicts who were willing to work with us in obtaining evidence to corroborate these assertions. The Commission's work with these addicts produced movies and recorded conversations of policemen selling narcotics. Some of the narcotics were paid for with merchandise the policemen believed to be stolen. Captain Daniel McGowan, a police officer of unquestioned integrity and experienced in anti-corruption work, testified that the picture of corruption presented by Patrolmen Phillips, Droge and Logan was an accurate one. In addition, there was testimony from, among others, a Harlem gambler,

CLE001137

10

Commission agents describing their investigations, and witnesses in the business community revealing corrupt police dealings with the hotel and construction industries. Recorded conversations and movies documented instances of police corruption, including gambling and narcotics payoffs, fixing court cases and shaking down a tow-truck operator. The cumulative effect of these two weeks of testimony made it not only unrealistic but absurd for anyone thereafter to adhere to the rotten-apple doctrine, either publicly or privately.

The doctrine did not die easily. Institutional pressures within the Department seemed to force the high command to continue giving lip service to the doctrine even when speaking out against corruption. Commissioner Murphy in his early statements about corruption regularly included a pointed statement indicating that the corruption in the Department was limited to a few officers. On one occasion he went so far as to imply that there were no more than about 300 corrupt police officers in the entire Department. After Patrolman Phillips had completed two of his three days of testimony at our public hearings, Commissioner Murphy found it necessary to discount his testimony of widespread corruption, referring to him as a "rogue cop."

However, one week later, after Phillips had completed his testimony and had been followed by Patrolmen Logan and Droge and others, the Department, speaking through First Deputy Commissioner William H. T. Smith, forthrightly rejected the rotten-apple doctrine by name. Smith defined it as standing for the proposition that "police departments are essentially free of corruption except for the presence of a few corrupt officers who have managed to slip into police service and also into key assignments such as gambling investigations, despite rigorously applied screening procedures designed to keep them out." He said that traditional police strategy had been to react defensively whenever a scandal arose by "promising to crack down on graft, to go after the 'rogue cops,' to get rid of 'rotten apples.' " Smith said the Department now rejected this approach "not just on principle,

11

but because as a way of controlling corruption it had utterly failed.''
He acknowledged that the result of adherence to the theory had been
a breakdown in public confidence: ''. . . they [the public] are sick of
'bobbing for rotten apples' in the police barrel. They want an en-
tirely new barrel that will never again become contaminated.''

### Changing Departmental Attitudes

The public hearings, in addition to helping bring about official
abandonment of the rotten-apple doctrine, have had dramatic effect
on the way members of the Department discuss corruption. This change
was graphically described shortly after our hearings by former Assist-
ant Chief Inspector Sidney C. Cooper in colorful language: ''Not very
long ago we talked about corruption with all the enthusiasm of a group
of little old ladies talking about venereal disease. Now there is a little
more open discussion about combatting graft as if it were a public
health problem.'' In short, the first barrier to a realistic look at cor-
ruption has been overcome: The problem has been officially, and
unofficially, acknowledged.

Some time after the public hearings were over, it was revealed
that Detective Leuci had been doing undercover work for the Federal
Government for over a year and a half, and that he had been doing it
with both the knowledge and protection of the Department's high com-
mand. News also began to spread throughout the Department that
other formerly corrupt policemen were doing undercover work for the
Department's Internal Affairs Division and for at least one District
Attorney's office. These revelations had considerable impact, both
direct and indirect, upon attitudes toward corruption within the
Department.

To put the direct impact in proper perspective, it should be
pointed out that any criminal activity, within a police department or
elsewhere, cannot thrive unless all of its participants are able to main-
tain confidence in each other. Patrolman Phillips' testimony made

CLE001139

12

this very clear.  In testifying about his own corrupt activities, he described how he could, by making a few telephone calls within five or ten minutes, "check out" the reliability of any other officer whose assistance he might require in a corrupt enterprise.  By way of illustration, he described instances where he had been similarly checked out while doing undercover work for the Commission.  This ability to check out, and rely upon, an officer with whom one has had no previous contact rested on the assumption—unchallenged before the advent of our Commission—that no police officer who had once become involved in corruption could ever be persuaded to disclose the corruption of others.  The actions of Detective Leuci and Patrolmen Phillips and Droge and of others as yet unnamed who are presently working undercover have undermined this assumption.

Even more important was the indirect effect produced by general knowledge that the undercover activities of these formerly corrupt policemen had been known to—and protected by—the Department's high command.  Traditionally, the rank and file have shown a deep cynicism, well justified by history, concerning pronouncements of new police commissioners.  They carefully examine the new commissioner's every word and action, searching for "messages":  Does he mean business?  Can he stand up against institutional pressures?

The initial lack of clarity in Commissioner Murphy's statements on the rotten-apple theory and his "rogue cop" reaction to the first widely publicized defiance of the code of silence were interpreted by some as suggesting a lack of commitment to total war on corruption.  However, the Department's final repudiation of the doctrine, and the general knowledge that the Department was using and protecting policemen who had agreed to do undercover work, gave reassurance to the doubters.

In short, we believe that the Department's recent reactions to the Commission's activities have promoted realistic self-criticism within

13

the Department. This spirit of self-criticism is an encouraging sign. For one thing, it is becoming less unusual for police officers to report evidence of police corruption. If this tendency continues, the day may be approaching when the rookie coming into the Department will not be pressured toward corruption, but can count on finding support for his desire to remain honest.

The present situation is quite like that existing at the close of previous investigations. A considerable momentum for reform has been generated, but not enough time has elapsed to reverse attitudes that have been solidifying for many years in the minds of both the public and the police.

After previous investigations, the momentum was allowed to evaporate.

The question now is: Will history repeat itself? Or does society finally realize that police corruption is a problem that must be dealt with and not just talked about once every twenty years?

Both immediate and long-term actions are mandatory. The reforms already initiated within the Department must be completed and expanded; there must be changes, both legislative and administrative, to curb pressures toward police corruption and to facilitate its control; and the momentum generated by the events before and during the life of this Commission must be maintained.

## A PLAN FOR IMMEDIATE ACTION

We are convinced that there is an immediate need for a supplement to the agencies currently charged with combatting police corruption.

A basic weakness in the present approaches to the problem of police corruption is that all agencies regularly involved with the problem rely primarily on policemen to do their investigative work. The

CLE001141

14

Department relies exclusively on its own members.  The District Attorneys in the five counties and the Department of Investigation, although they have a few non-police investigators, depend primarily upon policemen to conduct investigations.  In the case of the District Attorneys, there is the additional problem that they work so closely with policemen that the public tends to look upon them—and indeed they seem to look upon themselves—as allies of the Department.

At the present time a citizen wishing to complain about a policeman knows that his complaint will ultimately be investigated by other policemen.  This discourages complaints, because many New Yorkers just don't trust policemen to investigate each other.

We saw much evidence of this distrust.  Many people—sometimes represented by experienced lawyers—brought the Commission evidence of serious corruption which they said they would not have disclosed to the police or to a District Attorney or to the City's Department of Investigation.  Even today, complainants who call the Commission and are told that the investigation has ended often refuse to take down the phone numbers of these agencies.  It makes no difference whether or not this distrust is justified.  The harsh reality is that it exists.

This distrust is not confined to members of the public.  Many policemen came to us with valuable information which they consented to give us only upon our assurance that we would not disclose their identities to the Department or to any District Attorney.

Any proposal for dealing with corruption must therefore provide a place where policemen as well as the public can come with confidence and without fear of retaliation.  Any office designed to achieve this must be staffed by persons wholly unconnected with the Police Department or any other agency that routinely deals with it.  Our experience is illustrative.  Our investigative staff was wholly drawn from non-police sources.  Four investigators were lent to us by the Bureau of Internal Revenue, one by the Bureau of Narcotics and

CLE001142

15

Dangerous Drugs, and one by the Post Office Department. We also obtained the services of ex-members of the FBI, of Army Intelligence and of the Immigration Service. A new office could be similarly staffed.

Further, any proposed office must have jurisdiction going beyond the Police Department. In recent months there have been numerous accusations of corruption among prosecutors, lawyers, and judges. There is need for a public demonstration that society is genuinely committed to a war on corruption and is not simply indulging in a foray against the police. An office is therefore needed where everyone —including the policeman—can go with a corruption complaint against anyone involved in the criminal process. A City agency is inadequate to this task since prosecutors and judges are not all subject to City jurisdiction.

Any new office must also have authority to prosecute corruption cases in order to insure its independence of the agencies which may come under its scrutiny. This does not mean that it may not cooperate with local or Federal authorities as the Commission did with good results. There should, however, be independent access to grand juries and the right to issue subpoenas and grant immunity. In addition, there must be City-wide jurisdiction. Corruption patterns do not stop at county lines, and jurisdictional niceties have often severely hampered corruption investigations. Moreover, District Attorneys' offices are reluctant to encroach upon each other's jurisdictions, much less investigate each other's personnel.

Finally, there is a need for an office that can be established immediately, without the delays that would be inevitable should implementing legislation be required.

To meet these needs, we recommend that the Governor, acting with the Attorney General pursuant to §63 of the Executive Law, appoint a Special Deputy Attorney General with jurisdiction in the five counties of the City and authority to investigate and prosecute all crimes involving corruption in the criminal process.

The powers of such Deputy Attorney Generals are traditional and well established. They include the power to use the grand jury and employ all investigative techniques incident to grand jury proceedings. They also include the power to suggest grand jury presentments and make other public reports.

The proposed Special Deputy Attorney General should use these powers to the widest extent. While he should provide a well-publicized channel for the reception of complaints, his activities should not be complaint oriented. He should concentrate on the identification and elimination of patterns of corruption, and should keep the public advised of conditions requiring administrative or legislative change.

We recommend that the Governor specify that this Special Deputy Attorney General be limited to a term of five years. It should be possible at the end of five years to make an informed judgment of whether this special Deputy Attorney General should continue to supplement regular anti-corruption efforts in the criminal justice process.

## A PLAN FOR ANTI-CORRUPTION ACTION IN THE POLICE DEPARTMENT

Although the Commission believes that an anti-corruption agency outside the Police Department is required at this time, the Department's own anti-corruption effort must also be strengthened. Two actions are necessary for improvement. First, departmental doctrine that every commander is responsible for rooting out corruption in his command must be strictly adhered to in practice by requiring command accountability, as emphasized in many reforms ordered by Commissioner Murphy. Second, the Commission recommends that the Inspectional Services Bureau, which includes the anti-corruption agencies in the Department, be reorganized along the lines of the Inspections Office of the Internal Revenue Service. The Inspections Office is responsible to the Commissioner of Internal Revenue, but it plays no

CLE001144

17

part in the collection of revenues. Its sole responsibility is to seek out evidence of corruption and to assist in the prosecution of Bureau agents and civilians who become involved in corruption. Its agents expect to spend their careers in the Inspections Office. Therefore, no inspections officer need ever contemplate the possibility of serving in a unit with or commanded by someone he has investigated. An Inspectional Services Bureau similarly organized would place full responsibility upon the Commissioner and at the same time provide him with an anti-corruption arm which is unhindered by the various handicaps we have discussed.

## OTHER RECOMMENDATIONS

A significant reduction in police corruption can be achieved if the momentum for reform is maintained and if the following objectives are vigorously pursued:

First, corrupt activity must be curtailed by eliminating as many situations as possible which expose policemen to corruption, and by controlling exposure where corruption hazards are unavoidable.

Second, temptations to engage in corrupt activity on the part of the police and the public must be reduced by subjecting both to significant risks of detection, apprehension, conviction and penalties.

Third, incentives for meritorious police performance must be increased.

Fourth, police attitudes toward corruption must continue to change.

Fifth, a climate of reform must be supported by the public.

Commissioner Murphy has instituted a host of managerial changes aimed at achieving all the above objectives. In the recommendations

18

which follow, we single out some that need particular support and others that have not yet been implemented. But we concentrate mainly on reforms which require action by others than the Commissioner.

### *Reducing the Opportunities for Corrupt Activity*

#### Changing Laws

The laws against gambling, prostitution, and the conduct of certain business activities on the Sabbath all contribute to the prevalance of police corruption in obviously different degrees of seriousness. However, they have one characteristic in common—they are laws which are difficult to enforce because the "victims" of these crimes are usually willing participants and seldom complain to the police. Consequently, if a police officer for whatever motive decides to condone a violation, he need only fail to report it. Such a situation is an invitation to corruption. To curtail the opportunities for corruption fostered by these laws, the Commission makes the following recommendations:

*Gambling.* The criminal laws against gambling should be repealed. To the extent that the legislature deems that some control over gambling is appropriate, such regulation should be by civil rather than criminal process. The police should in any event be relieved from any responsibility for the enforcement of gambling laws or regulations.

*Sabbath laws.* The present Sabbath laws should be repealed as they have been in a number of states. To the extent they are retained, enforcement should not be a police function.

*Prostitution.* Although our evidence with respect to police corruption resulting from prostitution was not as strong as in other areas, the Commission believes that prostitution is a corruption hazard. It has been suggested that one way to eliminate the hazard would be

CLE001146

to legalize prostitution, but this has usually included some regulatory control and other countries which have taken this approach do not seem to have eliminated the related police corruption. To the extent that prohibition or regulation of prostitution is deemed necessary or desirable, the Commission can suggest no alternative agency for enforcement.

### Narcotics

The Commission believes that the police must continue to assume responsibility for enforcement of laws forbidding narcotics sale and possession as long as society deems it necessary to invoke criminal sanctions in this area. However, increased study and attention should be given to ways other than criminal sanctions for dealing with the addict.

The laws against marijuana are particularly controversial because of their growing unenforceability and the conviction of many that they are undesirable. However, the Commission has not found evidence that the marijuana laws are a distinct factor in police corruption.

### Regulated Industries

Any industry subject to regulations whose enforcement is entrusted to the police presents a serious corruption hazard. Our investigations focused in particular upon the construction industry, and bars and other premises having liquor licenses which are subject to detailed and intricate regulations which are highly conducive to corruption. We believe that many opportunities for corruption can be eliminated by making such laws more reasonable.

The Commission recommends that in any area where a regulatory agency has jurisdiction, police officers should, insofar as possible, be relieved of the responsibility of enforcement unless (1) the agency requests police assistance or (2) a threat to order exists and must

20

be dealt with on an emergency basis. Moreover, there must be publicly recognized means for waiving regulations where necessary, for example in construction, but we recommend that the police have no responsibility in this connection. We recognize that this approach will not in itself eliminate corruption but may simply transfer its hazards from the police to some other agency. But we believe that corruption in other agencies—undesirable as it is—has far less impact upon the body politic than corruption among the police.

The progression found again and again in the course of our investigation, from the acceptance by a police officer of petty graft to more serious corruption, makes it desirable to remove as many sources of such petty graft as possible. By eliminating the opportunity for petty graft, the Department can change the current attitude that such graft is an accepted part of the police job. This attitude makes it easier for a police officer to accept or solicit graft of a more serious nature when the opportunity presents itself. Moreover, policemen are more likely to pursue vigorously a corrupt public official who is not one of their own.

Finally, as a simple matter of efficiency there is no justification for using the police—with all their powers and prerogatives—in the enforcement of many miscellaneous reglations. It is ridiculous to have an armed police officer wasting his time (and that of his partner and supervising sergeant) checking restaurant washrooms to find out whether they are properly supplied with soap. We believe that the police should be taken out of bars and restaurants and away from building sites and returned to their principal job of protecting lives and property.

CLE001148

Case: 1:15-cv-01320-CAB Doc #: 82-47 Filed: 03/22/17 45 of 148. PageID #: 5981

### *Reducing the Temptations and Increasing the Risks*

#### Penalizing Bribe Givers

The Commission was struck by the apparent immunity from arrest enjoyed by givers as opposed to the takers of bribes. If the Police Department procedures in the past have been inadequate to apprehend members of the force who accept bribes, efforts to bring to justice those who give them have been almost non-existent.

Recently, a campaign was initiated to publicize the fact that the Police Department would hereafter arrest anyone offering a bribe. The Department has in fact increased its activity in this area. Bribery arrests in 1971 were up 440% over 1968 but the absolute numbers are still small. Further, the message conveyed by bribery arrests will be much stronger if the arrested bribers include individuals of some standing in the community like lawyers, hotel managers, restaurant or night-club managers, and construction superintendents. The publicizing of such bribe arrests will deter offers of bribes and afford a legitimate excuse for refusing to pay them.

An effective way to supplement a campaign against bribers is to let it be known that specially assigned policemen will be used to apprehend bribers. In several instances, Commission investigators received offers of bribes from gamblers, bar owners, and prostitutes who mistook them for policemen. In one case, two investigators entered a bar for the purpose of checking records. Before they could make their request, the bartender informed them that the precinct captain had already been paid and asked them what they wanted. Experiences such as this indicate that this approach can be effective.

#### Procedures to Facilitate Corruption Investigations

*Personnel Records.* This Commission was hampered in its investigations by the lack of an efficiently organized system of personnel records. There is no centrally located personnel file for each police

CLE001149

22

officer.  For example, his applicant record, his Academy record, his service record, his disciplinary record and his award record, his medical record, his marksmanship record, his continuing education and training record, and his examination scores and promotion records are all maintained in different places.  In order to check the record of an individual officer we found it necessary to go to as many as twelve different locations and search fourteen different files, since there was not even a central index to the various personnel files. It was not uncommon in these searches to discover all or part of a record missing or misfiled.  Some records, maintained only at the precinct or unit headquarters level, are virtually inaccessible to investigators without alerting the subject of the investigation.

The Department has had a stated intent for several years of creating a central personnel file for each member of the Department. A centralized index summarizing the dispersed records is in the initial stages of construction.  Both steps are necessary.  The system of personnel records centralization should provide for two sets of records. One set of confidential records should contain all facts and allegations concerning a police employee's career.  It should be maintained by the Internal Affairs Division and located in their headquarters.  Access to this confidential set of records should be rigidly controlled to maintain the integrity of the files, and the files should be so structured as to make the unauthorized removal of a record difficult and obvious. Their principal use would be in investigations.  A second set of accessible personnel records duplicating the first should be located at Police Headquarters, but this set should omit unsubstantiated allegations.  This second set could be maintained by the Chief Clerk's staff or the Personnel Bureau or any other unit which could provide response to legitimate inquiries.

Both the quality and accessibility of photographs of police officers on active duty increase the difficulties faced by investigators of possible corrupt activities.  Our investigators found that the pictures

CLE001150

23

maintained in the files frequently appeared to be many years old and were taken in a rigid pose not conducive to ready identification. Moreover, investigators, including the Department's own, must go to a central photographic file in order to obtain photographs of suspected police officers and often must engage in elaborate subterfuges to conceal their interest in a particular individual.

The Commission recommends that two photographic files of police employees be maintained, one at the Internal Affairs Division and the other with the accessible central personnel file. The rule that photographs be taken every five years should be enforced, and the photographs should include several poses.

*Complaints of Corruption.* A complaint from a citizen or a police officer is one starting point for detecting corruption and apprehending corrupt officers. Such complaints must be encouraged by informing the public specifically how and where to make complaints and what details are necessary for action. More effective procedures must be established, with strong controls for insuring that complaints get immediately recorded wherever in the Department they may be received. These actions are necessary to mesh with the new departmental procedures for ensuring adequate complaint follow-up.

*Line-ups.* Commission investigators had one experience where they were called upon to identify allegedly corrupt officers in a line-up. The line-up was conducted in such a way that our investigators were exposed to full view before a number of police officers not connected with the case and, indeed, the suspects themselves. While such conditions did not deter our professional investigators, it was apparent to them that they would have intimidated civilian witnesses. Line-up procedures should insure that a complaining witness can identify an officer in a manner that protects the witness' anonymity.

*Treatment of Cooperative Police Witnesses.* If the Department is to use formerly corrupt policemen as undercover agents, it must

24

be prepared to keep them on duty at full pay during the time that they are serving as agents and witnesses. When their services are no longer required, the Police Commissioner should allow them to resign in good standing as he did Patrolman Droge.

### Enforcement Responsibility

*Departmental Action Against Infractions Indicative of Corruption.* Anti-corruption investigators often know the identities of corrupt police officers and from observing their behavior can be certain of the fact that they are engaged in corrupt activities. Proving a criminal case, however, is a different matter, since corrupt activities are inherently covert and involve mutually trusting parties. Although a more vigorous and effective effort to make criminal cases is certainly desirable and possible, one solution to the corruption problem may lie elsewhere.

There are a number of regulations and procedures in the Department that call for disciplinary punishment for a variety of infractions related to corrupt behavior, such as the regulation against associating with gamblers, criminals, or persons engaged in unlawful activities except in the discharge of official duty or with the permission of the Police Commissioner. The rules require that the fact and purpose of such a meeting in the course of duty be recorded. Whenever this kind of meeting is observed and has not been recorded, the excuse commonly given by the officer is that he was attempting to get information from an informant and had merely forgotten to report the matter. Invariably, no charges are brought for such infractions if the commander is satisfied with the excuse given in the particular case. Such rules as this one are designed to deter corruption. Yet their uneven enforcement undermines the achievement of this goal.

The Commission recommends that the required reporting procedures be strictly enforced and that Departmental charges be brought against violators in all instances. The validity of the excuse for such

CLE001152

25

meetings should bear only upon the penalties imposed. However, since it would be unfair to change the enforcement policy abruptly, the Department should publicize its intention to punish with maximum severity any infraction of these rules. The threat of severe penalties may have a deterrent effect on an officer who knows how difficult it is to prove a corrupt conversation between him and a gambler or other criminal but who also knows how easy it is to prove the simple fact of the meeting.

*Expanded Penalties in Department Hearings.* Perhaps the most troublesome issue in the disciplining of policemen found guilty in Departmental hearings is the inappropriateness of the available penalties. The Administrative Code provides no gradations of penalty between outright dismissal from the force and a fine of 30 days pay or vacation followed by a year's probation. The Commission recommends that the disciplinary alternatives available to the Police Commissioner be broadened. Penalties under the Administrative Code should be changed so that there are penalties available between dismissal and a thirty-day fine.

The Police Commissioner can now reduce any officer above the rank of captain to captain. The Commission further recommends that provision be made for a penalty of reduction of one civil service rank after conviction on serious charges. This would mean that captains, and officers above captain, could be reduced to lieutenants and removed from command posts, lieutenants could be reduced to sergeants, and sergeants could be reduced to patrolmen.

This latter recommendation of rank reductions is necessary to provide meaningful penalties for failures to exercise supervisory and command responsibilities. At present, the usual penalty for such failure is transfer to a new assignment. Such a light penalty does little to motivate superior officers to move vigorously to eradicate corruption and laziness.

26

*Hearing Officers.* The Commission urges that the City Council approve the pending bill providing for additional Hearing Officers in departmental trials. The present requirement that only Deputy Commissioners can conduct such trials has created an unnecessary backlog.

*Pensions.* Another serious defect in the Department's disciplinary options is the present law requiring that any officer dismissed from the Department automatically forfeit his pension regardless of the nature of the offense bringing about his discharge, or how many years he may have worked to earn his pension, or how exemplary his prior record may have been. Although a Police Commissioner should be able to dismiss any policeman found to be corrupt, it by no means follows that a single act of corruption justifies what may amount to a fine of several hundred thousand dollars, the commuted value of many officers' vested pension rights. No civilian would be subjected to a comparable penalty.

The result of the present forfeiture rule has been that the courts on appeal have directed the reinstatement of patently unfit officers because they could not tolerate the injustice involved in the forfeiture of vested pension rights.

The solution recommended by the Commission is to separate considerations of pension from departmental disciplinary proceedings. Disciplinary proceedings within the Department should be concerned solely with the question of whether the offense has been established and whether the offender should be removed from the force or suffer some lesser departmental punishment. In the event of dismissal, and upon recommendation of the Police Commissioner, there should be a wholly separate proceeding conducted by the Corporation Counsel to determine whether the offender should be deprived of his accumulated pension rights.

Under present procedures, officers suspected of misconduct are permitted to put in their retirement papers and retire thirty days later,

CLE001154

Case: 1:15-cv-01320-CAB Doc #: 82-47 Filed: 03/22/17 51 of 148. PageID #: 5987

at which time they become immune to departmental disciplinary proceedings and become eligible to receive their pensions. This results in a thirty-day race, with a suspected officer seeking to retire before charges can be brought against him. The statute of limitations for beginning a pension proceeding should commence to run the day the officer is separated from the Department—either by disciplinary action or by resignation—and there should be no arbitrary period of time for the completion of such a proceeding. The normal rules for civil actions where issues of comparable importance are customarily decided should apply to such a proceeding.

Until these new procedures are adopted, the thirty-day limitation should immediately be extended to ninety days by passage of the bill to that effect now pending before the City Council.

*Effect of Disciplinary Records upon Promotions.* Officers with lengthy records of disciplinary infractions have, in the past, been promoted to supervisory and command ranks—even repromoted after demotion. The system of departmental recognition provides for the Department of Personnel to add extra points to the scores of officers taking a promotion examination. But a disciplinary record is never counted by imposing specified negative points for convictions of various rule infractions. The Commission recommends that revisions be made in the formal system of promotion points to include both positive points for good performance and negative points for convictions of rule infractions.

### Changing Procedures Which Encourage Corruption

Policemen sometimes engage in corrupt practices because alternative means of solving problems are not available or are too bothersome. For example, expense money is inadequate or too slow in being paid and procedures for handling contraband are too complex and too time-consuming. These situations, and others like them, can be readily corrected. Many such improvements have already been ordered by Police Commissioner Murphy.

CLE001155

28

*Reimbursement of Expenses.* Although plainclothesmen have traditionally been faced with the greatest temptation for corruption because of the nature of their work, the Depatment has made their job even more difficult by not giving them sufficient funds to do it properly. A plainclothesman incurs various expenses in the course of doing his job, but the Department has in the past allowed him only $100 per month. To facilitate the work of plainclothes officers, an expense advance should be provided, the amounts allowed should be flexible, and reimbursement for expenses should be prompt.

*Arrest Quotas.* The existence of informal arrest quotas is an inducement to a particular kind of corruption, the arrest of individuals not actually apprehended in the commission of the charged crime. Testimony before the State Investigation Commission in its investigation of narcotics described a pattern of requiring a quota of four felony arrests per month and concluded that this requirement led to "flaking" of individuals—the planting of narcotics upon a suspected individual. Our investigation confirmed the existence of such an informal quota as well as similar flaking in policy arrests. The Commission also found that plainclothesmen assigned to prostitution details were faced with the necessity of producing a stipulated number of arrests a night and, in order to do so, often arrested persons they considered to be "obvious" prostitutes, without obtaining sufficient legal evidence.

The emphasis on quality arrests which the Department has now established should be pressed vigorously, and steps should be taken to insure that individual commanders do not replace formal quotas with informal quotas.

*Informants.* Abuses with respect to the use of informants have, in the past, been facilitated by the loose control exercised over them. According to Departmental Rules and Regulations, informants must be registered to an individual police officer. But in fact the Commis-

sion has found that this rule is not enforced and informants deal with a number of police officers. This leads to corruption because officers will not usually engage in illegal activities, such as selling narcotics, with informants registered to them. The Commission recommends that rules requiring the registration of informants be enforced. We further recommend that officers be required to report all contacts with informants.

*Paid Informants.* At the present time, it is the policy of the Department that informants are not paid. This leads to corruption because of the temptation to reward informants with narcotics or other contraband. The Commission recommends that realistic appraisal be made of the funds necessary to maintain the Department's registered informants and that adequate funds be made available to the Department for this purpose. Procedures for accounting for the expenditure of these funds should be simplified to the maximum extent possible and should be no more complicated than a regular expense report.

*Gratuities.* Although the acceptance of "any valuable gift" is against Departmental regulations, the rule has not been enforced with any regularity. Maintaining that a free cup of coffee is the acceptance of graft while finding no wrongdoing when a Chief of Detectives accepts a meal for himself and guests worth $84 promotes an attitude of cynicism in the Department leading to corruption. The Commission recommends that the Department bring practice and policy into accord, and enforce diligently whatever policy is finally adopted. If the Department decides to permit policemen to accept free meals and goods, the Commission urges that all such gratuities be reported in memorandum books or on Daily Field Activity Reports, which should be reviewed daily by supervisory officers. Supervisory personnel should then be held responsible for insuring that such privileges are not abused.

*Sleeping Accommodations.* Since there are many occasions, such as a morning court appearance after a night of duty, when it is difficult

30

for an officer to return home to sleep, the Department should acknowledge this fact and arrange for sleeping accommodations.  The City should make appropriate arrangements to reimburse hotels to permit officers to occupy hotel rooms on a space-available basis.

### Management Procedures

The Department will always have to cope with opportunities and temptations for corruption.  In part, the Murphy administration's strategy for doing so is to reduce exposure to corruption hazards and to fix responsibility and insure individual accountability.  Many steps have been taken in these directions, and others are required.

*Field Activity Reporting.*  To make the concept of accountability work it is important to have an officer's account of what he did while on duty—to be compared with what he was supposed to do.  The necessity for having on record an account of a policeman's daily doings that can be verified or proved false was made clear to this Commission when it subpoenaed several dozen memorandum books of policemen about whom questions had been raised.  At that time the only record of a police officer's activities was his memorndum book, and he kept the only copy in his possession.  We discovered that these books were uniformly useless, not just because they contained falsifications but because they were full of blanks.  Under the memorandum book system, many patrolmen customarily leave large blanks and/or perhaps spend an hour or two a week reconstructing (or inventing) their activities.  Since memo books are retained by the officers, it is easy to go back and add entries to provide an account of an officer's daily activities when an investigation of his activities creates a need to do so.  To provide an improved record, the Department is now experimenting in twelve precincts with Daily Field Activity Reports for all patrolmen and is requiring them from plainclothes officers assigned to the Organized Crime Control Bureau (OCCB).  These reports are filled out in triplicate, turned in every day, and signed by a superior officer.  Whether or not the experimental Daily Field Activity Report form is satisfactory, there is a clear need for all field officers including

CLE001158

31

tectives to prepare during their tour a reporting form or book specifying where the officers were and what they were doing at specific times. At least two copies of this daily report should be submitted at the end of each tour for supervisory scrutiny and signature. One copy should be retained by the Department and one by the officer. Other copies should be prepared as required for administrative review, as is now done in the OCCB.

*Arrest Procedures.* Corruption in connection with the arrest of an offender is facilitated by the reporting form used by the Department to record arrests. The Commission found that, particularly in gambling arrests, the description of the alleged offense is often written by the police officer in such ambiguous terms that he can later testify in a manner exculpating the defendant. This fact enables a police officer to make himself available for a change of testimony in exchange for financial consideration. A forced-choice arrest form which removes the possibility of a change of testimony in key areas involving search and seizure and the legality of an arrest is necessary and should be adopted after field experimentation.

*Name Tags.* We have already referred to the fact of police isolation from the community. To many citizens, the police officer on the street is the nameless embodiment of authority. The present badge numbers cannot be easily read. The Commission recommends that the uniformed officers in the department be required to wear name tags on the outside of their uniforms. This is standard practice for identifying individuals who deal with the public like doctors on hospital staffs, bank tellers, and airline personnel. Men and women in the armed services of the United States have worn name tags for years.

### Reducing the Susceptibility to Corruption

There are two general approaches to reducing the susceptibility to corruption among police officers. The first is to improve screening and selection methods and standards. The second approach requires no less than a change in police attitudes.

CLE001159

32

*Background Investigations.*  To prevent the few situations that have arisen in which unsuitable candidates were admitted to the force and sent out to the field before their full background investigations had been completed, there should be established in practice, as well as by rule, an absolute ban against the swearing in of police officers until their background investigations have been finished and reviewed.

*Lateral Entry to Supervisory Ranks.*  A controversial reform in police practice involves the infusion of new blood at supervisory levels.  Currently, all supervisory and commanding officers must rise through the ranks, and the officer-enlisted man relationship which contributes to a sense of discipline in the military is often entirely lacking. The quality of superior officers is necessarily limited by the refusal of the Department to accept supervisory personnel from outside its own ranks.  If, as it appears to the Commission, the Department is imbued with an attitude of tolerance towards corruption, officers rising through the ranks cannot help but be conditioned by this prevailing attitude. Moreover, many superior officers are, rightly or wrongly, the subject of rumors as to their own past corrupt activities.  The Commission recommends that provision for lateral entry to the Department be established by amendments to the present Civil Service regulations to permit individuals of outstanding qualifications from other law enforcement agencies to assume supervisory ranks.

*Police College.*  A long-range reform which could facilitate lateral entry into all police departments would be the establishment of a National Police Academy at a college level.  Suggestions for a National Academy have usually revolved around the idea of retraining officers already on the job.  A national, Federally-funded academy patterned after the military service academies would provide a free college education for highly qualified young men and women who wish to make a profession out of police service.  Application to the college should be open to any high school graduate.  Entrance to the college, however, should be delayed until after the appointee has served one year, after

CLE001160

33

completion of training, in any police department. Following a regular four-year education leading to a bachelor's degree and including on-the-job training in several police departments, a graduate should return to the city where he originally served and assume the rank of sergeant. He would have a four-year obligation in that Department. As in the military service, provision would also be made for education in the same college of officers rising from the uniformed force through an officers' candidate school along the lines of the British Police College. An academy of this sort would add to the professionalism of police service.

*Partners for New Officers.* Under Commissioner Murphy, the Department is providing, for the first time, thorough training for all ranks in dealing with the hazards of corruption and the proper response to them. To supplement this, the Commission recommends that the Department develop a new approach for the first field assignment of new recruits. After their first assignment to a model precinct, officers should be assigned a senior "training" patrolman as their partner. Specially selected and carefully screened patrolmen with considerable experience, both in the Department and in the particular precinct or unit, should be used for this purpose. A precinct training syllabus should be provided to cover all phases of police work within the precinct.

*Master Patrolmen.* For men of patrolman rank, the Commission recommends a system of promotion to create a new classification of Master Patrolman. These Master Patrolmen would be promoted from the ranks of veteran patrolmen and would be given responsibilities for training new recruits.

### Enlisting Public Support

*Progress Reporting.* If concerned citizens are to be encouraged in bringing reports of corruption to the attention of the Police Department, they must be promptly informed of the final disposition of their

34

complaints. This will give the aggrieved citizen who feels that the action taken was inadequate an opportunity to seek a remedy from other agencies.

*Publication of Statistics.* Besides providing specific information to complainants, general information concerning corruption should be provided to the public. Raw data concerning disciplinary actions is difficult to collect because it exists only in individual records. Furthermore, statistics relating disciplinary dispositions to charges are not even compiled. A monthly report should be prepared and made available to all communications media showing the changes and dispositions of all departmental actions against corrupt officers by rank and command. Such a report would be complementary to the Department's publication of bribery arests. Similar reports are published in other cities, and in some the names of the accused officers are included.

*   *   *

The remaining sections of the Commission's report, which are to be issued shortly, set forth in detail the substantive findings upon which these recommendations are based.

August 3, 1972



THE PROFESSIONAL VOICE OF LAW ENFORCEMENT          NOVEMBER 1972

The
Knapp
Commission
and



CLE001163

BY LAWRENCE J. DEMPSEY

# THE

# KNAPP

# COMMISSION

# AND

# YOU





ON AUGUST 3, 1972, Mayor John V. Lindsay of the City of New York received a thirty-four page initial report from Whitman Knapp, Chairman of the Commission to Investigate Alleged Police Corruption.[1] This report, which will be referred to as the Knapp Report or Commission's Report, represents the results of a two-year Commission investigation into the extent and nature of police corruption in the City of New York. The findings of the Commission's investigation, which had also included public hearings, will be summarized and its principal recommendations reviewed.

Members of the law enforcement community who have heard or read releases of the Knapp Commission's report have inquired, "What is the

*LAWRENCE J. DEMPSEY is a Lieutenant with the New York City Police Department, and is currently assigned as Commanding Officer of the Department of Investigation's Squad, 111 John St., New York, N. Y. 10038. He holds A.A. and A.B. degrees in Police Science and Social Studies from Seton Hall University, an M.P.A. degree in Police Administration from the City University of New York, and is currently a doctoral candidate for a degree in Public Administration at New York University. (The views expressed in this article are those of Lieutenant Dempsey and not necessarily those of his Department.)*

CLE001164

*What is the Knapp Commission?*

*What did it find in the way of police corruption in New York?*

*What recommendations did the Knapp Report make concerning police corruption in New York?*

*What meaningful information applicable to all police agencies can be derived from the Knapp Report?*

Knapp Commission?"; "What did it find in the way of police corruption in New York?"; "What recommendations did the Knapp Report make concerning police corruption?"; and "What meaningful information applicable to my agency can I derive from the Knapp Report?" An attempt will be made to present an accurate summary of the Commission's findings, answers to the above-posed questions, and a commentary on recommendations offered with a view toward their applicability in other police departments.

## ALLEGATIONS OF POLICE CORRUPTION IN NEW YORK CITY

On the morning of April 25, 1970, the front page of *The New York Times* had a two-column headline which read: "Graft Paid to Police Here Said to Run Into Millions," with the subtitle: "Survey links payoffs to gambling and narcotics—some on force accuse officials of failure to act."[2] These front-page introductions to an extensive police corruption exposé heralded the establishment of first the Rankin Committee and then the Knapp Commission.

The *Times* reported that "narcotics dealers, gamblers, and businessmen make illicit payments of millions of dollars a year to the policemen."[3] The article went on to relate after a six-month survey, including the examination of police and court records, interviews with many law enforcement officials, former police officers, and citizens, that there was widespread corruption in the police department.

In addition, it was alleged that high-level officials within the city administration and the police department had failed to investigate a number of cases of corruption brought to their attention. An example cited by the press was that an executive order issued by Mayor Lindsay requiring certain procedures to be complied with in regard to allegations of corruption was ignored by high-ranking police officials.

Several days prior to the *Times* article, Mayor Lindsay had announced the formation of a special five-man committee to investigate police corruption and to review the procedures for investigating corruption. The committee established to investigate police corruption was to become known as the Rankin Committee, taking the name of the Corporate Counsel, J. Lee Rankin, named to head the Committee.

[1] Commission to Investigate Allegations of Police Corruption, Summary and Principal Recommendations, August 3, 1972.

[2] David Burnham, "Graft Paid to Police Said to Run Into Millions," *New York Times*, April 25, 1970, pp. 1, 18.

[3] *Ibid.*, p. 1.

[4] David Burnham, "City Opens Study of Policing Police," *New York Times*, April 24, 1970, pp. 1, 32.

[5] Text of letter to Mayor John V. Lindsay by Committee Set Up to Investigate Corruption, *New York Times*, May 15, 1970, Editorial Page.

## THE RANKIN COMMITTEE

Mayor Lindsay, on April 23, 1970, appointed a five-member committee (called by the press "the Rankin Committee") consisting of: J. Lee Rankin, the City Corporation Counsel; Police Commissioner Howard R. Leary; Investigation Commissioner Robert K. Ruskin; New York County District Attorney Frank S. Hogan; and Bronx District Attorney Burton B. Roberts, and charged the members with the responsibility of reviewing the city's procedures for investigating police corruption.[4]

The Committee later stated in a public letter to the mayor that it had been charged with a threefold responsibility:[5]

1. To evaluate the procedures presently employed by the police department to investigate charges of corruption in order to ascertain whether these procedures provide the public with adequate assurance that charges of police corruption are dealt with vigorously, promptly, and fairly.

2. To recommend improvements in these procedures where indicated.

3. To investigate the charges of corruption and other allegations growing out of the announcement of the Committee's formation.

The members of the Committee, which was named "The Special Com-

CLE001165

mittee to Investigate Police Corruption" (and which was called by the press "The Mayor's Panel on Police"), selected J. Lee Rankin to be its chairman. In addition to the three responsibilities of investigation noted above, the Committee also initially reviewed a New York City administrative code law that allows a police officer to retire with his pension privileges upon giving of thirty days' notice to the police department even if the officer is under departmental charges or criminal process for alleged corruption. (It was noted that in 1969, legislation in Albany was unsuccessfully sought that would have lengthened the period of time that a policeman would have to wait to retire if he were under investigation or criminal process.) This law remains to this day unamended on the books.

The thirty-day requirement was added to the administrative code of New York in the early 1950s following a major police scandal, called the Gross Investigation, that resulted in the indictment of seventy-seven police officers for receiving payoffs for protecting illegal gambling operations. Prior to the enactment of the thirty-day law, a policeman could retire immediately after giving notice, regardless of any investigation, departmental action, or criminal process, and get his full pension allowance.

The Rankin Committee was in operation from April 23, 1970, until May 11, 1970, during which time it received a total of 375 complaints, of which 59 did not pertain to police corruption. Of the 316 alleged corruption complaints, it was reported that 200 had been received by telephone, 111 by mail, and 5 by personal interview. A breakdown of the complaints indicated that: Eleven percent of the complaints alleged a payment of money or other item of value to a policeman who *could* be identified with a fair degree of certainty; in thirty percent of similar complaints the officers *could not* be identified; in seven percent of the complaints an identified officer was charged with failure to take necessary police action; in forty-eight percent of the total number of complaints an unidenti-

fied officer was charged with failure to take action.[6] (The remaining four percent of complaints were not accounted for.)

The Rankin Committee did specify in its final report that most complaints of alleged police misconduct were in connection with one or more of five types of illegal or improper conduct. These five were: narcotics; traffic violations; gambling and policy; prostitution; and liquor laws.

The Committee noted, in its final report to the mayor, that it had requested and received a copy of the police department's procedures for investigating corruption complaints; it had requested the public to report complaints; and, as noted above, did in fact receive 375 complaints. The Committee had asked the five New York City district attorneys to provide summaries of police prosecutions for the previous five years, and had reviewed the thirty-day retirement law. With reference to this law, it recommended a sixty-day retirement rule as well as a new law to divest a former officer of pension rights if he were proven guilty of a crime relating to his governmental employment even subsequent to his retirement.

The Rankin Committee's final report to the mayor recommended that the Committee be disbanded and that it be replaced with an independent investigatory body, appointed by the mayor from the private sector, with full authority to carry forward an investigation into police corruption. It was noted by Rankin that the recommendation for an independent body was made because the effective carrying out of investigations of alleged corruption complaints required a full-time investigative body with a skilled full-time staff. With regard to this recommendation, it was noted that all the Committee members had full-time government jobs, and it was also suggested that because of their official positions there could be conflicts of interest on the part of Committee members with their official responsibilities.

Within a week of the issuance of the Rankin Committee's report and recommendations to the mayor, a "Commission to Investigate Allegations of Police Corruption," which became known as the Knapp Commission, was appointed.

## THE KNAPP COMMISSION

On May 21, 1970, following the recommendations made by the Rankin Committee, Mayor Lindsay appointed a new five-man commission to investigate allegations of widespread police corruption within the New York City Police Department.[7]

The mayor selected Whitman Knapp, a New York attorney and a former head of the Indictment and Frauds Bureau of the New York County District Attorney's Office, to be chairman of the Commission. To serve on the Commission, the mayor also selected: Cyrus W. Vance, former Secretary of Defense under President Johnson; Joseph Monserrat, President of the Board of Education; Franklin Thomas, a former Deputy Police Commissioner for Legal Matters; and Arnold Bauman, a former Assistant District Attorney and Assistant United States Attorney for the Southern District of New York.[8] Mr. Bauman was later to resign and be replaced by John E. Sprizzo, who was also a former Assistant United States Attorney and professor of law at Fordham University.

Selected by the Commission to act as its Chief Counsel was Michael F. Armstrong, a former Assistant United States Attorney. He gathered about him a staff of some thirty persons with clerical, investigative, and legal backgrounds.[9]

The authority for the establishment of the Commission to Investigate Allegations of Police Corruption, referred to most often as the "Knapp Commission," or "the Commission," was by executive order of the mayor. In this order, the mayor stated that he would seek subpoena power for the Commission, and would use funds from the city law department budget to operate temporarily, pending a full budget of its own.

In July of 1970, the City Council of New York approved a $325,000 six-month budget that was later supplemented by a Law Enforcement Assistance Administration grant of $237,201. In December, 1970, the life of the Commission was extended an additional six months, until June 30, 1971. Finally, to sustain itself in order to hold hearings in the fall of 1971, and to prepare and write its final reports, the first of which was presented on April 3, 1972, the Commission had to seek private funds and did in fact receive a total of $33,000 in contributions from nine private foundations.[10]

## THE COMMISSION'S MANDATE

In the preface to the Knapp Commission's report, it is reported that the Commission was established by Mayor Lindsay upon the recommendation of the Rankin Committee after that Committee had reviewed the various complaints of corruption and examined the procedures of the police department to carry out corruption investigations. The objective of the Commission as stated was to determine the extent and

[6] Rankin Committee Report, *Report on Police Complaints Made to Rankin Committee April 24, 1970-May 11, 1970;* dated May 13, 1970.

[7] William Federici, "New Corruption Panel, Headed by Lawyer, Named by Mayor," *New York Daily News,* May 22, 1970, p. 1.

[8] *Ibid.,* Federici, p. 1.

[9] William Federici, "Armstrong is a Crackerjack Quarterback," *New York Daily News,* October 20, 1971, p. 18.

[10] David Burnham, "Knapp Inquiry's Expense," *New York Times,* March 17, 1972, p. 20.

CLE001166

nature of police corruption, to examine existing procedures dealing with corruption, and to recommend changes and improvements in those procedures. It was noted that it became important to make its findings on patterns of corruption clear to the public so that the public would encourage reform and support of the police commissioner in making the recommended reforms.

The Commission noted that its authority to carry out its investigation was derived from the mayor, who as the city's chief executive officer is ultimately responsible for the conduct of the police department. They also noted the uniqueness of a chief executive in ordering a public investigation of his own police force.

## EXTENT OF POLICE CORRUPTION

The Commission reported: "We found corruption to be widespread"; that plainclothesmen participated in regular semiweekly or monthly collections of payoffs from gambling establishments; that narcotic enforcement officers received individual payoffs; that detectives carried out shakedowns of individual targets; that uniformed officers received regular payoffs from gamblers, bars, businesses, etc.; and that payoffs and bribes were not only to first-level officers, but were paid to sergeants and lieutenants.[11]

The Commission reported that in the five of seventeen plainclothes divisions investigated in regard to police corruption, the investigation found a striking standardized pattern of corruption. They found that the officers assigned to plainclothes duty in the enforcement of vice and gambling laws participated in the collection of scheduled payments of graft amounting to as much as $3,500 a month from each gambling location and afforded each officer from $300 to $1,500 a month as his share (or "nut") of the so-called "pad" (payoff list money). Supervisors, sergeants and lieutenants and even higher officers received a share and a half, while newly assigned plainclothesmen had to wait two months for their first share.

The terminology for the receipt of police graft by narcotics officers was known as a "score," denoting a mostly one-time payment to an individual officer or partners, and ranged from minor shakedown payments to many thousands of dollars, with the largest narcotic payoff "score" uncovered by Knapp investigators to be $80,000.

The Commission reported that corrupt practices on the part of detectives not assigned to narcotic investigation, but to general investigative duties, took the form of shakedowns of individual

targets of opportunity and although these "scores" were not of the usual high amount as found in narcotic cases, they not infrequently came to several thousands of dollars for each score.

The corrupt practices carried on by uniformed patrolmen assigned to normal patrol operations were reported to be the receipt of monies in much smaller payment amounts than those received by plainclothesmen. Yet, when the number of smaller payments was totaled, it represented a serious corruption practice. It was reported that uniformed patrolmen participated in gambling "pads" and received regular payments from construction sites, bars, grocery stores, and other business establishments. Although the payments received by uniformed personnel were small—mostly under $20—they were reported to be so numerous as to add substantially to a patrolman's income. The Commission noted in its report that uniformed officers also received other payments, although less frequently, including those made from after-hour bars, bottle clubs, motorists for traffic violations, payments from tow-truck operators, money from cab drivers, parking lots, prostitutes, and defendants wanting to "fix" their court cases.

Another practice that the Knapp Commission found and reported to be widespread was the payment of gratuities by policemen to other policemen to expedite normal police procedures and paperwork or to gain favorable assignments.

The Knapp Commission found that sergeants and lieutenants who were so inclined could also participate in the same kinds of corrupt practices as the men they supervised. And in addition, some sergeants had their own "pads" from which the patrolmen who were working under the sergeants were excluded.

The Commission noted that although they were unable to develop hard evidence that superior officers above the rank of lieutenant were receiving payoffs, considerable circumstantial evidence and some testimony so indicated.[12] It was reported that most often, if a superior officer was corrupt, he would use a patrolman as his "bagman" to collect for him, and the patrolman would keep a percentage of the take for his role as a collector. It was noted that because there was the possibility that the "bagman" might solicit and keep money for himself although claiming to be collecting for his superior, it was extremely difficult for the Commission to determine with any degree of accuracy when a superior might be involved.

The Knapp Commission used two terms to describe the nature and significance of police corruption. These terms are "meat eaters" and "grass eaters."

A meat eater is a police officer who aggressively misuses his police powers for personal gain, whereas the grass eater is one who simply accepts payoffs that the happenstances of police work would throw his way. In describing these categories of police officers, the report noted that "although the meat eaters get the huge payoffs that get the headlines, they represent a small percentage of all corrupt policemen. The truth is, the vast majority of policemen on the take don't deal in huge amounts of graft."[13]

The Commission felt that the "grass eaters" are the heart of the problem; that because so great a number of police personnel is involved in this type of corrupt practice, its widespread nature tends to make the practice "respectable"; and that a code of silence exists among the police, with the effect that if any of them were to expose such corrupt actions, he would be branded as a traitor.

## DEPARTMENTAL ATTITUDE TOWARD POLICE CORRUPTION

The Commission noted that the police feel that the public seems to be preoccupied only with police corruption and not with corruption in other agencies, and views this as unfair; that this feeling on the part of policemen intensifies with the sense of isolation and hostility he experiences because of the nature of police work; and that this feeling of isolation and hostility are experienced by policemen not just in New York, but everywhere else.

The report goes into a discussion of group loyalty on the part of policemen (i.e., from danger of work, hostility they encounter from society, reliance on fellow officers), and from this group loyalty emerges two principal characteristics: (1) suspicion and hostility directed at any outside interference with the Department, and (2) an intense desire to be proud of the Department.

The combination of these two characteristics, hostility and pride, is viewed as having created what the Commission found "to be the most serious roadblock to a rational attack upon police corruption: a stubborn refusal at all levels of the Department to acknowledge that a serious problem exists."[14]

The Knapp Commission reviews the "rotten apple" theory, that of individual officer corruption being denounced as the "rotten apple" in an otherwise clean barrel and never admitting that

CLE001167

the individual officer corruption may be symptomatic of underlying disease. The Commission felt that the "rotten apple" theory was fostered in the Department because of its desire to maintain high morale within the Department and the desire to maintain a good public image outside of it.

The Commission examined and rejected the premises upon which the "rotten apple" doctrine rested and concluded that "there was no justification for fearing that public acknowledgment of the extent of corruption would damage the image and effectiveness of the Department."[13] The Commission felt the opposite was true; that a publicly admitted realistic attitude toward corruption could enhance the Department's credibility with the public and actually "promote confidence in the Department's good-faith desire to deal with those conditions."[14] It was also felt that morale in the Department would improve by the same reasoning.

## MAJOR RECOMMENDATIONS

The major recommendations of the Knapp Commission are:

1. The Governor of the State of New York should appoint a special deputy attorney general with jurisdiction in the five counties of the city and authority to investigate and prosecute all crimes involving corruption in the criminal process. The Commission recommended that the proposed special deputy attorney general should concentrate on the identification and then the elimination of patterns of corruption, and should keep the public advised of conditions requiring administrative or legislative change. It was recommended that the new office be limited to a five-year term.

2. Legislative action should be taken to change the existing laws against gambling, prostitution, and the conduct of certain businesses because of the fact that these laws actually provide opportunities for corruption. It was recommended that criminal laws against gambling be repealed; that Sabbath ("Blue") laws be repealed but that if such regulation is deemed desirable it should not be a police function; and that regulations concerning the construction industry, bars, and other premises having liquor licenses be altered by making such laws more reasonable, and with the police being removed from the enforcement process.

3. In direct reference to the police department, the doctrine of command responsibility for rooting out corruption should be strictly adhered to in practice by requiring command accountability. The anticorruption units in the police department should be reorganized along the lines of the Inspections Office of the Internal Revenue Service. Officers might spend their entire police career in this special anticorruption assignment.

4. Special emphasis should be placed upon the arresting of bribers, and the public should be made aware that specially assigned policemen will be used to apprehend such bribers. The arrest of lawyers, hotel managers, restaurant or night club managers, and construction superintendents should be publicized to deter offers of bribes and to afford the public a precedent for refusing to pay them.

5. Within the police department, certain personnel practices should be implemented: centralization of personnel records; updating of photographs of all personnel; improvement of the line-up identification procedure in attempting to identify corrupt officers; improvement of recording procedures for receipt of police corruption complaints; and establishment of a policy to facilitate dealing with a formerly corrupt officer who becomes a department's undercover agent.

6. The police commissioner should have increased powers in the departmental action he can take against officers found guilty of misconduct. The Commission recommended that the police commissioner be permitted to reduce in civil service rank captains, lieutenants, and sergeants convicted of violations of serious departmental regulations. Present laws should be changed to prohibit the retirement of officers with pension benefits while charges are pending, and provisions should be made for corrective pension action if an officer is, subsequent to retiring, found guilty of corrupt practices. It was recommended that fines and penalties imposed after departmental trial be broadened and that officers found guilty of departmental charges have points reduced from their promotional score average.

7. Police department procedures should be modified to provide police officers with reimbursement for legitimate expenses, and to provide payments to informants. Further suggestions were the elimination of any informal arrest quotas, and the provision of sleeping facilities for officers required to remain available for duty the next day.

8. The police department should implement certain management procedural changes that would assist the police commissioner in limiting opportunities for corrupt practices, to increase supervisory controls, to improve public relations, and to increase professional capabilities of the police.

### Recapitulation

The eight major recommendations were put forth by the Knapp Commission with the intent to assist in providing a means to curtail corrupt activities by:

• eliminating the many situations which expose officers to corruption, such as the changing of the laws;

• subjecting the officers to a significant risk of detection, apprehension, conviction, and penalties if they engage in corrupt activities, i.e., the establishment of a special unit within the department for corruption investigations;

• providing a means, through increased incentives, for meritorious police performance in fighting police corruption, and to change the total police force's attitude toward corrupt practices on the part of fellow officers by providing various recognitions and compensations within the departmental structure for honesty; and

• providing to the public a means of redress and avenues for communication with the police department so that the citizen may be able to report alleged police corruption and have action taken in regard to the allegation (investigation by a special force), and be given a certain amount of anonymity by not having to report complaints to the normal line units.

*Recommendation No. 1.* "That the Governor (Rockefeller), acting with the Attorney General (New York) pursuant to Section 63 of the Executive Law appoint a Special Deputy Attorney General with jurisdiction in all five counties of the City, with authority to investigate and prosecute all crimes involving corruption in the criminal process."[17]

This recommendation has become the most controversial of all the recommendations made in the Knapp report. In fact, the attention paid to this particular recommendation has far overshadowed the remaining recommendations of the report, and has generated the larger amount of news media coverage, and interjected into the total meaningfulness of the report a broad political controversy.

The Knapp Commission report noted that "a basic weakness in the present approach to the problem of (investi-

[11] Commission Report, *op. cit.*, p. 1.
[12] *Ibid.*, p. 3.
[13] *Ibid.*, p. 4.
[14] *Ibid.*, p. 6.
[15] *Ibid.*, p. 8.
[16] *Ibid.*, p. 8.
[17] *Ibid.*, p. 15.

gating) police corruption is that all agencies regularly involved with the problem rely primarily on policemen to do their investigative work."[18] It went on to add, "In the case of District Attorneys, there is the additional problem that they work so closely with policemen that the public tends to look upon them—and indeed they seem to look upon themselves—as allies of the Department."[19]

The Knapp Commission explained that the recommendation took into consideration the following factors:

1. In recent months there had been numerous accusations of corruption among prosecutors, lawyers, and judges.

2. Any newly created office must have jurisdiction going beyond the police department.

3. An office is needed where everyone—including the policeman—can go with a corruption complaint against anyone involved in the criminal justice process.

4. Any new office must also have authority to prosecute corruption cases in order to insure its independence of the agencies which may come under its scrutiny.

5. There should be independent access to grand juries and the right to issue subpoenas and grant immunity on a citywide basis.

6. There is a need for an office that can be established immediately, without the delays that would be inevitable should implementing legislation be required.

In comment, the Commission noted that a deputy attorney general should have grand jury power, could employ the investigative techniques required, make suggestions for grand jury presentations, make public any grand jury reports, channel the reception of complaints, use his resources for identification and elimination of patterns of corruption, and keep the public advised of conditions requiring administrative or legislative action.

*Recommendation No. 2.* Laws against gambling, prostitution, and the conduct of certain business activities on the Sabbath all contribute to the prevalence of police corruption and obviously in different degrees of seriousness; these laws are difficult to enforce; and because the victims of these crimes are usually *willing* participants and seldom complain to the police, the maintaining of the laws on the books provide an invitation to corruption.

In reference to gambling, the Commission recommends that the laws against gambling should be repealed,

and the policy should be that even if these laws are not repealed, the police should be relieved from the responsibility for the enforcement of these laws. With regard to Sabbath laws (Blue laws), similar laws have already been repealed in a number of other states and should be repealed in New York; further, enforcement of such laws not repealed should not be a police function. In reference to the laws regarding prostitution, the Knapp Commission did not find that these laws were as corrupting a hazard as first might be assumed, although the Commission did not wish to take a position on the legalization of prostitution. The Commission was not in a position to offer a recommendation on an alternate agency to enforce the prostitution laws.

The Commission noted that the police must continue to assume responsibility for enforcement of laws forbidding the sale and possession of narcotics as long as society deems it necessary to invoke criminal sanctions in this area. The laws regarding marijuana are particularly controversial because of their growing unenforceability and the conviction of many people that such laws are undesirable. The Commission was unable to find evidence that the marijuana laws are a distinct factor in police corruption.

A particular area of noted corruption in New York has been in the construction industry. The police department has been charged with the enforcement of various ordinances and regulations in regard to the construction industry and the carrying on of construction in the city. It has been reported by *The New York Times* that there are millions of dollars in bribes paid by the construction industry every year to public servants, including police. The Commission recommends that the function of regulation in the construction industry should be taken over by another jurisdictional agency and that the police should be relieved of the responsibility of the enforcement of these regulations and code requirements.

Traditionally, bars and other places that have liquor licenses have been subject to regulation and inspection by police officers. These bars and establishments selling liquor have always been a source of corrupt practices in the enforcement of regulations. It was felt by the Knapp Commission that the regulation of these premises dealing in alcohol and having liquor licenses should be taken over by another agency.

The Knapp Commission felt that by eliminating the opportunity for petty graft the department can change the current attitude that such graft is an accepted part of the police job. The

Commission stated that it believes the police should be removed from inspections of bars and restaurants as well as from building sites and returned to their principal job of protecting life and property.

*Recommendation No. 3.* The Commission recommended that within the police department there be established a unit whose sole responsibility would be to arrest policemen who solicit and accept bribes as well as those members of the public sector who try to bribe them. It suggested that the Inspectional Services Bureau (I.S.B.), which includes the anticorruption units in the police department as now constituted, be reorganized along the lines of the Inspections Office of the Internal Revenue Service, so that the new unit would have as its sole responsibility the ferreting out of evidence of corruption by police officers and assisting in the prosecution of officers and civilians who become involved in corrupt activities. It was noted that agents who are assigned to the Inspections Office of the Internal Revenue Service normally spend their complete careers within that office, and it was suggested that if a similar type of unit were established in the police department, the officers might serve their complete police careers in that unit. The Commission stated that the establishment of such a unit, which would report directly to the police commissioner, would place full responsibility upon the commissioner and at the same time provide him with an anticorruption arm that would be unhindered in the execution of its anticorruption functions.

*Recommendation No. 4.* The Knapp Commission recommended that the police department place special emphasis on the arrest of bribers, especially businessmen and lawyers. It noted that there was apparently almost complete immunity from arrest enjoyed by the givers of bribes as opposed to the takers of bribes. It was proposed that attention be focused also upon the persons who are the bribers, and every possible legal means be taken to make prosecutable cases against them. It was felt that when it became known to members of the community that if they offered a bribe to a police officer, they would place themselves in jeopardy of being arrested, and the practice of offering bribes would soon be discontinued.

*Recommendation No. 5.* The Commission further recommended that the police department change certain of its personnel practices so that investigation of police corruption would be facilitated. It advocated that certain records which are now maintained at various

CLE001169

locations within the department be centralized; e.g., personnel records concerning a single police officer which may presently be spread out over twelve different locations should be centrally filed where the proposed anticorruption unit might have ready access to them.

The Commission also recommended that photographs of police officers be updated as required by regulations in the police department every five years, and that the quality and accessibility of these photographs be improved to assist investigators in their task of identification of corrupt officers.

It was suggested in the conducting of lineups, where police officers are the target of the investigation, that the lineup identification procedures be changed from present practices so that witnesses are not seen by other members of the force and that the witnesses' identities be kept anonymous.

It was also noted that a procedure for handling a complaint from a civilian or a police officer should be established whereby the complaint is immediately recorded wherever in the department it is received, and that the public as well as police officers be encouraged to make complaints and be advised where they may do so. It was also suggested that necessary procedures be instituted to insure adequate complaint follow-up.

Another area that the Commission touched on is that if the department determines to "turn around" an officer (to use a formerly corrupt officer as an undercover agent in a given investigation), the department should be prepared to keep this officer on full pay during his undercover assignment and during the period of time after his exposure to the public. It will also be necessary for such officer to be available for court testimony or administrative hearings in order to effectively carry out the prosecution of the investigation. It was suggested that an officer, formerly corrupt, who is now used to the department's advantage, be permitted to resign from the police department in good standing.

*Recommendation No. 6.* Another recommendation was that the police commissioner be granted increased power and that there be changes made in the present civil service laws of New York providing for a wider range of penalties available in administrative hearings against derelict members of the force. At present, the highest fine penalty that may be imposed by the police commissioner is the loss of thirty days' pay, and only in the ranks above that of captain (who are not civil service) and designated grades (detectives) can the police commis-

sioner presently utilize demotion as a form of penalty. It was recommended by the Commission that the police commissioner be given the power to reduce by one civil service grade the members of the force of the rank of captain, lieutenant, and sergeant who have been found guilty of serious departmental charges.

It was noted by the Knapp Commission that there were certain rules and regulations already on the books of the police department that if effectively utilized could be used as a tool for assisting in the maintenance of integrity and honesty on the part of members of the force. An example of such an existing regulation is that a member of the force is prohibited from associating with gamblers, criminals, or persons engaged in unlawful activities (except in the discharge of official duties or with the permission of the police commissioner), and the rules require that an officer meeting or having conversation with a person so described must make certain entries in his memorandum book and complete certain reports. It was noted that this type of regulation, if enforced, could be used as an effective tool in regard to taking administrative action against police personnel who associate with criminals.

It was also recommended by the Commission that the New York City Council approve a pending bill that would provide for additional hearing officers in police department administrative trials, and this would alleviate backlogs created by the present requirement that only deputy commissioners may preside over these administrative trials.

An additional recommendation by the Commission calls attention to what is indicated to be a serious defect in the police department disciplinary options—the present law requiring that any officer dismissed from the police department automatically forfeits his pension regardless of the nature of events bringing about his discharge. Such factors as the number of years of service, his exemplary record, his rank, or other factors that should possibly be considerations in amelioration of his penalty are not now considered if he is dismissed from the department as regards his pension rights. Although dismissal of a corrupt officer by the police commissioner after a departmental trial may be warranted, the resultant loss of his total pension upon dismissal is a harsh punishment for an officer found guilty of violating departmental regulations. In recent instances in cases brought on appeal by officers who have lost pension rights after dismissal from the police department, the

court directed the police commissioner to reinstate the officers because it was determined the punishments were too severe. It was noted that if the police commissioner found it warranted to dismiss an officer from the force, there should be a wholly separate proceeding conducted by the city's attorney, the corporation counsel, to determine whether the offender should be deprived of his accumulated pension rights.

It was noted by the Knapp Commission in its recommendations for changing certain personnel practices that the police commissioner is severely hindered by the present law that permits an officer suspected of misconduct to file necessary papers for his retirement and to retire in thirty days unless he has been administratively tried and a decision rendered within the limited time. It has been suggested that the 30-day limitation be extended to 90 days, and that steps be taken to enact a law providing that there be no arbitrary period of time limit placed on the city for the completion of a proceeding against a police officer even if he has submitted retirement papers.

*Recommendation No. 7.* The Commission stated that certain police department procedures should be modified in order to eliminate practices that might encourage corrupt activities by police officers. In reference to the practices that should be looked into, they cited:

• The payment of expense money to personnel entitled to utilization of such funds is inadequate and too slow, and this condition should be corrected.

• Expense funds allowed to officers should not be arbitrarily limited to $100 per month per officer, but should be flexible to facilitate the officer's function, and that when money is laid out by an officer it should be reimbursed promptly.

• The existence of informal arrest quotas should be eliminated. The practice of establishing a required "quota," number of arrests or a particular type of arrest has led to a practice of "flaking," "the planting of narcotics upon a suspected individual," or in other incidents the supplementing of the amount of narcotic evidence found on an individual in order to raise the charge to a higher penal law degree.

• The method of registering and dealing with informants by the police department is too loose, and procedures should be adopted to provide a stricter control of the informer and the registration of an informant to an individual police officer; the informer should not be used by several police officers.

CLE001170

• The present policy of the New York City Police Department is not to utilize paid informants. It has been found by the Knapp Commission that certain corrupt officers use narcotics or other contraband in order to reward informants for information: the department should make available, in some instances, funds to pay informants.

• Although there is a regulation in the rules and procedures of the police department to the effect that receiving "any valuable gift" is a violation of departmental rules, the Knapp Commission reports that the rule has not been enforced with any regularity. The receiving of a free cup of coffee, meal, alcoholic beverage, or of any other valuable gift should be clearly stated to be a violation of the department's policies and such policies should be enforced. It was noted that *if* the police department decided to permit policemen to accept free meals or goods, then necessary steps should be taken to require the filing of reports and these reports should be reviewed by superior officers to insure against abuse of such privileges.

• Since there are occasions during which police officers must remain away from their homes overnight (e.g., court appearances after a late arrest, required appearance on the day shift at administrative hearings, or continued duty for an emergency situation), it is recommended that the department arrange for the provision of sleeping accommodations and to make appropriate reimbursements to the hotels that provided such facilities.

*Recommendation No. 8.* The Knapp Commission noted that the opportunities and temptations for corruptions are a continuing problem and recommended that certain administrative practices be revised and changes made in order to tighten supervisory control of the police.

The Commission observed that certain steps had been undertaken by the department to increase individual "accountability" and pointed out that one additional way of increasing the accountability is in changing the memorandum book record procedure. The present practice is for each officer to carry a memorandum book, a diary, in which an officer records the entries of all police activities of his tour of duty. The officer keeps the book in his possession, and the Commission considers this a uniformly useless document because many of the diaries contain falsifications and blank spaces.

It was recommended that an improved record document be instituted and noted that the police department was experimenting with a Daily Field Activity Report, which is a triplicate report that is inspected daily by a supervisor and copies retained.

It was also recommended that an arrest reporting form presently used in the police department be revised in order to make more specific the reporting format in reference to describing certain facts. It was stated that the description of an alleged offense is often done by the police officer in such ambiguous terms that he can later testify in a manner exculpating the defendant.

A recommendation that was immediately attacked by the Patrolman's Benevolent Association was that uniformed officers be required to wear name tags on the outside of their uniforms because the present badge number identification is not easily read and because the nameless officer is further isolated from the community.

The Knapp Commission felt there were two general approaches to reducing the susceptibility to corruption among police officers: The first was to improve the screening and selection methods and standards for police recruits, and the second was to change the attitudes of the police. In the area of screening, it was recommended that the practice whereby officers are assigned field work prior to the completion of their complete background investigation be discontinued.

The civil service regulations should be changed to allow lateral entry, permitting individuals of outstanding qualifications from other law enforcement agencies coming into the department to assume supervisory ranks.

It was suggested that as a long-range reform there be established a National Police Academy of college level. The Commission felt that the function of this academy should be that of providing a federally funded, free, four-year education for recruits instead of merely training officers already on the job. This academy would resemble the national military academies. Enrollees should come from police departments, after they had served one year following initial recruit training; then complete a four-year degree program which would include on-the-job training; and then be returned to their original department in the rank of sergeant. In return, the officer then would have a four-year obligation to that department.

The Commission recommended that the department develop a new approach for the first field assignment of a new recruit: a recruit should be assigned to work with a senior "training" patrolman as a partner. Specially selected and carefully screened patrolmen with considerable experience, both in the department and in the particular precinct or unit, would be selected for this role. Also, it recommended that a local or precinct training syllabus be provided for training recruits in all the phases of police work within the precinct in which he will be assigned. Along the same vein, the Commission felt that a new designation be established in the patrolman's rank—that of "master patrolman." The patrolmen would be promoted from the ranks of veteran patrolmen and would be given responsibilities for training new recruits.

The Knapp Commission indicated the second general approach for reducing corruption to be the encouragement of concerned citizens to bring reports of corruption to the attention of the police department and by promptly informing them of the final disposition of their complaints. In this manner, it would give the aggrieved citizen who feels that inadequate action was taken an opportunity to seek a remedy from other agencies.

The Commission believes that the police department should provide general information concerning corruption complaints to the public in the possible form of a monthly report showing the "changes" *(Note: It is believed by this writer that this word was meant to be "charges")* and dispositions of all departmental actions against corrupt officers by rank and command. This report would then become a supplement to the department's publication of bribery arrests.

## CONCLUSION

This article has been presented in an attempt to provide a review of the "Summary and Principal Recommendations of the Commission to Investigate Allegations of Police Corruption." Included in this article has been a brief historical background of the events and circumstances that led to the appointment by Mayor Lindsay of the Commission.

A proposed second article on this subject will analyze the findings and recommendations of the Knapp Commission, review the policies and programs instituted by the New York City Police Department as a result of the allegations and investigation of police corruption, and comment on the meaningfulness of the Commission's report to other law enforcement agencies.

The writer would welcome the views and comments of the readers with respect to the report's summary and principal recommendations, as well as general observations as to the value of such a Commission and what its contributions are to law enforcement.  ★

CLE001171

## By LAWRENCE J. DEMPSEY



# The Knapp

# Commission

MAJOR FINDINGS and recommendations of the Knapp Commission's Report were reviewed in Part I of this report.* This second part will present the responses, programs, and governmental actions taken as a result of the Commission's findings. In addition, a commentary will analyze these events and their meaningfulness to other law enforcement agencies.

## PUBLIC AND OFFICIAL RESPONSE

The findings of "widespread corruption" and the consequent recommendation that a Special Deputy Attorney General be appointed "to investigate and prosecute all crimes involving corruption in the criminal process" were the most widely reported and controversial of the findings and recommendations.[1] The Commission's findings and recommendations pertaining to various laws and their enforcement, command responsibility, the internal investigation of corruption within the Police Department, the arrest of those paying bribes, organizational changes

*Part II of a review of the Knapp Commission Report, presenting a commentary on the responses, programs and governmental actions taken as a result of the Commission's findings and the meaningfulness of these findings to law enforcement*

*LAWRENCE J. DEMPSEY is a Lieutenant, Commander of Detective Squad, with the New York City Police Department and is assigned as Commanding Officer of the Department of Investigation's Squad, 111 John Street, New York, New York 10038. He holds A.A. and A.B. degrees in Police Science and Social Studies from Seton Hall University, an M.P.A. degree in Public Administration from the City University of New York, and is currently a doctoral candidate for a degree in Public Administration at New York University. Lieutenant Dempsey is a member of the International Association of Chiefs of Police, Academy of Police Science, the American Association of Public Administrators, and the Municipal Association for Management and Administration. (The views expressed in this article are those of Lieutenant Dempsey and not necessarily those of his Department.)*

within the Police Department to facilitate corruption investigations, and increased administrative procedural management powers for the Police Commissioner all received relatively little exposure in the news media.

On August 28th, 1972, Mayor John V. Lindsay made his response to the Knapp Commission Report in the form of a seven-page press release setting forth his views.[2] Attached to the Mayor's statement was a four-page preliminary assessment of the Commission's study by Police Commissioner Patrick V. Murphy, Corporation Counsel Norman Redlich, and Personnel Director Harry Bronstein. The Mayor's statement, together with an attached memorandum by members of his Cabinet, represented New York City's official administration's response to the Knapp Commission's findings and recommendations.

On September 19th, 1972, Governor Nelson A. Rockefeller issued a five-page statement setting into motion a five-step program for the "investigation and prosecution of corruption at all levels in the system of criminal justice of New York City."[3] Governor Rockefeller's five-point program:

1. Directed the Attorney General of New York to "appoint a Special Prosecutor to investigate and prosecute corruption throughout the criminal justice system of New York City."[4]

This proposal is in accordance with the Knapp Commission's main recommendation, and it differs from Mayor

Lindsay's proposal in that the latter proposed a State Commissioner of Criminal Justice, with *statewide* jurisdiction.

2. Directed the bi-partisan State Commission of Investigation to establish a special New York City unit to monitor, evaluate, and make recommendations as to the conduct of elected and appointed public officials entrusted with the enforcement of the laws and the administration of justice in New York City.[5]

3. Directed the Counsel to the Governor to make an intensive study of proposals for dealing with corruption in the criminal justice system *statewide*, for the purpose of developing recommendations for the next session of the New York State Legislature.[6]

4. Obtained the services of Michael Armstrong, former Counsel to the Knapp Commission, as Consultant to both the Special Prosecutor and the State Commission of Investigation.[7]

5. Obtained federal and state financing to underwrite the anti-corruption program, consisting of a grant of $2 million dollars under the Federal Law Enforcement Assistance Act and requesting $2 million dollars in matching state funds. Immediately provided was $200,000 from the State Governmental Emergency Fund to initiate the programs outlined.

The most controversial element of the Governor's program was the appointment of a Special Prosecutor, Maurice N. Nadjari,[8] to "*supersede the district attorneys as to investigation and prosecution of corruption at all levels in the system of criminal justice*

*See *The Police Chief*, Vol. 39, No. 11 (November, 1972).

CLE001172

## nd *You*

*in the five counties of New York City, including police, prosecutors and their staffs, judges, court personnel, correction officers and lawyers. . . . His jurisdiction will include all past, present, and future investigation and prosecutions in this area." [9]*

The appointment of a Special Prosecutor by the Governor immediately became a heated public issue with all five District Attorneys taking exception to the appointment. The District Attorneys made their views known to the public, the press and a representative of the Governor. In addition, it was stated by several of the District Attorneys that a court challenge of the legality of the newly created office might be undertaken.

On September 30th, 1972, a joint announcement was made by the Office of the Governor and the five District Attorneys, to the effect that after meetings among the various officials, an understanding had been reached and guidelines had been adopted to insure harmony.

THE MANDATE: The Knapp Commission did attempt to accomplish its mandate "to determine the extent and nature of police corruption, to examine existing procedures dealing with corruption, and to recommend changes and improvements in those pro-

cedures." [10] And the Commission's chief recommendation that the Governor appoint a Special Deputy Attorney General with jurisdiction in the five counties of New York City to investigate and prosecute all crimes involving corruption in the criminal justice process, although controversial, eventually was implemented by Governor Rockefeller.

**Commentary:** Although I must concede that the Knapp Commission has attempted to accomplish its mandate, I take exception to its generalistic statements such as, "we found corruption to be widespread," and to its broad brush approach to labeling large segments of the police force "corrupt" based upon its samplings; the public showmanship in the carrying out of the investigation via television; and the failure to do more to protect the reputations of the tens of thousands of honest police officers of New York City. [11]

In addition, the Commission's report failed to place responsibility for the corruption it did uncover and the nonfeasance it found on the part of city administrators and police officials. With a so-called finding of "widespread corruption," would not a professionally responsible investigation also have established the persons or offices responsible for the conditions reported and made known these findings in its published report? I believe that it could have and should have.

The mandate of the Commission was partially accomplished, and now that the Commission is relieved from its task, attention should turn to an evaluation of its recommendations, policies, and procedures which can be implemented to cope with the corruption problem in the total criminal justice system.

RECOMMENDATIONS — SPECIAL DEPUTY ATTORNEY GENERAL: The major recommendation of the Knapp Commission Report, that the Governor appoint a Special Deputy Attorney General to investigate and prosecute all crimes involving corruption in the criminal process, was immediately attacked by all five local County District Attorneys. Mayor Lindsay praised the

---

[1] Commission to Investigate Allegations of Police Corruption, *Summary and Principal Recommendations,* August 3, 1972. pp. 1, 15.

[2] Office of the Mayor, City Hall, New York, New York, *A Statement by Mayor John V. Lindsay,* released August 28, 1972.

[3] State of New York, Nelson A. Rockefeller, Governor, *Statement by Governor Nelson A. Rockefeller,* September 19, 1972.

[4] *Ibid.,* p. 1.

[5] *Ibid.,* p. 2.

[6] *Ibid.,* p. 3.

[7] *Ibid.,* p. 3.

[8] *Ibid.,* p. 1.

[9] *Ibid.,* p. 3.

[10] Commission Report, *op. cit.,* Preface, p. I.

[11] Commission Report, *op. cit.,* p. 1.

CLE001173

District Attorneys and policemen and disagreed with the Commission that the District Attorneys were reluctant to prosecute the police for corruption because they were "allies," as alleged by the report.

It may be remembered that the Knapp Commission stated in the report that the District Attorneys had a problem in investigating police corruption due to the fact that police officers actually conducted the investigations and that the District Attorneys work so closely with policemen that the public tends to look upon them—as indeed they look upon themselves—as allies of the police.

The District Attorneys denounced this observation and recommendation, and united to oppose the appointment of the Special Prosecutor.

District Attorney Mackell, of Queens County, an ex-policeman, stated it was a "damnable lie" that the District Attorneys hesitated to prosecute policemen because they worked together on cases.[12] District Attorney Braisted, of Richmond County, stated he was "unalterably opposed" to the appointment of a Special Prosecutor, adding that the Commission had not "established any reasonable basis justifying such an appointment."[13] District Attorney Roberts, of Bronx County, called the report a "cheap shot" by a "Johnny-come-lately," adding that the Commission failed to produce "one scintilla of evidence" that the city's five District Attorneys had failed to investigate or prosecute cases of corruption in law enforcement agencies.[14] District Attorney Gold, of Kings County, stated, "I am no ally of any corrupt police officer or anyone else" and disputed that there was a "natural reluctance" on the part of District Attorneys to be suspicious of policemen.[15] The most senior District Attorney, Frank Hogan, of New York County, responded to the Special Prosecutor proposal by stating, "I don't see any reason for appointing a Special Prosecutor. . . . If there has been proof of conspiracy or collusion in this office, there might be reason for it."[16] Hogan went on to add at a press conference that "what infuriates me was the crutch he (Knapp) used to support the recommendation that a special attorney general be appointed to supersede the five District Attorneys."[17]

Even Mayor Lindsay, who appointed the Knapp Commission, did not agree with the Commission proposal for a Special Deputy Attorney General and disagreed with the contention that the District Attorneys were reluctant to prosecute the police for corruption because they were "allies" and stated,

"My experience with the District Attorneys of New York has been that they have been assiduous in their pursuit of wrongdoing in police matters and other matters."[18]

In effect, the five District Attorneys who were in the position of possibly being superseded, as well as the Mayor who ordered the investigation, were all opposed to the major recommendation of the Commission. The final result, even after the Mayor's detailed comments and his own recommendations on the appointment of a State Commissioner for Criminal Justice with statewide authority, *was the appointment September 19th, 1972, by Governor Rockefeller of the Special Prosecutor,* under the Attorney General, "to investigate and prosecute corruption throughout the criminal justice system of *New York City."*[19]

**Commentary:** In light of the District Attorney's actual records in prosecutions of officials throughout the criminal justice process (defining not only the relatively limited number of police corruption prosecutions, but to include, the very rare—if any—in some counties, prosecutions of judges, lawyers, prosecutors, court or correction personnel) and the cynicism of the public and news media towards actual corruption prosecution in the entire New York City criminal justice process, the position of Governor Rockefeller must be hailed as not only a warranted act, but a recognition of his responsibility.

Mayor Lindsay, in his press release, proposed that the Governor appoint a single State Commissioner for Criminal Justice not only to fight corruption, but to monitor *all* operations of the criminal justice system on a *statewide basis,* whereas the Governor limited the Special Prosecutor's investigation and prosecution of corruption throughout the criminal justice system to New York City alone.[20] Thus, the Knapp Commission's most important and controversial recommendation, opposed by all five District Attorneys, was implemented by Governor Rockefeller, along with the other four programs, as previously noted.

RECOMMENDATION — CHANGING LAWS: With reference to the other recommendations in the Knapp Commission report for changes in the criminal laws of the city and state, as in the areas of gambling and Sabbath Laws, Mayor Lindsay stated, "We have heard little discussion about these reforms in recent days, thus jeopardizing the possibility of intensive public education and support for these proposals."[21] In making particular reference to gambling laws, the Mayor called upon the

Governor and the Attorney General, along with key legislative leaders, to help reform the outmoded gambling and other laws that increase the risk of police corruption as cited by the Knapp Commission.[22]

The assault upon the Knapp Commission by the District Attorneys, the coverage by the news media of the various personalities involved, and the response by the Patrolmen's Benevolent Association totally overshadowed and eliminated from public concern the recommendation dealing with proposed law changes.

Proposed were changes in gambling laws, Sabbath (Blue) Laws, enforcement of prostitution laws, narcotic law sanctions, marihuana law enforcement problems, and regulatory laws governing various business practices. This important area of consideration pertaining to the enforcement of laws providing opportunities for corrupt activity was lost in the controversy over the proposal to appoint a Special Deputy Attorney General.

**Commentary:** The news media gave minimal coverage to the Mayor's statement that the time had come "for forthright leadership by the state government to revise the laws relating to victimless crimes."[23] The Governor's response was to direct his Counsel to make an intensive study of the various laws which provided opportunities for corruption.

The responsibility for dealing with the requirement to change laws rests not only with the State of New York, but also in some instances with the City Council of the City of New York. It is these legislative bodies that not only must review the Commission's recommendations on laws, but must revise or repeal laws which provide opportunities for corruption, particularly in areas where enforcement is deemed not wanted by the public.

The memorandum of the city department heads did review the various laws that the Commission had singled out for possible changes. With reference to

---

[12] John Toscano and Paul Meskil, "City DAs in High Dudgeon Over Low Rating by Knapp", *New York Daily News,* pp. 3, 66.

[13] *Ibid.,* p. 66.

[14] *Ibid.,* p. 66.

[15] *Ibid.,* p. 66.

[16] *Ibid.,* p. 1.

[17] *Ibid.,* p. 66.

[18] Murray Schumach, "Lindsay Disputes Knapp—Lauds District Attorneys", *New York Times,* August 19, 1972. pp. 1, 22.

[19] *Governor's Statement, op. cit.,* p. 1.

[20] David Burnham, "Governor Calls Step on D.A.'s His Most Important Act", *New York Times,* September 21, 1972, p. 28.

[21] *Mayor's Statement, op. cit.,* p. 1.

[22] *Ibid.,* p. 5.

[23] *Ibid.,* p. 5.

CLE001174

gambling laws, this memorandum supported changes in existing gambling laws which constitute an extreme and unenforceable prohibition, yet it did not share the Commission's view that gambling should be legalized in all its forms. The department heads did not support legalized prostitution, but did state that the Sabbath Laws needed revision, and joined with the Commission in its call to have the laws pertaining to regulation of industries reviewed.

**RECOMMENDATION — ANTI-CORRUPTION UNIT AND COMMAND ACCOUNTABILITY:** The Knapp Commission recommended that the doctrine of command responsibility or accountability for rooting out corruption be strictly enforced and that certain organizational changes take place to establish an Inspections Office similar to that of the Internal Revenue Service.

With reference to the reorganization of the internal investigation anti-corruption unit, the Memorandum attached to the Mayor's release states, "The Police Department's Inspectional Services Bureau shall be reorganized along the lines of the Inspections Office of the Internal Revenue Service."[24] It was noted that the Police Department was carefully studying the organization of the Inspections Office of the Internal Revenue Service with a view to adopting those features which might aid in its own operation.

**Commentary:** The accountability of command in the Police Department has been clearly established by the Police Commissioner along with meaningful, never before available tools for field integrity control. The long-time practice of centralization of corruption investigations has been revised, and a field level command structure has been implemented to investigate alleged corrupt practices and eliminate any possible field command excuses for failure to maintain integrity. The Police Commissioner had, long before the Commission's report, clearly implemented an accountability requirement upon commanders of all levels.

This recommendation of the Knapp Commission on accountability was really superfluous in that Commissioner Murphy had implemented command accountability in October, 1970.

**RECOMMENDATION—ARRESTING BRIBERS:** The Commission felt that bribers had received apparent immunity from arrest and wanted special emphasis placed upon their arrest as well as informing the public that attempted bribers of police would be arrested.

It is to be noted that during 1971, the first year of Commissioner Murphy's tenure, the arrest figures for attempted bribery of officers were up 440 percent

over the 1968 figures.[25] While the 1971 arrest figures for bribery arrests were 95, in this year (1972) there are already 391 bribery arrests.[26] In the first ten months of 1972, 77 policemen have been arrested on corruption charges, compared to 70 arrests for all of 1971. In addition, a policy of reward incentive has been established by the Police Commissioner. He created a five-man bribery arrest evaluation board to review all bribery arrests and he recently promoted to detective grade several officers who made bribery arrests, thereby increasing their compensation. Other members of the force making bribery arrests have been given assignments or career promotional opportunities merited by their demonstrated integrity.

The dishonest officer must indeed be wary for, as recently demonstrated in a joint investigation by the Police Commissioner's Office and the Bronx District Attorney's Office, eight narcotics officers were indicted, arrested and charged with conspiracy, robbery, petit larceny and official misconduct for stealing nearly $15,000 from arrested addicts.[27] In this case an undercover officer and a "turned around rogue cop" provided the information and evidence.

**Commentary:** When the public realizes that offering a bribe may cause their arrest, and when officers become cognizant of the Police Commissioner's statement, "I hope every policeman will understand that the person traveling with him could testify against him," then bribers and bribe seekers will think twice before offering or soliciting a bribe.[28]

Bronx District Attorney Roberts commented, "We must eliminate the scourge of police corruption if we are to eliminate the scourge of crime that infests this city."[29] The Police Commissioner noted, "Morale is strengthened as our integrity is strengthened," and when recently he was asked if the commanders of the officers indicted and arrested in the Bronx were being investigated, he responded that he was conducting an investigation to determine whether the commanders involved had "lived up to their responsibilities."[30]

**RECOMMENDATION — FACILITATION OF CORRUPTION INVESTIGATIONS:** The Knapp Commission made various recommendations under the above general caption dealing with personnel records, centralized indexing, officer photographs, handling of complaints, line-up procedures, and treatment of witnesses.

Again, this area of proposals by the Commission was also virtually ignored

by the news media coverage of the report. The memorandum attached to the Mayor's statement explains that the Police Department has already adopted as policy the Knapp Commission recommendation regarding cooperative "turned around" witnesses, the photographing procedures of force members, and centralized personnel records are being established with a modern data processing system scheduled to become operative in 1973. Also, complaint procedures and line-up practices were being reviewed to provide for improved processing and procedures.

**Commentary:** The procedural findings or recommendations made by the Commission pertaining to facilitating corruption investigations, although not notably colorful recommendations, provided a necessary emphasis to stimulate renewed attention to the practices mentioned.

**RECOMMENDATION—ADDITIONAL POWERS FOR THE POLICE COMMISSIONER:** The Knapp Commission recommended that the Police Commissioner be granted increased authority in personnel practices and that various Civil Service and Administrative Code Laws be changed to provide the Commissioner greater flexibility in matters such as fines, demotions, reduction in civil service grade, funding to hire additional hearings officers, and changes in the pension forfeiture procedures.

The memorandum attached to the Mayor's statement indicated that Police Department Rules and Procedures were under revision not only to eliminate the non-practical ones, but to make more enforceable the meaningful regulations which would result in better supervision and improve activity reporting.

The expansion of the power of the Commissioner to impose penalties during the period between the thirty-day fine and dismissal is being supported by drafting enabling legislation, whereas the reduction in civil service rank proposal is being supported by the Police Commissioner, but that also requires necessary legislative action.

The providing of funds for additional hearing officers is one requiring legislative action and fundings by the City

[21] Mayor's Statement, op cit., Commissioner's attachment, p. 1.

[25] David Burnham, "Murphy To Reward Police Who Arrest Bribe-Givers", New York Times, September 19, 1972, p. 57.

[26] Ibid., p. 57.

[27] David Burnham, New York Times, September 7, 1972, pp. 1, 50.

[28] "Jury Indicts 8 Police in Addict Arrests", Staten Island Advance, September 7, 1972, p. 2.

[29] Burnham, September 7, 1972, op. cit., p. 50.

[30] Ibid.

CLE001175

Council, as is the extension of the thirty-day limitation rule for retirement when charges are pending. It is to be noted that legislation on the latter has been pending for over two years and would have applicability not only to police officers but to all city employees.

The Commission's proposal that negative points be deducted on promotional examinations as a penalty for conviction of violation of departmental regulations was opposed by the Department heads in the memorandum attached to the Mayor's statement. The Department heads also stated opposition to separate hearings in cases of pension forfeitures on the grounds that these hearings would be burdensome and lengthy.

**Commentary:** The revision of the thirty-day rule in retirement applications is long overdue and the failure to act effectively to bring about legislative changes and implementation is a reflection on the City Council of New York.

As to negative points on a promotional record evaluation, this writer feels a negative point deduction would be unfair, particularly after the officer had already been subject to departmental charges, conviction, and administrative penalty. But, I tend to agree with the view of Knapp toward the promotional process and its belief that an officer who has a lengthy record of disciplinary infractions certainly should not be promoted to supervisory and command rank, as they found was the case, and "even repromoted after demotion." [31]

The revision of the Rules and Procedures of the Police Department, when finally completed, will be a meaningful accomplishment, which, coupled with the revised and improved reporting system, should result in closer supervision, with supervisors held to increased accountability. The general forms of discipline such as increased fines, demotions, reductions in grade, etc., may in fact not be necessary, although these should be available tools in light of the greater command accountability.

The present system of departmental disciplinary proceedings calls for a trial before a hearing officer of Deputy Commissioner rank, with a prosecutor and defense counsel presenting the evidence. I would think that a possible military-type court martial panel, if implementable, with representation by peer rank, might be considered as an appropriate new approach and thereby eliminate the need for Deputy Commissioners to hold the hearings, eliminate possible legal defense costs, and

give force members a feeling that they had been dealt with fairly by peer group judgment.

**RECOMMENDATION — CHANGING PROCEDURES THAT ENCOURAGE CORRUPT PRACTICES:** The Commission reviewed various practices of the police officers that were believed to encourage corrupt activities, such as the Department's policies and attitude towards expense funds, arrest quotas, dealing with informants, paying of informants, acceptance of gratuities, and the utilization of service facilities, such as sleeping accommodations, of the business community.

The Police Department has already taken steps in the area of funding of expenses for both operational outlays and informant payments, whereas the procedural aspects of registration of informants is in the process of being facilitated and control procedures established.

Acceptance of gratuities or services has never been authorized by the Police Department, nor has the establishment of any arrest quotas ever been authorized. Clearly stated has been the policy of no acceptance of gratuities and no arrest quota formulation. The Department has taken steps to increase supervision and accountability to insure the enforcement of the No Gratuity—No Quota policies established by the Police Commissioner.

**Commentary:** As any experienced police administrator knows, funds must be available for operational purposes and for payments to informers. Since steps had already been taken to provide funding and control expenditures, the Knapp findings only provided an additional focus on the matter of expenses.

Any form of quota system for arrests or summons activity that might be established by field commanders to improve their own operational images must be prohibited. Operational procedures or practices that might provide the opportunity for "flaking" or manipulation on the part of officers in handling of evidence or contraband must be revised to provide increased supervision and controls. Overzealousness in the establishment of quotas must be guarded against and can be effectively countered by establishing appropriate standards of productivity.

The policy of no acceptance of gratuities or services must be maintained with possible additional emphasis given to the subject by a special educational program for members of the police force as well as to the public.

It should be noted here that in early October, 1972, the Patrolmen's Benevolent Association, in cooperation with the Police Department's training

program, incorporated a lecture presentation covering the employment benefits that officers stand to lose if they are convicted of taking a bribe. This meaningful and practicable instruction in the consequences of bribe acceptance or solicitation is a realistic approach by the Patrolmen's Benevolent Association as contrasted to its past silences.

**RECOMMENDATION — MANAGEMENT PROCEDURES:** The Commission made reference to certain management or administrative procedures that might be implemented. Procedural recommendations related to field activity reporting, arrest procedures, use of name tags, screening and selection process, lateral entry, college training, recruit field training, and gaining public support (via advising complainants of the status of particular corruption investigations and the issuance of statistics on corruption investigations).

It must be noted that the field activity reporting and arrest reporting procedures had previously been under review by the Police Department and is either in the experimental or procedural change stage. Name tags, strongly objected to by the Patrolmen's Benevolent Association, had been the subject of long debate and study and will not be readily resolved.

Personnel practices such as field training of recruits is under experiment in selected commands. The policy of the Department on screening and clearance of applicants prior to their being sworn into office—that is, not to swear the individual into office until the investigation is completed and reviewed—has not changed.

The Knapp Commission recommendation relative to a long-range program for lateral entry into all police departments and the establishment of a national police academy as a college level institution are definitely worthwhile, although not new. A national police academy would have to be a federally funded program, and lateral entry even at a sergeant's rank would require detailed study and legislative changes. Police line organizations and superior officer associations are sure to take a long hard look at an education program that would assure promotion to the rank of sergeant upon return to a department.

Enlisting public support in the reporting of corruption or other complaints has been the Police Department's policy; the progress of final reporting to the citizen of investigation status has been reviewed, and procedures implemented to notify the public of the findings of an investigation. Reporting to the public statistical infor-

---

[31] Commission Report, *op. cit.*, p. 27.

CLE001176

mation on corruption investigations is under study by the Deputy Police Commissioner of Public Affairs as to the form such reports will take.

**Commentary:** The various recommendations made by the Knapp Commission on management procedures and enlisting public support were neither new nor innovative. As indicated above, several of the recommended proposals were or are under study, another is being experimented with, others are matters of policy, and still others have either financial or legally imposed limitations on implementation by the Police Department.

## COMMENTARY IN REVIEW

The Knapp Commission made recommendations and findings in a diverse number of areas of concern to the police and in some instances to the criminal justice system in general. This review has presented a reflection on the Commission's summary and principal findings, the Statement by Mayor Lindsay and the policy statements by various concerned City Commissioners as contained in the Memorandum attached to the Mayor's Statement, as well as the

subject of the Governor's five-step program.

It is important to note that the Commission's findings and recommendations that received the most attention in the press were those that dealt with the appointment of a Special Deputy Attorney General, and to note that even the Mayor's response dealt primarily with that issue. Governor Rockefeller's appointment of the Special Prosecutor and his programs represent the actual governmental response to the Knapp Commission's findings and in fact, when fully implemented, will represent the backbone of the assault on corruption in the criminal justice system in New York City.

It should be noted further that the jurisdiction of the Special Prosecutor is limited to the five New York City counties and thereby either places the responsibility for the other fifty-seven counties in New York State with the local prosecutors or with the Governor to provide the Special Prosecutor with possible future broader authority.

To the members of the criminal justice system in all other parts of the country, as well as the other fifty-seven

counties of New York, the value of the Knapp Commission Report lies in its presentation of a check list to which the responsible administrator can compare his agency and programs in order to evaluate the integrity of his organization.

Corruption as found and exposed in New York City can be uncovered to some extent in every other police department and when discovered is a shamefully painful experience to all members of our profession. Yet, there is a lesson to be learned: results can be achieved by a direct, open approach to the corruption problem by a forceful leader who aggressively and directly addresses himself to the problem.

The next section will present an outline of the procedures and programs implemented by Commissioner Murphy in his fight not only to eliminate corrupt practices within the department, but to bring into existence the most modern and professional police department in the nation—a department *that can call itself* with unhesitating self-pride, the name that the community has in the past called it: *"The Finest."*

*Continued on page 30*

New from DUR 

SOMETHING

**Only Dura Lav offers a choice of three different vandal-proof push-button valves—at no additional charge!**

**1—Hot and Cold Push-Button Valves.** Close softly on release of buttons. Diaphragm action prevents water "hammer".

**2—Metering-Type Push-Button Valve with Diverter Spout.** Permits water to flow for up to 10 seconds after hot and cold buttons are released, for ease of washing and drinking.

**3—Metering-Type Push-Button Valves with Non Hold-Open Feature and Diverter Spout.** Prevents flooding by stopping flow of hot and cold water even if push buttons are jammed.

**All these "extras" are standard with Dura Lav!**
• No valve springs or packing to wear out
• Recessed paper holder furnished with unit
• Heavy-duty stainless-steel construction won't corrode, chip, scratch or peel—cleans easily • All seams welded to withstand abuse • Compact designs fit into the tightest areas for maximum use of room area.

*For more information write or call:* (215) 548-1000

**HEINTZ DIVISION·KELSEY-HAYES** Philadelphia, Pa. 19120





CLE001177

## POLICIES AND PROGRAMS: ACCOUNTABILITY/INTEGRITY

The cornerstone of good management and organizational efficiency is dynamic leadership. Although the word "dynamic" may not have been previously used in describing Police Commissioner Patrick Murphy, it is indeed applicable to him in the face of all the drastic changes effectuated in New York City's Police Department under his leadership.

The word "responsibility" is not a new term to management nor to a chief executive of an agency, but to the New York City Police Department the word "accountability" is. It is now a new meaningful interpretation of command responsibility. Management principles state that final responsibility cannot be delegated, that the chief executive is responsible for the honest and efficient operation of his department. For decades, executive police command officers have been able to always pass the proverbial "buck" upwards or downward by either blaming the "top brass" for failure to give necessary authority to act or blaming subordinates for failures to carry out the executive officers' directives. In the New York City Police Department that has changed; the buck is not passed, it is *held* and that's called "accountability."

Patrick V. Murphy has provided to *all* levels of command the supervisory control tools of professional management to accomplish assigned missions, and he has added the previously missing ingredient of command accountability to make sure that the mission is accomplished.

If the professional police definition of accountability would appear to be a new concept to the reader, a brief definition of it as applicable to command authority in the New York City Police Department will be provided. Police Commissioner Patrick V. Murphy describes *accountability* as:

"Department-wide posture must reflect scrupulous honesty. Indications of corruption must be exposed and expunged. This is your responsibility. I will hold each of you *accountable* for the misdeeds of your subordinates. With bold leadership you can—and you must—create a climate in which dishonesty is unthinkable. Let the word go out to every precinct station house, to every detective squad room, to every command and every man on every post; we will not tolerate dishonesty in any form." [32]

The policies and procedures implemented in the New York City Police Department are generated in fact by the chief executive and supported through attitude and practice by his top command. Yet it is not just the determination to establish a policy or carrying out the letter of the policy; it is rather the intent of the policy and the interest of the total personnel complement to translate that policy into fact. In New York City, there has been for years the expressions in the police vernacular of "off the record" or, "Is the job on the level?" Both these expressions were used to reflect a certain cynicism to "the Job," the official policies, or facts as stated.

Well, as already demonstrated in this article, by the Police Commissioner's response to the Knapp Commission's findings, the belief has filtered down to the man on the street that the "job is on the level," *now*.

To accomplish this transformation, first the top brass had to be convinced. That took a certain amount of time and changes. Accountability had to be accepted not just as a newly stated interpretation of responsibility, but an actual form of direct control and a management principle applicable to each commander personally.

Since October, 1970, and the appointment of Commissioner Murphy, there has been a new First Deputy Commissioner, a new Deputy Commissioner of Administration, two changes in the Deputy Commissioner of Public Affairs, and the establishment of a new Deputy Commissioner position for Organized Crime Control. The positions of Chief Inspector and the Chief of Patrol have been vacated and filled; the positions of Chief of Detectives, Chief of Inspectional Services, Chief of Personnel have been changed more than once. Of the 201 highest ranking police commanders—deputy inspectors to assistant chief inspectors—only 19 still remain in the same positions that they held in 1970. In implementing an aggressive policy of promotions from Civil Service lists to captains, lieutenants, and sergeants, over 500 middle management promotions have taken place. Realistically, when a new Police Commissioner is appointed, changes in command level personnel do take place, but these changes in command represent not only a change of the individual in the rank, but a change of the attitude of the person filling the position. Their acceptance of the philosophy of accountability is desired by the Commissioner. Lip service is not enough. Acceptance of accountability at every level of command has become not just the byword but a fact.

One of the first and most important personnel changes made by Commissioner Murphy was the appointment of Michael J. Codd as the Department's Chief Inspector. In this position, Chief Inspector Codd is the highest ranking member of the service and is in command of over 33,700 uniform and civilian personnel. In his 29-year career he has served in patrol, safety-emergency, the office of Chief Inspector, and as commander of the Tactical Patrol Force and as a patrol borough commander. Chief Codd, who started his police career as a New York State trooper, is a World War II veteran of the China-Burma-India Theatre of Operations, attained the military rank of colonel, and is a graduate of the FBI National Police Academy. Chief Inspector Codd is command head of the uniform and detective forces of the Department and is the highest ranking officer designated by his four-star rank.

Therefore, by recognizing the changes necessary to combat corruption, by instituting command accountability, by implementing the procedures to carry out the policies, and by re-establishing in the personnel a confidence in the integrity and leadership ability of the top command, the police membership was able to accept the belief that "the job is on the level," and that nothing short of that would be tolerated by the Police Commissioner.

The question is not only the one of accountability, but of policies and programs instituted to change personnel attitudes and provide command with the necessary guidelines and tools to create an environment of mutual confidence and trust. The policies that have helped establish the changes varied in approach and area of concern.

First, there was the establishment of the principle of accountability as described. Then there was the building of a command support team to support leadership; and this was accomplished. Then, when coupled with organizational structural changes to provide the avenues for change, the implementation of program improvement was in progress.

Shortly after becoming Police Commissioner, Patrick Murphy took decisive steps to launch a foundation for cooperation with all the various other law enforcement agencies conducting corruption investigations in New York City. What had been a press criticism of the former Commissioner's failure to comply with an executive order of Mayor Lindsay and failure of high ranking police officials to cooperate in corruption investigations with other agencies was quickly rectified.

A previous Executive Order, Number 21, issued by the Mayor was imple-

[32] *Spring 3100, The Magazine for Policemen*, November, 1970, p. 5.

CLE001178

mented and a cooperative relationship established with the City Commissioner of Investigation, Robert K. Ruskin, and the five county District Attorneys. A working liaison was established with the various federal and state investigating units and a forthright attitude of cooperation and support was initiated.

To strengthen his management team and organization, on October 26, 1970, Commissioner Murphy appointed William H. T. Smith the First Deputy Police Commissioner. The position of First Deputy Commissioner is without question the second most demanding position in the Department and in that position Commissioner Smith not only serves as executive officer to the Police Commissioner, but commands the Inspectional Services Bureau of the department.

Commissioner Smith brought to his post the administrative ability, judgment, and leadership that Commissioner Murphy wanted in his second in command. Commissioner Murphy has stated that he felt that of all his accomplishments as Police Commissioner that probably one of the most important was the luring of Commissioner Smith from his Washington, D. C., position to return to the New York City Police Department to act as chief architect of integrity and in overseeing the changes that had to be made in the Department.

Commissioner Smith's background reflects a well-balanced law enforcement and executive career. He joined the New York City Police Department in 1941 as a patrolman. He was a captain in 1963 when he went to the Syracuse Police Department as first deputy police chief, and in 1964 he was appointed police chief of Syracuse. In 1967, he became the Director of the Inspections Division, Federal Department of Housing and Urban Development, Washington, D. C., and served in that position until appointed First Deputy Police Commissioner by Commissioner Murphy.

The Inspectional Services Bureau, under Commissioner Smith, was given a broader functional role in its field inspectional responsibilities, internal affairs investigations, intelligence operations, and functions deemed essential to provide the Police Commissioner with information about internal and external environment in which the Police Department operates.

More recently, in March, 1972, there was established a Special Force under the direct command of the First Deputy Police Commissioner to "continue investigation into matters uncovered or reported by the Knapp Commission as well as related matters furnished by United States Attorney Whitney North Seymour, Jr."[33] This unit was to become the liaison with the Knapp Commission, the United States Attorney's Office, and the local District Attorneys in corruption investigations.

Another innovative organizational change made by Commissioner Murphy was the establishment in October, 1971, of a completely new bureau in the Department, the Organized Crime Control Bureau. Appointed to the newly created post as Deputy Commissioner of this Bureau was William P. McCarthy, who returned from retirement to head up this new command.[34]

Deputy Commissioner McCarthy was charged with responsibility for the coordination of the Department's efforts to combat organized crime, for gathering and analyzing data on crime syndicates and major figures, and for establishing liaison with other agencies in the criminal justice system.[35] One of the major changes was to place the complete enforcement operation for narcotics and public morals directly under one command in this new Bureau.

Staff, administrative, and auxiliary units were all changed in various ways. Command of the Personnel Bureau was placed in a civilian director, and the Planning Division was renamed the Office for Programs and Policies, also headed by a civilian director.

The most extraordinary command change in the Department's uniform force was made in the Patrol Service Bureau with the appointment of Donald F. Cawley as Chief of Patrol. Commissioner Murphy in the promotion and appointment of Chief Cawley "jumped" him in rank over 72 men higher in rank and seniority and made him the youngest man in Department history to hold such rank. Chief Cawley at the time of his appointment had less than twenty years of police service and had served in patrol, inspections, administrative, and patrol division command positions. A graduate of John Jay College of Criminal Justice, Chief Cawley brought to the Patrol Service Bureau, which is the uniform patrol force branch of the Department, the youth, vitality, and freshness to management approach necessary for changes envisioned by the Police Commissioner.

The Patrol Services Bureau has become the major area of reorganization, with scores of field commander changes and multi-model precinct experiments taking place. Field commanders have received command level staff assistance in the form of executive officers, training officers, personnel officers, planning officers, and field internal affairs units (corruption investigation units). Commanders now have the tools for insuring subordinate level accountability and are able to accept accountability within their commands.

The Detective Division, which has been organizationally restructured for detective specialization, has also had a major structural change by the establishment of Special Investigations Division. The Chief of Detectives, Louis C. Cottell, also received additional command level rank officers for staff assistance, decreasing his span of control, and providing for an improved internal coordination and centralization of certain functional units.

In final review of all the units within the organizational structure of the Police Department, it is clear that every single command or unit has had changes—changes not for the sake of change, but to provide the implementation on every level of command in the Department of realistic and fair commander's accountability—accountability to the renewed standards of honest and dedicated law enforcement, supported by the Commissioner, and with necessary tools of management and field resources to support the implementations of the operational functions and the ultimate organizational mission.

The area of policies and programs for the implementation of accountability for effectiveness of command and integrity would not be complete without the mention of certain other changes that have taken place under Commissioner Murphy. Departmental procedures have been revised to enforce more realistically the gambling laws, the Sabbath law, and the Administrative Code rules for construction sites. Personnel evaluation procedures, career advancement guidelines, and disciplinary case procedure have all been reviewed and revised in accordance with modern police management concepts. Staff facilities such as a Bribery Evaluation Board, Management Assessment Center, and a complete revampment of the Police Academy's command and middle management training programs have also been inaugurated. At line operational level, procedures requiring changes in the superior officer's responsibility for recommendation of subordinate personnel, notification to subordinates of their evaluation standings, and reporting to citizens on the results of corruption complaint investigations have been instituted.

*Continued on page 34*

---

[33] *Temporary Operating Procedure No. 70,* New York City Police Department, March 17, 1972.

[34] *General Order No. 28,* New York City Police Department, October 6, 1971, p. 1.

[35] *Ibid.,* p. 1.

CLE001179

All of the policies and programs herein reported are supportive aids to carrying out the ultimate police mission, but are in essence only aids. The key element in professional law enforcement service is leadership, coupled with integrity and accountability. Commissioner Murphy has stated, "In order to improve performance, the men need effective leadership. . . . As Police Commissioner, it is my inescapable responsibility to provide this leadership."[36]

## THE KNAPP COMMISSION AND YOU

The views hereinafter presented are those of the writer in reflecting on the total aspect of the information previously presented and will include my personal commentary on the possible meaningfulness of the Knapp Commission investigation as it might apply to you and your department. Many of the comments may seem to be superfluous or very basic in light of the material already presented, yet of necessity this section must be of general nature to afford a broad approach.

To police chiefs of large police departments, with established sophisticated anti-corruption units, my comments may seem an over-simplification of the problem and perhaps seemingly patronizing. To the chief of a smaller police department, who has never faced a corruption problem and wants to determine if he may have one, my advisory comments represent preliminary considerations. To those chiefs who feel secure and self-confident in the integrity of their department, I offer congratulations and this simple reminder: *In every city where corruption has become a major internal problem or where a corruption scandal has surfaced, the executive command has professed surprise and disbelief and, before too long, found themselves replaced.*

The fact that corruption existed in one of the leading police departments of the world, the exposé of police corruption featured as front page news, the Knapp Commission's investigation and hearings, the findings and recommendations of the Commission, the actions of a commissioner to establish accountability, the policies and procedures implemented in a department to structure integrity and efficiency—all present a case study that may be of value to you and your department.

The amount of meaningfulness that can be derived from this article and made applicable to your department is dependent upon the need that exists and one's leadership capabilities. Can-

did self-assessment, factual evaluation of conditions, constructive criticism of organizational and operational formats will all go a long way towards making whatever changes may be warranted.

AN ENLIGHTENED LOOK: The principles of management dictate that to solve a problem it must first be determined if one exists; then, if there is a need, a plan is devised for its solution. This principle would also be applicable to the question of organizational integrity and corruption liability.

The first question, then, is to determine if there is a problem or the need for a plan. This may be accomplished by an initial internal survey of the organization to attempt to discover any practices that may present a corruption hazard or be corruption-prone. A checklist of the first areas to be reviewed might include those that the Rankin Committee found to be most susceptible to corruption: narcotics, traffic, gambling, prostitution, and liquor law violations. A survey of the number and substance of the corruption complaints in these areas for the past six-month period might prove the most productive quick check to the possible nature of areas of corruption concern.

Another avenue of approach might be a less formal one—the approach of obtaining an external view by asking operational personnel of other law enforcement agencies in the general jurisdictional area of your department to present you with a candid assessment, documented if possible, of the corruption hazards your personnel face or any corruption complaints they are aware of concerning members of your force.

The next approach might be a procedural assessment of your department, not only as to the *formal* policies on gratuities, gifts, services, etc., but the *informal* practices that have been ignored for years. Look at the operating procedures relating to the handling of seized narcotics, cash found on gamblers, searching of prisoners, handling of bar incident complaints, associations with criminals, return of stolen property, traffic situations, etc.

Organization evaluation might be the next approach, a look at the structure of your agency to determine if there is or is not a need for an integrity control unit or, at the minimum, an inspectional unit to exercise a minimal amount of internal or field inspectional control. Possibly one particular superior officer should be designated to exercise an integrity control function and/or supervise a corruption investigation unit.

The above ideas represent a management approach to an exploratory inquiry into the possible corruption

hazards or practices that may face an administrator or a department. Next, I will present an approach that aims not at organizational structure, but at personnel and their attitudes.

HOSTILITY AND PRIDE: Quality leadership, coupled with management principles have demonstrated the extensive organizational changes that can take place over a relatively short period of time. But organizational changes are not enough. Let us now look to a more direct approach, the changing of the attitudes of the police officers themselves.

The Knapp Commission found "two principal characteristics of group loyalty: (1) suspicion and hostility directed at any outside interference with the Department, and (2) an intense desire to be proud of the Department."[37] These two characteristics, hostility and pride, can be foundation blocks of integrity in any department when properly directed by leadership to fight corrupting influences.

Hostility must be channeled not towards the public or outside reviewers of the department but against any person or condition—inside or outside the force—that might be a threat to the reputation of the department. Pride does not have to be instilled; every police officer is proud of his profession. This pride must be channeled and reinforced until it reaches such a forceful self-motivating intensity that it will not tolerate any possible reflection on the integrity of the force and by its intensity further eliminate the environment conducive to corrupting hazards.

These two characteristics, hostility and pride, held by the Knapp Commission to be "the most serious roadblock to a rational attack upon police corruption: a stubborn refusal at all levels of the Department to acknowledge that a serious problem exists," can be channeled into avenues of motivation for sustained integrity.[38] The forging of the feelings of pride and hostility into weapons of integrity determination will not only sustain professional honesty, but will prevent any corrupting practices from becoming established. Self-motivation by the force towards integrity can become another support to the administration in its organizational goal of honest service to the public.

"BLINDNESS" TO CORRUPTION: There may be no greater lack of protection for the public or a police department's reputation than the "blind cop," who is "blind" in his loyalty to a

[36] *Open Door*, Notes from Commissioner Murphy, No. 3, March 16, 1972.
[37] Commission Report, *op. cit.*, p. 6.
[38] *Ibid.*, p. 6.

CLE001180

dishonest fellow officer, a corrupting citizen, or a corruption situation in his department. The permissiveness to the individual act of corruption by another officer or subordinate, the failure to report a corrupt act or practice, the failure to personally act to stop a corrupt situation—this is the "blindness" I speak of here.

The chief or superior officer who "doesn't want to know" and the members "who fail to report," and reflect an attitude of "don't rock the boat" are in fact responsible for corruption and should be held as accountable as the dishonest actors themselves.

Payoffs of bribes, operation of pads, individual scores, withholding of evidence of narcotics, changing of testimonies, etc., cannot take place if fellow officers refuse to become "blind" to them. Silver or gold should not be able to buy blindness to dishonesty, nor should a misguided loyalty to a fellow officer or a superior officer afford willful permissiveness towards corrupt acts.

The citizens, who are either victims of extortion or are willing bribers, are not blind to the integrity of the police force. The public may well be more aware of the integrity level of the force than the chief or other responsible administrators. Therefore, channels of communication, formal or informal, must be established to receive the complaints and feedback from the public, and not just from organized community groups, but from persons arrested, summoned and regulated by the police. The police administration must be visible, and accessible, to the public.

The news media is not "blind" or asleep, but often just comfortably dozing, sometimes with its eyes closed, sometimes open. Awakened, it can offer to the police administrator the platform for securing from the politicians and the governmental agencies concerned the necessary changes needed. If the news media sees and hears the cries of the public about conditions of corruption and it fails to act, then it fails in its position of public trust.

Therefore, tribute by law enforcement professionals as well as the public should be paid to the David Burnhams and to the New York Times for their alertness, perseverance and courage in investigatory reporting on the police. Police administrators can find in an informed news media relationship a strong ally for public support and an ally in maintaining department integrity.

"Blindness" to corruption on the part of members of the force, by the citizenry and by the news media cannot be allowed to become a chronic disease;

instead, it should be considered a transient affliction that can be cured. Proper leadership can cure certain internal departmental ills, and with the support of the citizenry and the news media, the department's "integrity function" can be strengthened.

HAZARDOUS PROFESSION: The police profession is one of the most physically hazardous professions in our society and experiences yearly hundreds of deaths, thousands of injuries, and untold pain and suffering to members of the profession and their families. Yet, a normally unrecognized or unreported police hazard is the corruption threat. It is today, in our affluent, permissive society, a more devastating and greater hazard than the physical one. Ever mindful must every officer and administrator be of the corruption hazards as well as of the corruptors.

Disclosure of corruption, criticism of a department, complaints of police conduct are not destroyers of morale. It is the internal shame, the realization of the frustration of being prevented from acting, administration permissiveness, the sense of contributory guilt by failure to act against corrupt practices— these are the factors that destroy morale. Honest law enforcement officers feel no personal shame at disclosures of dishonest practices, only a strong anger at being betrayed by fellow officers and the bribing public.

Omnipresence—as is needed in leadership alertness to corruption, in policies and procedures towards integrity programs, in alertness to persons or conditions of corruption hazards—will reduce any possible opportunities for corruption and instill the conscious fear of any corrupt act by either an officer or a citizen.

Police administrators must use the tools of management and always be prepared to respond to the charges or questions of police corruption, not with defensiveness but with openness toward the corruption hazard and toward the administrative steps taken to prevent and remove them.

THE POLICE ADMINISTRATOR: Police administrators must never forget that their position of office and command authority is a temporary one, that just as they have been appointed or promoted to office, so shall their successor be similarly appointed or promoted. The administrator, therefore, must be ever mindful of the right of the public or press to ask questions concerning his stewardship and not become too sensitive to any assessment of his administration.

A law enforcement officer must be prepared to answer any questions that might have relevance to his profes-

sional integrity. These questions, whether in the form of a financial questionnaire, a request to take a lie detector examination, a requirement to provide a current personal background questionnaire with the intention of having an updated personal investigation conducted, must be accepted as a requirement of his office. The police administrator, as well as the lowest ranking police officer on the force, must be prepared to answer to the community not only as to the way he is performing his sworn duties but as to his integrity in office.

Every law enforcement officer, regardless of rank or position should ask himself the following questions: What would a Knapp Commission type investigation find in my department? What leadership and administrative policies adopted by the New York City Police Department may be applicable to my department? What am I personally prepared to do about police corruption?

To these questions I respond as well. I have in detail reported to you what the Knapp Commission found in my department; I have presented to you for your consideration an insight into what leadership, in this instance as exemplified by New York City's Commissioner Murphy, can accomplish and reviewed the programs that might be applicable to your department; and I personally have accepted the responsibility of investigating governmental corruption in my own work.

## CONCLUSION

I realize that by nationally reviewing the Knapp Commission Report I have exposed my department to examination and possible criticism. But I feel no shame for my department. New York has faced its problems and is constructively resolving them. There may be those who might think it best to censor or play down the Commission's report. I don't feel that there is any need to do so.

Furthermore, by presenting my personal uncensored views in this article, I hope I may enhance the prestige of our profession by affording you the possible standards by which to assess the integrity hazards facing you, your personnel, and your department. The professional ethics of law enforcement require no less of me.          ✭

---

*The writer would welcome the views and comments of readers with respect to the Knapp Commission Report, these articles, and any general observations that might assist him in his attempt to document the impact of the Knapp Commission on law enforcement.*

CLE001181

APPENDIX ITEM E

## CONFIDENTIAL MEMORANUM

TO:  Mr. Lee C. Howley     September 2, 1970

FROM:  Bruce L. Newman

RE:  Organizing Public Safety in Cleveland

    At your request and that of the other members of your committee, the following is a brief summary of the findings and recommendations of the 1922 Cleveland Foundation Survey of Criminal Justice in Cleveland regarding the machinery of police administration in Cleveland, together with an analysis of those findings and recommendations in light of the most recent surveys and treatises on the subject. Included in the latter analysis are the President's Crime Commission Task Force Report on the Police; the Eastman Report on the Police and Wrap-up Report of the Cleveland Little Hoover Commission; The International City Managers' Association's treatise on Municipal Police Administration; and a recent treatise by Bruce Smith entitled Police Systems in the United States. Finally, this memorandum also includes a legal comparison of the present City Charter provisions regarding police administration and those in existence in 1922.

I.  The Cleveland Foundation Survey of Criminal Justice in Cleveland

  a)  Background

    One of the first efforts undertaken by The Cleveland Foundation after its creation in 1914 was a comprehensive survey of criminal justice in Cleveland. This survey, not unlike recent criminal justice studies, was undertaken in response to a "growing feeling of insecurity of life and property" in Cleveland. The Survey was directed by Roscoe Pound and Felix Frankfurter. Its purposes as stated in the Preface were "...first, to render an accounting of the functioning of (the criminal justice) system, to the fullest extent that social institutions are as yet adapted to statistical appraisal; and, second, to trace to their controlling sources whatever defects in the system the inquiry disclosed."

    The survey, which was first published in 1922, consisted of over 600 pages of findings and recommendations covering all aspects of the criminal justice system, including police administration, prosecution, the criminal courts and correctional and penal treatment. The Survey was published widely throughout the country and is still quoted as one of the most comprehensive surveys of its kind.

CLE001182

**b)**  Findings and Recommendations Re:
   The Machinery of Police Administration in Cleveland

   The 1922 Survey gave extensive attention to what it felt was the essential and critical flaw in Cleveland's organization for public safety:  split executive responsibility for the police.  After quoting the appropriate sections of the Cleveland City Charter, the survey states as follows:

   "Thus it appears that the chief is given wide powers,--wider than in most cities where there is a non-professional administrative head, such as the director of public safety, between the mayor and the chief--that he is charged with the initiation of authority in administration, that is, has 'exclusive' control under ordinary circumstances, while the director's connection with the routine affairs of the police division is restricted to business matters or, as the charter vaguely calls it, 'administration of the affairs of the division.'  Yet, when the real test of 'exclusive' control appears, it is found that the director and not the chief has all the power.  The director makes all of the really important decisions, as, for example, in the matter of preparing the budget for police service, making rules and regulations, conducting disciplinary trials, and making the selections for appointment and promotions from the civil service lists.  The director, however, is not required, nor does he have an opportunity, to establish immediate and constant contact with the actual administrative processes of police work.

   "There is another odd arrangement in connection with the distribution of powers and the establishment of a line of responsibility between the two heads of the police service.  The director, while depending on the chief to exercise 'exclusive' control up to the point where the director himself makes the really important decisions, does not have direct control over the chief, but merely over the facilities with which the chief has to work.  The chief is appointed by the mayor and not by the director.  Likewise the mayor alone has 'the exclusive right to suspend the chief of the division of police or fire for incompetence or any other just and reasonable cause.'  As a result, the chief is answerable to the director for his management of police work, but responsible to the mayor and not the director as far as his 'incompetence' is concerned.  Only confused notions respecting official responsibility can result from such a situation.

-2-

"In the matter of disciplinary action, it should be pointed out here that there is another step in the scale of responsibility beyond the mayor and director.  The municipal civil service commission alone has the power to pass on charges preferred against the chief of police, and it renders final judgment as well in all cases involving lower ranks which may be appealed to the commission from the judgment of the director.

"Under such a scheme of confused responsibility for police as has been outlined above, to whom do the people at Cleveland properly look for results in policing the city? Who is held to account when a wave of robberies, burglaries, or automobile thefts occurs? Is it the Director of public safety or the chief of police? Which of the two officials bears the final responsibility? The answer under the present arrangement is, neither. Whenever the question of efficiency is called up, the director can point to his chief and say: 'There is the man who is running the department. I did not appoint him nor remove him; he is subject to civil service provisions. If he doesn't do his job satisfactorily, I am not ...' A chief under the same conditions could reply by an equal ... the last word in matters of discipline is as to hired ... regardless of their political friends and ... others on their tour, if I could say: 'I am hired and equipped ... governing the department and were ... to use in accordance ... my own standards of judgment ... would account ... The whole scheme is admirably suited to the ... the buck' ... involved.

"Manifestly, the executive of such official, as suggested, would be ultimately responsible to the director, the Director of police safety was ... no power to ... the machinery he ... police: on the other hand, is checked at every score of points, while the administrator should have free and ... and complete authority ... is in the chief of a child driving a horse ... is beside him ready to grip the reins in front of him ... highway at important moments in the driving safely.

"Naturally, under the present arrangement, the whole question of administration changes with shifts in the offices of Director and chief, and since neither officer is dependent on the other for appointment or continuance in office, such changes will be occurring only by accident. Experience in the past has shown that with an aggressive type of man serving as chief the director will become a sort of fifth wheel whose exercise of his charter authority is likely at best to be a source of obstruction. With a less aggressive

-2-

chief it is probable that the director will assume more
influence in the disposition of members of the force than
is intended in the charter, and more than he is fitted to
assume by reason of the multiplicity of his duties and
his remoteness from actual police operations.  Unless the
chief be especially aggressive, almost to the point of
standing against the director, the suggestions of the
latter, because of his superior position, will be tantamount
to orders."

As a result the Survey recommended that:

1.  There should be a direct line of responsibility in the
police organization, running from a single head down through the whole
structure;

2.  The police service be disassociated from the department
of public safety and established as an independent department; and,

3.  The department of police be in charge of a single
administrative head, to be known as the director of police, appointed
by the Mayor with full responsibility for administering the police
service and with the exclusive right to name his own immediate assistants,
including the chief ranking officer of the uniformed force to correspond
to the present chief of police.

II.  Other Surveys and Treatises

a)  The Cleveland Little Hoover Commission

It is difficult to establish the official Cleveland Little
Hoover Commission (Commission) position on reorganization of the police.
There was, of course, no one Commission report.  Instead there were
several reports on various city functions.  The pertinent one is Project
#6 -- Police The Eastman Report, which did not make a specific, official
recommendation on organization of the police force above the chief level,
yet the Commission apparently supported the Pound-Frankfurter concept.

The Eastman Report did, in fact, adopt the nomenclature appro-
priate to a restructured Department of Public Safety, explaining in a
footnote that it did so because "it is recommended elsewhere that the
Police Division be changed to department status with the Chief of Police
reporting directly to the Mayor."  In the report's nomenclature:
"Department:  Designates the police agency which is responsible for all
police functions.  Its chief reports directly to the Mayor."

-4-

The "elsewhere" mentioned in the Eastman Report's puzzling footnote is the "Executive Director's Recommendations" made by Commission Executive Director, Dorward C. Witzke and attached to the Wrap-Up Report of the Commission, but not an official part thereof. This reference is puzzling also since Witzke wrote:  "CLHC Report #6 -- Police recommended that the Police Division and the Fire Division be separated and that the police activities be upgraded to departmental status."

The Executive Director's Recommendations presents, without much in the way of further textual explanation, a revised organizational chart of the city government which in part is as follows:

CLEVELAND LITTLE HOOVER COMMISSION



Proposed organization:



<u>Firefighting force</u> and <u>dog pound</u> would be included, along with other functions, in a newly-created "Department of Community Services."

<u>Traffic Engineering</u> would go into a "Technical Department."

-5-

**b.**   Current Trends

The current trend in organization for police control is along the course of establishing clear responsibility for the police in the hands of the elected chief executive, who is in turn responsible to an elected city council and the public at large. The trend is toward the elimination of buffers or baffles such as safety directors and citizen boards between the police and political leaders.

State control of municipal police departments remains in only a few cities in Missouri (Kansas City); Maryland (Baltimore); Maine and New Hampshire. Except for the recent experiment in Washington, D.C., which apparently hinged almost exclusively on one individual, no major cities have established safety departments since the early 50's when the movement seemed to have peaked. According to the International Association of Chiefs of Police, the following are the only major cities with safety directors: Cleveland, Cincinnati, Louisville, Pittsburgh, Rochester, Wilmington, and Gary.

Most major cities abide by the recommendation of the International City Managers' Association's Municipal Police Administration:

"The police function should be administered through a regular city department headed by a police chief directly responsible to the chief administrator of the city."

Realization of the complexities of police work demands a community re-appraisal of what the police should do and how they should be organized to do it. The President's Crime Commission Task Force Report on the Police devoted considerable attention to increasing the role of the police themselves in making policy on police matters, but only as part of a general community effort.

"The basic need," said the report, "...is for giving police policy-making greater visibility, so that the problems and current police solutions are known to the community; to devise methods of involving members of the community in discussions of the propriety of the policies; and to develop in the police a willingness to see this process as inherent in a democratic society and as an appropriate way of developing policies which are both effective and supported by the community." (p.33)

The desirability of community involvement in law enforcement does not, of course mean -- nor does it have to lead to -- local community control of law enforcement. While some liberal and radical groups are keenly interested in such a concept, there are good and sufficient reasons for maintaining centralized control through elected officials. As the Task Force Report emphasized, "Politicial accountability should be discussed among the police prosecutors and community groups. These should be approved by the political executive and given full publicity in the community, especially with those directly affected." (p.213)

-6-

Such "civilian" control can, has and will be called "political interference." But it can and should be called "democracy." The risk of improper influence is minimized, said the Task Force Report, when such control is exercised frankly and openly. The vice of political influence of an earlier day was that it tended to be of a personal nature and secretive.

III. **Legal Comparison of Present City Charter Provisions and Those in Existence in 1922**

As in 1922 the Police Department for the City of Cleveland continues to operate as a division within the Department of Public Safety. The Safety Department is administered by a Director appointed by the Mayor and serving at his pleasure. As was the case in 1922, the current City Charter provides that the Safety Director shall be the executive head of police and fire forces under the direction of the Mayor.

Again as in 1922 the Chief of Police is appointed by the Mayor, may be suspended by the Mayor, which right of suspension is lodged exclusively with the Mayor.

The Chief of Police shall have exclusive control of the stationing and transfer of patrolmen and other officers and employees constituting the police force under such rules and regulations as may be established by the Mayor or by the Director of the department to whom the Chief of Police may be immediately responsible. This language is from Section 116 in Chapter 25 of the City Charter, having been adopted to be effective November 6, 1951. Under related Section 119 of Chapter 25 of the Charter, effective November 9, 1931, the Chief of Police shall have the exclusive right to suspend any of the officers or employees under his management and control for specified reasons contained in the Charter provision. The right of suspension vested in the Chief is subject to review by the Director and thereafter through the Civil Service Commission. These provisions were the same in 1922.

The Director shall make rules for the regulation and discipline of the Fire and Police Departments and shall provide for the classification of the members in accordance with the authorization of City Ordinances.

In summary, there is no essential difference in the relationship between the Mayor, the Safety Director and the Chief of Police as these relationships existed in 1922 and as they now exist under the law of the City. Both the Director and the Chief serve at the pleasure of the Mayor. The Director's authority over the Chief is subject to the direction of the Mayor, and the Chief controls the exclusive right to suspend officers or employees in the Police Division subject to a further procedure which does involve the Director.

-7-

The actual administrative functions of the Safety Department confine the Director largely to responsibility in business matters, such as the purchase of supplies and equipment, budgets, repair and upkeep of property. An exception to this is the power of the Safety Department as an appointing authority under the direction of the Mayor, subject to the Civil Service law of the City, in selecting recruits and promoting members of the Police Department. Nevertheless, the Chief, as previously noted, does have exclusive control of the stationing and transfer of all patrolmen and other officers and employees, according to the rules and regulations of the Director. As a consequence, as in 1922, there is the continuing picture of a Chief given wide powers as to suspension, control of the stationing and transfer of personnel, and daily police operations; whereas, the Director exercises decisions on administrative matters regarding budgets, rules and regulations, disciplinary appeals, and selecting for appointments and promotions.

Though the Chief appears to be answerable to the Director for certain management aspects of police work, it is the Mayor who exercises the exclusive control for removing the Police Chief. Moreover, when the Director exercises his judgment on disciplinary action of the Chief, the Director's findings are still subject to further review by the Civil Service Commission, so that the Director's control over disciplinary matters in the Department are intermediate and not final from an administrative standpoint.

As in 1922, the office of Safety Director remains a permissive department of city government. Under Section 77, Chapter 13 of the City Charter, the mandatory departments are Law, Finance and Public Utilities. Other departments and offices of the city government are permissive in accordance with their establishment by ordinance of Council, with the concurrence of the Board of Control. The same procedure follows for discontinuance, as well as combination, changes of functions, and duties of departments and offices; so that, in addition to the power of the purse, the City Council along with the Board of Control has, in fact, a continuing transient power over the Department of Safety.

Without further review of the duties of the Safety Department for the operation of the Fire Department, the Dog Pound, and the Division of Traffic Engineering and Parking, it is clear that there is no essential difference in the structure of the Department of Safety, nor any essential difference in the administrative problems as these matters appeared in 1922 as against the way they are now.

## IV.  Summary

Modern trends in organization for control of large city police forces favor the establishment of clear and direct lines of responsibility between a mayor and a single administrator of the police force.

-8-

CLE001189

Cleveland's organizational set-up guarantees divided authority, responsibility and direction.

The police function deserves full departmental status, with its head reporting directly to the mayor, and thus should be disassociated from the fire, traffic, parking and pound functions, for which appropriate "homes" must be found.

The present absence in the Safety Director's office presents an excellent opportunity to review the need for that office and indeed the whole organization of public safety.

-9-

CLE001190

C OF C 302-214

# CITY OF CLEVELAND
### INTER-OFFICE CORRESPONDENCE

*To*   James Carney, Director of Safety          *Date*   October 5, 1972
       Gerald Rademaker, Chief of Police

*From*   Ralph J. Perk, Mayor              *Subject*   Protection for the Citizens of
                                                        Cleveland


"The public evaluates the work of a Police Department upon
the service rendered.  The manner in which a police officer
performs his duties in the preservation of the public peace, the
apprehension of offenders and the protection of life and property
under the laws of the State and the ordinance of the City, is a
criterion that determines the reputation of a Police Department.

"Other factors taken into consideration are the officer's
conduct, efficiency, intelligence, impartiality and diligence in
the execution of his duties.

"The public expects that an officer's every act shall be for
the public interest and that all laws be enforced without fear,
favor, prejudice or bias."


These words are taken from the introduction to the "Manual of
Rules" of the Cleveland Police Department.  I bring this to your attention because
of events that have taken place in recent months which reflect upon the operation
of your Department and Division respectively.

These events have included the actual indictment of Cleveland police-
men for offenses such as armed robbery, rape, and manslaughter, the damaging
of a bar by members of the Cleveland Police Department, and continuous
citizen complaints of poor or no response to calls for assistance and help.

October 5, 1972
Page 2

As Chief Executive Officer and Mayor of the City of Cleveland, I am instructing you both to take immediate steps to reverse this trend and rectify an intolerable situation.

The people of the City of Cleveland demand and should be entitled to service and rapid responses by your Department.  Such service depends upon efficient management and it therefore follows that the efficient operation of the Police Department begins and ends with the proper management of resources by the Executive Officers of the Division of Police.  Manpower is the most expensive resource of any undertaking and it must be utilized to its fullest potential.  Failure to maintain proper attitude, discipline, efficient distribution of personnel, and prompt and proper investigation of complaints reflects directly upon the Executive Officer's failure to carry out his duties and responsibilities.

While I recognize that the unlawful action of a few policemen should not reflect upon the vast majority of dedicated members of the Cleveland Police Department, the time has come to stop making excuses and to act.  The increased demand for services placed upon every individual police officer within the City requires that every available minute be spent on an actual complaint or investigation or be used in a highly visible protective patrol.

CLE001192

October 5, 1972
Page 3

A highly visible police force in all areas of the City will provide the public with the increased protection they demand, as well as, insure rapid response to calls for help.  As a first step, I am instructing the Chief of Police to issue orders making it a violation of departmental regulations for any policeman, while in uniform or on duty, to be seen or found in a bar or cocktail lounge unless he is there on a specific complaint or request for assistance. Each superior officer will be held directly responsible for insuring that those patrolmen under his command use their time most effectively to insure immediate response to complaints and an active preventive patrol.  Complaints brought against members of the Cleveland Police Department for misuse of time will reflect directly upon their immediate supervisors.

Supervision will also be extended to the equipment used by individual officers.  I refer to your Rule 84, Section 1, "Officers and members shall carry only such weapons as are furnished by the City of Cleveland, or those which have been authorized by the Chief of Police."

An immediate review of all existing permissions to carry other than City supplied firearms shall be undertaken to determine that only those firearms meeting departmental regulations are being used.  As Chief of Police, you will take the necessary action to determine what, if any, weapons should, in fact, be authorized based upon conditions as they exist today.

October 5, 1972
Page 4

A monthly inspection on an unscheduled basis will be instituted by the platoon and unit captains throughout the department. These inspections will also include an inspection of each vehicle being used to determine that only authorized weapons are being carried. Appropriate reports will be forwarded to the Safety Department and the Office of the Mayor as to when, where, and by whom each inspection was conducted. Further, a complaint that an officer is using or carrying an unauthorized weapon will reflect on that individual's superior officer as well as the offending member.

Effective immediately, plans will also be formulated and action taken to rotate all District and Detective Bureau command officers of the rank of Deputy Inspector on a regular three-month basis. Captains, as members of the Executive Officer's staff, will also be rotated between Districts and the Detective Bureau on a staggered basis every nine months — 1/3 of the District and Detective Bureau captains to be rotated every three months effective immediately.

A maximum of three captains should be assigned to the Detective Bureau, and a minimum of 18 to the six Police Districts to insure an around-the-clock responsibility within each working platoon. If it is not possible for you to accomplish this continual supervision with your present personnel assignments, it will be necessary to take steps to reassign personnel to fulfill this basic requirement.

October 5, 1972
Page 5

I realize that the reduction of crime cannot be achieved by police action alone, and that any successful campaign will require the cooperation and assistance of all the members of our community. Such participation and assistance has been demonstrated in the past by those citizen members of the Cleveland Police Auxiliary.

You will immediately proceed with the implementation of the Citizen Auxiliary Police Program. Funds are now available to purchase the necessary uniforms and equipment to outfit those members who have already completed their basic training. Additional funds are being sought to uniform and equip an additional 1,500 such volunteers. Funds will also be available soon for the expansion of the Cleveland Police Outreach Program. Organizational steps should be taken now so that immediate implementation can take effect upon the receipt of these funds.

To insure the proper and most efficient and effective implementation of these programs, you will immediately assign an experienced officer in Community Relations matters of at least the rank of Captain to carry out these projects. If additional personnel are needed to successfully carry out these projects, you should reassign and transfer experienced officers for this purpose on a high priority basis.

CLE001195

October 5, 1972
Page 6

It has also been brought to my attention that members of the Police Department have been transferred to the Radio Communications Center as a form of disciplinary action.   Such use of a 6.5 million dollar investment which serves as a focal point of all citizen complaints and requests for help will not be tolerated.

All personnel who have recently or in the past been transferred to the communications center     for discipline, or similar reasons, should be removed immediately.   Postive action will be taken to correct the inadequacies existing in this most important center that links the Cleveland Police Department to the community.   Plans should also be formulated and implemented, to place a limited number of civilian personnel in the communications center on a test basis.   Further, thought should be given and plans formulated for expanded use of the Citizen Police Auxiliary, as well as, paid civilian personnel to assist in the daily non-police duties now being performed by regular-trained police officers.

Immediate steps should also be undertaken for a complete revision of the "Rules of Conduct and Discipline" written in 1950, for members of the Cleveland Police Department so that it is consistent with the requirements and conditions that exist today in 1972.

October 5, 1972
Page 7

       As Chief Executive Officer and Mayor of this City, I will insist that those persons responsible for providing service to the City of Cleveland fulfill their obligations.   I will personally make inspection tours of all police districts and central station to insure that these orders are being carried out.

CLE001197

Excerpt from..... Issues in Police Patrol-- A Book of Readings,
"Standards for the Performance of the Urban Police Function,"
The American Bar Association

## Introduction

These standards are offered in the belief that greater understanding
of the function of police in a democratic society is necessary if there
is to be needed improvement in the quality of police service.

Although titled the *Urban* Police Function, much of what is recom-
mended in these standards is applicable also to the police of the
smaller community, who share many problems with their urban coun-
terparts. The use of the phrase "urban police function" is meant only
to stress the fact that police problems in the large city are most criti-
cal and that some of the solutions, *e.g.,* a police legal advisor on the
staff of the department, are not feasible in the small police agency.
Even so, a proposal such as that of a police legal advisor does have
significance for the smallest of departments. They also need good
legal advice. But it must be furnished by different institutional arrange-
ments as, for example, through the district attorney of the county or
the attorney general of the state. In brief, the basic principles advocated
in these standards are applicable to all police; some of the specific
recommendations, however, are directed to the critical problems of
the urban police.

The police in this country have suffered from the fact that their
role has been misunderstood, the fact that demands made upon them
have been so unrealistic, and the fact that the public has been so
ambivalent about the function of police. It has taken a period of
rapid social and political change—with all of the resulting demands
that have been placed upon the police—to make the public more con-
scious of the importance and the complexity of the police function.
But this has been a mixed blessing. The fact that the police have played

1

CLE001198

**The Urban Police Function**

so central a role in the recent tumult has also resulted in their having become a symbol in the polarization that currently marks our society— their being the subject of scorn and derision in some quarters and the subject of praise and exaltation in others. This development has greatly complicated the task of meeting current needs more effectively—and has made it more important than it has ever been in the past for a greater number of citizens to have a comprehensive, dispassionate understanding of the complex role that the police play.

The central message of the standards which follow is expressed well by the Chief Justice of the United States, Warren E. Burger, in a recent address to local and state police administrators up on their graduation from the FBI Academy. In his address the Chief Justice said in part:

It is often overlooked that no public officials in the entire range of modern government are given such wide discretion on matters dealing with the daily lives of citizens as are police officers. In the broad terms of public administration, I think it would be a safe assumption that the scope of discretion enlarges as we look upward in the hierarchy of government. In other words, the higher the rank, the greater is the discretion. But this is not true in police work. The policeman on the beat, or in the patrol car, makes more decisions and exercises broader discretion affecting the daily lives of people, every day and to a greater extent, in many respects, than a judge will ordinarily exercise in a week. . . .

No law book, no lawyer, no judge can really tell the policeman on the beat how to exercise this discretion perfectly in every one of the thousands of different situations that can arise in the hour-to-hour work of the policeman. Yet we must recognize that we need not choose between no guidelines at all and perfect guidelines. There must be some guidance by way of basic concepts that will assist the officer in these circumstances.

Basically, as I suggested, it is a matter of common sense and sound judgment, and yet we know that one man's common sense may be another man's mistake. Hence this need for carefully devised basic standards to guide the exercise of this discretion and, second, for careful and comprehensive training of officers before they are thrust into situations that would often baffle the wisest judge.

The standards that follow and the commentaries that support them are addressed to the legal profession, to the police profession, and to a

**2**

CLE001199

**Introduction**

wide range of other groups which, like the legal profession, should have a special interest in and responsibility for the improvement of the police service. Included among the latter are state legislatures, city councils, mayors, city managers, civil service agencies, personnel administrators, public and private funding agencies, and educational institutions that currently have or are contemplating programs relating to the police. The standards and commentaries are also addressed to various groups active in educating the citizenry, such as the League of Women Voters and the instructors of high school civics courses, in the belief that improvement in the quality of policing is ultimately going to require much more understanding support from the entire community.

The legal profession has a special responsibility. The impact of the lawyer upon police is great. Lawyers acting collectively and as individual legislators, judges, district attorneys, city attorneys, and defense counsel, often have occasion to deal with important aspects of what police do. The impact of the legal profession can either be a positive or a negative one. In the past it has been too often an uninformed and largely negative reaction. The leading writer in the field of administrative law has recently said:

> The police are among the most important policy-making agencies, despite the widespread assumption that they are not. . . .
> Despite the extensive policy-making by the police, the continuing assumption by the community and by the police themselves has been that the police do not make policy.*

This lack of understanding about the nature of the police task is, unfortunately, shared by most of the legal profession. Where police administrators have tried to acknowledge their important policy-making responsibility and to do something constructive about it, the principal obstacles have, more often than not, been lawyers, including some city attorneys and some judges. Where police administrators have tried to get the desperately-needed staff legal assistance, the principal

*K. DAVIS, DISCRETIONARY JUSTICE 81, 83 (1969).

3

The Urban Police Function

opponents have customarily been lawyers. This opposition to positive, needed change has for the most part reflected a lawyer's failure to fully appreciate the important and complex governmental responsibility which the urban police have today. Without this understanding by the legal profession, it seems unlikely that the most able police admin- istrator can successfully make basic improvements in the quality of police service.

The standards are in fact "standards" in the loosest sense of the term. Some are merely descriptive of an aspect of the police function. Some urge acceptance of a viewpoint or urge that increased attention be given to a specific problem. Some call for the development of new statutory or policy guidelines for the police, or for administrative rules and regulations. Some call for experimentation and further explora- tion in testing basic changes in personnel and organizational structure and in the reallocation of priorities to better fulfill the nature of the police responsibility. Some call for further research and the develop- ment of model legislation or regulations and policies. Others point out that in many cases improvements in police service are directly related to improvements in systems of which the police are an integral part, such as the criminal justice system and the public and mental health systems. Very few are set forth in such terms as to constitute model procedures that can be implemented immediately on a national basis. Rather, for the most part, these standards represent an approach for dealing with the critical problems and needs confronting urban police agencies.

This varied use of "standards" is to a great extent a reflection of the underdeveloped character of the police field. It is far more important, today, that there be more widespread acceptance of the realities and complexities of police work (e.g., that the police constitute an impor- tant administrative agency charged with the exercise of broad discre- tion) than it is that there be agreement with regard to the mechanics of running a police agency (e.g., that police officers should be 5'6" tall and be of a weight proportionate to their height). But the fact that so little attention has been given to the broad underlying problems makes it impossible to speak to them with anything approaching the

4.

CLE001201

opponents have customarily been lawyers. This opposition to positive, needed change has for the most part reflected a lawyer's failure to fully appreciate the important and complex governmental responsibility which the urban police have today. Without this understanding by the legal profession, it seems unlikely that the most able police administrator can successfully make basic improvements in the quality of police service.

The standards are in fact "standards" in the loosest sense of the term. Some are merely descriptive of an aspect of the police function. Some urge acceptance of a viewpoint or urge that increased attention be given to a specific problem. Some call for the development of new statutory or policy guidelines for the police, or for administrative rules and regulations. Some call for experimentation and further exploration in testing basic changes in personnel and organizational structure and in the reallocation of priorities to better fulfill the nature of the police responsibility. Some call for further research and the development of model legislation or regulations and policies. Others point out that in many cases improvements in police service are directly related to improvements in systems of which the police are an integral part, such as the criminal justice system and the public and mental health systems. Very few are set forth in such terms as to constitute model procedures that can be implemented immediately on a national basis. Rather, for the most part, these standards represent an approach for dealing with the critical problems and needs confronting urban police agencies.

This varied use of "standards" is to a great extent a reflection of the underdeveloped character of the police field. It is far more important, today, that there be more widespread acceptance of the realities and complexities of police work (*e.g.*, that the police constitute an important administrative agency charged with the exercise of broad discretion) than it is that there be agreement with regard to the mechanics of running a police agency (*e.g.*, that police officers should be 5'6" tall and be of a weight proportionate to their height). But the fact that so little attention has been given to the broad underlying problems makes it impossible to speak to them with anything approaching the

4

CLE001202

**Introduction**

specificity with which one can address the more traditional concerns in the operation of a police department. It is hoped, however, that these standards will stimulate broadly-based discussion and debate; will result in new efforts to identify specific needs and programs for the police throughout the country; and, ultimately, will play a part in the implementation of the many changes that are so desperately needed if the police are to fulfill effectively their function in society.

The selection of matters to be addressed has also been influenced by an awareness that others have struggled with similar problems in recent years. Of special significance, from the standpoint of this project, has been the work of the President's Commission on Law Enforcement and Administration of Justice and the work of the American Law Institute in its development of a Model Code of Pre-Arraignment Procedure. An effort has been made to avoid covering the same ground covered by these projects, but there has been no hesitation in drawing upon the work of both groups to the extent that it bears directly upon the problems and issues addressed by this project. Extensive use has been made of material originally collected as part of the American Bar Foundation's Survey of the Administration of Criminal Justice— in particular, the published volumes on Arrest (W. LaFave) and on the Detection of Crime (L. Tiffany, D. McIntyre, and D. Rotenberg).

Note has been taken of the extensive work done by groups like the International Association of Chiefs of Police in the development of very specific standards for organizing, staffing, and training police agencies. Such specific standards, it is felt, should appropriately be developed within the police field by individuals familiar with the intricacies of police operations. The standards, to the extent they address these same areas, are limited to reflecting the effect that it is felt resolution of some of the broader issues dealt with will have upon prevalent forms of police organization, staffing, and training.

While the initial interest in focusing upon the police in this project emanated from a concern with the operations of the criminal justice system, it became clear that one of the major complexities in police operations stems from the fact that the police have many responsibilities that extend beyond those which they have in the criminal process;

**5**

CLE001203

that it is no longer possible to examine police functioning in a meaningful fashion without viewing the police as an agency housing a multitude of varied duties and responsibilities. This conclusion has led to an exploration of areas quite removed from the traditional interests of those primarily concerned with the operation of the criminal justice system. But the exploration has confirmed the initial belief that the manner in which the police perform in these other areas has a very direct bearing and impact upon their effectiveness within the criminal justice system—and that the overall attitude of the community toward the quality of police performance in these other areas has a direct effect upon the quality of criminal justice administration.

6

CLE001204

*Standards*

### PART I. GENERAL PRINCIPLES

**1.1   Complexity of police task.**

(a) Since police, as an agency of the criminal justice system, have a major responsibility for dealing with serious crime, efforts should continually be made to improve the capacity of police to discharge this responsibility effectively. It should also be recognized, however, that police effectiveness in dealing with crime is often largely dependent upon the effectiveness of other agencies both within and outside the criminal justice system.

(b) To achieve optimum police effectiveness, the police should be recognized as having complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses. Such other police tasks include protection of certain rights such as to speak and to assemble, participation either directly or in conjunction with other public and social agencies in the prevention of criminal and delinquent behavior, maintenance of order and control of pedestrian and vehicular traffic, resolution of conflict, and assistance to citizens in need of help such as the person who is mentally ill, the chronic alcoholic, or the drug addict.

(c) Recommendations made in these standards are based on the view that this diversity of responsibilities is likely to continue and, more importantly, that police authority and skills are needed to handle appropriately a wide variety of community problems.

**1.2   Scope of standards.**

To ensure that the police are responsive to all the special needs for police services in a democratic society, it is necessary to:

7

CLE001205

(i) identify clearly the principal objectives and responsibilities of police and establish priorities between the several and sometimes conflicting objectives;

(ii) provide for adequate methods and confer sufficient authority to discharge the responsibility given them;

(iii) provide adequate mechanisms and incentives to ensure that attention is given to the development of law enforcement policies to guide the exercise of administrative discretion by police;

(iv) develop a system of control to ensure proper use of police authority;

(v) develop an appropriate professional role for individual police officers;

(vi) provide police departments with human and other resources necessary for effective performance;

(vii) improve the criminal justice, juvenile justice, mental health, and public health systems of which the police are an important part;

(viii) gain the understanding and support of the community; and

(ix) provide adequate means for continually evaluating the effectiveness of police services.

### 1.3  Need for experimentation.

There is need for financial assistance from the federal government and from other sources to support experimental and evaluative programs designed to achieve the objectives set forth in these standards.

## PART II. POLICE OBJECTIVES AND PRIORITIES

### 2.1  Factors accounting for responsibilities given police.

The wide range of government tasks currently assigned to police has been given, to a great degree, without any coherent planning by

8

CLE001206

state or local governments of what the overriding objectives or priorities of the police should be. Instead, what police do is determined largely on an ad hoc basis by a number of factors which influence their involvement in responding to various government or community needs. These factors include:

(i) broad legislative mandates to the police;

(ii) the authority of the police to use force lawfully;

(iii) the investigative ability of the police;

(iv) the twenty-four-hour availability of the police; and

(v) community pressures on the police.

**2.2  Major current responsibilities of police.**

In assessing appropriate objectives and priorities for police service, local communities should initially recognize that most police agencies are currently given responsibility, by design or default:

(i) to identify criminal offenders and criminal activity and, where appropriate, to apprehend offenders and participate in subsequent court proceedings;

(ii) to reduce the opportunities for the commission of some crimes through preventive patrol and other measures;

(iii) to aid individuals who are in danger of physical harm;

(iv) to protect constitutional guarantees;

(v) to facilitate the movement of people and vehicles;

(vi) to assist those who cannot care for themselves;

(vii) to resolve conflict;

(viii) to identify problems that are potentially serious law enforcement or governmental problems;

(ix) to create and maintain a feeling of security in the community;

(x) to promote and preserve civil order; and

(xi) to provide other services on an emergency basis.

**2.3  Need for local objectives and priorities.**

While the scope and objectives of the exercise of the government's police power are properly determined in the first instance by state and local legislative bodies within the limits fixed by the Constitu-

9

CLE001207

### The Urban Police Function

tion and by court decisions, it should be recognized there is considerable latitude remaining with local government to develop an overall direction for police services. Within these limits, each local jurisdiction should decide upon objectives and priorities. Decisions regarding police resources, police personnel needs, police organization, and relations with other government agencies should then be made in a way which will best achieve the objectives and priorities of the particular locality.

**2.4 General criteria for objectives and priorities.**

In formulating an overall direction for police services and in selecting appropriate objectives and priorities for the police, communities should be guided by certain principles that should be inherent in a democratic society:

(i) The highest duties of government, and therefore the police, are to safeguard freedom, to preserve life and property, to protect the constitutional rights of citizens and maintain respect for the rule of law by proper enforcement thereof, and to preserve democratic government;

(ii) Implicit within this duty, the police have the responsibility for maintaining that degree of public order which is consistent with freedom and which is essential if our urban and diverse society is to be maintained;

(iii) In implementing their varied responsibilities, police must provide maximum opportunity for achieving desired social change by freely-available, lawful, and orderly means; and

(iv) In order to maximize the use of the special authority and ability of the police, it is appropriate for government, in developing objectives and priorities for police services, to give emphasis to those social and behavioral problems which may require the use of force or the use of special investigative abilities which the police possess. Given the awesome authority of the police to use force and the priority that must be given to preserving life, however, government should firmly establish the principle that the police should be restricted to using the minimum amount of force necessary in responding to any situation.

10

CLE001208

§ 3.1

Standards

## 2.5  Role of local chief executive.

In general terms, the chief executive of a municipality should be recognized as having the ultimate responsibility for his police department and, in conjunction with his police administrator and the municipal legislative body, should formulate policy relating to the nature of the police function, the objectives and priorities of the police in carrying out this function, and the relationship of these objectives and priorities to general municipal strategies. This will require that a chief executive, along with assuming new responsibilities for formulating overall directions for police services, must also:

(i) insulate the police department from inappropriate pressures including such pressures from his own office;

(ii) insulate the police department from pressures to deal with matters in an unlawful or unconstitutional manner; and

(iii) insulate the police administrator from inappropriate interference with the internal administration of his department.

## PART III. METHODS AND AUTHORITY AVAILABLE TO THE POLICE FOR FULFILLING THE TASKS GIVEN THEM

## 3.1  Alternative methods used by police.

The process of investigation, arrest, and prosecution, commonly viewed as an end in itself, should be recognized as but one of the methods used by police in performing their overall function, even though it is the most important method of dealing with serious criminal activity. Among other methods police use are, for example, the process of informal resolution of conflict, referral, and warning. The alternative methods used by police should be recognized as important and warranting improvement in number and effectiveness; and the police should be given the necessary authority to use them under circumstances in which it is desirable to do so.

11

CLE001209

**§ 3.3**

### The Urban Police Function

**3.2  Avoiding overreliance upon the criminal law.**

The assumption that the use of an arrest and the criminal process is the primary or even the exclusive method available to police should be recognized as causing unnecessary distortion of both the criminal law and the system of criminal justice.

**3.3  Need for clarified, properly limited authority to use methods other than the criminal justice system.**

There should be clarification of the authority of police to use methods other than arrest and prosecution to deal with the variety of behavioral and social problems which they confront. This should include careful consideration of the need for and problems created by providing police with recognized and properly-limited authority and protection while operating thereunder:

(i) to deal with interferences with the democratic process. Although it is assumed that police have a duty to protect free speech and the right of dissent, their authority to do so is unclear, particularly because of the questionable constitutionality of many statutes, such as the disorderly conduct statutes, upon which police have relied in the past;

(ii) to deal with self-destructive conduct such as that engaged in by persons who are helpless by reason of mental illness or persons who are incapacitated by alcohol or drugs. Such authority as exists is too often dependent upon criminal laws which commonly afford an inadequate basis to deal effectively and humanely with self-destructive behavior;

(iii) to engage in the resolution of conflict such as that which occurs so frequently between husband and wife or neighbor and neighbor in the highly-populated sections of the large city, without reliance upon criminal assault or disorderly conduct statutes;

(iv) to take appropriate action to prevent disorder such as by ordering crowds to disperse where there is adequate reason to believe that such action is required to prevent disorder and to deal properly and effectively with disorder when it occurs; and

(v) to require potential victims of crime to take preventive

12

CLE001210

action such as by a legal requirement that building owners follow a burglary prevention program similar to common fire prevention programs.

**3.4** Legislative concern for feasibility of criminal sanction.

Within the field of criminal justice administration, legislatures should, prior to defining conduct as criminal, carefully consider whether adequate authority and resources exist for police to enforce the prohibition by methods which the community is willing to tolerate and support. Criminal codes should be reevaluated to determine whether there are now adequate ways of enforcing the prohibition. If not, noncriminal solutions to all or a portion of the problem should be considered.

PART IV. LAW ENFORCEMENT POLICY-MAKING

**4.1** Exercise of discretion by police.

The nature of the responsibilities currently placed upon the police requires that the police exercise a great deal of discretion—a situation that has long existed, but is not always recognized.

**4.2** Need for structure and control.

Since individual police officers may make important decisions affecting police operations without direction, with limited accountability, and without any uniformity within a department, police discretion should be structured and controlled.

**4.3** Administrative rule-making.

Police discretion can best be structured and controlled through the process of administrative rule-making by police agencies. Police administrators should, therefore, give the highest priority to the formulation of administrative rules governing the exercise of discretion, particularly in the areas of selective enforcement, investigative techniques, and enforcement methods.

**13**

§ 4.5

## The Urban Police Function

**4.4  Contribution by legislatures and courts.**

To stimulate the development of appropriate administrative guidance and control over police discretion, legislatures and courts should actively encourage or require police administrative rule-making.

(a) Legislatures can meet this need by delegating administrative rule-making responsibility by statute and requiring compliance therewith.

(b) Courts can stimulate administrative development in several ways including the following:

(i) Properly-developed and published police administrative policies should be sustained unless demonstrated to be unconstitutional, arbitrary, or otherwise outside the authority of the police;

(ii) To stimulate timely and adequate administrative policy-making, a determination by a court of a violation of an administrative policy should not be a basis for excluding evidence in a criminal case unless the violation of administrative policy is of constitutional dimensions or is otherwise so serious as to call for the exercise of the superintending authority of the court. A violation should not result in mandatory civil liability; and

(iii) Where it appears to the court that an individual officer has acted in violation of administrative policy or that an administrative policy is unconstitutional, arbitrary, or otherwise outside the authority of the police, the court should arrange for the police administrator to be informed of this fact, in order to facilitate fulfillment by the police administrator of his responsibility in such circumstances to reexamine the relevant policy or policies and to review methods of training, communication of policy, and supervision and control.

**4.5  Method of policy-making.**

In its development of procedures to openly formulate, implement, and reevaluate police policy as necessary, each jurisdiction should be conscious of the need to effectively involve a representative cross-section of citizens in this process.

14

CLE001212

§ 5.2

Standards

## PART V. CONTROL OVER POLICE AUTHORITY

**5.1  Need for accountability.**

Since a principal function of police is the safeguarding of demo-
cratic processes, if police fail to conform their conduct to the re-
quirements of law, they subvert the democratic process and frustrate
the achievement of a principal police function. It is for this reason
that high priority must be given for ensuring that the police are
made fully accountable to their police administrator and to the
public for their actions.

**5.2  Need for positive approaches.**

Control over police practice should, insofar as possible, be posi-
tive, creating inducements to perform properly rather than concen-
trating solely upon penalizing improper police conduct. Among the
ways this can be accomplished are:

(i) Education and training oriented to the development of pro-
fessional pride in conforming to the requirements of law and
maximizing the values of a democratic society;

(ii) Inducements to police officers in terms of status, compen-
sation, and promotion, on the basis of criteria that are related as
directly as possible to the police function and police goals;

(iii) Elimination of responsibilities where there is a com-
munity expectation that police will "do something," but adequate
lawful authority is not provided. Either the needed authority
should be given or the police should be relieved of the respon-
sibility;

(iv) Systematic efforts by prosecutors and judges to encourage
conforming police behavior through: (a) a more careful review
of applications for warrants and (b) formulation of new pro-
cedures to simplify and otherwise provide easy access for judicial
review of applications for warrants, thereby encouraging maxi-
mum use of the formal warrant process;

(v) Requirements that police develop administrative policies
controlling police actions which, if reasonable, would be sustained
and utilized by the courts; and

**15**

CLE001213

(vi) Effective involvement of the community in the development of police programs.

### 5.3  Sanctions.

It should be recognized that no existing single sanction or combination of sanctions is likely to ensure completely satisfactory review and control over police activities. The sanctions now existing include:

(i) the exclusion of evidence obtained by unconstitutional means;

(ii) criminal and tort liability for knowingly engaging in unlawful conduct;

(iii) injunctive actions to terminate a pattern of unlawful conduct; and

(iv) local procedures for handling complaints against police officers, procedures which usually operate administratively within police departments.

Each of these should be continually reevaluated and changed when necessary to achieve both effective control over the exercise of police authority and the effective administration of criminal justice.

### 5.4  Need for administrative sanctions and procedures.

In order to strengthen administrative review and control, responsibility should formally be delegated to the police for developing comprehensive administrative policies and rules governing the duties and responsibilities of police officers together with procedures and sanctions for ensuring that these duties and responsibilities are met. Police administrative rules and procedures should establish effective investigative, hearing, and internal review procedures for alleged violations. Such procedures should include provisions for handling, monitoring, and reviewing citizen complaints in such a way as to ensure diligence, fairness, and public confidence. In developing such rules and procedures, recognition must be given to the need to conform procedures to administrative due process requirements, to

16

develop means for ensuring impartial investigations, and to keep the public informed of all administrative actions as they are taken.

**5.5  Municipal tort liability.**

In order to strengthen the effectiveness of the tort remedy for improper police activities, municipal tort immunity, where it still exists, should be repealed and municipalities should be fully liable for the actions of police officers who are acting within the scope of their employment as municipal employees.

## PART VI. POLICE UNIONS AND POLITICAL ACTIVITY

**6.1  Collective interest of policemen and limitations thereon.**

(a) Policemen have a proper collective interest in many aspects of their job such as wages, length of work week, and pension and other fringe benefits. To implement this interest, the right of collective bargaining should be recognized. However, due to the critical nature of the police function within government, there should be no right to strike. Effective alternatives to the right to strike, such as compulsory arbitration, should be made available as methods by which policemen can pursue their collective interest; and model procedures governing this important matter should be developed.

(b) The right of police to engage in collective action, however, should be subject to the following limitations:

(i) The preservation of civilian control over law enforcement policy-making requires that law enforcement policy not be the subject of collective bargaining.

(ii) The need to preserve local control over law enforcement and over the resolution of law enforcement policy issues requires that law enforcement policy not be influenced by a national police union.

(iii) The maintenance of police in a position of objectivity in engaging in conflict resolution requires that police not belong to

**17**

a union which also has nonpolice members who may become party to a labor dispute.

(iv) The achievement of proper control by the police administrator over his department requires that collective action not interfere with the administrator's ability effectively to implement the policies and objectives of the agency.

**6.2 Police officer contribution to police policy.**

Policemen, as individuals and as a group, have a proper professional interest in and can make significant contributions to the formulation and continuing review of local law enforcement policies within individual communities. Methods should be developed by police administrators, therefore, to ensure effective participation in the policy-making process by all ranks including the patrolman who, because of his daily contact with operational problems and needs, has unique expertise to provide on law enforcement policy issues.

**6.3 Political activity by policemen.**

Policemen share the individual right to engage in political and other protected first amendment activity. However, police should not use their authority or the indicia of office, such as the uniform, for this purpose because of its inherently coercive nature nor should they engage in collective political activity which compromises their ability to view objectively conflicts with which they may be called upon to deal.

## PART VII. ADEQUATE POLICE RESOURCES

**7.1 Variety of police methods.**

Police should be provided with effective methods for carrying out the full range of governmental responsibilities delegated to them. Adequate development of such methods requires:

(i) a variety of skills in individual police officers;

18

(ii) arrangements for police officers to make referrals to the various private and public services and resources available in the community, and the existence of sufficient resources to meet community needs, particularly those required for treatment of drug addiction; and

(iii) broad use of informal means of resolving conflict.

**7.2 Important function of patrolmen.**

The nature of police operations makes the patrolman a more important figure than is implied by his rank in the organization. He exercises broad discretion in a wide array of situations, each of which is potentially of great importance, under conditions that allow for little supervision and review. Even with the controls recommended in these standards, in the interest of developing a police profession as well as in the interest of improving the quality of police operations generally, the patrolman himself should understand the important and complex needs of policing in a free society and have a commitment to meeting those needs.

**7.3 Recruitment.**

In view of the broad diversity of the police role, experiments should be conducted which make use of different levels of entry for personnel and standards particularly relevant for the various levels. Such recruitment standards should be related directly to the requirements of various police tasks and should reflect a great degree of concern for such factors as judgmental ability, emotional stability, and sensitivity to the delicate and complicated nature of the police role in a democratic society.

**7.4 Training.**

Training programs should be designed, both in their content and in their format, so that the knowledge that is conveyed and the skills that are developed relate directly to the knowledge and skills that are required of a police officer on the job.

19

§ 7.5

### 7.5 Recruitment of college graduates.

College graduates should be encouraged to apply for employment with police agencies. Individuals aspiring to careers in police agencies and those currently employed as police officers should be encouraged to advance their education at the college level. Communities should support further educational achievement on the part of police personnel by adopting such devices as educational incentive pay plans and by gradually instituting requirements for the completion of specified periods of college work as a prerequisite for initial appointment and for promotion. To increase the number of qualified personnel, police departments should initiate or expand police cadet or student intern programs which subsidize the education and training of potential police candidates.

### 7.6 Police education.

Educational programs that are developed primarily for police officers should be designed to provide an officer with a broad knowledge of human behavior, social problems, and the democratic process.

### 7.7 Importance of police administrator.

In addition to directing the day-to-day operations of his agency, the police administrator has the responsibility to exert leadership in seeking to improve the quality of police service and in seeking to solve community-wide problems of concern to the police. The position of police chief should be recognized as being among the most important and most demanding positions in the hierarchy of governmental officials.

### 7.8 Authority of police administrator.

A police administrator should be held fully responsible for the operations of his department. He should, therefore, be given full control over the management of the department; and legislatures, civil service commissions, and employee associations should not restrict unnecessarily the flexibility that is required for effective management.

**7.9  Qualifications for police administrator.**

In the screening of candidates to assume leadership roles in police agencies, special attention should be given to the sensitivity of the candidate to the peculiar needs of policing in a free society; to the degree to which the candidate is committed to meeting the challenge of achieving order within the restraints of the democratic process; to the capacity of the candidate to deal effectively with the complicated and important issues that police administrators must confront in the decision-making processes that affect police operations; and to the overall ability of the candidate to manage and direct the total resources of the agency. A community should employ the best qualified candidate without regard to his present location or departmental affiliation.

**7.10  Police department organization.**

More flexible organizational arrangements should be substituted for the semimilitary, monolithic form of organization of the police agency. Police administrators should experiment with a variety of organizational schemes, including those calling for substantial decentralization of police operations, the development of varying degrees of expertise in police officers so that specialized skills can be brought to bear on selected problems, and the substantial use of various forms of civilian professional assistance at the staff level.

**7.11  Research.**

A research capability should be developed within police agencies that will aid the police administrator in systematically formulating and evaluating police policies and procedures and that will equip the administrator to participate intelligently in the public discussion of important issues and problems involving the police.

**7.12  Need for in-house police legal advisor.**

Given the nature of the police function, police administrators should be provided with in-house police legal advisors who have

21

CLE001219

the personal orientation and expertise necessary to equip them to play a major role in the planning and in the development and continual assessment of operating policies and training programs.

**7.13** Relationship of legal advisor to police administrator.

In view of the important and sensitive nature of his role, a police legal advisor or the head of a police legal unit should report directly to the police administrator. The relationship of a police legal advisor to a police department should be analogous to that of house counsel to a corporation. The police legal advisor should provide independent legal advice based upon his full understanding of the police function and his legal expertise, and should anticipate as well as react to legal problems and needs.

**7.14** Priority tasks for legal advisor.

Among the range of tasks that may be performed by police legal advisors, priority should be given to assisting police administrators in:

(i) formulating the types of administrative policies that are recommended in these standards;

(ii) developing law-related training programs pertinent to increased understanding of the nature of the police function, of departmental policies, of judicial trends and their rationale, and of the significant role of the police in preserving democratic processes;

(iii) formulating legislative programs and participating in the legislative process;

(iv) maintaining liaison with other criminal justice and municipal agencies on matters primarily relating to policy formulation and policy review, and assessing the effectiveness of various agencies in responding to common legal problems; and

(v) developing liaison with members of the local bar and encouraging their participation in responding to legal problems and needs of the police agency.

22

CLE001220

**Standards**

## PART VIII. POLICE PERFORMANCE IN THE CRIMINAL JUSTICE SYSTEM

**8.1 Relationship of the criminal justice and other systems to the quality of police service.**

(a) To the extent that police interact with other governmental systems such as the criminal justice, juvenile justice, and public and mental health systems, police effectiveness should be recognized as often largely dependent upon the performance of other agencies within these systems.

(b) For these standards to be of value in the criminal justice system, other parts of the system must operate, as a minimum, in such a manner that: (i) criminal cases are speedily processed; (ii) prosecutors and judges carefully review applications for warrants and use simplified procedures and otherwise provide easy access for impartial review of applications for warrants; (iii) the lower trial courts, especially in the larger cities, are conducted in a dignified and orderly manner, considerate of and respectful toward all the participants; and (iv) sentencing alternatives and correctional programs are as diversified and effective as possible.

## PART IX. PUBLIC UNDERSTANDING AND SUPPORT

**9.1 Contribution of legal profession.**

Members of the legal profession should play an active role, individually and collectively, in developing local government policies relating to the police, in supporting needed changes in the form of police services, and in educating the total community on the importance and complexity of the police function. Among other things, each local bar association should appoint a special committee with which the police administrator can confer as to appropriate means of achieving objectives proposed in these standards.

**23**

Case: 1:15-cv-01320-CAB  Doc #: 82-47  Filed: 03/22/17  118 of 148.  PageID #: 6054

**9.2**  Responsibility of educational institutions.

Educational institutions should undertake research and teaching programs which provide understanding of the complex social and behavioral problems which confront urban police.

**9.3**  The news media.

Public understanding of the police function is heavily dependent upon the coverage given by mass media to the newsworthy events in which the police are involved. Newspaper, radio, and television reporters assigned to reporting on police activities should have a sufficiently thorough understanding of the complexities of the police function to enable them to cover such events (as well as other matters that now go unreported) in a manner that promotes the public's understanding of the police role.

**9.4**  Openness by police.

Police should undertake to keep the community informed of the problems with which they must deal and the complexities that are involved in dealing with them effectively. Police agencies should cooperate with those who seek an understanding of police operations by affording opportunities for interested citizens to acquaint themselves with police operations and by providing access to the accumulation of knowledge and experience that the police possess.

## PART X.  EVALUATION

**10.1** Measure of police effectiveness.

The effectiveness of the police should be measured generally in accordance with their ability to achieve the objectives and priorities selected for police service in individual communities. In addition, the effectiveness of police should be measured by their adherence to the principles set forth in section 2.4. This means that, among other things, police effectiveness should be measured in accordance with the extent to which they:

24

CLE001222

**Standards**

(i) safeguard freedom, preserve life and property, protect the constitutional rights of citizens and maintain respect for the rule of law by proper enforcement thereof, and preserve democratic government;

(ii) develop a reputation for fairness, civility, and integrity that wins the respect of all citizens, including minority or disadvantaged groups;

(iii) use the minimum amount of force reasonably necessary in responding to any given situation;

(iv) conform to rules of law and administrative rules and procedures, particularly those which specify proper standards of behavior in dealing with citizens;

(v) resolve individual and group conflict; and

(vi) refer those in need to community resources that have the capacity to provide needed assistance.

Traditional criteria such as the number of arrests that are made are inappropriate measures of the quality of performance of individual officers. Instead, police officers should be rewarded, in terms of status, compensation, and promotion, on the basis of criteria defined in this section which directly relate to the objectives, priorities, and essential principles of police service.

**10.2 Responsibility of society and government generally.**

The recommendations made in these standards require particular attention at the level of municipal government. Along with the recommendations relating specifically to police agencies, however, it should be recognized that police effectiveness is also dependent, in the long run, upon:

(i) the ability of government to maintain faith in democratic processes as the appropriate and effective means by which to achieve change and to redress individual grievances;

(ii) the willingness of society to devote resources to alleviating the despair of the culturally, socially, and economically deprived;

(iii) the development of effective ways of dealing with drug addiction; and

25

§ 10.2

The Urban Police Function

(iv) the improvement of the criminal justice, juvenile justice, mental health, and public health systems as effective ways of dealing with a wide variety of social and behavioral problems.

26

CLE001224

APPENDIX ITEM H



THE CLEVELAND POLICE DEPARTMENT
ORGANIZATION CHART
DECEMBER APRIL 23, 1973
GERALD J. RADEMAKER, CHIEF OF POLICE

CLE001225



A REPORT OF THE
COMMISSION ON A
NATIONAL INSTITUTE OF JUSTICE

AMERICAN BAR ASSOCIATION

CLE001226

# THE STUDY OF OFFICIAL CORRUPTION

## David Burnham*

More than a decade ago, a respected New York judge wrote that the vast discretion exercised by the police, prosecutors and judges of America "involves great hazard." (27 *Univ. of Chicago L. Rev.* 427, 1960.) The statement was made by Judge Charles D. Breitel, now a member of the New York Court of Appeals, formerly an assistant district attorney under Thomas E. Dewey and Frank S. Hogan.

Discretion, Judge Breitel wrote, "makes easy the arbitrary, the discriminatory, and the oppressive. It produces inequality of treatment. It offers a fertile bed for corruption."

It seems to me that Judge Breitel's observations suggest a critically important area of research for the proposed National Institute of Justice, namely, corruption.

It is my belief—based on more than five years of detailed study in New York City and extensive reading and more limited research in other areas of the country—that corruption does in fact have a significant impact on the operation of the criminal justice system in many of our cities. I further believe that corruption is a reasonable, feasible and necessary subject of systematic and sustained study.

Before discussing the substance of such research, I think it might be useful to analyze why researchers have not grappled with the subject of corruption in the past. The first reason springs from the experience, attitudes and knowledge of many of those who operate and staff such study groups. Put bluntly, it has been my experience that researchers often are naive and tend to assume their own

---

*New York Times

CLE001227

hard-working, concerned and reformist attitudes are far more widely shared than is the actual fact.

A second reason, which like the first grows from the reformist stance of many researchers, is the tendency to consider corruption in moralistic terms, as the failure of flawed individuals, rather than the failure of a system of administrative controls. Certainly Federal District Judge Whitman Knapp, the architect of the single most persuasive attack on the so-called "rotten apple" theory, and Police Commissioner Patrick V. Murphy, the builder of an impressive edifice of administrative corruption controls in New York City, have shown that it is the barrel which needs examination, not the apples.

Once corruption is perceived as a matter of systematic failure and not individual flaw, a third reason for not conducting research about the corruption problem melts away. This is the natural hesitation which staff members of a study commission or research group feel in suggesting to a local administrator that he might have a corruption problem. The former head of the Internal Affairs Division of the New York Police Department, a lawyer and member of the bar who now is working with the New York City Rand Institute, has discussed a similar hesitation that once existed in the Department. "Not very long ago we talked about corruption with all the enthusiasm of a group of little old ladies talking about venereal disease. Now there is a lot more open discussion about combating graft as if it were a public health problem."

If the problem of corruption is not primarily a question of individually derelict policemen—or lawyers, or assistant district attorneys or judges—what is it? It is my feeling that corruption is a condition, perhaps a disease is the closest analogy, which has a debilitating effect on the day-to-day performance of many institutions. The system of criminal justice probably is more vulnerable to this disease than many other institutions because of vast discretion its officials have been granted and the almost total lack of monitoring of their conduct.

Judge Brietel, in the same excellent paper previously cited, catalogued some of these areas of discretion:

> The police exercise discretion whether to arrest or not, whether to investigate or not. The prosecutor has, too, the discretion whether to investigate or not. The grand jury, if there is one, has virtual discretion to indict or not, the contrary applicable statutes notwithstanding. The prosecutor, again, has the discretion whether to prose-

CLE001228

cute an indictment or *nolle pros.*, or to accept a lesser plea. The court has the discretion in determining which counts to submit to a jury, the lesser plea it may accept, or the sentence that will be imposed.

And within the intricate inter-meshing of the different bureaucratic steps so compactly summarized here, there are a number of areas of discretion which Judge Breitel did not record. A district attorney, for example, can choose to present evidence to a grand jury in such an incomplete or clumsy way that no indictment will be returned even though it appears that vigorous prosecution was his aim. Another kind of discretion enjoyed by a big city district attorney concerns whether or not he will announce a particular indictment to the media. This is a key initiative on his part because of the failure of the press on most occasions to write a story about an indictment unless the prosecutor announces it.

Even when corruption is accepted as an administrative failure rather than personal idiosyncrasy, there is a general tendency to conceive of corruption as having only a limited impact on the criminal justice system. I feel this view of corruption is seriously inaccurate. Consider, for a moment, how corruption influences just one segment of the system, the police.

(1) Corruption results in the non-enforcement of a wide range of laws and regulations, some important, some not. The non-enforcement in certain instances is chronic, in other instances occasional. In many cities, the police not only fail to enforce the gambling laws but also they serve as the gambling industry's regulatory agency, assigning territories and limiting competition in much the same way that the Federal Communications Commission deals with broadcasters.

The police involvement in narcotics appears to be more limited, but according to information provided the New York Police Department by the Federal Bureau of Narcotics and Dangerous Drugs, at least 72 of its narcotic detectives between 1968 and 1970 were in fact dealing in heroin.

Enforcement of laws regulating restaurants, bars, construction companies, parking firms, tow trucks, pistol ownership, pawn shops, auto wrecking firms, and many other commercial areas is often withheld for a fee or used to develop an unofficial but extensive police licensing system. In New York, during the last few years several

94

cases have come to light where suspects arrested for serious street crimes such as mugging have paid the police for their freedom.

(2) Corruption has an impact both on how policemen are deployed and how policemen respond to citizen requests for assistance. For many years, for example, police departments across the country have resisted using street crime prevention teams that operate in civilian clothes. Though part of this reluctance stems from a long standing commitment to the notion that uniformed patrol prevents crime, there also is another, usually unstated, reason: plainclothes policemen are harder to keep track of and much more prone to corruption and "cooping" (loafing on the job).

A police captain on the East Side of Manhattan recalled some time ago how corruption influenced the response of two uniformed radio motor patrolmen he was riding with. The captain said the policemen explained to him, as they were driving by the owner of a small grocery store who was waving for help, "He's no good." This is department slang meaning the owner was a poor provider of the free cigarettes, coffee, etc., that such tradesmen are supposed to supply. A liquor store owner on the West Side said he gave the police several thousand dollars a year in cash and free liquor in return for quick assistance in ejecting the occasional drunks who wandered into his shop. The liquor dealer acknowledged that the extra service guaranteed by his bribes shortchanged those who did pay.

(3) Corruption has an impact on the attitude of the public toward the police and all law enforcement. The widespread belief that New York policemen are intimately involved in the sale of drugs has poisoned the feelings of many blacks and Puerto Ricans. It has also created a strong undercurrent of resentment among many whites whose children in recent years have become more involved in drugs.

(4) Corruption has an impact on the attitude of policemen toward themselves and their jobs. "If I have the name, I might as well play the game," one policeman explained. The raw cynicism of policemen, the widespread belief among them that "nothing is on the level," corrodes morale and thus affects all police service. A police sergeant remembers an incident a number of years ago when he was patrolling the streets of Harlem. A woman was knocked down and injured by a car. The sergeant, then a rookie, went to the side of the woman lying on the street. His partner, an old timer, known in the police parlance as "a hairbag," walked up too. "Alright lady," the

95

old timer asked, "what do you want, a $3 or $5 ambulance?" Ambulance service is free in New York.

(5) Corruption undermines the authority of police commanders, weakening all police discipline. If the patrolmen in a precinct know a sergeant has organized a "pad" to shake down the contractors, how responsive will they be when the sergeant orders them to use restraint during a demonstration? If two of the highest officials in a police department agree to provide four detectives—a guard service—to an influential merchant who by reputation is also a fence, how concerned will these detectives be when the same commanders issue public statements condeming corruption?

(6) Corruption influences recruiting by discouraging the more idealistic young people in a community from becoming policemen and by attracting the tough and cynical.

(7) Corruption is a major secret tax. In New York City alone, at least until recently, it is likely that police graft alone totals millions of dollars a month.

(8) Corruption generates other crime. In the most direct manner, the Knapp Commission found a number of narcotics policemen who were paying their addict informants illegally seized heroin to commit burglaries and robberies for them. The policemen, the Knapp Commission found, on some occasions actually specified the brand and proof of liquor to be stolen for them.

In a broader sense, to the extent that corruption has facilitated the importation, wholesaling, and retailing of heroin, it probably could be shown to have contributed to the muggings and burglaries which New York's addicts frequently commit to obtain the money they need to buy heroin. There is also a small but steady trickle of policemen who are found to have become active partners with auto thieves, fences, drug dealers and even armed robbers. Stealing goods from already burglarized establishments by the patrolmen who respond to the burglar alarm reportedly is a common practice in many American cities.

(9) Police corruption has a corrosive impact on others in the criminal justice system. Many young assistant district attorneys, legal aid lawyers and judges privately acknowledge strong suspicion that the police testimony in a large number of cases—especially those involving gambling and narcotics—is perjured. The lawyers and judges go along with the police because of the great public con-

96

CLE001231

cern about narcotics. But going along results in a small daily loss of self respect. A recent investigation by Bronx District Attorney Burton B. Roberts—in which scores of policemen have been charged with faking evidence and stealing money from addicts—suggests this pattern may be extensive.

These are some of the ways police corruption affects the police and the public. Recent investigations and indictments by United States Attorneys for both the Southern and Eastern districts of New York concerning activities in the office of Queens District Attorney Thomas J. Mackell; studies by the New York State Joint Legislative Committee on Crime concerning the comparative lenient treatment accorded some organized crime figures by the judiciary; and newspaper accounts of politically-connected drug dealers receiving special treatment in Queens and Brooklyn—all suggest, however, that corruption extends beyond the police.

United States Attorney Whitney North Seymour, Jr., offered his assessment of the problem during a recent news conference. Mr. Seymour stated that a lengthy investigation by his office, which he said had been short circuited by premature disclosure in the press, had uncovered "very substantial indications of extensive corruption in our criminal justice system that, frankly, shocked me as I learned about it . . . I think it's a fair statement that we had an opportunity to disclose extensive corruption in every aspect of the administration of criminal justice in this city. I don't mean to say every court and I don't mean to say every individual, but to demonstrate how the courts can be abused by the corrupt and to lay the foundation for doing something to correct it . . ."

The work of Albert Reiss among the police of Chicago, Boston and Washington, D.C.; William Westley's superb description of corruption in an un-named small mid-western city and newspaper accounts of corruption in various corners of the criminal justice system in a large number of other cities, including New Orleans, Detroit, Denver, Albany, Philadelphia and Baltimore, would suggest that New York City does not have exclusive jurisdiction on the problem.

Corruption research should have three separate but related objectives. The research should attempt to measure the extent and impact of the problem in different parts of the system and different kinds of cities. The testimony of virtually all knowledgeable observers strongly suggests that the large eastern cities like New York, Philadelphia and Boston have a different corruption problem than the

97

newer cities, such as Los Angeles. The recent rash of federal indictments for corruption in one city in the Pacific Northwest, however, would suggest that youth alone is no guarantee that a city will be less prone to corruption.

A second aim should be to learn why corrupt practices have come to exist. My own theory now is that the various agencies of the criminal justice system are more susceptible to corruption than other areas of government because so many agencies in the criminal justice system share responsibilities. Both the police and the prosecutor, for example, can choose whether to investigate or not. When a defendant pleads guilty to a felony, it is virtually impossible to determine who was responsible for the final outcome. Was it the assistant district attorney who worked out the details of the plea with a defense attorney and therefore—either explicitly or in the range of possible sentences for a particular degree of a crime—determined how many months the prisoner would spend in prison? Or was it the judge who accepted the plea and may have played a role in negotiating it? Or perhaps was it the probation officer who wrote the pre-sentence report on the defendant?

The problem of finding out who is responsible, who is accountable, is difficult where the individual actors in a system have so much discretion to act. But the problem is compounded by the division of responsibility.

This is perhaps a "political science" theory of corruption. There are many other disciplines that should be called upon to help suggest why there is corruption. Dr. Martin Symonds, a psychiatrist who once was a New York policeman, has noted that poor people offer tips to functionaries in the desperate hope that they will not be crushed. He says many of the poor develop a feeling that all is lost if their tip is rejected. If this theory is correct, it suggests that perhaps we should reject the rotten apple theory of individual responsibility for the corrupter as well as the corrupted.

A third area for research should be to develop strategies to reduce corruption. One obvious approach, suggested above, would be to attempt to work out administrative procedures that would guarantee discretion while better defining responsibility—both for individual acts and for broad policy decisions. There are, however, many other approaches. The concept of removing the corruption hazard through changes in the criminal law is one example. The Fund for

93

the City of New York has one research project in this area which is attempting to decide how a legal numbers game could best be organized.

Unlike Smollet's Uncle Toby, I understand that my hobby horse is not the only one in the world. I do believe, however, that the proposed National Institute of Justice should break with past tradition and devote some of its resources to the problems of corruption.

99

CLE001234

Chicago Tribune, Tuesday, May 28, 1974

# Black, Latin, Foran partner to head police brutality unit

## By Joe Morang

THREE ATTORNEYS, including a black and a Latin American, were named yesterday by Police Supt. James M. Rochford to head the newly established Office of Professional Standards.

The new office, to include a staff of 30 full-time civilian investigators, will investigate complaints of police brutality and corruption, and eventually assume the duties of the Internal Affairs Division Rochford said.

Rochford said applications for the investigator positions will be r e c e i v e d by the three-man panel, and he and the panel will jointly s e l e c t investigators.

These positions will pay from $14,000 to $18,000 a year, he said.

NAMED TO the board were James J. Casey, 35, a former assistant United States attorney and currently a law partner of former U. S. Atty. Thomas A. Foran; Richard J. Salas, 30, former assistant state's attorney and curently the o n l y Latin American member of U. S. Atty. James R. Thompson's staff; and Robert R. Woolridge, 54, a black private attorney who also is a hearing officer for the Illinois Department of Revenue.

Rochford said the men were selected from 50 applicants. The positions pay $25,000 a y e a r, and under police department regulations, the three men will

be allowed to continue their outside employment for up to 20 hours a week.

The inclusion of a black and Latino to head the new office was apparently in response to complaints f r o m minority groups that their charges of police brutality were not adequately handled by the Internal Affairs Division, in which policemen police other policemen.

Casey, a graduate of De Paul Law School, worked in the attorney general's office in Washington in the early 1960s, leading a grand jury investigation of large drug firms. He came to Chicago in 1963 as a member of the Justice Depart-

Continued on page 4, col. 3

CLE001235



Tribune Photo by Layatte Miller

**Attys. Robert Woolridge [left], Richard Salas and James Casey** were named yesterday by Police Superintendent James Rochford [right] to head the Chicago Police Department's new office of Professional Standards.

## Police brutality

# Black, Latin, Ex-U.S. aide head unit

Continued from page one

ment's Organized Crime Strike Force, and prosecuted such gangland figures as Jack Cerone, Richard Cain, and Willie Daddano.

He also instituted immunity proceedings against the late Paul [The Waiter] Ricca, who was forced to testify in the Cerone trial. He resigned in 1970 to enter private practice with Foran.

He and Foran served as the defense attorneys for former County Clerk Edward J. Barrett, who was convicted of bribery, mail fraud, and tax charges. Casey also has served as a hearing officer for the Chicago Police Board.

Salas, a graduate of the Uni-versity of Illinois Law school, worked as a teacher in the Cooper School before joining the state's attorney's office in 1970. He worked under Edward V. Hanrahan and Bernard Carey before joining Thompson's staff in 1973.

As an assistant state's attorney, Salas prosecuted Carlos Bruno, a Latin American police officer charged with killing a patron in a North side restaurant while he was off duty.

As an assistant United States attorney, Salas prosecuted former Ald. Joseph Potempa on extortion and income tax charges. Recently, he worked in South Dakota, helping the United State's attorney's office there prepare cases against several persons arrested during the Wounded Knee rebellion.

He also has served as a legal consultant to several Latin American organizations.

Woolridge is a graduate of Loyola University Law School and has worked since 1961 as a hearing officer for the Illinois Department of Revenue. His main duties have been to conduct hearings on contested sales taxes claims made by the state against businesses.

He has been in private practice for 23 years.

Rochford said the three men will supervise the activities of the civilian investigators and then report directly to him.

"The buck will stop here," Rochford said.

The new office will begin operations on June 1, he said. Altho, initially, the Internal Affairs Division will continue to investigate cases involving excessive force and police corruption, Rochford said he expects that the Office of Professional Standards eventually will handle all investigations in those areas.

APPENDIX ITEM K

**GIVE LIGHT AND THE PEOPLE WILL FIND THEIR OWN WAY**



# The Cleveland Press

*A Scripps-Howard Newspaper*

THOMAS L. BOARDMAN, Editor          ROBERT H. HARTMANN, Business Manager

**OHIO'S LARGEST EVENING NEWSPAPER**

Wednesday, May 29, 1974                                        **PAGE C 4**

# Detente at City Hall?

There have been indications lately that Mayor Perk and Council President George Forbes have put away their dueling pistols and are acting more out of concern for the public good than their own political ends.

The most striking example of this is the way the two men have come together on the matter of reform within the Cleveland Police Department.

Perk's initial reaction to charges of police corruption was to form a panel of five clergymen to investigate the department. This so-called God Squad was met with derisiveness by Forbes, who vowed that Council would not approve a $100,000 grant to allow the clergymen to operate.

Since then the God Squad has changed its character, and Perk and Forbes are speaking almost with the same voice. The mayor added a lawyer, a law school dean and a housewife to the God Squad and is now shopping for a topflight investigator.

Forbes has pulled in his fangs and is no longer insisting that a Council-controlled commission investigate police. Forbes believes the way to reform and clean up the department is to take Civil Service protection away from high-ranking members of the force so any rottenness at the top, which inevitably infects those below, can be cut away. This is a sensible way to proceed, and the mayor seems to want to take this road, too.

Also, it should not escape notice that when Perk proposed last week that the city take over the incredible shrinking Justice Center, the mayor made a point of saying he would not proceed without keeping Council leadership informed. Perk has not always done that in the past.

The detente apparent here may be fragile, but seeds of cooperation, if nurtured properly, can bloom in glorious ways.

Having said that, we confess a certain perplexity as to why Forbes has raised again the controversial issue of partisan mayoral elections. Forbes says Council will place on the fall ballot the issue of a four-year term for mayor along with a return to partisan mayoral primaries.

This newspaper long has advocated a four-year term for mayor, believing along with just about everyone else that two years is not enough time for a mayor to make his mark. The question of non-partisan primaries is more nettlesome. We think the non-partisan mayoral system works well, because issues seldom are Democrat or Republican oriented. It's merely a question of the best man for the job.

Politicians tend to view this question according to which system is better for their particular camp. That's how Forbes and Perk wind up on opposite sides of the fence.

Forbes' views on this are hardly new, and in that light his latest move may be seen as something less than a personal assault on Perk. We hope so, at any rate. These two wily politicians can do a great deal for the city when they are not engaged in carving each other up.

CLE001237

APPENDIX ITEM L

# THE PLAIN DEALER

**OHIO'S LARGEST NEWSPAPER**

133D YEAR—NO. 151  ★

CLEVELAND, FRIDAY, MAY 31, 1974

138 PAGES

15¢

## No one indicted in cheat spot probe

# Grand jury blasts police lassit...



By Leslie Kay

A Cuyahoga County grand jury looking to allegations of cheat spot payoffs to police officers in the 4th District announced yesterday it had indicted no one, but it issued a report highly critical of the department, citing findings of toleration, ignorance and indifference toward cheat spots.

In the 12-page report, jurors wrote that such qualities as discipline, respect and competency were replaced by disrespect, incompetency, indifference and something less than quality police work," a situation that they said ruined the morale of idealistic young policemen.

The jurors listed 10 suggestions for changes in department operations and policies a n d in municipal court practices which, they said, would "remedy, in part, the wrongs that we see. ..."

T h e grand jury, whose foreman is Samuel H. Miller, board vice chairman and chief operating officer of Forest City Enterprises, Inc., heard more than 20 witnesses, the report said.

The jury said its findings may be applicable to other police districts.

"We concluded that over a period of years a number of cheat spots operated; a number of arrests in connection therewith were made; a number of reports were filed; a number of cheat spots presumably disappeared, many reappeared; some persons went to court and none received any substantial or deterrent type penalty," the jurors wrote.

"Most, by both the courts and the police, were regarded as minor and insignificant law violations — that, notwithstanding the fact, we all agree, that related crimes of mugging, homicides, robberies, narcotic law violations, stem from or in some measure relate to cheat spots and prostitution."

The grand jury found that while there was a clear order that police districts as well as the citywide vice unit had jurisdiction in such cases, there was a division of opinion among policemen on which had authority and at least one witness said the "district was divested of complete authority in vice matters."

Continued on Page 6-A

CLE001238

# Grand jury blasts police laxity

⭐ **From First Page**

It also found that men in supervisory jobs often advised new patrolmen "that cheat spots should not be the subject of their concern. . . .

"We found in too many instances the apparent philosophy of, 'It was always this way,' or a lack of concern or indifference; in some instances a gross ignorance even to the extent that a man with many years of experience and rank did state, 'I don't know and never heard of any cheat spots in the district.'

"We found what appeared to be an atmosphere of toleration, condoning and indifference, if not an atmosphere of favoritism for one reason or another, with respect to cheat spots operating."

"It did not surprise us," the jurors wrote, "that such qualities as discipline, respect, competency were replaced by disrespect, incompetency, indifference and something less than quality police work.

"This was the reaction of new, younger men to a situation that strained their idealism and ruined their morale."

Miller said the grand jury found insufficient evidence to indict an inspector and three captains who had been accused of accepting $750 a month to allow a cheat spot at 3319 E. 116th St. to stay in business.

The accusation had been made in a statement by a young patrolman who said the owner of the cheat spot had given him the information. The patrolman's statement was detailed in March in part of a Plain Dealer Investigative Team series on corruption.

It was another grand jury headed by Miller that indicted four policemen in other cases last month. The current grand jury is now expected to investigate charges that another patrolman has accepted payoffs to fix Cleveland Municipal Court cases.

Miller said the grand jury would reopen its investigation if the police department does not take notice of the jury's report.

The report noted that the jurors "do not mean to condemn certainly an entire police department, but we do mean to make constructive criticism . . ."

It suggested:

• An ordinance requiring retirement for policemen at age 60, or, at the latest, 65. Mandatory retirement now is at 70, according to Safety Director James T. Carney.

• Limiting tours of duty within a district, especially for officers, to two years. This would "guard against officers becoming so entrenched in a distric, as to develop ties, friendships, complacency, etc., which foster vice rather than discouraging the same." It would also enable officers to become familiar with the whole city and work with more patrolmen, the jurors noted.

• Abolishing seniority as a criterion for civil service examinations, replacing it with consideration of performance.

• That municipal courts "impose meaningful penalties so as to make these penalties deterrents to further illegal activities. Maximum penalties should be the rule, not minimum penalties."

• Establishing a unit to evaluate and re-evaluate personnel to make the best use of their attributes and to develop incentives and goals. The unit, the grand jury suggested, should also be concerned with complaints about police officers and should be designed to handle them quickly.

• Adopting a rule that any man can report misconduct of officers to the personnel evaluation unit or the police chief "without going through channels" and that the complaining policeman be told how his complaint was resolved.

• Mandatory periodical meetings within units so "proper contact can be made between the men of highest rank in the unit and the men of lowest rank . . . . This should be a team effort. There should be an esprit de corps — a pulling together." The first order of business in these meetings should be a restatement of policy that dishonesty, incompetence and indifference will not be tolerated.

• The safety director and police chief should personally inspect each district monthly.

• Each district commander and the special squads, such as the vice unit, should communicate on vice activities.

• Ongoing educational programs "be a continuing effort so as to develop men experienced in administrative and personnel work as well as that which is usually is regarded as police work."

The grand jury suggested that suburban police departments also take note of the report.

Safety Director Carney said he would study it and meet with Chief Gerald J. Rademaker on it.

<u>APPENDIX ITEM M</u>

# THE PLAIN DEALER
## OHIO'S LARGEST NEWSPAPER

**THOMAS VAIL**
Publisher and Editor

**ROY O. KOPP**
Business Manager

**THOMAS R. GUTHRIE**
Executive Editor

Net paid circulation for six months ended March 31, 1974
DAILY 412,444    SUNDAY 511,679
As filed with the Audit Bureau of Circulations, subject to audit.

Page 4-B                Cleveland, Ohio                Friday, May 31, 1974

# Jury finds lax enforcement

The need for exposing and correcting well-rooted bad practices in the Cleveland Police Department is made clear in a report by one of the two Cuyahoga County grand juries currently sitting.

The report, written by foreman Samuel H. Miller, reinforces demands for investigative efforts by Mayor Perk's crime commission, aided by professional investigators.

After hearing more than 20 witnesses in testimony extending over more than four days, the Miller jury wrote no indictments, but it did report a pattern of police laxity toward cheat spots.

The grand jury looked into a patrolman's charges that high-ranking officers of the police department's Fourth District protected a place where illegal drinking and gambling flourished.

The jurors found the evidence not enough for an indictment. But they also found that police control of cheat spots has been hobbled by confused responsibility, too low a priority and too easy a toleration.

"We found," said the report, "what appeared to be an atmosphere of toleration, condoning and indifference, if not an atmosphere of favoritism for one reason or another, with respect to cheat spots operating.

"It did not surprise us that such qualities as discipline, respect, competency were replaced by disrespect, incompetency, indifference and something less than quality police work. This was the reaction of new, younger men to a situation that strained their idealism and ruined their morale."

Unlike some grand jury reports of the past, this one is based directly and exclusively on testimony heard by the jurors, and it consequently is especially deserving of a respectful hearing.

Among the report's suggestions for reform, two strike us as particularly useful.

One is to set up a personnel unit which would be also concerned with public relations and complaints.

The other is to make it possible for "any man, at any time . . . to report to the chief or the above referred-to unit, without going through channels, for the purpose of relating information of misconduct of any sort of a fellow officer, regardless of his rank." In addition, the complainant would be entitled to find out what happened to his complaint.

In the interests of the community and of policemen who take pride in their work, the grand jury report should be heeded.

CLE001240

APPENDIX ITEM N

THE PRIMARY PURPOSE OF THE GRAND JURY IS, AND PROPERLY SO,

THE FUNCTION OF RETURNING OF "INDICTMENTS" OR "NO BILLS" AS

RELATES TO SPECIFIC CHARGES OF CRIME.  THIS GRAND JURY, PURSUANT

TO GENERAL INSTRUCTIONS BY THE PRESIDING JUDGE, DID LOOK INTO

ALLEGED CRIMINAL MATTERS BY WAY OF INVESTIGATION, AS DISTINGUISHED

FROM CHARGES AGAINST PARTICULAR DESIGNATED INDIVIDUALS.  THIS

GRAND JURY, IN AN INVESTIGATION, DID NOT SEE FIT TO INDICT ANYONE

FOR CRIMINAL CONDUCT BECAUSE OF THE LACK OF SUFFICIENT EVIDENCE

AND DID NOT RETURN ANY "NO BILLS" BECAUSE NO ONE WAS SPECIFICALLY

DESIGNATED AS THE SUBJECT OF CHARGES.

FOR THIS GRAND JURY TO MERELY DROP THE MATTER AT THIS POINT

WOULD SEEM TO BE AN EXERCISE IN FUTILITY, WOULD SERVE NO USEFUL

PURPOSE AND WOULD FRUSTRATE THE DESIRES OF ITS MEMBERSHIP TO

GIVE EXPRESSION TO SOME OF THEIR VIEWS RELATIVE TO CRIMES AND

RELATED MATTERS.

TO MENTION NAMES, WE FEEL, OR TO RELATE SPECIFIC TESTIMONY

BEFORE THE GRAND JURY WOULD BE IN VIOLATION OF OUR OATH OF

SECRECY AND THIS WE SHALL NOT DO.  HISTORICALLY, GRAND JURIES

HAVE REPORTED ON MATTERS TOUCHING CRIME, WHICH REFLECT THE GRAND

JURY'S CONCLUSIONS DRAWN FROM A MULTITUDE OF INFORMATION PRESENTED

TO IT IN THE COURSE OF ITS TENURE IN OFFICE.  THIS GRAND JURY,

OVER A PERIOD OF MORE THAN FOUR SOLID DAYS, LISTENED TO MORE THAN

TWENTY WITNESSES AND HEARD MANY REPORTS RELATING TO THE ALLEGED

OPERATIONS OF CHEAT SPOTS IN A POLICE DISTRICT WITHIN THIS CITY

AND THE POLICE DEPARTMENT IN CONNECTION THEREWITH.

WE DO NOT STATE THAT THIS PARTICULAR DISTRICT IS ANY

DIFFERENT THAN ANY OTHER POLICE DISTRICT IN THE CITY OF

CLEVELAND, FOR WE DIDN'T RECEIVE INFORMATION ON THE OTHERS.

BUT IN SOME MEASURE, WE SUPPOSE WE COULD CONCLUDE THAT IT IS

TYPICAL AND NOT DISSIMILAR FROM THE OTHERS.  WE CONCLUDED THAT

OVER A PERIOD OF YEARS A NUMBER OF CHEAT SPOTS OPERATED; A NUMBER

OF ARRESTS IN CONNECTION THEREWITH WERE MADE; A NUMBER OF REPORTS

FILED; A NUMBER OF CHEAT SPOTS PRESUMABLY DISAPPEARED, MANY RE-

APPEARED; SOME WENT TO COURT AND NONE RECEIVED ANY SUBSTANTIAL

OR DETERRENT TYPE PENALTY.  MOST, BY BOTH THE COURTS AND THE

POLICE, WERE REGARDED AS MINOR AND INSIGNIFICANT LAW VIOLATIONS -

THAT NOT WITHSTANDING THE FACT, WE ALL AGREE, THAT RELATED CRIMES

OF MUGGING, HOMICIDES, ROBBERIES, NARCOTIC LAW VIOLATIONS, STEM

FROM OR IN SOME MEASURE RELATE TO CHEAT SPOTS AND PROSTITUTION.

OUR OBSERVATIONS WERE THAT WHILE A CLEARLY DEFINED ORDER

EXISTED GIVING JURISDICTION TO BOTH THE LOCAL DISTRICT AND THE

CITY WIDE VICE UNIT, TO ENFORCE THE LAW, THERE WAS NOT ONLY A

CLE001243

DIVISION OF OPINION AS TO WHETHER OR NOT ONE OR THE OTHER HAD

AUTHORITY, EXPRESSION WAS GIVEN ON AT LEAST ONE INSTANCE, THAT

THE DISTRICT WAS DIVESTED OF COMPLETE AUTHORITY IN VICE MATTERS.

OUR FURTHER OBSERVATIONS WERE TO THE EFFECT THAT OFTIMES MEN

IN SUPERVISORY CAPACITY, EITHER INSTRUCTED OR ADVISED THE PATROLME[N]

WITH RELATIVELY FEW YEARS IN THE DEPARTMENT, THAT CHEAT SPOTS

SHOULD NOT BE THE SUBJECT OF THEIR CONCERN BUT RATHER THIS WAS

FOR CITY WIDE VICE OR WAS REGARDED BY THEM AS HAVING SUCH A LOW

PRIORITY THAT IT SHOULD NOT BE OF THEIR CONCERN.

WE FOUND IN TOO MANY INSTANCES THE APPARENT PHILOSOPHY OF "IT

ALWAYS WAS THIS WAY," OR A LACK OF CONCERN OR INDIFFERENCE;

IN SOME INSTANCES A GROSS IGNORANCE EVEN TO THE EXTENT THAT A

MAN WITH MANY YEARS OF EXPERIENCE AND RANK DID STATE "I DON'T

KNOW AND NEVER HEARD OF ANY CHEAT SPOTS IN THE DISTRICT."

CLE001244

WE FOUND WHAT APPEARED TO BE AN ATMOSPHERE OF TOLERATION,

CONDONING AND INDIFFERENCE, IF NOT AN ATMOSPHERE OF FAVORITISM

FOR ONE REASON OR ANOTHER WITH RESPECT TO CHEAT SPOTS OPERATING.

IT DID NOT SURPRISE US THAT SUCH QUALITIES AS DISCIPLINE,

RESPECT, COMPETENCY WERE REPLACED BY DISRESPECT, INCOMPETENCY,

INDIFFERENCE AND SOMETHING LESS THAN QUALITY POLICE WORK. THIS

WAS THE REACTION OF NEW YOUNGER MEN TO A SITUATION THAT STRAINED

THEIR IDEALISM AND RUINED THEIR MORALE.

WE DO NOT MEAN TO CONDEMN CERTAINLY AN ENTIRE POLICE DEPARTMEN

BUT WE DO MEAN TO MAKE CONSTRUCTIVE CRITICISM SO THAT ALL MAY

BENEFIT BY THE SAME, SO THAT OUR POLICE DEPARTMENT OF TOMORROW

AND THE DAY AFTER WILL BE ONE OF QUALITY; SO THAT IT WILL BE A

PROFESSION ATTRACTING YOUNG MEN; THAT IT WILL BE THE PRIDE OF

ALL OF OUR CITIZENRY. TO REMEDY IN PART THE WRONGS THAT WE SEE,

CLE001245

WE MAKE SEVERAL - HOPEFULLY CONSTRUCTIVE - SUGGESTIONS:

1.  THAT CITY COUNCIL ENACT AN ORDINANCE MAKING A MANDATORY
RETIREMENT AGE FOR POLICEMEN AT AGE 60, CERTAINLY NO LATER THAN
65.

WITH ALL DUE RESPECT TO AGE AND EXPERIENCE, WE FIND THAT A
MAN BEYOND THIS AGE IN THIS DAY AND ERA DOES NOT HAVE THE PHYSICAL
AND MENTAL STAMINA; DOES NOT HAVE THE ATTITUDE OF INNOVATION
AND PROGRESSIVENESS; DOES NOT HAVE THE ZEAL AND DETERMINATION
THAT HE ONCE POSSESSED IN HIS YOUNGER YEARS SO NECESSARY TO GOOD
POLICE WORK.

2.  WE SUGGEST THAT THERE BE A UNIT WITHIN THE POLICE DEPARTME
DESIGNED WITH CAPABILITIES TO EVALUATE AND RE-EVALUATE THE
PERSONNEL WITH REGARD TO ABILITY, TALENT, DESIRE, EXPERIENCE,
CHARACTER AND HABITS SO AS TO MAKE THE BEST USE OF THE ATTRIBUTES

6.

CLE001246

OF THE AVAILABLE MANPOWER AND SO AS TO DEVELOP INCENTIVES AND

GOALS WITHIN THE DEPARTMENT.

WE FURTHER SUGGEST THAT THIS UNIT BE A UNIT CONCERNED WITH

PUBLIC RELATIONS AND COMPLAINTS RELATIVE TO POLICE OFFICERS INVOLV

MENT WITH THE PUBLIC, OR WITH ANY FELLOW POLICE OFFICER; THAT

THIS UNIT BE DESIGNED TO MOVE QUICKLY AND EXPEDIENTLY TO RESOLVE

A COMPLAINT OR AN INTERNAL PROBLEM SO THAT IF IN FACT A POLICE

OFFICER IS DERELICT IN HIS DUTIES - IS INVOLVED IN CRIMINAL ACTIVI

OR IS THE SUBJECT OF A COMPLAINT BY A CITIZEN - THAT THE MATTER

CAN BE RESOLVED EXPEDITIOUSLY AND THOROUGHLY SO AS TO ESTABLISH THE

FACT OF HIS INVOLVEMENT OR LACK OF INVOLVEMENT SO AS TO PUT IN

ACTION THE NECESSARY DISCIPLINARY PROCEDURE OR IN THE ALTERNATIVE,

IF THE FACTS ARE UNWARRANTED, QUICKLY AND EXPEDITIOUSLY, CLEAR HIM

OF ANY CHARGES.

7.

CLE001247

3.  WE SUGGEST THAT THERE BE MANDATORY PERIODICAL MEETINGS

WITHIN THE UNITS IN EACH DISTRICT SO THAT PROPER CONTACT CAN

BE MADE BETWEEN THE MEN OF HIGHEST RANK IN THE UNIT AND THE MEN

OF LOWEST RANK, SO THAT EDUCATION AND EXPERIENCE, INFORMATION,

TECHNIQUES, POLICY CAN BE DEPARTED ONE TO ANOTHER.  THIS SHOULD

BE A TEAM EFFORT.  THERE SHOULD BE AN ESPRIT DE CORP - A PULLING

TOGETHER.  THIS DOES NOT MEAN THAT RANK AND AUTHORITY SHOULD BE

DISREGARDED.  IT DOES MEAN, HOWEVER, THAT AN OPPORTUNITY SHOULD

BE AFFORDED TO GAIN AND COMMAND RESPECT.

AS PART OF THESE MEETINGS, THE VERY FIRST ORDER OF BUSINESS

AT EVERY MEETING SHOULD BE A STATEMENT AND RESTATEMENT OF POLICY

MADE BY THE SUPERIOR OFFICER TO THE EFFECT

" THAT HIS POLICY AND THE POLICY OF THE DE-

PARTMENT IS THAT NOT ONLY WILL DISHONESTY AND

INCOMPETENCY AND INDIFFERENCE NOT BE TOLERATED,

CLE001248

BUT NEITHER WILL THE APPEARANCE OF THE SAME BE
TOLERATED."

FURTHER, THAT SHOULD ANYTHING OCCUR THAT IN ANY WAY TAINTS THAT

POLICY THAT IT BE RESOLVED IMMEDIATELY.

4.    THAT EACH DISTRICT BE THE SUBJECT OF PERSONAL INSPECTION

BY THE POLICE CHIEF AND THE SAFETY DIRECTOR MONTHLY SO AS TO

DETERMINE FIRST HAND THAT SUGGESTION # 3 IS BEING CARRIED OUT AND

SO AS TO DETERMINE NOT ONLY THAT DEPARTMENT RULES ARE BEING FOL-

LOWED, BUT ALSO TO ASCERTAIN JUST WHAT IS GOING ON IN THE DISTRICT.

PAPER REPORTS DO NOT AND CANNOT REFLECT A TRUE PICTURE.  THERE

SHOULD BE NO FIXED TIME FOR THESE INSPECTIONS - EACH DISTRICT

SHOULD BE READY FOR AN INSPECTION AT ALL TIMES.

5.    THAT EACH DISTRICT COMMANDER AND SPECIAL SQUADS SUCH AS

THE VICE UNIT OR TASK FORCE MAINTAIN A LIAISON SO AS TO PASS ON

CLE001249

INFORMATION AND REPORTS RELATIVE TO VICE ACTIVITIES AND FOLLOW UP

REPORTS AS TO WHAT, IF ANY, ACTION WAS TAKEN IN CONNECTION

THEREWITH.

6. THAT A RULE BE ADOPTED TO THE EFFECT THAT ANY MAN, AT

ANY TIME, IS FREE TO REPORT TO THE CHIEF OR THE ABOVE REFERRED TO

UNIT, WITHOUT GOING THROUGH CHANNELS, FOR THE PURPOSE OF

RELATING INFORMATION OF MISCONDUCT OF ANY SORT OF A FELLOW OFFICER,

REGARDLESS OF HIS RANK AND THAT THAT OFFICER IN TURN BE ENTITLED

TO FEED-BACK INFORMATION AS TO HOW THE MATTER OF HIS COMPLAINT WAS

RESOLVED.

7. THAT THE MUNICIPAL COURTS IMPOSE MEANINGFUL PENALTIES SO

AS TO MAKE THESE PENALTIES DETERRENTS TO FURTHER ILLEGAL ACTIVITIES.

MAXIMUM PENALTIES SHOULD BE THE RULE, NOT MINIMUM PENALTIES.

8. THAT TO THE EXTENT POSSIBLE TOURS OF DUTY WITHIN A

CLE001250

DISTRICT, PARTICULARLY FOR THE OFFICERS BE LIMITED TO NO LONGER THAN TWO YEARS. THIS WILL ENABLE ALL OFFICERS TO BECOME FAMILIAR WITH ALL PARTS OF CLEVELAND, TO COME TO KNOW AND WORK WITH MORE PATROLMEN, AND MORE IMPORTANT PERHAPS TO GUARD AGAINST OFFICERS BECOMING SO INTRENCHED IN A DISTRICT AS TO DEVELOP TIES, FRIENDSHIP COMPLACENCY, ETC. WHICH FOSTER VICE RATHER THAN DISCOURAGING THE SAME.

9. THAT CONSIDERATION OF PERFORMANCE AS A POLICE OFFICER BE GIVEN IN CIVIL SERVICE EXAMINATIONS ON SOME ESTABLISHED OBJECTIVE BASIS RATHER THAN SENIORITY. BECAUSE MEN WILL ACQUIRE SENIORITY IN WHATEVER RANK THEY ATTAIN THERE WILL BE A SPREAD OF RANK IN ALL AGE BRACKETS.

10. THAT ON GOING EDUCATIONAL PROGRAMS BE A CONTINUING EFFORT SO AS TO DEVELOP MEN EXPERIENCED IN ADMINISTRATIVE AND

PERSONNEL WORK AS WELL AS THAT WHICH USUALLY IS REGARDED AS

POLICE WORK.

THIS REPORT IS SUBMITTED TO THE COURT IN THE HOPE AND

EXPECTATION THAT IT WILL BE RECEIVED NOT ONLY BY THE CLEVELAND

POLICE DEPARTMENT BUT BY THE SUBURBAN POLICE DEPARTMENTS AND AS

WELL BY THE NEWS MEDIA AS A GENUINE AND SINCERE EXPRESSION OF

FEELING AND CONCERN BY THIS GRAND JURY.

SHOULD THIS REPORT FALL ON DEAF EARS, NOT ONLY WILL OUR

EFFORTS HAVE BEEN IN VAIN, BUT WE PREDICT THAT SUCH REACTION

WILL BE SELF-DEFEATING, WILL RESULT IN MORE SERIOUS CONSEQUENCES

IN THE IMMEDIATE FUTURE.

CLE001252